**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:

PROTECTIVE PRODUCTS OF                          Case No. 10-
AMERICA, INC., *et al.*,[1]                       Chapter 11 Cases
                                                (Joint Administration Pending)
                   Debtors.
_____/

**DECLARATION OF NEIL E. SCHWARTZMAN IN SUPPORT OF THE DEBTORS'**
**CHAPTER 11 PETITIONS AND REQUEST FOR FIRST DAY RELIEF**

**I.      Introduction**

1.      My name is Neil E. Schwartzman.   I am over the age of eighteen and am competent to testify.  I am the Chief Operating Officer of Protective Products of America, Inc. ("PPA") and I am Chief Administrative Officer for CPC Holding Corporation of America ("CPC Holding"), Protective Products International Corp. ("PPI") and Ceramic Protection Corporation of America ("CPC").  PPA, CPC Holding, PPI, CPC, together with Protective Products of North Carolina, LLC ("PPNC") are collectively referred to as the "Debtors".

2.      I joined PPA in April 2007, initially as PPA's Chief Information Officer.  I became Chief Operating Officer in July, 2009.  I have over 25 years of experience, including serving for five years as Vice President of Information Technology for The GEO Group, Inc.  In addition I have held positions at The Sports Authority, Sunglass Hut International, Michaels Arts and Crafts and ICH Corporation.

---

[1] The name and last four digits of the taxpayer identification number for each of the Debtors follows in parenthesis: (i) Protective Products of America, Inc. (9709); (ii) CPC Holding Corporation of America (8086); (iii) Ceramic Protection Corporation of America (7305); (iv) Protective Products International Corp. (7373); and (v) Protective Products of North Carolina, LLC (0927).  The address for the Debtors is 1649 NW 136th Avenue, Sunrise, FL 33323.

3.      In my capacity as Chief Operating Officer or Chief Administrative Officer of the Debtors, as applicable, I am familiar with the Debtors' day-to-day operations, business affairs and books and records.  I have personal knowledge of the facts set forth herein.

4.      In addition to myself, the current  management of the Debtors consists of the following:

    a.  R. Patrick Caldwell – CEO and Director.  Mr. Caldwell became CEO in July 2009 and joined PPA in January 2009 as Senior Vice President, Sales and Marketing.   Prior to joining PPA, Mr. Caldwell served as Deputy Assistant Director, Office of Protective Operations, U.S. Secret Service and spent 27 years in the U.S. Secret Service in a number of key positions, including Special Agent in charge of the Vice Presidential Protective Division.  Mr. Caldwell also served in the United States Marine Corp and received the Silver Star for Valor and the Purple Heart for services in Vietnam;

    b.  Brian L. Stafford – Chairman of the Board.  Mr. Stafford also served as acting CEO of the Company for the period March 18, 2009 through July, 2009.  Prior to joining PPA, Mr. Stafford served as the 20th Director of the U.S. Secret Service.  During his 31 year career, Mr. Stafford safeguarded Presidents Nixon, Ford, Carter, Regan, Bush and Clinton and served as the agency's lead executive under both President William Jefferson Clinton and President George W. Bush.  Consistent with the dual missions of the Secret Service, Mr. Stafford served in both investigative and protective capacities, including Special Agent in Charge of the Presidential Protective Division.  Mr. Stafford served in the U.S. Army and was awarded the Bronze Star after a tour of duty in Vietnam;

c.  Jason Williams – Chief Financial Officer – Mr. Williams became the CFO in May 2008.  He joined PPA in August 2007 as the Corporate Controller.  Prior to joining PPA, Mr. Williams held the position of Director, Reporting and Analysis and Corporate Controller for PharmNet Development Group, Inc., a publicly traded contract research organization.  Mr. Williams experience includes more than seven years as a financial principal and regulatory consultant in the financial services industry.  Mr. Williams is a Certified Public Accountant (inactive) in the State of Florida; and

d.  Deon Vaughan – Senior Vice President, General Counsel and Secretary – Ms. Vaughan joined the Company in March 2008.  Prior to joining PPA, Ms. Vaughan served as Vice President, Deputy General Counsel and Compliance Officer at Owens Corning, a NYSE-listed global manufacturing company. During her ten year tenure at Owens Corning, Ms. Vaughan spent three years as Vice President, Audit and three years as the Vice President of Environment, Health, Safety and Regulatory law.  Ms. Vaughan's experience also includes private practice at Squire, Sanders & Dempsey, LLP.

## II.    Factual Background

5.    On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11, title 11, United States Code (the "Bankruptcy Code") in this Court.

6.    The Debtors continue to operate their businesses and manage their assets as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

7.    No trustee, examiner or official committee of unsecured creditors has been appointed or established in the Debtors' bankruptcy cases.

A.      **Background and Corporate Structure of the Debtors**

8.      PPA is a publicly traded company on the Toronto Stock Exchange, and together with its subsidiaries, is engaged in the design, manufacture and marketing of advanced products used to provide ballistic protection for personnel and vehicles in the military and law enforcement markets.

9.      PPA, formerly Ceramic Protection Corporation, was originally formed on November 1, 1995, in Alberta, Canada through the amalgamation of two Canadian companies, and on February 26, 1996, the name was changed to Ceramic Protection Corporation.  Prior to 2004, PPA's principal business activities were the manufacture and distribution of alumina and alumina-bonded silicon carbide products and the distribution of polyethylene materials to the industrial wear management and ballistic protection markets.

10.     In 2004 PPA acquired Alanx Wear Solutions, Inc., a manufacturer of boron carbide and silicon carbide products for personal armor systems and industrial wear management applications, and in 2005, PPA expanded its sales of armor products to include ceramic personal armor plates and vehicle armor panels.

11.     In May 2006 PPA acquired PPI, located in Sunrise, Florida.  This acquisition expanded PPA's product portfolio to include a variety of soft armor products and provided PPA with an increased geographic scope and the opportunity for significant growth in the military and police armor markets.  Following the acquisition of PPI, PPA expanded its sales and marketing efforts to military and law enforcement channels and received several significant orders, including an order valued at $36.2 million for Modular Tactical Vests ("MTVs") from the United States Marine Corp.  In 2007, PPA  received orders totaling $63.0 million from various branches of the U.S. military.

12.     On January 2, 2008, PPA acquired the production facility and manufacturing assets of ForceOne, LLC, in North Carolina.  This acquisition added to PPA's soft armor capabilities and enabled PPA to better control its production and delivery schedules of soft armor vests for the U.S. military.

13.     On July 31, 2008, PPA completed its U.S. domestication process and incorporated in the State of Delaware under its new name Protective Products of America, Inc,

14.     PPA is an industry leader in the design, manufacture, and sale of high performance and high quality products used for ballistic protection.  PPA's product portfolio includes lightweight ceramic armor for vehicles and military personnel, composite based products and concealable soft body armor products for law enforcement and the MTV ballistic system for military personnel in many high performance applications, such as handling ballistic threats.

15.     PPA's subsidiary, PPI is an ISO 9001:2008 certified manufacturer.  Further, PPA is one of very few companies able to provide customers with an integrated personnel armoring system of ceramic plates, soft ballistic material and vests for law enforcement and the military.

16.     PPA currently has 95 employees, with the vast majority located at their Sunrise, Florida facility.

**B.     Liquidity and Capital Structure[2]**

17.     An organizational chart of the Debtors is attached hereto as **<u>Exhibit A</u>**.

18.     Since the beginning of 2007, PPA has relied primarily on debt and equity financing to fund its operations.

---

[2]  The discussion contained in this section of my Declaration is for overview and disclosure purposes only.    The Debtors' professionals and management of the Debtors continue review of the liens and claims asserted against the Debtors' assets described in this Declaration.  The Debtors reserve the right to contest the validity, priority or extent of any and all liens, and to object to all claims putatively secured by such liens.

19.    Pursuant to an amended and restated credit facility dated as of January 30, 2009, as amended, amongst CIBC, as lender, PPA, as borrower, and CPC, PPI, CPC Holding and PPNC as guarantors (PPA and guarantors collectively, the "Obligors"), the senior secured revolving loan facility to PPA was $5,158,547.20 (the "Credit Facility").   As of January 12, 2010, borrowings under the Credit Facility totaled approximately $7,602,760.

20.    CIBC asserts first priority liens on, and security interests in, substantially all of the Obligors' assets, both tangible and intangible, real and personal, and the proceeds and recoveries of the foregoing (collectively, the "Collateral").   As such, CIBC may assert a perfected first-priority security interest in the Collateral, including Cash Collateral.

21.    In August and September 2007, PPA issued $5.1 million in principal value of subordinated, nonconvertible debentures ("Sub NC Debentures") at an interest rate of 12.0% per annum, due to mature 2 years from the date of issuance. Of this $5.1 million total amount, $3.4 million was scheduled to mature in August 2009, and $1.7 million was scheduled to mature in September 2009, prior to any renegotiation of terms. In February and March 2008, PPA also issued $6.0 million of subordinated, convertible debentures ("Sub C Debentures") at an annual interest rate of 10.0% per annum, due to mature in February 2011, and completed a public offering of common stock for net proceeds of $14.1 million. The Sub NC Debentures and the Sub C Debentures contain subordination and other restrictive provisions that prohibit payment of interest and principal to holders in the event of PPA's default under its senior credit facility with Canadian Imperial Bank of Commerce ("CIBC"). Holders of Sub NC Debentures entered into Subordination Agreements with CIBC which provide further restrictions on the holders' ability to take action relative to the subordinate nature of the debt.

22.    Since the issuance of these debt securities, PPA has been in default with CIBC during certain fiscal quarters, and remained in default at December 31, 2009.  Due to PPA's defaults with CIBC, the Company's credit agreement with CIBC has been amended several times since its inception. In January 2009, the Company and CIBC entered into a Forbearance Agreement which was subsequently amended in July 2009. The First Amending Agreement to the Forbearance Agreement provided that CIBC will not exercise any remedies with respect to existing defaults by PPA under the Amended and Restated Credit Agreement until the earliest of (i) October 31, 2009, (ii) any other default by PPA under the Amended and Restated Credit Agreement, or (iii) any breach by PPA of the Forbearance Agreement. PPA and CIBC executed a Second Amending Agreement to the Forbearance Agreement in December 2009, wherein CIBC provided an additional $700,000 in financing to PPA and extended its forbearance through January 8, 2010.

23.    For the fiscal year ended December 31, 2007, the Debtors, on a consolidated basis, generated sales of approximately $80.2 million, including sales of approximately $73.7 million from Debtors' continuing operations, and reported net loss of approximately $10.1 million, including a net loss of approximately $1.4 million from Debtors' continuing operations. For the fiscal year ended December 31, 2008, the Debtors, on a consolidated basis, generated sales of approximately $97.4 million, including sales of approximately $85.4 million from Debtors' continuing operations and reported a net loss of approximately $69.2 million including a net loss of approximately $31.1 million from Debtors' continuing operations. The increase in losses in 2008 was attributable to (i) the closing of the Delaware facility resulting in impairment charges of $27 million; and (ii) as a result in the overall decline of the Debtors' business, an additional  impairment of goodwill and intangible assets of $28.3 million.

24.     As of September 30, 2009, the Debtors, on a consolidated basis, reported approximately $26.6 million in assets, and approximately $29.1 million liabilities, which are summarized as follows:

Assets:

| | |
|---|---|
| Cash, accounts receivable, inventory | $9.6 million |
| Income taxes receivable | $5.0 million |
| Property, plant and equipment | $2.0 million |
| Other assets | $10.0 million |

Liabilities:

| | |
|---|---|
| Secured Bank indebtedness | $6.6 million |
| Accounts payable and other accrued liability | $6.8 million |
| Sub NC Debentures | $5.4 million |
| Sub C Debentures | $6.2 million |
| Deferred tax liability | $4.1 million |

### III.     Prior Cost Cutting Initiatives

25.     The nationwide difficulties confronting the U.S. economy have been widely reported, and the Debtors were not been insulated from this downturn.  PPA's financial position has been negatively impacted by a series of unprecedented and repeated delays in contract solicitation and award timing.   As of December 31, 2008, PPA, through its subsidiaries, employed 323 workers.   As of January 12, 2010, PPA has 97 employees and 4 contract workers. The reduction included production and administrative staff.  The reduction was implemented at the Company's facilities in Florida and North Carolina.

26.     PPA has been working diligently to remove excess operating expense from the Company's overhead in order to better align the cost base with the needs of PPA as well as in

response to the extension of the proposal acceptance period for the U.S. Army's Improved Outer Tactical Vest ("IOTV") Program.

27.     In early 2008 a major solicitation was issued by the U.S. Army for the IOTV. PPA bid on the solicitation in April 2008 and on August 13, 2009, PPA received written notice from the U.S. army that PPA was not selected for an award under this solicitation.  After the filing of protest(s) concerning such award, on December 4, 2009, PPA was notified by the U.S. Army that PPA would be participating in the IOTV award.  Since the award would be pursuant to an IDIQ (Indefinite Delivery Indefinite Quantity) contract, PPA is unable to estimate the amount, if any, that would be awarded to PPA.

28.     Effective December 18, 2009, PPA's subsidiary, PPNC, ceased operations and closed its manufacturing facility in Granite Falls, North Carolina.  The closure resulted in a headcount reduction of 75 employees.

29.     Following the closure of this facility, all manufacturing assets and operations have been consolidated into PPA's primary manufacturing facility and headquarters located in Sunrise, Florida.  PPA believes that this consolidation will improve its production efficiency by utilizing existing idle capacity at its South Florida manufacturing facility.  PPA expects to realize these anticipated efficiencies and subsequent cost savings during the first quarter 2010, and expects costs associated with the closure of this facility to be minimal.

## IV.    Events Leading To The Chapter 11 Filing

30.     The Debtors commenced these cases in order to gain much needed breathing room to monetize certain of their assets and to facilitate an orderly reorganization or sale of their enterprise.

31.     During the past three years, the Debtors relied primarily on debt and equity

financing to provide liquidity for their operations.  Due to their lack of profitability and the general condition of the financial markets in the U.S., the Debtors' ability to obtain additional financing on favorable terms was limited.

32.    During 2007 and 2008 the Debtors incurred significant losses at their Newark, Delaware ceramics manufacturing facility.  These losses, combined with significantly less favorable opportunities for awards under certain ceramic armor bids, indicated that the carrying value of certain assets may not be recoverable.  On January 27, 2009, the Debtors completed the sale of substantially all of the Delaware assets for $3.2 million in cash.  The proceeds from this sale were used to reduce indebtedness outstanding on the line of credit.

33.    The Debtors' contract with the U.S. Marine Corps was substantially completed during the third quarter if 2009.  As a result of the Debtors inability to replace prior year contracts that had been substantially fulfilled with new contract awards, the Debtors revenues from the U.S. military are substantially lower than in 2008.

34.    The Debtors commenced these cases to effectuate the sale of their businesses as going concerns to Protective Products Enterprises, Inc., as more particularly described in Section I below.

**V.**    **Necessity for Emergency Hearings on "First Day" Motions**

35.    Contemporaneously herewith, the Debtors have filed the following "first day" motions (the "First Day Motions"):

    a) Ex Parte Motion for Joint Administration;

    b) Ex-Parte Agreed Motion for Authorization to File Consolidated   Chapter 11 Case Management Summary;

    c) Motion to Establish Limited Notice;

d) Motion to Establish Procedures for Monthly and Interim Compensation and Reimbursement of Expenses for Professionals;

e) Application for Order Authorizing Employment of Berger Singerman, P.A. as Counsel To The Debtors *Nunc Pro Tunc* to Petition Date;

f) Application for Authority to Retain Bayshore Partners, LLC, as Investment Banker *Nunc Pro Tunc* to Petition Date;

g) Emergency Motion of Debtors and Debtors in Possession for Interim Order: (I) Authorizing Post-Petition Secured Superpriority Financing Pursuant to Bankruptcy Code Sections 105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d); (II) Authorizing the Debtors' Use of Cash Collateral Pursuant to Bankruptcy Code Section 363(c); (III) Granting Adequate Protection Pursuant to Sections 361, 363 and 364 of the Bankruptcy Code; (IV) Modifying the Automatic Stay and (V) Setting Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c);

h) Emergency Motion for Order (1) Authorizing Continued Use of Existing Business Forms and Records; (2) Authorizing Maintenance of Existing Bank Accounts and Cash Management Systems; and (3) Extending Time To Comply With 11 U.S.C. § 345 Investment Guidelines;

i) Emergency Motion For Authority To Pay Prepetition Wages, Compensation And Employee Benefits Pursuant to Sections 105(a) And 363(b) Of The Bankruptcy Code;

j) Motion To Authorize Payment of Prepetition Use, Franchise Taxes and Trust Fund Obligations;

k) Motion to Authorize the Payment of Critical Vendors;

l) Motion to Reject Unexpired Leases as of the Petition Date and Abandon Assets Located Therein;

m) Emergency Motion For Entry of Order (A) Approving Competitive Bidding and Sale Procedures; (B) Approving Form and Manner of Notices; (C) Approving Form of Asset Purchase Agreement, Including Break-up Fee and Expense Reimbursement; (D) Scheduling Dates To Conduct Auction and Hearing to Consider Final Approval of Sale, including Treatment of Executory Contracts and Unexpired Leases; (E) Approving Sale of Substantially All The Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (E) Granting Related Relief;

n) Emergency Motion for an Order Establishing Notification and Hearing Procedures for Trading in Claims and Equity Securities.

## VI.    Service of First Day Motions

36.    Notice of all motions presented to the Court for consideration as First Day Motions was served by hand delivery, facsimile or electronic mail on all parties identified on **Exhibit B** to this Declaration on January 13, 2010.

## VII.    Motion for Joint Administration

37.    The Debtors seek orders directing the joint administration of their chapter 11 cases for procedural purposes only, including the joint filing of any disclosure statements and plans of reorganization and other contested matters, pursuant to Federal Rule of Bankruptcy Procedure 1015(b) and Local Rule 1015-1.

38.    The Debtors are "affiliates" as I understand that term as defined in section 101(2)(A) of the Bankruptcy Code, PPA is the direct or indirect parent of each of the other Debtors.

39.    The issues that will be addressed in these bankruptcy cases will be related and overlapping.  Joint administration of these cases will obviate the need for duplicative notices, motions, applications, hearings and orders, and will therefore save considerable time and expense for the Debtors and their estates.

40.    The rights of the respective creditors of the Debtors will not be adversely affected by the proposed joint administration because the Debtors will continue as separate and distinct legal entities and will continue to maintain separate books and records.  Moreover, each creditor may still file its claim against a particular estate.  The rights of all creditors will actually be enhanced by the reduction in costs resulting from joint administration.  The Court also will be relieved of the burden of scheduling duplicative hearings, entering duplicative orders and

maintaining redundant files.  Finally, supervision of the administrative aspects of these chapter 11 cases by the Office of the United States trustee will be simplified.

### VIII.        Request to File Consolidated Case Management Summary

41.     I understand that in accordance with Administrative Order 05-1 dated May 20, 2005, the debtor in possession in a Chapter 11 case is directed to file with the Court and serve all parties of record, within the earlier of three business days after relief is entered, or one business day prior to the date of the first scheduled hearing, a completed local form *Chapter 11 Case Management Summary* (the "Case Management Summary") providing certain information regarding the assets, liabilities and financial affairs of Chapter 11 debtors. These Chapter 11 cases were commenced by PPA and four (4) of its related debtor affiliates.

42.     The Debtors have each filed in their respective Chapter 11 cases, *ex-parte* motions seeking joint administration of these Chapter 11 cases.  The Debtors request that the Court authorize them to file a consolidated Case Management Summary, reflecting the asset, liability and financial information of each of the Debtors.  The Debtors request authority to file a consolidated Case Management Summary, as the filing of a separate Case Management Summary for each of the numerous Debtors would be burdensome.  In addition, much of the information contained in the Case Management Summary is duplicative for many of the Debtors and the filing of a consolidated Case Management Summary is more efficient and will provide the Court and parties-in-interest with a true financial picture of the various Debtors.

43.     I understand from counsel that they have contacted the Office of the U.S. Trustee in advance of the filing of the Motion, and have been advised that the U.S. Trustee does not object to the filing of a consolidated Case Management Summary in these Chapter 11 cases.  However, although the U.S. Trustee does not oppose the requested relief, the U.S. Trustee has

reserved the right to request that the Debtors each prepare and file separate Case Management Summaries should the U.S. Trustee believe that such separate Case Management Summaries are necessary. The Debtors believe that authorization to file a consolidated Case Management Summary is an efficient way to proceed.

## IX.     Request To Limit Notice

44.     There are approximately 250 vendors, creditors, and other parties in interest of the Debtors. In addition, there are approximately 1000 shareholders of PPA. Ongoing mail outs to all persons and entities which have an interest in these proceedings are costly and burdensome to the Debtors' estate and their counsel. Bankruptcy Rule 2002(i) and Local Rule 2002-1(K) permits parties to limit notice in most circumstances. Based upon the above, the Debtors request that the Court limit the notice of all pleadings in these Chapter 11 Cases to the Master Service List as provided in Local Rule 2002-1(K) to the following parties:

(a)     The U.S. Trustee;

(b)     The Debtors;

(c)     The Debtors' attorney;

(d)     Any indenture trustees;

(e)     The members of and attorneys to any official committee established pursuant to 11 U.S.C. § 1102, and, before such appointment, the creditors shown on each of the Debtors' List of Twenty Largest Unsecured Creditors;

(f)     Creditors holding claims known to be secured by property in which the estate has an interest;

(g)     The United States and its agencies as required by Bankruptcy Rule 2002(j);

(h)     Those parties and attorneys who have formally requested notice by filing with the court and serving upon Debtors' attorney a notice of appearance of request for service of notices and papers in the case;

(i)     Any examiner or trustee (and their attorneys) appointed in the case; and

(j)      Any parties and entities (including local government units) previously  known to the debtor to have a particularized interest in the subject of the notice(s) required to be served.

45.      The Debtors submit that the relief requested herein will reduce the administrative burden upon the Court and its staff and is in the best interests of the Debtors, their estates and their creditors.

## X.      Motion to Establish Interim Compensation Procedures

46.      The Debtors seek approval of interim compensation procedures for professionals retained by the Debtors. The proposed procedures by the Debtors will provide an orderly mechanism to compensate professionals and provide reimbursement of out-of-pocket expenses on a monthly basis, comparable to those established in other complex chapter 11 cases in this and other districts as explained to me by counsel.  In this way, the Court and parties in interest can more effectively monitor the fees incurred, and the Debtors will be able to spread out their payments of professional fees, rather than suffer larger depletions to their cash on an irregular basis.

47.      In summary, the requested monthly compensation procedure would require all professionals retained with Court approval to present to counsel for the Debtors, counsel for the Official Committee of Unsecured Creditors, if one is established, any other appointed committee, and the United States Trustee a detailed statement of services rendered and expenses incurred for the prior month. If no timely objection is filed, the Debtors would promptly pay 80% of the amount of fees incurred for the month, with a 20% holdback, and 100% of out-of-pocket expenses for the month.  These payments would be subject to the Court's subsequent approval as part of the normal interim fee application process (approximately every 120 days).  These procedures will help ensure the continued services of professionals rendering critical services to the Debtors and help facilitate a successful reorganization.

### XI.   <u>Motions Related to Debtors' Business Operations</u>

**A.**     **Retention of Berger Singerman.**

48.     The Debtors seek to employ and retain the law firm of Berger Singerman as co-counsel for the Debtors, effective as of the Petition Date.

49.     The Debtors have selected Berger Singerman as co-counsel because of the firm's extensive experience with business reorganizations. Berger Singerman has extensive experience and knowledge in the field of debtors' and creditors' rights and representing business debtors in reorganizations under chapter 11 of the Bankruptcy Code.  Berger Singerman has expended significant resources working with the Debtors to prepare for this bankruptcy filing.  Berger Singerman has become extremely familiar with the Debtors' business operations and legal obligations to various creditors' constituencies.  Berger Singerman's appearance before this Court for the matters in these Chapter 11 cases will be efficient and cost effective for the Debtors' estates.

50.     Berger Singerman was not owed any fees and costs as of the Petition Date and is not otherwise a creditor of the Debtors.

51.     Counsel has informed me that corporations must be represented by a licensed attorney in Florida and federal court.  Because of the wide range of relief sought by the Debtors on an expedited basis, I believe the Debtors would suffer immediate and irreparable harm if they were not able to obtain the immediate services of counsel from the outset of this case.   For example, the Debtors need immediate use of cash collateral.  Without the availability of cash, the Debtors will not be able to operate their businesses and preserve the value of their assets for the benefit of their estates.  Therefore, I believe that immediate approval of Berger Singerman's retention is critical in order to avoid immediate and irreparable injury.

### B.        Retention of Bayshore Partners, LLC as Investment Banker

52.        The Debtors seek to approval of their agreement (the "Agreement") with Bayshore Partners, LLC to provide investment banking services to the Debtors in order to assist the Debtors in evaluating their strategic options with respect to the sale or recapitalization of their businesses and related assets both as a going concern outside of bankruptcy and in the context of a potential Chapter 11 bankruptcy filing.  The approval of the Debtors' Agreement with Bayshore Partners, LLC to provide investment banking services, on the terms and conditions of the Engagement Letter annexed to the motion, will facilitate the orderly and efficient management of these Chapter 11 cases.

### C.        Motion For Authority To Use Cash Collateral/DIP financing

53.        The Debtors seek the entry of an interim Order (the "Interim Order") authorizing, on an emergency and limited basis, use of  "Cash Collateral" (as that term is defined in Section 363(a) of the Bankruptcy Code.

54.        An immediate and critical need exists for the Debtors to be permitted access to Cash Collateral to continue to operate.  Therefore, the Debtors seek an emergency preliminary hearing (the "Preliminary Hearing") in accordance with Rule 4001(b)(2) of the Federal Rules of Bankruptcy Procedures (the "Bankruptcy Rules").  At the Preliminary Hearing, the Debtors will seek entry of an Interim Order authorizing the use of cash in which the following lender may assert an interest.

### (i)        Canadian Imperial Bank of Commerce ("CIBC")

55.        Pursuant to an amended and restated credit facility dated as of January 30, 2009, as amended, amongst CIBC, as lender, PPA, as borrower, and CPC, PPI, CPC Holding and PPNC as guarantors (PPA and guarantors collectively, the "Obligors"), the senior secured

revolving loan facility to PPA was $5,158,547.20 (the "Credit Facility").   As of January 12, 2010, borrowings under the Credit Facility totaled approximately $7,602,760.

56.    CIBC has first priority liens on, and security interests in, substantially all of the Obligors' assets, both tangible and intangible, real and personal, and the proceeds and recoveries of the foregoing (collectively, the "Collateral").  As such, CIBC asserts a perfected first-priority security interest in the Collateral, including Cash Collateral.

57.    The Debtors have also obtained a commitment from CIBC for secured post-petition financing.  Pursuant to the terms of the Credit Agreement, CIBC shall provide up to $740,000 in secured post-petition financing to the Debtors.  The Debtors require access to the financing in order to pay payroll, occupancy expense, and other expenses incidental to the operation of their business.   Absent the financing, the Debtors will not have sufficient working capital to fund their post-petition operations and preserve going concern value.  Accordingly, the financing is necessary to avoid immediate and irreparable harm to the Debtors and their estates. Efforts to obtain financing from other sources would have been futile given (a) the Debtors' capital structure and the inability of the Debtors to successfully obtain financing that primes the liens of CIBC, as the Debtors could not establish adequate protection of CIBC's liens in that circumstance, and (b) the paucity of credit in the market generally

58.    The terms of the financing were negotiated between the Debtors and CIBC at arms' length and in good faith.

**D.    Request to Maintain Use of Cash Management and Existing Business Forms**

59.    I understand that the Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of chapter 11 cases.  These guidelines require chapter 11 debtors to, among other things, close all existing

bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation, "debtor-in-possession," the bankruptcy case number, and the type of account.  These requirements are designed to provide a clear line of demarcation between prepetition and postpetition transactions and operations and to prevent the inadvertent postpetition payment of prepetition claims.  The Debtors seek a waiver of these requirements.

I further understand that section 345 of the Bankruptcy Code establishes certain requirements with respect to all deposits and investments of money of the estate.  The Debtors seek a forty-five (45) day extension of time to comply with the requirements of section 345 or to request a waiver of such requirements.

60.    The Debtors seek a waiver of the requirement that they open a new set of books and records as of the Petition Date because the Debtors respectfully submit that opening a new set of books and records would create unnecessary administrative burdens and would cause unnecessary expense, utilization of resources, and delay.  With the use of computer technology, it will be easy to differentiate between pre and post-petition transactions by date.  In the ordinary course of their businesses, the Debtors use many checks, invoices, stationery, and other business forms.  By virtue of the nature and scope of the businesses in which the Debtors are engaged, and the numerous other parties with whom the Debtors deal, the Debtors need to be permitted to use their existing business forms without alteration or change.  Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations.  Accordingly, the Debtors respectfully request that they be authorized to continue to use their existing business forms and to maintain their existing business records.

61.     The Debtors respectfully request authority to maintain their existing bank accounts (each a "Bank Account" or "Account" and collectively, the "Bank Accounts" or "Accounts") and cash management systems (each a "Cash Management System" and collectively, the "Cash Management Systems") in accordance with their usual and customary practices to ensure a smooth transition into chapter 11 with minimal disruption to operations. The Debtors also request authority to close any of the Bank Accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates.

62.     Only if the Bank Accounts are continued with the same account numbers can the transition into chapter 11 be smooth and orderly, with minimal interference with continuing operations.  In order to conduct their post-petition businesses, the Debtors need to be able to issue checks to vendors, service providers, employees, and others.  To open new accounts and obtain checks for those accounts will cause delay and disruption to the Debtors' businesses. Moreover, as discussed above, a change in the Accounts to which customers wire and route payments could delay the Debtors' receipt of funds needed for operations.  By preserving business continuity and avoiding operational and administrative paralysis that closing the existing Bank Accounts and opening new ones would necessarily create, all parties-in-interest, including employees, vendors, and customers, will be best served, and the benefit to the Debtors' estates will be considerable.  The confusion that would otherwise result could only work to the detriment of these chapter 11 cases.  (Of course, no checks issued prior to the Petition Date are to be honored, except as otherwise provided by separate order of this Court.)

63.     The Debtors each employ a Cash Management System in the ordinary course of its business.  The Cash Management Systems are similar to those commonly employed by corporate enterprises of size and complexity comparable to the Debtors.  The Debtors' Bank

Accounts are maintained at Northern Trust Bank of Florida, N.A. ("Northern Trust").    The Debtors transfer gross payroll expenses to Paychex from the Debtors' general operating account. Paychex, the Debtors' payroll administrator, then pays employees' salaries by issuing direct deposits and Paychex checks from the transferred funds.    In addition, Paychex submits the Debtors' employee and employer related tax withholdings and administers the Debtors' employee and employer related tax withholdings and administers the Debtor's flexible benefit plan.  Paychex then advises the Debtor as to the amount of its employees' 401(k) plan.  The Debtor then makes weekly deposits of employees' 401(k) plan contributions directly to CPI Qualified Benefits Plan for the benefit of their employees.

64.    The Debtors will continue to maintain records respecting all transfers between and among the Bank Accounts so that all transactions can be ascertained after they have occurred.  In addition, the Debtors will instruct their banks to add the designation, "Debtor-in-Possession" or "DIP" to their current and any future domestic Accounts with each such bank, will treat the Accounts for all purposes as Accounts of the Debtors as DIPs, and will maintain records that recognize the distinction between prepetition and postpetition transfers.

65.    To the extent that the Debtors' cash and investments do not currently comply with the requirements of section 345 of the Bankruptcy Code, the cash and investments are relatively safe because the Debtors' financial institution is financially stable.  Debtors believe that Northern Trust is an authorized depositories.  Consequently, an extension of time to determine any actions necessary to comply with section 345(b)'s investment guidelines should pose no risk to the Debtors' estates or their creditors.  Moreover, due to the significant amounts of money that may be in the Bank Accounts from time to time, it would take some time for the Debtors to locate and determine, where necessary, appropriate alternative accounts that satisfy

section 345(b).  Requiring the Debtors to change their deposits and other procedures abruptly could result in harm to the Debtors, their estates, and their creditors because such change would disrupt the Cash Management Systems.  Conversely, the Debtors' estates and their creditors will not be harmed by the Debtors' maintenance of the status quo because of the relatively safe and prudent deposit guidelines already utilized by the Debtors.  Therefore, a reasonable extension of time to meet the requirements of section 345(b) is justified.

66.      I understand from counsel that courts have recognized that strict enforcement of the United States Trustee requirements does not always serve the purposes of a Chapter 11, and that courts, including courts from this district, have often granted relief from these requirements and replaced them with alternative procedures.  *See, e.g., In re Gemini Air Cargo, Inc.* Case No. 06-10780-BKC-AJC (Bankr. S.D. Fla. Mar. 20, 2006) (Order Granting Debtors' Emergency Motion For Order (1) Authorizing Continued Use Of Existing Business Forms And Records; (2) Authorizing Maintenance Of Existing Corporate Bank Accounts And Cash Management System; And (3) Extending Time To Comply With 11 U.S.C. § 345 Investment Guidelines); *In re Fine Air Serv., Corp.*, Chapter 11 Case No. 00-18671-75 (Bankr. S.D. Fla. Feb. 7, 2001) (Order Granting Debtor's Emergency Motion for Order Authorizing (a) Continued Use of Existing Bank Accounts and Business Forms and (b) Maintenance of Cash-Management System). Granting the Debtors relief from the above-referenced requirements will help facilitate a successful reorganization.

### E.      Request to Pay Employee Wages, Salaries and Related Items.

67.      The Debtors seek authority to pay certain prepetition obligations owed to their Employees (as defined below).

### (i)    Pre-Petition Wages and Salaries

68.    PPI has both salaried and hourly employees.  PPI uses Paychex as its payroll processor. PPI pays a fee of approximately $350.00 per pay week for processing payroll.  The PPI's employees are paid weekly, which equates to 52 pay periods in a calendar year.  The gross amount of the PPI's average weekly payroll is approximately $84,000 per pay period.  Very few employees have regular adjustments to their wages or salaries for overtime.  However, overtime pay may be granted on a case by case basis, if approved by management in advance.  Both employer and employee taxes related to wages and salaries are paid concurrently with the payment of wages and salaries.  Employees received their most recent paychecks on January 8, 2010, which includes payments of all amounts owed through January 1, 2010.  Prepetition wages owed are those to Employees for accrued and unpaid wages from January 2, 2010 through the Petition Date.  If all checks cleared, PPI estimates that total prepetition wages and salaries which remain unpaid as of the Petition Date are approximately $84,101.42 (the "Accrued Wages").  In addition, certain employees accrued a portion of their wages beginning May 2009. The total accrued prepetition deferral of wages from March 2009 to the Petition Date is $187,230.77 (the "Deferred Wages").

69.    The Debtors seek to pay the outstanding amounts of Accrued Wages (but not the Deferred Wages) owed as of the Petition Date for accrued and unpaid wages, salaries and adjustments thereto, including amounts that they are required by law to withhold from employee payroll checks in respect of federal, state and local income taxes, garnishment contributions, social security and Medicare taxes.  Failure to pay the Employees would have a very negative impact on employee morale and result in a reduction in performance that would be detrimental to Debtors' business.

70.    Because the prepetition Employee obligations constitute priority claims pursuant to section 507(a)(4) of the Bankruptcy Code, which claims must be paid in full pursuant to section 1129(a)(9) of the Bankruptcy Code in order to confirm a plan of reorganization, payment of such obligations at this time merely affects the timing, but not the appropriateness, of such payments.  To the extent that  Employees are owed in excess of $10,950 in respect of prepetition Employee obligations earned within 180 days of the Petition Date, the Debtors seek to cap the payment at $10,950, and will not pay in excess of this amount for such obligations.

### (ii)    Vacation, Sick Leave and Holiday Benefits

71.    Many employees have accrued vacation and sick leave earned before the Petition Date. Based on their position and tenure, the Employees accrue 5 sick days per year and up to 20 paid days of vacation time, and they are paid for 8 various holidays, *i.e.*, New Years Day, Memorial Day, Thanksgiving Day, etc. ("SVD").  Many Employees have accrued SVD before the Petition Date. The Debtors seek the authority, within their discretion, to honor their vacation, sick leave and other leave obligations to certain Employees in the ordinary course of their business.  The Debtors also request authority, in the exercise of their business judgment, to permit their Employees to use accrued vacation, sick, and other leave.

### (iii)    Other Amounts Withheld from Employees

72.    The Debtors also routinely and ordinarily make deductions from Employees' paychecks relating to federal, state, and local tax withholdings, child support orders or garnishments, and the like.  The Debtors request authority to pay over to the appropriate parties all such funds in accordance with existing company policies and practices.

73.    Absent the relief requested herein, existing Employees and their families will suffer undue hardship because the funds requested to be paid are needed to enable the Employees

and their families to meet their financial obligations and to maintain their life and health insurance.  If the requested relief is not granted, many of the Debtors' Employees  – who are essential to the Debtors' operations and reorganization -  may seek other employment.  The Debtors' ability to preserve their business and assets and ultimately reorganize will be adversely affected if they are unable to retain their dedicated and loyal Employees.  Accordingly, it is critical that any hardship and disruption caused by this chapter 11 proceeding be minimized in order to preserve morale and maintain the Debtors' workforce and, therefore, the Court authorize the payment of the above-referenced Employee obligations.

### F.    Request to Pay Taxes and Fees

74.    The Debtors request authorization, but not direction, to pay prepetition sales, use, franchise, trust fund and other taxes and similar obligations in the ordinary course of their business. In addition, the Debtors request that (i) to the extent the Debtors have paid certain taxes which should not have been paid, the Court authorize them to seek a refund of such taxes, and (ii) to the extent that the Debtors dispute any such pre-petition tax, the Court authorize the Debtors to set aside, in a segregated account, funds to pay the subject tax until a final determination is made as to whether the Debtors are obligated to pay the subject tax.

75.    In connection with the operation of their business, the Debtors (a) incur certain taxes and collect or incur payroll and employment-related taxes (collectively, the "Taxes") on behalf of various taxing authorities; (b) are charged fees, licenses, and other similar charges and assessments by various licensing authorities, and collect certain fees from its customers (collectively the "Fees").  The Taxes and Fees are paid to various taxing and licensing authorities (the "Authorities") on a periodic basis that is established for each particular Tax or Fee. As of the

Petition Date, the Debtors estimate that they owe to the Authorities, on a pre-petition basis, approximately $1,404,746.80 in Taxes and Fees.

76.    The Debtors believe that the failure to pay the Taxes and Fees could have a material adverse impact on their ability to operate in the ordinary course of business.   The Debtors further request that all depositories on which checks were drawn in payment of pre-petition amounts to the Authorities be directed to clear such checks as and when presented for payment. The Debtors submit that the ability to pay the Taxes and Fess will help ensure a successful reorganization.

G.        **Request for Approval of Expedited Procedures for the Rejection of Unexpired Leases and Abandonment of Property.**

77.    The Debtors are in the process of consolidating their operations, which may require exiting some of their existing leased space. In January 2009, the Debtors closed operations in Delaware.  Accordingly, those leases are not necessary to the Debtors' ongoing operations.   Further, the assets located on the premises in Delaware have no value and are burdensome to the Debtors.  Therefore, pursuant to 105(a), 365(a) and 554 of the Bankruptcy Code, the Debtors seek entry of an order authorizing and approving the rejection of the unexpired Delaware leases  and abandonment of any assets located on those premises.

H.        **Request to pay Critical Vendors.**

78.    A smooth transition into and through bankruptcy is essential in preserving the value of the estate.   That smooth transition will only be possible with the cooperation and support of certain essential vendors who are necessary to provide goods or services needed to

complete existing orders for customers.  Because they are so critical, the Debtor requests authority to pay these essential-vendor claims in the ordinary course of business.[3]

79.    The list of essential vendors, including amounts owed, as well as a description of the critical importance for each vendor is attached hereto as **Exhibit C**.

80.    The total amount owed, $191,942.75 amount will be satisfied in the ordinary course of business.

I.    **Bid Procedures Motion**

81.    On June 16, 2009, the Debtors retained Bayshore Partners, LLC, the broker dealer affiliate of Farlie Turner & Co. ("Bayshore Partners"), in order to assist the Debtors in evaluating their strategic options with respect to the sale or recapitalization of their businesses and related assets both as a going concern outside of bankruptcy or in the context of a potential chapter 11 bankruptcy filing.

82.    As a result of Bayshore Partners' efforts, on December 21, 2009, the Debtors and Sun Capital Partners Group V, Inc. ("Sun Capital")  executed a non-binding letter of intent (the "Letter of Intent") pursuant to which Sun Capital proposed to acquire, subject to due diligence, certain of the Debtors' assets for approximately $8,000,000 in cash plus the assumption of specified liabilities.  Importantly, the Letter of Intent permitted the Debtors to retain certain assets, including their interest in several tax refunds valued by the Debtors at approximately $5.5 million.

83.    After arm's length negotiations over both price and contract terms, on January 12, 2010 the Debtors, as sellers, and Protective Products Enterprises, Inc., an affiliate of Sun Capital

---

[3] The Debtors do not have the current ability to pay these Essential Vendors in full.  The Debtors propose to structure a payment program commensurate with thier ability to pay these Essential Vendor claims in accordance with the Budget.

(the "Proposed Purchaser"), as purchaser, entered into the Asset Purchase Agreement (the "Agreement").

84.     The Agreement provides for the sale of the assets identified in the Agreement (the "Acquired Assets") to the Proposed Purchaser, or to a higher bidder pursuant to the bidding procedures for which approval is sought in the bid procedures motion.  The bid procedures motion also requests authority to assume and assign certain unexpired leases and executory contracts as provided in the Agreement.

85.     The Agreement also contemplates bidding procedures and an auction process and allows the Debtors to seek a higher and better purchase offer for the Acquired Assets.  The Debtors believe that the consummation of the Agreement will yield net proceeds sufficient to pay all of the allowed secured claims in the cases and make a distribution to the holders of allowed unsecured claims.

**J.      Trading Motion.**

86.     The Debtors have in excess of $10,000,000 of net operating losses ("NOL").  I understand that unrestricted trading could severely limit the Debtors' ability to use these NOLs. The Debtors seek to establish notice and hearing procedures regarding the trading of claims against the Debtors and equity securities in PPA as a precondition to the effectiveness of such trades or transfers.

87.    This concludes my declaration.

I DECLARE UNDER PENALTY OF PERJURY THAT FOREGOING IS TRUE AND

CORRECT TO THE BEST OF MY KNOWLEDGE.

Signed this 12th day of January, 2010.

NEIL E. SCHWARTZMAN
Chief Operating Officer

## **EXHIBIT A**
**Organizational Chart**



**<u>EXHIBIT B</u>**
**Service list**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:

PROTECTIVE PRODUCTS OF
AMERICA, INC., *et al.*,[1]

          Debtors.

_____/

Case No. 10-

Chapter 11 Cases

(Joint Administration Pending)

## MASTER SERVICE LIST

### The Debtors

Protective Products of America, Inc.
1649 NW 136th Avenue
Sunrise, FL 33323

Protective Products International Corp.
1649 NW 136th Avenue
Sunrise, FL 33323

Protective Products of North Carolina, LLC
1649 NW 136th Avenue
Sunrise, FL 33323

CPC Holding Corporation of America
1649 NW 136th Avenue
Sunrise, FL 33323

Ceramic Protection Corporation of America
1649 NW 136th Avenue
Sunrise, FL 33323

### Debtors' Counsel

Jordi Guso, Esq.
Berger Singerman, P.A.
200 South Biscayne Blvd., Suite 1000
Maimi, FL 33131

Debi Evans Galler, Esq.
Berger Singerman, P.A.

200 South Biscayne Blvd., Suite 1000
Maimi, FL 33131

### U.S. Trustee

Office of the United States Trustee
51 Southwest First Avenue
Room 1204
Miami, FL 33130
Tel. 305 536-7285
Fax  305 536-7360

### Secured Creditors

Canadian Imperial Bank of Commerce
Attn: Jack McMurray
BEC Place
161 Bay Street, 8th Floor
Toronto, Ontario

GreatAmerica Leasing Corp.
P.O. Box 609
Cedar Rapids IA 52406-0000

US Bankcorp
P.O. Box 580337
Minneapolis MN 55458-0000

### Counsel for Secured Creditors

Blakes, Cassels & Graydon LLP

---

1 The name and last four digits of the taxpayer identification number for each of the Debtors follows in parenthesis:
(i) Protective Products of America, Inc. (9709); (ii) CPC Holding Corporation of America (8086); (iii) Ceramic
Protection Corporation of America (7305); (iv) Protective Products International Corp. (7373); and (v) Protective
Products of North Carolina, LLC (0927).  The address for the Debtors is 1649 NW 136th Avenue, Sunrise, FL 33323.

Attn: Milly Chow
199 Bay Street
Suite 2800, Commerce Court West
Toronto, ON M5L 1A9 Canada

Shutts & Bowen LLP
Attn: Larry I. Glick
1500 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131

**20 Largest Unsecured Creditors (for each Debtor)**

Albricas, LLC
530 Sawgrass Corporate Parkway
Sunrise, FL 33325

Alice Hamby
1844 Dry Ponds Rd
Granite Falls, NC  28630

Allied Waste Services
P.O. Box 9001099
Louisville, KY  40290-1099

Artesian Water Co.
664 Churchmans Road
Newark, DE  19850-5151

B Walker Enterprises Inc.
P.O. Box 1802
Hickory, NC  28603

Blue Cross & Blue Shield
P.O. Box 7777
Philadelphia, PA 19175-0247

Bowne of Atlanta, Inc.
1201 West Peachtree Street
Suite 2700
Atlanta, GA 30309

Broward County Revenue Collect
815 N.E. 13th Street
Fort Lauderdale, FL 33304-2007

Burgee Fire Protection
1430 College Avenue SW
Lenoir, NC  28645

Carolina Base-Pac Corp.
3157 Freezer Locker Road
P.O. Box 783

Hudson, NC  28638

Carpreco, LLC
4181 US Highway 321-A
Sawmills, NC  28630

Ceradyne Diaphorm
P.O. Box 515059
Los Angeles, CA 90051-5059

Collier Equipment Company
P.O. Box 175/734 Co. Road 59
Anderson, AL  35610

CompBenefits
P.O. Box 769209
Roswell, GA  30076

Constellation New Energy
Bank of America Lockbox
Service
Constellation NewEnergy, Inc.
14217 Collections Center Dr.
Chicago, IL  60693

Corporation Service
Company
P.O. Box 13397
Philadelphia, PA  19101

Czarnowski Display Service Inc
6067 Eagle Way
Chicago, IL 60678-1060

Deer Park Direct
Div. of Nestle Waters NA, Inc.
P.O. Box 856192
Louisville, KY  40285-6192

Delmarva Power
P.O. Box 17000
Wilmington, DE  19886

Delta Com
ID 1058
P.O. Box 2252
Birmingham, AL  35246-1058

Dorothy Ward
2 Comolet Drive
Granite Falls, NC 28630

Duke Energy
P.O. Box 70516

2

Charlotte, NC  28272-0515

Environmental Resources
Mgmt
350 Eagleview Blvd.
Suite 200
Exton, PA 19341

Executive Management
P.O. Box 785016
Philadelphia, PA 19178-5016

Gaia, LLC
908 King Street
Suite 300
Alexandria, VA 22314

Gary's Repair Service Inc.
4886 Ike Starnes Road
Granite Falls, NC  28630

GDS Hickory #685
P.O. Box 9001099
Louisville, KY  40290-1099

Global Armour SA (Pty) Ltd
P.O. Box 10605
Ashwood, KS

H.P. White Laboratory
3114 Scarboro Road
Street, MD 21154-1822

Jay Bird Fuels LLC
4174 US Highway 321A
Granite Falls, NC  28630

JPS Composite Materials
2200 South Murry Ave.
Anderson, SC 29622

K&S Sprinkler Company
P.O. Box 1700
Lenoir, NC  28645

Keen Compressed Gas
P.O. Box 41601
Philadelphia, PA  19101-1601

Kelly Generator & Equipment
1955 Dale Lane
Owings, MD  20736

Lincoln Fabrics Ltd.
63 Lakeport Road
Judy Palmer
St. Catharines, ONT L2N 4P6

LTC
2626 West May
Wichita, KS 67213

Maricela Jimenez
465 10th Avenue Drive
Hickory, NC  28601

Mcubed Technologies, Inc.
1 Tralee Industrials Park
Newark, DE  19711

Old Dominion Freight Line
P.O. Box 198475
Atlanta, GA 30384-8475

Paiho Group
28411 Witherspoon Parkway
Valencia, CA 91355

Pencader V Limited
Partnership
c/o Emory Hill Real Estate
10 Corporate Circle
New Castle, DE 19720

Pencader X Limited
Partnership
c/o Emory Hill Real Estate
10 Corporate Circle
New Castle, DE 19720

Piedmont Paper Company Inc.
85 Thompson St.
P.O. Box 5413, Biltmore Stn.
Asheville, NC  28813

Polytek Development Corp.
55 Hilton Street
Easton, PA  18042

RDM Consulting
9315 Crosby Road
Silver Spring, MD 20910

Saint-Gobain Abrasives
P.O. Box 0070
Pittsburgh, PA  15264-0070

3

Salesforce.com Inc
Attn: David Cooper, Esq.
Bialson Bergen & Schwab
2600 El Camino Real, Suite 300
Palo Alto, CA 94306

Savannah Luggage Works
P.O. Box 447
Highway 297 North
Vidalia, GA 30475

Scheneider Trailer &
Container
104 Alan Drive
Harmony Business Park
Newark, DE 19711

Silverson Machines Inc.
P.O. Box 589
East Longmeadow, MA 01028

Southern Imaging
4012 Hickery Blvd.
Granite Falls, NC 28630

Tammy Lackey
402 Burke Street
Hickory, NC 28601

Teijin Aramid USA, Inc
801-F Blacklawn Road
Conyers, GA 30012

Terry Cannon
2192 Atlas Drive
Granite Falls, NC 28630

The American Ceramic
Society
600 N Cleveland Ave
Suite 210
Westerville, OH 43082

Top Value Fabrics
P.O. Box 2050
Carmel, IN 46082-2050

Town of Sawmills
4076 US Highway 321-A
Sawmills, NC 28630

Warehouse Services
2901 E. Fourth Avenue
Columbus, OH 43219

Washington Mills North
Grafton
P.O. Box 428
North Grafton, MA 01536

## Governmental Agencies/Taxing Authorities

Florida Department of Revenue
P.O. Box 6668
Tallahassee, FL 32314-6668

Florida Department of Revenue
c/o Agency Clerk
501 S. Calhoun Street
Room 201, Carlton Building
Tallahassee, FL 32399

Internal Revenue Service
Centralized Insolvency Operations
P.O. Box 21126
Philadelphia, PA 19114

Internal Revenue Service
Special Procedures - Insolvency
7850 SW 6th Court
Plantation, FL 33324

Special Asst. U.S. Attorney
P.O. Box 9, Stop 8000
51 SW 1st Avenue, #1114
Miami, Fl 33130

Special Asst. U.S. Attorney
IRS District Counsel
1000 S. Pine Island Rd., Ste 340
Plantation, FL 33324-3906

The Honorable Eric H. Holder, Jr.
Attorney General of the U.S.
950 Pennsylvania Avenue, NW Room 4400
Washington, DC 20530-0001

Honorable Jeffrey H. Sloman,
Acting U.S. Attorney
99 NE 4th Street
Miami, Fl 33132

Environmental Protection Agency
Ariel Rios Building
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460

4

2554224-1

Florida Department of Environmental Protection
Southeast District Office
400 North Congress Avenue, Suite 200
West Palm Beach, Florida 33401

BROWARD COUNTY - REVENUE COLLECTION
DIVISION
Tax & License Section
115 S. Andrews Avenue Room A-100
Fort Lauderdale, Florida 33301

Florida Department of Revenue
5050 West Tennessee Street
Tallahassee, FL 32399-0100

County Taxes:
New Castle County Government Center
87 Reads Way
New Castle, DE 19720

State Department of Revenue
Carvel State Office Building
820 North French Street
Wilmington, DE 19801

Department of Natural Resources and Environmental
Control
Richardson & Robbins Building
89 Kings Hwy
Dover, DE 19901

Business Property, Commissioner of the Revenue
Mailing Address:  Post Office Box 644,
Fredericksburg VA 22404-0644
Overnight Address: 715 Princess Anne Street, Rm
102, Fredericksburg VA 22401

(Dept. of Environmental Quality)
DEQ Central Office
629 East Main Street
Richmond, Va. 23219
P.O. Box 1105,
Richmond, VA 23218

5

**EXHIBIT C**
**Critical Vendor List**

PPI Critical Vendors List

| Vendor Name | Expected Balance as of 01/13/2010 | Comment |
|---|---|---|
| Brookwood Fabrics (Factor - Wells Fargo) | $ 2,700.00 | Nylon fabric supplier.  Specific ballistic panel cover material named in our NIJ certifications.  Any change away from this vendor will result in re-certificiation of our already certified NIJ products. |
| Honeywell | $ 73,335.48 | Ballistic fabric supplier.  Specific vendor/fabric required by our NIJ certifications.  Any change away from this vendor will result in re-certificiation of our already certified NIJ products as well as re-certification of our products with the government. |
| Lincoln Fabrics Inc. | $ 115,907.27 | Ballistic fabric supplier.  Specific weaver and fabric is named in our government contracts and NIJ certifications.  Any change away from this vendor will result in re-certificiation of our already certified NIJ products as well as our approved DHS products. |

$ 191,942.75