## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

In re:

PROTECTIVE PRODUCTS OF                         Case No. 10-
AMERICA, INC., *et al.*,[1]                     Chapter 11 Cases
                                               (Joint Administration Pending)

               Debtors.
_____/

**EMERGENCY MOTION OF DEBTORS AND DEBTORS IN POSSESSION FOR
INTERIM ORDER:  (I) AUTHORIZING POST-PETITION SECURED
SUPERPRIORITY FINANCING PURSUANT TO BANKRUPTCY CODE SECTIONS
105(a), 362, 364(c)(1), 364(c)(2), 364(c)(3) AND 364(d), (II) AUTHORIZING THE
DEBTORS' USE OF CASH COLLATERAL PURSUANT TO BANKRUPTCY CODE
SECTION 363(c), (III) GRANTING ADEQUATE PROTECTION PURSUANT TO
SECTIONS 361, 363 AND 364 OF THE BANKRUPTCY CODE, (IV) MODIFYING THE
AUTOMATIC STAY AND (V) SETTING FINAL HEARING PURSUANT TO
BANKRUPTCY RULES 4001(b) AND 4001(c)**

### Basis for Emergency Relief

**The Debtors request that the Court consider this Motion on or
before January 15, 2010.  The Debtors have very limited
liquidity.  They are cash constrained and require an
expeditious sale process in order to preserve going concern
value.  The Debtors' secured lender has agreed to provide the
Debtors with additional liquidity through February 26, 2010.
The Debtors seek approval of the financing in order to have
liquidity to fund operations through the sale.**

Protective Products of America, Inc. ("PPA") and its affiliated debtors (collectively, the

"Debtors"), by and through undersigned counsel, as debtors and debtors in possession in the

captioned chapter 11 proceedings, hereby seek, through this motion (the "Motion"), the

immediate entry of an interim order (the "Interim Order") in substantially the form attached

---

[1] The name and last four digits of the taxpayer identification number for each of the Debtors follows in parenthesis:
(i) Protective Products of America, Inc. (9709); (ii) CPC Holding Corporation of America (8086); (iii) Ceramic
Protection Corporation of America (7305); (iv) Protective Products International Corp. (7373); and (v) Protective
Products of North Carolina, LLC (0927).  The address for the Debtors is 1649 NW 136th Avenue, Sunrise, FL
33323.

hereto as <u>Exhibit 1</u> and, after the Final Hearing (as defined below), entry of a final order (the "<u>Final Order</u>") authorizing the DIP Borrower (as defined below), pursuant to Rule 4001(c)(2) of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>") to obtain emergency post-petition debtor-in-possession financing on an interim basis, subject and pursuant to the terms of the DIP Credit Agreement (as defined below).   Pursuant to Federal Rule of Bankruptcy Procedure 4001(b)(1)(B) and (c)(1)(B), the Debtors submit the following list and summary of the material terms of the DIP Credit Agreement (as defined below) and proposed Interim Order, setting forth the location within the relevant documents of such material terms.[2]

| **Material Provision** | **Summary Description and/or Location of Provisions in Relevant Documents** |
|---|---|
| DIP Lender | Canadian Imperial Bank of Commerce |
| DIP Borrower | Protective Products of America, Inc. |
| Entities with an interest in the Cash Collateral | Canadian Imperial Bank of Commerce ("CIBC" or the "Pre-Petition Lender") |
| The purposes for the use of the Cash Collateral. | Continued operation of the Debtors' businesses pending the Chapter 11 proceedings and the orderly sale and disposition of the Debtors' assets pursuant to the Bankruptcy Code. |
| Interest Rates | Prior to the occurrence of an Event of Default, 14%; 17% from and after the occurrence of an Event of Default. |
| Maturity Date | The earliest to occur of (a) February 26, 2010, (b) the effective date of a plan of reorganization or liquidation in the Case, (c) the effective date of a sale of all or substantially all of the Debtors' assets or business pursuant to Section 363 of the Bankruptcy Code which is authorized by the Bankruptcy Court (and in the event of a series of transactions resulting in the sale of all or substantially all of the Debtors' assets, the last to close or consummate such sales), and (d) an Event of Default. |

---

[2] The following summary contains truncated descriptions of material terms and is qualified in its entirety by the actual terms of the proposed Interim Order and the DIP Credit Agreement themselves.  Capitalized but undefined terms used in this summary shall have the meanings given to such terms in the DIP Loan Documents, the Interim Order, and/or this Motion, as applicable.

| | |
|---|---|
| Events of Default Under DIP Credit Agreement and Termination Events | Credit Agreement at Section 7.01, p. 30, **Interim Order, ¶ 26, p. 23**. |
| Liens | Senior, priming liens, subject only to Permitted Liens.  **Interim Order, ¶ 9**. |
| Loan Amount | Up to $665,000 fund the Operating Loan, plus $75,000 for the Wind-Down Loan. |
| Superpriority and Priming Lien | The DIP Lender shall receive Superpriority Claim status pursuant to 364(c)(1) senior to any Superpriority Claim granted as adequate protection in respect to the Prepetition Lender and any other claims of any entity, including, without limitation, any claims under Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or 1114 of the Bankruptcy Code.  The DIP Lender shall receive (a) pursuant to Section 364(c)(2), first priority liens on all property of the Debtors that is not subject to any properly perfected liens, and (b) pursuant to Section 364(c)(3), second priority liens subject only to the Carve-Out and the Permitted Liens (which will have first priority).  The liens granted to the DIP Lender shall, subject to the Carve-Out, prime any other liens (other than the Permitted Liens) not perfected and a matter of public record under applicable law as of the Petition Date, or otherwise avoidable.  **Credit Agreement Section 6.01, p. 26**. |
| Adequate Protection | The Pre-Petition Lender shall be granted Superpriority Claims and Adequate Protection Liens in all Collateral to secure an amount equal to the sum of the aggregate diminution, if any, subsequent to the Petition Date, in the value of the Pre-Petition Collateral, caused by (i) the aggregate reduction in the amount of Pre-Petition Collateral available to satisfy the Pre-Petition Obligations as a consequence of depreciation, use, sale, loss, decline in market price or otherwise of the Pre-Petition Collateral, or (ii) the sum of the aggregate amount of all cash proceeds of Pre-Petition Collateral or the aggregate fair market value of all non-cash Pre-Petition Collateral that is used to satisfy any other expenses of, or claims against, Debtors other than the Pre-Petition Obligations.  The Adequate Protection Liens will be subject only to (i) the Carve-Out, (ii) the Superpriority Claims and liens on the Collateral to secure obligations owed to the DIP Lender under the DIP Credit Agreement, and (iii) the Permitted Liens, if any.  **Interim Order at ¶ 10, p. 14**. |
| Findings and Determination as to validity, | The findings contained in the Interim Order with respect to the validity, enforceability, priority, or amount of Pre-Petition Obligations and Pre-Petition Liens shall be binding upon all parties in interest unless (a) the |

| | |
|---|---|
| enforceability, priority, or amount of Pre-Petition Obligations and Pre-Petition Liens<br><br>Deadline for contesting Pre-Petition Obligations and Pre-Petition Liens | Creditors' Committee or other party in interest (other than any of the Debtors) has filed an adversary proceeding or contested matter (subject to limitations on the payment of fees and expenses incurred as set forth in the Interim Order) with the Court challenging the Pre-Petition Obligations or the Pre-Petition Lender's liens and security interests in the Pre-Petition Collateral, and/or asserting claims against the Pre-Petition Lender, not later than **seventy (75) days** after entry of the Interim Order, and (b) the Bankruptcy Court rules in favor of the plaintiff in any such timely filed adversary proceeding or contested matter.  If no adversary proceeding or contested matter is timely brought, (i) the Pre-Petition Obligations shall constitute allowed secured claims for all purposes, (ii) the Pre-Petition Lender's liens and security interests on the Pre-Petition Collateral shall be deemed to be valid, legal, binding, perfected, not subject to avoidance or subordination (subject only to the Carve-Out and any applicable Permitted Liens), and not subject to any other further challenge by any party in interest seeking to exercise the rights of the Debtors' estates, and (iii) any claims of the Debtors' estates against the Pre-Petition Lender shall be deemed to be waived and released.  **Interim Order at ¶ 30, p. 28**. |
| Waiver or modification of Code provisions or applicable rules relating to the automatic stay | Except as provided in the Interim Order, the automatic stay provisions of § 362 of the Bankruptcy Code will be modified to the extent necessary to permit the DIP Lender to exercise all rights and remedies provided for in the Interim Order, without the need for filing further pleadings or application to or order of the Bankruptcy Court.  Upon the occurrence of any Event of Default, and if such Event of Default is not cured after five (5) business days written notice of the Event of Default by the DIP Lender to the Debtors and their counsel, counsel to the Creditors' Committee, if one is appointed, and to the U.S. Trustee, the DIP Lender and the Pre-Petition Lender may file a motion to terminate the automatic stay.  The Court shall conduct a hearing on an expedited basis in order to act on the motion to terminate the automatic stay under section 362.  The only issue that may be raised or addressed at such hearing is whether an Event of Default occurred.  **Interim Order at ¶ 19, p. 18.** |
| Limitation on Use of Proceeds | No portion of Post-Petition Advances, the Collateral, or Cash Collateral of the Pre-Petition Lender or the DIP Lender shall be used to prosecute claims against the Pre-Petition Lender, but may be used to investigate claims during the 75-day investigation period for the Official Committee of Unsecured Creditors.  **Interim Order at ¶ 27(b), pp. 23-24**. |
| Indemnification | The Debtors shall indemnify the DIP Lender and its affiliates, officers, directors, attorneys, agents and  employees from and against any and all claims and liabilities (including attorneys' fees) that may be asserted against the DIP Lender in connection with any investigative, |

| | |
|---|---|
| | administrative or judicial proceeding (whether or not Lender shall be designated a party thereto) or any other claim relating to or arising out of any DIP Loan Document or any actual or proposed use of proceeds of the DIP Credit Agreement or any of the Debtors' obligations to the DIP Lender; except for gross negligence or willful misconduct. **DIP Credit Agreement Section 8.04(b), p. 38**. |
| Limitation of Rights of Parties under § 506(c) | Subject to the Carve-Out, the Lender shall be entitled to Superpriority Claim status pursuant to Section 364(c)(1) of the Bankruptcy Code senior to any Superpriority Claim granted as adequate protection in respect to the Prepetition Lender and any other claims of any entity, including, without limitation, any claims under Section 506(c) of the Bankruptcy Code. **Interim Order at ¶ 15, p. 16.** |

By way of this Motion, the Debtors seek the immediate entry of the Interim Order, and, after the Final Hearing (as defined below), entry of a Final Order:

(1)  Authorizing the DIP Borrower (as defined below) pursuant to Rule 4001(c)(2) of the Bankruptcy Rules to obtain debtor-in-possession financing on an emergency and interim basis, subject and pursuant to the terms of:

(a)     that certain Superpriority Priming Debtor-In-Possession Credit Agreement substantially in the form attached to the proposed Interim Order as <u>Exhibit A</u> (the "<u>DIP Credit Agreement</u>"), by and among PPA, as borrower (the "<u>DIP Borrower</u>"), each of the other Debtors as guarantors (the "<u>Guarantors</u>"), Canadian Imperial Bank of Commerce ("<u>CIBC</u>" or "<u>DIP Lender</u>"), as lender; and

(c)  any related documents required to be delivered by or in connection with the DIP Credit Agreement (the DIP Credit Agreement, any such related documents and all other "Loan Documents" as defined under the DIP Credit Agreement hereinafter collectively being called the "<u>DIP Loan Documents</u>").

By way of this Motion, the Debtors further seek entry of a Final Order:

(2)     Approving the terms and conditions of the DIP Loan Documents, and

authorizing the DIP Borrower and the Guarantors to execute and enter into the respective DIP Loan Documents to which they are to be parties;

(3)    Authorizing and directing the DIP Borrower and the Guarantors to execute and deliver, from time to time, all such other documents, instruments and agreements and perform all such other acts as may be required in connection with the DIP Loan Documents;

(4)    Authorizing the Debtors, pursuant Section 363(c) of Title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (as amended, the "Bankruptcy Code"), and Bankruptcy Rule 4001(b)(2), to utilize Cash Collateral (as defined below) as set forth herein and in the Final Order and subject to the pertinent provisions of the DIP Loan Documents;

(5)    Authorizing the DIP Borrower, pursuant to Sections 364(c)(1), (c)(2), (c)(3) and (d) of the Bankruptcy Code, to obtain debtor-in-possession super-priority financing under the DIP Credit Agreement (all such financing, loans, extensions of credit, and other indebtedness, including interest and fees in connection therewith, shall hereinafter be referred to as the "Post-Petition Advances"), which financing and indebtedness, due and owing by the DIP Borrower to the DIP Lender, and unconditionally guaranteed by the DIP Guarantors, shall, subject to the Carve-Out (the "Carve-Out")[3]: (a) have priority pursuant to Section 364(c)(1) of the Bankruptcy Code, over any and all administrative expenses of the kind specified in or created or awarded pursuant to, inter alia, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b) and 726 of the Bankruptcy Code; (b) be secured pursuant to Section 364(d)(1) of the

---

[3] The term Carve-Out as used herein, shall have the meaning given to such term in the proposed Interim Order. As set forth in the Interim Order, the Carve-Out includes, (a) the payment of any unpaid fees payable pursuant to 28 U.S.C. § 1930 (including, without limitation, fees under 28 U.S.C. § 1930(a)(6)), (b) the fees due to the Clerk of the Court, (c) the actual fees and expenses incurred by professionals retained by an order of the Court entered pursuant to Sections 327 or 1103(b) of the Bankruptcy Code, including fees attributable to time entries for the periods on or prior to the occurrence of the Termination Date, provided they are within the amounts set forth in the Budget and are subsequently allowed by the Bankruptcy Court under Sections 330 and 331 of the Bankruptcy Code, and (d) the Break-Up Fee and Expense Reimbursement in favor of Protective Products Enterprises, Inc. pursuant to the Bid Procedures Order.

Bankruptcy Code by first priority priming liens and security interests in the Pre-Petition Collateral (as defined below) with respect to liens that were not perfected and a matter of public record under applicable law as of the Petition Date (as defined below) or that are otherwise avoidable or can be set aside for any reason; (c) be secured pursuant to Section 364(c)(2) of the Bankruptcy Code by first priority liens and security interests in any and all Collateral (as defined below) not otherwise subject to perfected liens or security interests  (including, without limitation, any such Collateral acquired or generated by the Debtors or their estates after the Petition Date (as defined below)); and (d) be secured pursuant to Section 364(c)(3) of the Bankruptcy Code by junior liens and security interests in any and all Collateral that is subject to Permitted Liens (as defined below);

(6)     Modifying the automatic stay imposed by Section 362 of the Bankruptcy Code to the extent reasonably necessary to permit the DIP Lender and the Debtors to implement, as permitted by this Order, the terms of this Order;

(7)     Authorizing the DIP Borrower, after an emergency interim hearing (the "Interim Hearing") on the Motion pursuant to Bankruptcy Rule 4001(b)(2) and 4001(c)(2), to obtain from the DIP Lender debtor-in-possession super-priority financing up to the maximum amount of $250,000, and authorizing the Debtors to use cash collateral under the terms and conditions as set forth in the DIP Loan Documents and the Interim Order pending a final hearing on the Motion (the "Final Hearing") at which the Debtors will seek entry of a Final Order approving the use of cash collateral and post-petition financing up to the maximum amount of $740,000 (and otherwise on terms substantially identical to those contained in the Interim Order) in accordance with Fed. R. Bankr. P. 4001(b) and (c) and other applicable rules and statutes;

(8)     Authorizing, under Bankruptcy Code sections 361, and 363(e), the Debtors' grant

of adequate protection to the Pre-Petition Lender (as defined below) with respect to any diminution in the value of the pre-petition collateral (the "Pre-Petition Collateral") in which the Pre-Petition Lender holds valid and perfected liens and security interests as of the Petition Date (as defined below);

(c)     the obligations arising under the Note (as defined under the Pre-Petition Credit Agreements), as the same have been, and may from time to time hereafter be amended, restated or otherwise modified (the "Pre-Petition Credit Obligations");

(d)     letter of credit obligations (collectively, the "Pre-Petition Letter of Credit Obligations") arising under the Pre-Petition Credit Agreements, as the same have been, and may from time to time hereafter be amended, restated or otherwise modified; and

(e)     the guaranty obligations of the Pre-Petition Guarantors, arising under the Pre-Petition Credit Agreements (collectively, the "Guaranty of Payment Obligations") (hereinafter, all pre-petition collateral, security, pledge and ancillary documents executed in connection therewith at any time, including without limitation, the Pre-Petition Liens (defined below), shall hereinafter be collectively referred to as the "Pre-Petition Transaction Documents");

(9)     Scheduling the Final Hearing; and

(10)     Granting the Debtors such other and further relief as the Court deems necessary, appropriate, equitable, proper, and consistent with the terms of this Order, the Motion and the DIP Loan Documents.

The facts and circumstances supporting this Motion are set forth in the *Declaration Of Neil E. Schwartzman In Support Of The Debtors' Chapter 11 Petitions And Request For First Day Relief* (the "First Day Declaration"). In further support of this Motion, the Debtors respectfully state as follows:

## I.    Jurisdiction

1.    This Court has jurisdiction over this Motion under 28 U.S.C. sections 157 and 1334. Venue is proper under 28 U.S.C. sections 1408 and 1409.  This is a core proceeding, as defined in 28 U.S.C. section 157(b).

2.    The bases for the relief requested herein are Bankruptcy Code sections 105, 361, 362, 363, and 364, Bankruptcy Rules 2002, 4001, and 9014.

## II.    Background

3.    On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

4.    The Debtors are operating their business and managing their affairs as debtors in possession.  11 U.S.C. §§ 1107(a) and 1108.

5.    The Debtors design, manufacture and market advanced products that provide ballistic protection for personnel and vehicles in the military and law enforcement markets. Their product portfolio includes a full line of soft armor police and military protective products, including vests, special purpose armor plates, shields, helmets and law enforcement vehicle door protection systems. One of their signature products is the Modular Tactical Vest, or MTV, which was selected in 2006 by the U.S. Marine Corps in a competitive process, to replace its previous Interceptor body armor system. The Debtors are capable of providing customers with an integrated armoring system of soft ballistic material, vests and plates for military personnel.

6.    The Debtors' customers include agencies of the U.S. Government, international militaries, prime government contractors who integrate the Debtors' products into their armor systems, distributors and law enforcement agencies. During the nine months ended September 30, 2009, approximately 95% of their products were sold to customers in the United States.

7.     The Debtors maintain their headquarters and primary manufacturing and research and development facilities in Sunrise, Florida.

8.     For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the First Day Declaration.

## PRE-PETITION SECURED INDEBTEDNESS

9.     PPA, as borrower, the other Debtors, as guarantors, and Canadian Imperial Bank of Commerce ("CIBC" or "Pre-Petition Lender"), as the pre-petition lender, are parties to that credit agreement dated as of September 21, 2004, as amended and restated pursuant to an amended and restated credit agreement dated as of January 30, 2009, as further amended by a second amending agreement to the forbearance agreement executed December 29, 2009, as the same may be further amended, supplemented, restated, replaced or otherwise modified from time to time, (collectively, the "Pre-Petition Credit Agreement").  Pursuant to the Pre-Petition Credit Agreement, CIBC provided working capital and term loans to the Debtors.

10.     As of the Petition Date, the Debtors were indebted to CIBC in the approximate amount of $7,600,000.

11.     CIBC asserts that its indebtedness is secured by senior liens in and upon substantially all of the assets of the Debtors.

## III.     Relief Requested

### *The Debtors' Need for Post-Petition Financing and Use of Cash Collateral*

12.     The Debtors do not have working capital or financing to operate their businesses. Accordingly, they require post-petition financing and the ability to use the all of the cash generated from the operation, sale, disposition or other realization of any assets or property subject to the Pre-Petition Liens, wherever located, and which constitutes cash collateral as

Case 10-10711-JKO    Doc 18    Filed 01/13/10    Page 11 of 107

defined in section 363 of the Bankruptcy Code (the "Cash Collateral").  The need for post-petition financing and the use of the Pre-Petition Lenders' Cash Collateral is immediate.  In the absence of such use, serious and irreparable harm to the Debtors and their estates will occur.

13.     The success of these chapter 11 cases and the stabilization of the Debtors' operations and business at the outset thereof depend upon the Debtors' ability to continue to fund the operations of their businesses and permit them to meet payroll and other operating expenses, as well as the Debtors' ability to preserve the going concern value of their various real estate developments and projects.

14.     In view of the foregoing, the relief sought herein is immediate, necessary, and essential in order for the Debtors to continue to meet their financial obligations to their employees, contractors, and professionals, among others, and to maintain their operations and property so as to maximize the value of their estates.  For these same reasons, the relief sought herein is in the best interests of the Debtors and their estates.

15.     The Debtors have been informed that the DIP Lender is willing to provide the Post-Petition Advances under the DIP Credit Agreement, subordinate their Superpriority Claims (as defined in the DIP Credit Agreement), security interests and liens to the Carve-Out, and consent to the Debtors' use of Cash Collateral, subject to the conditions set forth in the Interim Order and in the Loan Documents, including, without limitation, the provisions of the Interim Order assuring that the security interests and liens pursuant to section 364(c) and (d) of the Bankruptcy Code and the various claims, Superpriority Claims, and other protections granted pursuant to the Interim Order and the DIP Loan Documents will not be affected by any subsequent reversal or modification of the Interim Order, or by any other order that is applicable

2551436-1                                    11

to the DIP Loan Documents (including with respect to the Cash Collateral), as provided in section 364(e) of the Bankruptcy Code.

16.     The Debtors believe that the DIP Lender has acted in good faith in consenting to and in agreeing to provide the financing under the DIP Credit Agreement, and the reliance of the DIP Lender on the assurances referred to above is in good faith.  The DIP Lender and the Debtors have negotiated at arms' length and in good faith regarding the DIP Credit Agreement and the Debtors' use of Cash Collateral to fund the continued operations of the Debtors.  The DIP Lender will not agree to provide the DIP Credit Agreement, or agree to the Debtors' use of Cash Collateral, absent the approval of the terms and conditions set forth in the DIP Loan Documents and the Interim Order.

17.     Given the extent of outstanding secured and unsecured indebtedness owing by the Debtors and the extreme time constraints resulting from the Debtors' liquidity problems, the range of realistic financing alternatives was extremely limited.[4]  The Debtors submit that the terms and conditions set forth in the DIP Loan Documents, taken as a whole, are fair and reasonable under the circumstances; reflect the Debtors' and their respective directors' exercise of prudent business judgment consistent with their fiduciary duties; and are supported by reasonably equivalent value and fair consideration.

18.     The Pre-Petition Lender is entitled to receive adequate protection, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, for any diminution in the value of the Pre-Petition Collateral, including Cash Collateral, resulting from, without limitation: (i) the Debtors' use of such Pre-Petition Collateral, including Cash Collateral, (ii) the sale or lease of

---

[4] The Debtors submit that efforts to obtain financing from other sources would have been futile given (a) the Debtors' capital structure and the inability of the Debtors to successfully obtain financing that primes the liens of CIBC, as the Debtors could not establish adequate protection of CIBC's liens in that circumstance, and (b) the paucity of credit in the market generally.

such Pre-Petition Collateral other than Cash Collateral, (iii) the automatic stay imposed by section 362 of the Bankruptcy Code, (iv) the priming liens granted to the DIP Lender, and/or (v) the subordination to the Carve-Out (as defined below).  In view of the foregoing, the Debtors respectfully request entry of an Interim Order in substantially the form attached hereto as Exhibit 1.

### IV.  Bases for the Relief Requested

**A.    Use of Cash Collateral pursuant to Bankruptcy Code Section 363**

19.    Section 363 of the Bankruptcy Code governs a debtor's ability to use, sell or lease property of the estate.  Section 363(c)(2) of the Bankruptcy Code restricts a debtor's ability to use cash collateral.  That section provides, in pertinent part:

> The trustee [or debtor in possession] may not use, sell or lease cash collateral under paragraph (1) of this subsection unless -
>
> (A)    each entity that has an interest in such cash collateral consents; or
>
> (B)    the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

20.    Section 363(a) of the Bankruptcy Code defines "cash collateral" as including cash and cash equivalents "whenever acquired," in which the estate and any entity other than the estate have an interest, and the "proceeds, products, offspring, rents or profits of property subject to a security interest as provided in section 552(b) of this title whether existing before or after the commencement of a case under this title."  11 U.S.C. § 363(a).  Under Bankruptcy Code sections 363(c)(2) and (e), the Court may authorize the Debtors to use Cash Collateral as long as their secured creditors consent to such use, or if such secured creditors are "adequately protected."

21.     The Pre-Petition Lender has consented to the use of Cash Collateral, provided that the Pre-Petition Lender receives adequate protection, and provided such use is: (i) consistent with the purposes set forth in the Interim Order and the DIP Credit Agreement, (ii) in accordance with the budget (the "Budget")[5] in substantially the form as attached to the Interim Order, and (iii) not prohibited by the Interim Order or the DIP Credit Agreement.

22.     As adequate protection to the Pre-Petition Lender for any diminution in value of the Pre-Petition Collateral resulting from the Debtors' use of Cash Collateral after the Petition Date or the Debtors' use, sale or disposition of the other Pre-Petition Collateral, the Debtors propose to grant to the Pre-Petition Lender: Superpriority Claims and valid, binding and enforceable liens (the "Adequate Protection Liens") in all Collateral (as defined in the Interim Order) to secure an amount that is equal to the sum of the aggregate diminution, if any, subsequent to the Petition Date, in the value of the Pre-Petition Collateral, caused by (i) the aggregate reduction in the amount of Pre-Petition Collateral available to satisfy the Pre-Petition Obligations as a consequence of depreciation, use, sale, loss, decline in market price or otherwise of the Pre-Petition Collateral, or (ii) the sum of the aggregate amount of all cash proceeds of Pre-Petition Collateral or the aggregate fair market value of all non-cash Pre-Petition Collateral that is used to satisfy any other expenses of, or claims against, Debtors other than the Pre-Petition Obligations.

23.     The Adequate Protection Liens proposed to be granted to the Pre-Petition Lender will be subject only to (i) the Carve-Out, (ii) the Superpriority Claims and liens on the collateral which secures obligations owed to the DIP Lender under the DIP Credit Agreement, and (iii) the following liens or security interests: (A) US Bancorp in respect of 1 Industrial Equipment

---

[5] The Budget is attached as Exhibit B to the Interim Order.

Faroarm 8ft. w/ 7ft AX, and (B) State of California, Division of Corporation Franchise Tax[6]

(together, the "Permitted Liens"), to the extent any such Permitted Liens are properly perfected

and duly enforceable.

24.     The Debtors submit that the Superpriority Claims and Adequate Protection Liens

are necessary to provide some measure of adequate protection to the Pre-Petition Lender.

Moreover, assuming the Court grants such adequate protection to the Pre-Petition Lender, the

Pre-Petition Lender has indicated that it will consent to the use of Cash Collateral.  Accordingly,

pursuant to sections 363(c)(2) and (e) of the Bankruptcy Code, the Debtors submit that use of

Cash Collateral is proper under the circumstances, and they request authorization to use Cash

Collateral based on the grounds set forth herein.

**B.     Incurrence of Secured Debt Pursuant to Bankruptcy Code Section 364**

25.     Section 364(c) of the Bankruptcy Code provides as follows:

(c)     If the trustee [or debtor in possession] is unable to obtain unsecured credit
allowable under § 503(b)(1) of this title as an administrative expense, the court, after
notice and a hearing, may authorize the obtaining of credit or the incurring of debt –

(1)     with priority over any and all administrative expenses of the kind specified
in § 503(b) or 507(b) of this title;

(2)     secured by a lien on property of the estate that is not otherwise subject to a
lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

26.     In addition, section 364(d)(1), which governs the incurrence of post-petition debt

secured by senior or "priming" liens, provides that, the Court may, after notice and a hearing:

(1)     authorize the obtaining of credit or the incurring of debt secured by a senior or
equal lien on property of the estate that is subject to a lien only if –

---

[6] The Debtors dispute their liability to the State of California and the validity, priority and extent, if any, of the liens
asserted by the State of California.

(A)     the trustee is unable to obtain such credit otherwise; and

(B)     there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

27.     Pursuant to section 364 of the Bankruptcy Code, a debtor may, in the exercise of its business judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the borrowing is in the best interests of the estate.  *See* 11 U.S.C. sections 364(c), (d); *In re Ames Dep't Stores*, 115 B.R. 34, 38 (Bankr. S.D.N.Y. 1990) (with respect to post-petition credit, courts "permit debtor[s]-in-possession to exercise their basic business judgment consistent with their fiduciary duties"); 3 COLLIER ON BANKRUPTCY  364.03, at 364-7-18 (15th ed. rev. 2001).

28.     To satisfy the standards of section 364 of the Bankruptcy Code, a debtor is not required to seek credit from every possible source: "the statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable."  *Bray v. Shenendoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986).  Rather, a debtor need only demonstrate "by a good faith effort that credit was not available without" the protections of section 364(c).  *Id.; see also In re Ames*, 115 B.R. 38, 40 (Bankr. S.D.N.Y. 1990).  Where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct an exhaustive search for financing"  *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988).  In general, a bankruptcy court should defer to a debtor's business judgment regarding the need for and proposed use of funds unless such judgment is arbitrary and capricious.  *In re Curlew Valley Associates*, 14 B.R. 507, 511-14 (Bankr. D. Utah 1981).

29.     The Debtors have satisfied the requirements of sections 364(c) and (d) because, under current circumstances, they are unable to obtain credit otherwise.  The liens granted to the

DIP Lender shall, subject to Carve-Out, be (a) first priority liens on all property that is not subject to properly perfected liens, and (b) a second priority lien on all property that is subject to Permitted Liens. The Debtors believe that by operation of Section 506(b) of the Bankruptcy Code any claims secured by liens that are junior to the Permitted Liens are undersecured *en toto* because the value of the collateral.

30.      The Debtors firmly believe that the financing to be provided as contemplated by the DIP Credit Agreement represents the best—and only—financing available to them at this time, warranting approval of the DIP Loan Documents and proposed Interim Order on an emergency basis, pending the Final Hearing.

31.      In the exercise of their business judgment, the Debtors have concluded that the DIP Lender, due to its existing long-term relationship in its capacity as the Pre-Petition Lender, is the only lender able to offer a post-petition credit facility that meets the Debtors' working-capital needs on the terms, and within the time frame, required by the Debtors. Courts routinely defer to the business judgment of the debtors on most business decisions, including borrowing decisions. *See, e.g., In re Simasko Prod. Co.*, 47 B.R. 444, 449 (D. Colo. 1985) ("business judgments should be left to the board room and not to this Court"); *In re Lifeguard Indus., Inc.*, 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same); *In re Curlew Valley Assocs.*, 14 B.R. 506, 511-13 (Bankr. D. Utah 1981) (courts generally will not second-guess a debtor's business decisions where those decisions constitute "a business judgment made in good faith, upon a reasonable basis, and within the scope of its authority under the Code"). "More exacting scrutiny would slow the administration of the debtor's estate and increase its costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten

the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

32.    In the instant case, the Debtors' proposed use of Cash Collateral and the granting of the priming liens to the DIP Lender (which will be subject to the Carve-Out and Permitted Liens as set forth in the proposed Interim Order) are essential to maintain the value of the Pre-Petition Collateral and the Debtors' estates.   Further, access to the DIP Credit Agreement and use of the Cash Collateral will preserve the value of the Debtors' businesses to the greatest extent practicable under the circumstances.

33.    More fundamentally, unless the Debtors have access to the Cash Collateral and the DIP Credit Agreement, they will not have sufficient funds to continue to operate their businesses and to preserve their assets.   Indeed, in the absence of such financing, they will not continue as a going concern, resulting in a dramatic decrease in the value of the Pre-Petition Collateral and the overall estates.   Accordingly, the use of the Cash Collateral and DIP Credit Agreement to avert an immediate shutdown and liquidation of the Debtors, and to enable the Debtors to effect a preservation of the value of the Pre-Petition Collateral is clearly in the best interests of the Debtors' estates.

34.    Based on the circumstances present here, and the grounds and authorities set forth above, the Debtors firmly believe that the financing sought is the best financing available, and that it is in the best interests of their estates and creditors to enter into the DIP Credit Agreement. They respectfully request authority to do so.

## V.    Request For Modification Of Automatic Stay

35.   The proposed Interim Order contemplates a modification of the automatic stay imposed by section 362(a) of the Bankruptcy Code to the extent necessary to implement and

effectuate the terms and conditions of the Interim Order.  Moreover, under the terms of the proposed Interim Order, upon the occurrence and during the continuance of any event of default as defined in the DIP Loan Documents ("Event of Default"), and if such Event of Default is not cured after five (5) business days written notice of the Event of Default by the DIP Lender to the Debtors and their counsel, counsel to the Creditors' Committee, if one is appointed, and to the U.S. Trustee, the DIP Lender and the Pre-Petition Lender may file a motion to terminate the automatic stay.  The Interim Order further provides that the Court shall conduct a hearing on an expedited emergency basis, but not more than three (3) days following the filing of the motion, in order to act on the motion to terminate the automatic stay under section 362 for the purpose of allowing the DIP Lender and the Pre-Petition Lender to exercise all of its rights and remedies under the Interim Order, the Loan Documents, and applicable law.  Finally, the Interim Order provides that the only issue that may be raised or addressed at such hearing is whether an Event of Default has occurred.

36.     Stay modifications of this sort are ordinary and typical features under these circumstances and, in the Debtors' business judgment, are reasonable.  Accordingly, the Debtors respectfully request that the Court modify the automatic stay as provided in the proposed Order.

## VI.     Notice

37.     No trustee, examiner or creditors' committee has been appointed in these chapter 11 cases.  Notice of this Motion has been given by overnight mail, hand delivery or facsimile to the following parties or, in lieu thereof, their counsel if known:  (a) the United States Trustee for the Middle District of Florida; (b) each of the Debtors' 20 largest unsecured creditors; (c) the Pre-Petition Lender; (d) the DIP Lender; (e) the Internal Revenue Service; and (f) all other known holders, if any, of secured claims against any of the Debtors' assets.   In light

of the nature of the relief requested, the Debtors submit, and request that the Court find, that such notice is appropriate and that no further notice need be given.

### VII.    Request for Final Hearing

38.    Pursuant to Bankruptcy Rule 4001(c)(2), the Debtors respectfully request that the Court set a date for an Final Hearing that is no later than 15 days following the Petition Date. The Debtors respectfully request that they be authorized to provide notice of the Final Hearing as soon as practicable after the entry of an order approving this Motion, by serving copies of such notice via fax or overnight delivery or other express mail to (a) the parties served with a copy of the Interim Order; (b) any other party that has filed a request for notices with the Court; and (c) counsel for any statutory committee, if one is appointed.  In light of the nature of the relief requested herein, the Debtors submit that no other or further notice is required.

### REQUEST FOR WAIVER OF LOCAL RULE 9075-1(B) CERTIFICATION

39.    The Debtors respectfully request that the Court waive the provisions of Local Rule 9075-1(B) which requires an affirmative statement that a bona fide effort was made in order to resolve the issues raised in this Motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.

WHEREFORE, the Debtors respectfully request that the Court:

(i)    enter the Interim Order, substantially in the form attached hereto as **Exhibit 1**, authorizing the relief requested herein;

(ii)    approve the form and manner of notice of the Final Hearing on this Motion, as set forth herein;

(iii)    schedule the Final Hearing on this Motion and enter the Final Order following the conclusion thereof; and

(iv)    grant such other and further relief as the Court may deem just and proper.

Dated: January 13, 2010                              Respectfully submitted,

                                                     **BERGER SINGERMAN, P.A.**
                                                     *Proposed Counsel for the Debtors*
                                                     200 South Biscayne Boulevard, Suite 1000
                                                     Miami, FL  33131
                                                     Telephone:  (305) 755-9500
                                                     Facsimile:   (305) 714-4340


                                                     By:  /s/  Jordi Guso
                                                             Jordi Guso
                                                             Florida Bar No. 863580
                                                             jguso@bergersingerman.com
                                                             Debi Evans Galler
                                                             Florida Bar No. 0985236
                                                             dgaller@bergersingerman.com

**<u>EXHIBIT 1</u>**

Proposed Interim Order

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:

PROTECTIVE PRODUCTS OF                                   Case No. 10-
AMERICA, INC., *et al.*,[1]                              Chapter 11 Cases
                                                        (Joint Administration Pending)
Debtors.

_____/

**INTERIM ORDER PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363,**
**364(c), 364(d) AND 364(e) AND FED. R. BANKR. P. 4001 AND 9014**
**(I) AUTHORIZING THE DEBTORS TO OBTAIN SECURED POST-PETITION**
**FINANCING ON SUPER-PRIORITY PRIMING LIEN BASIS, (II) AUTHORIZING THE**
**USE OF CASH COLLATERAL AND PROVIDING ADEQUATE PROTECTION, (III)**
**MODIFYING THE AUTOMATIC STAY AND (IV) PRESCRIBING FORM AND**
**MANNER OF NOTICE AND SETTING TIME FOR FINAL HEARING**

THIS MATTER came before the Court for an interim hearing on January ___, 2010 (the

"Interim Hearing"), upon the Motion filed on January ___, 2010 (the "Motion") [Dkt. No. ___],

by the above-captioned debtors (the "Debtors"), seeking, *inter alia*:

(a)        pursuant to Sections 105, 361, 362, 363, 364(c), 364(d) and 364(e)

of the United States Bankruptcy Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code"), Rules

2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure ("Bankruptcy Rules") and

Local Rules 2002-1, 4001-1, 4001-3, and 9013-F of the Local Rules of the United States

Bankruptcy Court for the Southern District of Florida:

(i)        authorization for the Debtors to obtain superpriority post-

petition loans, advances and other financial accommodations (the "DIP Credit Facility") in the

---

[1] The name and the last four digits of the taxpayer identification number for each of the Debtors follows in parenthesis: (i) Protective Products of America, Inc. (9709); CPC Holding Corporation of America (8086); (iii) Ceramic Protection Corporation of America (7305); (iv) Protective Products International Corp. (7373); and protective Products of North Carolina, LLC (0927).  The address for the Debtors is 1649 NW 136th Avenue, Sunrise, FL 33323.

amount of up to $740,000 on the terms set forth in the Superpriority Priming Debtor in Possession Credit Agreement, as the same now exists or may hereafter be amended or modified subject to the limitations in this Interim Order (the "DIP Credit Agreement"), dated as of January 12, 2010, among the Debtors and Canadian Imperial Bank of Commerce, a Canadian chartered bank, as lender (the "DIP Lender"), and the other "Loan Documents" (as defined in the DIP Credit Agreement);

    (ii) authorization for the Debtors to comply with the DIP Credit Agreement and to enter into and comply in all respects with the Loan Documents, and approval of all of the terms and conditions of the DIP Credit Agreement;

    (iii) the granting in favor of the DIP Lender of super-priority administrative claim status in each of the Debtors' cases under chapter 11 of the Bankruptcy Code (each a "Case" and collectively, the "Cases") pursuant to Section 364(c)(1) of the Bankruptcy Code in respect of all of the "Obligations" (as defined in the DIP Credit Agreement);

    (iv) as security for the Obligations, the granting in favor of the DIP Lender pursuant to Section 364(c)(2) of the Bankruptcy Code, of perfected, first priority, valid, enforceable and non-avoidable liens on and security interests in all property of each of the Debtors that is not subject to valid, perfected and non-avoidable liens in existence at the time of the Petition Date (as defined below) or to valid liens in existence at the time of the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, if any, excluding "Avoidance Actions" (as defined in the DIP Credit Agreement), provided that the proceeds of Avoidance Actions (including, without limitation, assets as to which liens are avoided) shall be subject to such liens under Section 364(c)(2) of the

2

Bankruptcy Code and available to repay the "Loans" (as defined in the DIP Credit Agreement) and all of the other Obligations; and

(v)    as further security for the Obligations, the granting to the DIP Lender pursuant to Section 364(d)(1) of the Bankruptcy Code, of perfected, first-priority, valid, enforceable and non-avoidable senior priming liens on and security interests in all property of each of the Debtors (junior only to the "Permitted Liens," as defined below);

(vi)    authorization for the Debtors to use "Cash Collateral" as defined in Section 363(a) of the Bankruptcy Code  on an interim basis and in limited amounts as set forth in the "Budget" (as defined in the DIP Credit Agreement) and attached hereto as Exhibit B;

(vii)    granting the "Prepetition Lender" (as defined in the DIP Credit Agreement) certain replacement liens and other rights as adequate protection for the Debtors' use of Cash Collateral;

(b)    pursuant to Bankruptcy Rule 4001, an interim hearing (the "Interim Hearing") be held before the Court to consider entry of this Interim Order and that a final hearing (the "Final Hearing") thereafter be held to consider entry of a final order (the "Final DIP Order") authorizing on a final basis the relief set forth in this Interim Order; and

(c)    the granting of certain related relief provided for herein.

Due and appropriate notice of the Motion, the relief requested therein, the material terms of this Interim Order and the Interim Hearing has been served by the Debtors, whether by telecopy, e-mail, overnight courier or hand delivery, on the following parties: (a) the Office of the United States Trustee; (b) those parties listed on the List of Creditors Holding the 20 Largest Unsecured Claims Against the Debtors, as identified in the Debtors' Chapter 11 petitions; (c)

counsel to the DIP Lender and the Prepetition Lender; (d) all parties who are known to assert a lien on assets of the Debtors; (e) the U.S. Treasury; (f) the Internal Revenue Service; (g) all applicable state and local taxing authorities; and (h) all entities that have requested notice in the Debtors' Cases under Bankruptcy Rule 2002 (collectively, the "Interim Notice Parties").

Upon the record made by the Debtors at the Interim Hearing, including the Motion and other filings and pleadings in the Cases, and good and sufficient cause appearing therefor:

THE COURT MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.    Petition. On January 13, 2010 (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division (the "Bankruptcy Court" or this "Court").

B.    Debtor in Possession Status. Each of the Debtors is continuing in the management and possession of its business and properties as a debtor in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

C.    Jurisdiction and Venue. Consideration of the Motion constitutes a "core proceeding" as defined in 28 U.S.C. §§ 157(b)(2)(A), (D), (G), (K), (M) and (O). The Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157 and 1334.

D.    Notice. Sufficient and adequate notice of this Interim Order has been provided based upon the notice sent to the Interim Notice Parties and no further notice of, or hearing on, the Motion or this Interim Order is necessary or required, except for the Final Hearing.

4

E.      Findings Regarding Post-Petition Financing and Use of Cash Collateral.

(i)      *Need for Post-Petition Financing*.  The Debtors have an immediate need to obtain the DIP Credit Facility and the interim relief sought in the Motion. The Debtors represent, the unrefuted testimony at the Interim Hearing confirms, and the Court finds that without the financing proposed by the Motion, the Debtors will not have the funds necessary to pay post-petition payroll, payroll taxes, trade vendors, suppliers, overhead and other expenses necessary for the management and preservation of the Debtors' assets and properties in order to conduct the sale (the "Sale") that is the subject of the Debtors' motion to establish bidding procedures. The Debtors have requested that, pursuant to the DIP Credit Agreement and this Interim Order, the DIP Lender make loans and advances and provide other financial accommodations to the Debtors to be used by the Debtors (by way of one or more intercompany loans) to pay: (A) the fees and expenses of the DIP Lender associated with negotiation, execution and delivery of the DIP Credit Agreement and the other Loan Documents; (B) for working capital and other general corporate purposes of the Debtors, subject to the Budget and to the extent not prohibited by this Interim Order; (C) the fees and expenses of the Debtors' advisors and the advisors to any Creditor's Committee, in each case associated with the Cases, incurred prior to the closing of the Sale, subject to the Budget, the further Orders of this Court and to the extent not prohibited by this Interim Order; (D) to make any other payments permitted to be made in this Interim Order, or in any "first day" Order entered by the Bankruptcy Court to the extent permitted under the Budget or as otherwise consented to by the DIP Lender; and (E) to pay all other present and future costs and expenses of the DIP Lender, including all reasonable fees and expenses of consultants, advisors and attorneys paid or incurred at any time in

connection with the financing transactions when, as and to the extent provided for in the DIP Credit Agreement.

(ii)     *No Credit Available on More Favorable Terms*. The Debtors represent, the unrefuted testimony of the witnesses at the Interim Hearing confirms and the Court finds that the Debtors are unable to obtain unsecured credit allowable under Section 503(b)(l) of the Bankruptcy Code or pursuant to Section 364(a), (b) or (c)(1) of the Bankruptcy Code or secured credit pursuant to Sections 364(c)(2) and (c)(3) sufficient to pay the expenses set forth in the Budget.  Additionally, under the circumstances, the Debtors could not procure the necessary financing on more favorable terms than those offered by the DIP Lender pursuant to the Loan Documents and this Interim Order.

(iii)     *Business Judgment and Good Faith Pursuant to Section 364(e)*. The Debtors represent, the unrefuted testimony at the Interim Hearing confirms, and the Court finds that the terms and conditions of the DIP Credit Agreement, pursuant to which the post-petition loans, advances, and other credit and financial accommodations will be made or provided to the Debtors by the DIP Lender have been negotiated at arm's length and in good faith, as that term is used in Section 364(e) of the Bankruptcy Code, and are in the best interests of the Debtors, their estates and creditors. The Debtors further represent, the unrefuted testimony at the Interim Hearing confirms and the Court finds that the DIP Lender is extending financing to the Debtors in good faith, as such term is used in Section 364(e) of the Bankruptcy Code, and in express reliance upon the protections set forth therein, and is entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is stayed, vacated, reversed, amended or modified on appeal or otherwise.

6

(iv)    *Reasonably Equivalent Value*.  The Debtors represent, the unrefuted testimony at the Interim Hearing confirms, and the Court finds that the terms of the DIP Credit Facility are reasonable, reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties and constitute reasonably equivalent value and fair consideration.

(v)    *Good Cause, Immediate Entry*.  The Debtors represent, the unrefuted testimony at the Interim Hearing confirms, and the Court finds that the interim relief requested by the Motion is necessary to avoid immediate and irreparable harm to the Debtors' estates. The unrefuted testimony at the Interim Hearing proved that the requested financing and use of Cash Collateral is necessary to preserve and maintain the value of the Debtors' assets pending their disposition. Good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of this Interim Order.

(vi)    *Necessity and Adequate Protection*.  The unrefuted testimony at the Interim Hearing demonstrates that the expenses provided for in the Budget and this Interim Order are the reasonable, necessary costs and expenses of preserving the value of the Debtors' assets pending the Sale. Absent the interim borrowing of funds under the DIP Credit Agreement authorized by this Interim Order and the use of Cash Collateral, the value of the Debtors' assets and businesses would be severely threatened and would decline significantly. Therefore, the Debtors' estates will suffer immediate and irreparable harm absent interim approval of the DIP Credit Facility and authorization to use Cash Collateral.  In view of the foregoing, and based on the unrefuted testimony at the Interim Hearing, the Court finds and concludes that the interests of all entities holding liens in any property comprising the DIP

Collateral (as such term is hereinafter defined), who have not otherwise consented to the relief granted herein, are adequately protected as required by Section 364(d) of the Bankruptcy Code.

(vii)    *Consent.*    The Prepetition Lender has consented to the Debtors' use of its Cash Collateral, subject to compliance by the Debtors with the Budget and the terms of this Interim Order.

F.    Debtors' Stipulations.

(i)    On the Petition Date, each of the Debtors were jointly and severally indebted to the Prepetition Lender under the "Prepetition Facility" (as defined in the Credit Agreement) in the principal amount of $7,602,760, together with all accrued and unpaid interest thereon, plus all fees, service charges, legal fees (including, without limitation, accrued and unpaid legal fees) and expenses and other costs, and the Debtors affirm their absolute and unconditional obligation and promise to repay the obligations owed under the Prepetition Facility to the Prepetition Lender in accordance with the terms of the Prepetition Facility (the "Prepetition Loan Obligations");

(ii)    The liens granted to the Prepetition Lender to secure the Prepetition Loan Obligations (the "Prepetition Liens") are (A) binding upon the Debtors, (B) valid, perfected and enforceable according to their terms, except to the extent that enforcement is stayed by virtue of Section 362(a) of the Bankruptcy Code, and (C) not subject to avoidance, recharacterization, disallowance or subordination under the Bankruptcy Code or applicable law;

(iii)    All payments prior to the Petition Date in respect of the Prepetition Facility are not subject to avoidance, recharacterization, disallowance or subordination under the Bankruptcy Code or applicable law;

Based upon the foregoing, and after due consideration and good cause appearing therefor:

2556533-2

IT IS ORDERED that:

      1.    <u>Motion Granted</u>. The Motion is GRANTED on an interim basis and this Interim Order shall be fully effective upon its entry. Objections to the relief granted by this Interim Order, if any, to the extent not withdrawn or resolved at or before the Interim Hearing, are overruled.

      2.    <u>Approval of the DIP Credit Agreement</u>. The DIP Credit Agreement attached hereto as Exhibit A is hereby approved and incorporated herein by reference.

      3.    <u>Interim Borrowing Authorization</u>. The Debtors are authorized and empowered to immediately borrow, obtain, and guarantee as applicable, loans and other financial and credit accommodations from the DIP Lender, and to incur the Obligations pursuant to the terms and conditions of the DIP Credit Agreement and this Interim Order, in such amount or amounts as may be made available to the Debtors by the DIP Lender, in accordance with the terms and conditions set forth in the DIP Credit Agreement and this Interim Order.  Upon entry of this Interim Order, the Debtors are authorized to borrow from the DIP Lender the first advance of the "<u>Operating Loan</u>" (as defined in the DIP Credit Agreement) in an amount up to, but not to exceed, $250,000.

      4.    <u>No Impairment</u>. The Debtors are authorized and directed to execute, deliver, perform and comply with all of the terms and conditions of the DIP Credit Agreement and the Loan Documents. Each of the DIP Credit Agreement and the Loan Documents shall constitute valid, binding, enforceable and non-avoidable obligations of the Debtors for all purposes in the Cases, any subsequently converted case of any of the Debtors under Chapter 7 of the Bankruptcy Code, after the dismissal or reorganization of any of the Cases, after transfer of venue of any of the Cases to any court other than the Court, or after the appointment of a Chapter

9

11 trustee in any of the Cases.  No obligation or liability owed, or payment, transfer or grant of security or priority to the DIP Lender under this Interim Order, the DIP Credit Agreement or any other Loan Document shall be voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable non-bankruptcy law (including, without limitation, under Section 502(d) or Section 548 of the Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or be subject to any defense, reduction, setoff, recoupment, counterclaim or equitable claim of marshaling, whether in the Cases or any other subsequent proceedings, including, without limitation, any subsequent Chapter 7 case.  The Obligations, once paid by the Debtors, shall be nonrefundable.

> 5.    Use of Loan Proceeds and Cash Collateral.

> (i)    Generally. The Debtors may use the proceeds of the initial advance of the Operating Loan and Cash Collateral, and incur Obligations under the DIP Credit Agreement, solely in accordance with and pursuant to the financial covenants and other terms and conditions set forth in the Loan Documents and this Interim Order, including, without limitation, pursuant to the Budget, but in all events only until the occurrence of the "Termination Date" (as defined below). Subject to the limitations in the DIP Credit Agreement and this Interim Order, the Debtors shall use the proceeds of the Loans and Cash Collateral: (A) to pay the fees and expenses of the DIP Lender associated with negotiation, execution and delivery of the DIP Credit Agreement and the other Loan Documents; (B) for working capital and other general corporate purposes of the Debtors, subject to the Budget and to the extent not prohibited by this Interim Order; (C) to pay the fees and expenses of the Debtors' advisors and the advisors to any "Creditor's Committee" (as defined in the DIP Credit Agreement) incurred prior to the closing of the Sale, all of the foregoing subject to the Budget, the further Orders of this Court and to the

10

extent not prohibited by this Interim Order; (D) to make any other payments permitted to be made in this Interim Order, or in any "first day" Order entered by the Bankruptcy Court to the extent permitted under the Budget or as otherwise consented to by the DIP Lender; and (E) to pay all other present and future costs and expenses of the DIP Lender, including all reasonable fees and expenses of consultants, advisors and attorneys paid or incurred at any time in connection with the financing transactions when, as and to the extent provided for in the DIP Credit Agreement.

(ii)    No Duty to Monitor Compliance. The DIP Lender and Prepetition Lender may assume the Debtors will comply with this Interim Order, the Budget and the Loan Documents and they shall not (i) have any obligation with respect to the Debtors' use of the Operating Loan or Cash Collateral; (ii) be obligated to ensure or monitor the Debtors' compliance with any financial covenants or other terms and conditions of this Interim Order or any Loan Document; or (iii) be obligated to pay (directly or indirectly from the DIP Collateral or the Cash Collateral) any expenses incurred or authorized to be incurred pursuant to this Interim Order or the Budget or be obligated to ensure or monitor that sufficient proceeds of the DIP Credit Facility or Cash Collateral exist to pay such expenses, subject to the Carve-Out as defined below.

6.    Conclusive Evidence of DIP Loan Obligations. The terms, conditions and covenants of the DIP Credit Agreement and other Loan Documents shall be sufficient and conclusive evidence for all purposes of the borrowing and financing arrangements among the Debtors and the DIP Lender, and the resulting Obligations, including, without limitation, the Debtors' obligation to pay all principal, interest, fees (including, without limitation, commitment fees, exit fees), and other costs and expenses (including, without limitation, all reasonable fees

11

and expenses of the attorneys of the DIP Lender), as more fully set forth and to the extent provided in the Loan Documents. The signature of any officer of the Debtors appearing on any one or more of the Loan Documents shall be sufficient to bind the respective Debtors and their estates thereto. No board of directors, member, shareholder or other approval or resolution shall be necessary or required to consummate, effect or validate the transactions contemplated by this Interim Order or the Loan Documents, provided, however, that the Debtors shall provide to the DIP Lender such resolutions and certificates as may be required under the Loan Documents.

7.    <u>Interest, Fees, Costs and Expenses</u>. The Obligations shall bear interest at the rates (including at the "<u>Default Rate</u>" after the occurrence of an "<u>Event of Default</u>," each such term as defined in the DIP Credit Agreement), and be due and payable (and paid) as set forth in, and in accordance with the terms and conditions of this Interim Order and the Loan Documents, in each case without further notice, motion or application to, order of, or hearing before, the Court. The Debtors shall pay all of the Obligations as and when the same shall become due under the terms of the DIP Credit Agreement, in each case whether or not such amounts are included in the Budget. None of the fees, costs and expenses payable to the DIP Lender shall be subject to separate approval by the Court. The Debtors shall indemnify the DIP Lender (and other applicable parties) to the extent set forth in the DIP Documents.

8.    <u>Super-Priority Claims</u>. For (a) all Obligations arising pursuant to the DIP Credit Agreement and the Loan Documents and (b) all claims of the Prepetition Lender arising from the Debtors' use of Cash Collateral or the automatic stay of enforcement of the Prepetition Lender's rights under the Prepetition Facility to the extent not adequately protected by this Interim Order, the DIP Lender and Prepetition Lender are granted an allowed super-priority administrative claim pursuant to Section 364(c)(1) and Section 507(b) of the Bankruptcy Code,

12

respectively, such claims sharing equal priority as between the DIP Lender and the Prepetition Lender, but with priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtors, now in existence or hereafter incurred by any of the Debtors and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia, Sections 105, 326, 328, 330, 331, 503(b), 507(a), 507(b), and/or 364(c)(1) of the Bankruptcy Code (the "Super-Priority Claim"), provided that the Super-Priority Claim shall be subject and subordinate to the Super-Priority Claim Carve Out (as defined below).

9.      DIP Lenders Lien Grant. To secure the prompt payment and performance of any and all of the Obligations under the DIP Credit Agreement, the DIP Lender shall have, and is granted in accordance with the terms and conditions of the Loan Documents, effective on and after the Closing Date, but subject in all cases to the Collateral Carve-Out (as defined below), liens on the following property (collectively, the "DIP Collateral") with priority as stated below:

(a)      pursuant to Section 364(c)(2) of the Bankruptcy Code, valid, perfected, enforceable and non-avoidable first priority liens on and security interests in all of the Debtors' assets that are not subject to valid, perfected and non-avoidable liens in existence on the Petition Date, or to valid liens in existence on the Petition Date that are perfected subsequent to the Petition Date as permitted by Section 546(b) of the Bankruptcy Code, which assets, if applicable, include, without limitation, all inventory, accounts receivable, general intangibles, chattel paper, owned real estate, if any, real property leaseholds, fixtures, machinery and equipment, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements, and other intellectual property and capital stock of subsidiaries of the Debtors, but excluding

13

Avoidance Actions, provided that the proceeds of Avoidance Actions (including, without limitation, assets as to which liens are avoided) are included within "DIP Collateral;"

(b)    pursuant to Section 364(d) of the Bankruptcy Code, valid, perfected, enforceable and non-avoidable first priority senior priming liens on and security interests in all of the Debtors' assets, including, without limitation, all inventory, accounts receivable, general intangibles, chattel paper, owned real estate, if any, real property leaseholds, fixtures, machinery and equipment, deposit accounts, patents, copyrights, trademarks, trade names, rights under license agreements, and other intellectual property and capital stock of subsidiaries of the Debtors that is subject, as of the Petition Date, to any existing lien, right or interest, including liens pursuant to the Prepetition Facility and any other indebtedness or obligations secured by an existing lien on the property of any of the Debtors, (other than the liens of (i) US Bancorp in respect of 1 Industrial Equipment Faroarm 8ft. w/ 7ft AX, and (ii) State of California, Division of Corporation Franchise Tax[2] (together, the "Permitted Liens") solely to the extent the Permitted Liens are properly perfected and duly enforceable), all of which existing liens, rights and interests (the "Primed Liens") shall be primed by and made subject and subordinate to the perfected first-priority senior liens to be granted to the DIP Lender.

10.    Adequate Protection Liens.    To provide adequate protection for the Debtors' use of the Prepetition Lender's Cash Collateral, the Prepetition Lender shall have, and is granted, a replacement lien and security interest upon all assets of the Debtors that are subject to the Prepetition Liens, and the proceeds, products and profits thereof, with such replacement lien having the same validity, priority and enforceability as the Prepetition Liens had immediately prior to the Petition Date (the "Replacement Lien"). Without limiting the foregoing,

---

[2] The Debtors dispute their liability to the State of California and the validity, priority and extent, if any, of the liens asserted by the State of California.

the Replacement Lien shall be junior to the lien granted to the DIP Lender upon the DIP Collateral to secure the Obligations under the DIP Credit Agreement.

11.     <u>Further Assurances</u>. In furtherance of the foregoing and without further notice, motion or application to, order of, or hearing before, the Court, each of the Debtors is authorized and directed to perform all acts and to execute and deliver all instruments and documents that the DIP Lender and Prepetition Lender determine to be reasonably required or necessary for such Debtor's performance of its obligations under the DIP Credit Agreement, the other Loan Documents and this Interim Order, including, without limitation:

(i)     the execution and delivery of, and performance of the transactions contemplated by, the Loan Documents;

(ii)     to the extent not explicitly prohibited by this Interim Order, the execution, delivery and performance of one or more amendments, waivers, consents or other modifications to and under the Loans, in each case in such form as the Debtors and the DIP Lender may agree;

(iii)     the payment to the DIP Lender and Prepetition Lender of the Obligations and the Prepetition Loan Obligations and other amounts payable under this Interim Order as and when due; and

(iv)     the prompt performance of all other acts required under or in connection with this Interim Order or the Loan Documents, including, without limitation, prompt delivery to the DIP Lender and the Prepetition Lender (and their respective professionals) of such reporting and financial information and access to the Debtors' books and records, in each case as

15

may be reasonably requested by them from time to time and as required under the Loan Documents.

12.    <u>No Other Liens</u>.  Except for the Permitted Liens, no Lien having a priority superior to, or *pari passu* with, the Lien granted upon the DIP Collateral to secure the Obligations or the Replacement Lien granted as adequate protection for the use of the Prepetition Lender's Cash Collateral, and no claim having priority superior to, or or *pari passu* with, the Super-Priority Claim, shall be granted or allowed until the indefeasible payment in full, in cash, of the Obligations and the Prepetition Loan Obligations.

13.    <u>Adequate Protection Payments</u>.  To provide additional adequate protection for the Debtors' use of the Prepetition Lender's Cash Collateral, the Borrower shall pay to the Prepetition Lender, the current cash payment of interest at the non-default rates and at the times provided for in the Prepetition Facility, whether or not such interest payments are included in the Budget.  In the event that this Court subsequently determines that the Prepetition Lender is undersecured, then any payments authorized under this paragraph shall be applied to reduce the outstanding principal balance owed to the Prepetition Lender.

14.    <u>Sale Proceeds and Tax Refunds</u>.  All cash proceeds realized by the Debtors from (i) the Sale or (ii) "<u>Tax Refunds</u>" (as defined in the DIP Credit Agreement) shall be used by the Debtors, first, to repay all Obligations outstanding under the DIP Credit Facility and, second, to repay all obligations outstanding under the Prepetition Facility.

15.    <u>Waiver of 506(c) Claims Against DIP Lender and Prepetition Lender</u>. Except for the Carve-Out (as defined below), no costs or expenses of administration that have been, or may hereafter be, incurred in the Cases or in any subsequently converted case under

16

Chapter 7 of the Bankruptcy Code shall be charged or asserted by Debtors (or a Chapter 7 Trustee) against the DIP Lender, the Prepetition Lender or their respective collateral, pursuant to Section 105 or Section 506(c) of the Bankruptcy Code or otherwise without the prior written consent of the DIP Lender or the Prepetition Lender (and no such consent shall be implied from any other action, inaction or acquiescence by the DIP Lender or the Prepetition Lender).

          16.    <u>Lien Perfection</u>. This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of all of the liens and security interests in and upon the DIP Collateral and the Replacement Lien granted pursuant to this Interim Order or the Loan Documents, without the necessity of (a) filing, recording or serving any financing statements, documents or instruments that may otherwise be required under federal or state law in any jurisdiction (collectively, the "<u>Lien Recording Documents</u>"), (b) taking possession of any collateral or evidence thereof (<u>provided</u> that, without limiting the foregoing, any third party in possession of any DIP Collateral, is hereby deemed a bailee for the benefit of and on behalf of the DIP Lender) or (c) taking any other action to validate or perfect the liens, and security interests granted in this Interim Order or the Loan Documents. If the DIP Lender shall, in its discretion, elect to file any Lien Recording Documents, the Debtors are authorized and directed to execute, or cause to be executed, all such Lien Recording Documents upon the DIP Lender's request and the filing, recording or service thereof (as the case may be) of such Lien Recording Documents shall be deemed to have been made at the time of and on the Petition Date. The DIP Lender may, in their discretion, file a certified copy of this Interim Order in any filing or recording office in any county or other jurisdiction in which the Debtors have an interest in real or personal property and, in such event, the subject filing or recording officer is authorized and directed to file or record such certified copy of this Interim Order. To the extent that any

17

applicable non-bankruptcy law would otherwise restrict the grant, scope, enforceability, attachment or perfection of the liens, mortgages, deeds of trust, deeds to secure debts and security interests authorized or created hereby, or otherwise would impose filing or registration requirements with respect thereto, such law is preempted to the maximum extent permitted by the Bankruptcy Code, applicable federal law, and the judicial power of the Court.

17.    <u>Nullifying Pre-Petition Restrictions on Post-Petition Lien Grants</u>. Notwithstanding anything to the contrary contained in any pre-petition agreement, contract, lease, document, note or instrument to which any Debtor is a party or under which any Debtor is obligated, any provision that restricts, limits or impairs in any way any Debtor's ability or right to grant liens or security interests upon any of the DIP Collateral (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) shall not be effective and shall be unenforceable against any such Debtor or the DIP Lender to the maximum extent permitted under the Bankruptcy Code.

18.    <u>Maintenance of Collateral</u>. Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the respective collateral of the DIP Lender or the Prepetition Lender except as otherwise provided for in the DIP Credit Agreement, the Loan Documents, this Interim Order or further Order of the Court.

19.    <u>Modification of Automatic Stay</u>. After the occurrence of an Event of Default, the DIP Lender and the Prepetition Lender may give notice in writing (such notice, an "<u>Exercise Remedies Notice</u>,"), served by hand, telefax or electronically by the DIP Lender and Prepetition Lender upon the Court, the Debtors' counsel, counsel to the "<u>Creditors Committee</u>" (as defined in the DIP Credit Agreement), if any, any trustee of the Debtors appointed under

18

Chapter 7 or 11 of the Bankruptcy Code, and the U.S. Trustee, and filed on the Court's docket. Five business days after the giving of an Exercise Remedies Notice, the DIP Lender, following a hearing on expedited notice, may seek to terminate the automatic stay provisions of Section 362 of the Bankruptcy Code to the extent necessary to permit the DIP Lender and Prepetition Lender to take any and all actions and enforce all remedies that they may deem appropriate to proceed against and realize upon their respective collateral and obtain the full and indefeasible repayment of the Obligations and the obligations arising under the Prepetition Facility, in each case without further notice, application or motion to, or order from the Court, and neither Section 105 of the Bankruptcy Code nor any other provision of the Bankruptcy Code or applicable law shall be utilized to prohibit the exercise, enjoyment and enforcement of such rights, benefits, privileges and remedies by the DIP Lender and Prepetition Lender regardless of any change in circumstances (whether or not foreseeable).  In no event shall the DIP Lender or the Prepetition Lender be subject to the equitable doctrine of marshaling or any similar doctrine arising from the exercise of their respective rights under the DIP Credit Agreement or the Prepetition Facility.

20.    <u>Reservation of Rights</u>. Except as specifically provided herein, entry of this Interim Order shall not be deemed to prejudice any and all rights, remedies, claims, causes of action and defenses the DIP Lender or Prepetition Lender may have against and shall not in any way constitute: (a) impairment of the right of the DIP Lender or Prepetition Lender to file a motion for relief from stay, a motion or request for other relief, including but not limited to commencing any adversary proceeding in the Cases; (b) agreement, consent, or acquiescence to the terms of any plan of reorganization; (c) impairment of any other rights, remedies or defenses available to the DIP Lender or Prepetition Lender, including the right to respond to any motion, application, proposal, or other action, or (d) modification of any rights or remedies that the DIP

19

Lender or Prepetition Lender may have against any other person or entity under the Bankruptcy Code or applicable law. All rights, remedies, claims, causes of action and defenses are specifically reserved by the DIP Lender and Prepetition Lender.

21.    <u>No Liability to Third Parties</u>. In making decisions to advance loans to the Debtors, in administering any loans, in approving any budget, consenting to the use of Cash Collateral or in taking any actions permitted by this Interim Order or the Loan Documents, as applicable, the DIP Lender and Prepetition Lender shall not (i) be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 <u>et seq</u>., as amended, or any similar federal or state statute) or (ii) owe any fiduciary duty to any Debtor, its respective creditors or its respective estate, and their relationship with each Debtor shall not constitute nor be deemed to constitute a joint venture or partnership with such Debtor.

22.    <u>No Implied Waiver</u>. The failure, at any time or times hereafter, of the DIP Lender or Prepetition Lender to require strict performance by the Debtors of any applicable provision of this Interim Order or the Loan Documents shall not waive, affect or diminish any right of such parties thereafter to demand strict compliance and performance therewith. No delay on the part of DIP Lender or Prepetition Lender in the exercise of any right or remedy under this Interim Order or the Loan Documents shall preclude any other or further exercise of any such right or remedy or the exercise of any other right or remedy. None of the rights or remedies of the DIP Lender or Prepetition Lender under this Interim Order or the Loan Documents shall be deemed to have been amended, modified, suspended or waived unless such amendment,

20

2556533-2

modification, suspension or waiver is in writing and signed by the DIP Lender or Prepetition Lender against whom such amendment, modification, suspension or waiver is sought.

23.    <u>No Lien Alteration</u>. The receipt by the Debtors of any proceeds of the DIP Collateral, Tax Refunds or proceeds of other collateral securing the Prepetition Loan Obligations shall not affect, alter, or otherwise modify the validity, priority or perfection of any liens upon and security interests in and/or claims against such proceeds, and such liens and claims shall continue to exist in and against such proceeds in the possession of the Debtors, in each case with the same validity, priority and perfection as existed immediately prior to such receipt by the Debtors.

24.    <u>Binding Effect of this Interim Order and the Loan Documents</u>.

(a)    The Debtors irrevocably waive any right to seek any modifications of this Interim Order without the prior written consent of the DIP Lender and Prepetition Lender, and no such consent shall be implied by any other action, inaction or acquiescence by the DIP Lender.

(b)    The provisions of this Interim Order and any actions taken pursuant hereto shall survive entry of any order that may be entered converting any of the Cases to a Chapter 7 case, dismissing any of Cases (in the case of any such dismissal, to the maximum extent permitted under the Bankruptcy Code and other applicable law), changing the venue of any of the Cases to any court other than the Court, or any order that may be entered confirming or consummating any plan of reorganization of the Debtors; and the terms and provisions of this Interim Order, as well as the priorities in payment, liens and security interests granted pursuant to this Interim Order shall continue in this or any superseding case under the Bankruptcy Code, and such priorities in payment, liens and security interests shall maintain their priority as

21

provided by this Interim Order until all the Obligations and Prepetition Loan Obligations are indefeasibly paid and satisfied in full in cash; provided that all obligations and duties of the DIP Lender hereunder, under the Loan Documents or otherwise with respect to any future loans and advances or otherwise shall terminate immediately upon the Termination Date, unless the DIP Lender has given its express prior written consent thereto.

(c)     The provisions of this Interim Order and the DIP Documents shall be binding upon all parties-in-interest in these cases, including, without limitation, the Debtors, the DIP Lender, the Prepetition Lender, and the Creditor's Committee, if appointed, and their respective successors and assigns (including, to the fullest extent permitted by applicable law, any Chapter 7 or Chapter 11 trustee hereinafter appointed or elected for any Debtor's estate, an examiner appointed pursuant to Section 1104 of the Bankruptcy Code or any other fiduciary hereafter appointed as a legal representative of any Debtor or with respect to the property of any Debtor's estate) and shall inure to the benefit of the DIP Lender and its successors and assigns.

25.     Good Faith. The terms of the financing arrangements and use of Cash Collateral among the Debtors, the DIP Lender and Prepetition Lender have been negotiated in good faith and at arms' length among the Debtors and the DIP Lender, and any loans, advances or other financial accommodations that are made or caused to be made to the Debtors by the DIP Lender and the Prepetition Lender pursuant to the Loan Documents and this Interim Order are deemed to have been made and provided in good faith, as the term "good faith" is used in Section 364(e) of the Bankruptcy Code, and shall be entitled to the full protection of Section 364(e) of the Bankruptcy Code in the event that this Interim Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

26.     <u>Termination Date</u>. The authorization of the Debtors to obtain loans or other financial accommodations from the DIP Lender in accordance with the Loan Documents and to use the Prepetition Lender's Cash Collateral in accordance with this Interim Order shall automatically terminate, without further order or relief from this Court, upon the earliest to occur of the following (the "<u>Termination Date</u>"): (i) February 8, 2010, unless this Court shall have entered a Final DIP Order in form and substance satisfactory to the DIP Lender and Prepetition Lender on or before that date, or such later date as the DIP Lender and Prepetition Lender have consented to in writing; or (ii) an Event of Default.  All of the rights remedies and benefits provided to the DIP Lender and the Prepetition Lender under this Interim Order shall survive the Termination Date.

27.     <u>Carve-Out</u>.

(a)     Subject to the terms and conditions contained in this paragraph, the liens and security interests in the DIP Collateral to secure the Obligations and the Prepetition Liens shall be subordinate to the following: (i) amounts payable pursuant to 28 U.S.C. § 1930, (ii) allowed reasonable fees and expenses of attorneys, accountants and other professionals retained in the Cases pursuant to Sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code (the "Professionals"), in an aggregate amount not to exceed the amount set forth in the Budget for such fees and expenses, and (iii) the Transaction Fee payable to Bayshore Partners, LLC pursuant to its engagement letter (collectively, the "<u>Collateral Carve-Out</u>").

(b)     Subject to the terms and conditions contained in this paragraph, the Super-Priority Claim shall be subordinate to the following: (i) amounts payable pursuant to 28 U.S.C. § 1930, (ii) allowed reasonable fees and expenses of the Professionals, (iii) any break fee or expense reimbursement allowed by this Court in connection with the Asset Purchase Agreement

23

between Protective Products Enterprises, Inc. and the Debtors, dated January 13, 2010 (the "APA"), not to exceed the respective amounts set forth in the APA for such fees and expenses, and (iv) the Transaction Fee payable to Bayshore Partners, LLC pursuant to its engagement letter (collectively, the "Super-Priority Claim Carve-Out").

(c)     Notwithstanding anything in this Order, the Budget, or the Collateral Carve-Out and the Super-Priority Carve-Out (collectively the "Carve-Out") to the contrary, the Debtors, the Professionals, any Chapter 7 Trustee or Chapter 11 Trustee, or any other person or entity, shall not use the proceeds of the Loans or Cash Collateral, or receive the benefit of the Carve Out, for payment or reimbursement of any fees or expenses incurred in connection with any (i) challenge, contest, objection to or dispute regarding the extent, validity, priority or enforceability of, or any attempt to avoid, as the case may be (A) the "Liens" (as defined in the DIP Credit Agreement) securing the Loans or the Prepetition Liens, (B) the amounts owed to the DIP Lender or the Prepetition Lender in respect of the Loans and the Prepetition Facility (other than disputes limited solely to manifest errors in mathematical calculation), or (C) repayment of the Loans or the Prepetition Facility, (ii) objection or attempt to prevent, hinder, or delay the DIP Lender or Prepetition Lender from asserting or enforcing any Lien, claim, right or defense, (iii) request that the payment of the respective claims of the Lender or the Prepetition Lender, or the Liens securing their respective claims, be subordinated to the payment or Liens of any other creditor or party in interest, (iv) commencement or prosecution of any action or proceeding regarding any claims, causes of action, or defenses against the DIP Lender or the Prepetition Lender, or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns, or successors, or (v) any act that has or could have the effect of materially and adversely modifying or compromising the rights and remedies of the DIP Lender or the Prepetition Lender,

24

provided that the Carve-Out may be used by the Professionals employed by the Creditor's Committee to investigate (but not to assert) any claims and defenses against the Prepetition Lender.

(d)     Payment of any claims or expenses within the Carve-Out shall not reduce the Obligations or the Prepetition Loan Obligations.  The DIP Lender and the Prepetition Lender are not responsible for the direct payment or reimbursement of any fees or expenses within the Carve-Out and do not guaranty that any of the Debtors have sufficient funds to pay such fees or reimburse such expenses.

(e)     So long as no Termination Event has occurred, the Debtors are authorized to use the Post-Petition Advances and the Cash Collateral in accordance with and limited to the amounts in the Budget to pay such compensation and expense reimbursements of professional persons retained by the Debtors (the "Debtor Professionals") and any  professional persons retained by any Creditors' Committee appointed by the United States Trustee (the "Committee Professionals") as may be awarded by the Court pursuant to Section 328, 330 or 331 of the Bankruptcy Code (the "Professional Expenses").  The Debtor Professionals and the Committee Professionals, if any, shall be permitted to submit to the Debtors, with copies to counsel for the DIP Lender, periodic statements (but no more frequently than on a monthly basis) for services rendered and reimbursable expenses incurred by them (the "Conditional Professional Expenses").  The DIP Lender shall advance commencing on Monday, February 1, 2010 and continuing each Monday thereafter, the amounts set forth in the Budget, and allocated for such fees and expenses; said funds shall be advanced by wire transfer to and segregated and escrowed in an escrow account maintained by counsel for the Debtors for payment to the Committee Professionals and the Debtor Professionals, in accordance with the procedures which may be

25

approved by the Court for the payment of professionals (the "Professional Expense Escrow").

Funds deposited in the Professional Expense Escrow shall be available and may be used solely

for the payment of the Conditional Professional Expenses and the Professional Expenses (to the

extent not previously paid). DIP Lender shall have a first priority lien on all funds in the

Professional Expense Escrow and any amounts not payable to any Professionals shall be returned

to DIP Lender for application on account of the Obligations. Nothing in this subparagraph shall

prejudice or impair the rights of either the Debtors' Professionals or the Committee's

Professionals to request an award of compensation in excess of the amounts set forth in the

Budget (the "Unbudgeted Professional Expenses") or the rights of the DIP Lender to object to

the amount or reasonableness of the Professional Expenses or the Unbudgeted Professional

Expenses. In no event, however, shall the DIP Lenders be responsible for the payment of

Unbudgeted Professional Expenses or any amounts in excess of the Carve-Out nor shall any of

the Collateral be surcharged, under Section 506(c) or any other provision of the Bankruptcy

Code or otherwise, for the payment of Unbudgeted Professional Expenses or any other

Professional Expenses not subject to the Carve-Out. Any claim for Unbudgeted Professional

Expenses shall be subordinate to the Superpriority Claims granted to the DIP Lenders and Pre-

Petition Lenders pursuant to paragraphs 14 and 15 of this Order. Notwithstanding the foregoing,

nothing herein shall be deemed as a consent to the allowance of the fees or expenses of any

professionals retained by the Debtor or the Creditors' Committee or a waiver of the rights of the

Pre-Petition Lenders or the DIP Lenders to object to any requests for allowance of any fees or

expenses.

28.     No Modification or Stay of Interim Order. Based on the findings set forth

in this Interim Order, in consideration for the financing provided under the DIP Credit Facility

and the Prepetition Lender's consent to the use of its Cash Collateral, the DIP Lender and Prepetition Lender are entitled to, and granted, the full rights, benefits, privileges and protections of, and provided by, Section 364(e) of the Bankruptcy Code with respect to the Obligations and Liens on the DIP Collateral, the Replacement Lien and the Super-Priority Claim and other rights, remedies and benefits created by this Interim Order, in the event that this Interim Order or any authorization or approval contained herein is subsequently stayed, vacated, reversed or modified on appeal. If any or all of the provisions of this Interim Order are hereafter reversed, modified, vacated or stayed, or if any order shall be entered by the Court converting any of the Cases to a case under Chapter 7 of the Bankruptcy Code, dismissing or closing any of the Cases such action or event shall not affect (a) the validity and enforceability of any Obligations incurred by the Debtors to the DIP Lender prior to the effective date of such action or (b) the validity or enforceability of any Lien or the Super-Priority Claim authorized or created under this Interim Order or pursuant to the Loan Documents, as applicable, which Obligations, Liens and Super-Priority Claim shall maintain their priority, validity and perfection unless and until all Obligations of the Debtors hereunder are indefeasibly paid in full.

29.    <u>Amendment</u>. The Debtors and the DIP Lender may amend, modify, supplement or waive any provision of the Loan Documents without further approval of the Court unless such amendment, modification, supplement or waiver (i) increases the interest rate (other than a result of the imposition of the default rate of interest specified in the DIP Credit Agreement), (ii) increases the "<u>Commitment</u>" (as defined in the DIP Credit Agreement), (iii) shortens the "<u>Maturity Date</u>" (as defined in the DIP Credit Agreement), or (iv) makes such other change as is materially adverse to the interests of the Debtors' estates.

27

30.    Rights of Creditors.  Nothing contained in this Interim Order or the Stipulations of the Debtor contained herein affects or impairs the rights of creditors, a Creditors Committee, if any, or other parties with standing (other than the Debtors) to challenge the validity, priority, extent or enforceability of the Prepetition Liens or any payment made to the Prepetition Lender before or after the Petition Date (a "Challenge"), provided that such Challenge is filed with the Court on or before 75 days after the date of the entry of this Interim Order (the "Challenge Deadline").  Any Challenge that is not filed timely, shall be deemed irrevocably waived and abandoned.

31.    Final Hearing. This matter is set for a Final Hearing at _____.m. on _____, 2010, in the United States Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, at which time any party-in-interest may appear and state its objections, if any, to the Motion. Objections shall be in writing and shall be filed with the Clerk of the Court, on or before _____, 2010, by 4:30 p.m., with a copy served upon:

(i)    counsel to the Debtors, Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn:  Jordi Guso, Esq.;

(ii)    counsel to the Committee;

(iii)    counsel to the Proposed Purchaser, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn: Patrick Nash and Paul Wierbicki and Greenberg Traurig, P.A., 1221 Brickell Avenue, Miami, Florida 33131, Attn: Scott Grossman; and

(iv)    the Office of the United States Trustee.

Any objections by creditors or any other party-in-interest to the Motion or any of the provisions of the post-petition financing arrangements among the Debtors and the DIP Lender shall be

28

deemed waived unless filed and received in accordance with the foregoing on or before the close of business on such date. In the event the Court modifies any of the provisions of this Interim Order at or following such Final Hearing, such modifications shall not affect (a) the rights and priorities of the DIP Lender and Prepetition Lender pursuant to this Interim Order with respect to the DIP Collateral, any Obligations arising prior to such modifications, the Replacement Lien, or the Super-Priority Claim to the extent of the incurrence of Obligations or the use of Cash Collateral or (b) any payments made to the DIP Lender or Prepetition Lender pursuant to the provisions of this Interim Order, and this Interim Order shall remain in full force and effect except as specifically modified at or following the Final Hearing.

32.     <u>Conflicting Provisions</u>. Unless otherwise provided in this Interim Order, to the extent the terms and conditions of the Loan Documents are in conflict with the terms and conditions of this Interim Order, the terms and conditions of this Interim Order shall control.

33.     <u>Successors and Assigns</u>. The provisions of this Interim Order shall be binding upon the DIP Lender, the Debtors and their respective successors and assigns, including any trustee appointed in the Cases, and shall inure to the benefit of the DIP Lender and its successors and assigns.

34.     <u>Effectiveness</u>. Notwithstanding any Bankruptcy Rule to the contrary, the terms and conditions of this Interim Order shall (a) be immediately enforceable, and (b) not be stayed absent the grant of such stay under Bankruptcy Rule 8005 after a hearing upon notice to the Debtors and the DIP Lender.

# # #

Submitted by:

Jordi Guso, Esq.
Berger Singerman, P.A.
200 South Biscayne Boulevard, Suite 1000
Miami, FL  33131
Tel.:  (305) 755-9500
Fax:  (305) 714-4340
Email:  jguso@bergersingerman.com

Copy furnished to:
Jordi Guso, Esq.
*(Attorney Guso is directed, pursuant to Local Rule 5005-1, to serve conformed copies of this Order upon all parties in interest, and to file a Certificate of Service with the Court confirming such service.)*

## **EXHIBIT A**

DIP Credit Agreement

**SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of January 13, 2010**

among

**PROTECTIVE PRODUCTS OF AMERICA, INC.**

as debtor and debtor-in-possession and as the Borrower,

**THE GUARANTORS NAMED HEREIN,**

each as debtor and debtor-in-possession,

**AND**

**CANADIAN IMPERIAL BANK OF COMMERCE**

as Lender

# TABLE OF CONTENTS

**Page**

ARTICLE I          DEFINITIONS AND ACCOUNTING TERMS ............................................. 2

    1.01    Defined Terms ............................................................................. 2

    1.02    Other Interpretive Provisions ................................................ 15

    1.03    Accounting Terms ................................................................. 16

    1.04    Rounding .............................................................................. 16

    1.05    Times Of Day ....................................................................... 16

ARTICLE II          THE LOANS ........................................................................... 16

    2.01    The Loans ............................................................................. 16

    2.02    Borrowing of the Loans ....................................................... 17

    2.03    Prepayments ........................................................................ 17

    2.04    Repayment of the Loans ...................................................... 18

    2.05    Interest ................................................................................. 18

    2.06    Fees and Expenses ............................................................... 18

    2.07    Computation Of Interest And Fees ...................................... 19

    2.08    Evidence Of Indebtedness .................................................... 19

    2.09    Payments .............................................................................. 19

    2.10    Security and Superpriority Claim ........................................ 19

ARTICLE III          TAXES AND YIELD PROTECTION ......................................... 20

    3.01    Taxes .................................................................................... 20

    3.02    Survival ................................................................................ 21

ARTICLE IV          CONDITIONS PRECEDENT TO LOANS ................................ 21

    4.01    Conditions Of Initial Borrowing .......................................... 21

    4.02    Conditions To All Borrowings ............................................. 23

ARTICLE V          AFFIRMATIVE COVENANTS ................................................ 24

    5.01    Statements ............................................................................ 24

    5.02    Certificates; Other Information ............................................ 24

    5.03    Notices ................................................................................. 26

    5.04    Preservation Of Existence; Business, Etc ............................ 26

    5.05    Maintenance Of Properties .................................................. 27

    5.06    Maintenance Of Insurance ................................................... 27

# TABLE OF CONTENTS
## (continued)

**Page**

| | | |
|---|---|---|
| 5.07 | Compliance With Laws | 27 |
| 5.08 | Books and Records | 27 |
| 5.09 | Inspection Rights | 27 |
| 5.10 | Use Of Proceeds; Maximum Cash-On-Hand | 27 |
| 5.11 | Compliance With Environmental Laws | 28 |
| 5.12 | Further Assurances | 28 |
| 5.13 | Compliance With Terms Of Leaseholds | 28 |
| ARTICLE VI | NEGATIVE COVENANTS | 28 |
| 6.01 | Liens | 28 |
| 6.02 | Indebtedness | 30 |
| 6.03 | Investments | 30 |
| 6.04 | Fundamental Changes | 31 |
| 6.05 | Dispositions | 31 |
| 6.06 | Restricted Payments | 31 |
| 6.07 | Change in Nature of Business | 32 |
| 6.08 | Transactions With Affiliates | 32 |
| 6.09 | Burdensome Agreements | 32 |
| 6.10 | Budget Compliance | 32 |
| 6.11 | Amendments Of Organization Documents | 32 |
| 6.12 | Accounting Changes | 32 |
| 6.13 | Partnerships, Etc | 32 |
| 6.14 | Speculative Transactions | 32 |
| 6.15 | Formation Of Subsidiaries | 32 |
| 6.16 | Other Action | 32 |
| ARTICLE VII | EVENTS OF DEFAULT AND REMEDIES | 33 |
| 7.01 | Events Of Default | 33 |
| 7.02 | Remedies Upon Event of Default | 37 |
| 7.03 | Application of Funds | 37 |
| ARTICLE VIII | MISCELLANEOUS | 38 |
| 8.01 | Amendments, Etc | 38 |

# TABLE OF CONTENTS
(continued)

**Page**

8.02    Notices and Other Communications; Facsimile Copies; ..................................... 38

8.03    No Waiver; Cumulative Remedies ..................................................... 40

8.04    Expenses; Indemnity; Damage; Waiver.................................................. 40

8.05    Payments Set Aside...................................................................... 41

8.06    Successors and Assigns Generally ..................................................... 42

8.07    Right of Setoff........................................................................... 42

8.08    Interest Rate Limitation ............................................................... 42

8.09    Counterparts; Integration; Effectiveness............................................. 42

8.10    Survival Of Representations and Warranties ....................................... 42

8.11    Severability ............................................................................. 43

8.12    USA Patriot Act Notice ............................................................... 43

8.13    Governing Law; Jurisdiction; Etc .................................................... 43

8.14    WAIVER OF JURY TRIAL............................................................ 44

SIGNATURES..................................................................................................................S-1

## **EXHIBITS**

Exhibit A            Budget
Exhibit B            Notice of Borrowing
Exhibit C            Compliance Certificate
Exhibit D            Interim Order

## **SCHEDULES**

Schedule 7.01(h)            Pension Plan Contributions

## <u>SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT</u>

    This SUPERPRIORITY PRIMING DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "<u>Agreement</u>") is entered into as of January 13, 2010, among **PROTECTIVE PRODUCTS OF AMERICA, INC.**, a Delaware corporation and a debtor and debtor in possession in a case pending under Chapter 11 of the Bankruptcy Code, as the borrower (the "<u>Borrower</u>"), the Guarantors party hereto, and **CANADIAN IMPERIAL BANK OF COMMERCE**, a Canadian chartered bank, as lender (the "<u>Lender</u>").

### PRELIMINARY STATEMENTS:

    1. On January 13, 2010 (the "<u>Filing Date</u>"), Borrower and each of its direct and indirect subsidiaries and certain of its affiliates filed voluntary petitions with the Bankruptcy Court initiating the Cases and have continued in the possession of their respective assets and in the management of their respective businesses pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

    2. Borrower has requested that the Lender provide a secured superpriority priming debtor-in-possession credit facility to the Borrower in the aggregate principal amount of up to $740,000 (the "<u>DIP Credit Facility</u>") having priority over all Existing Liens encumbering the Business Assets including Liens securing the Prepetition Facility (the "<u>Primed Liens</u>").

    3. The DIP Credit Facility shall be comprised of (a) an Operating Facility in an aggregate principal amount of up to $665,000, which can be drawn by the Borrower in installments as provided herein; and (b) a Wind Down Loan in the principal amount of up to $75,000.

    4. The proceeds of the Operating Loan will be used (i) to pay related fees and expenses associated with negotiation, execution and delivery of this Agreement and the other Loan Documents, (ii) for working capital and other general corporate purposes of the Loan Parties subject to the Budget and to the extent not prohibited hereunder, (iii) to pay fees and expenses of the Loan Parties' advisors and the advisors to any Creditor's Committee, in each case associated with the Cases, subject to the Budget and to the extent not prohibited hereunder, and incurred prior to the closing of the Sale, and (iv) to make any other payments permitted to be made in the Orders or in the First Day Orders or by the Bankruptcy Court to the extent permitted under the Budget and not prohibited by this Agreement, or as otherwise consented to by the Lender, other than in respect of wind down expenses post closing of the Sale.  The proceeds of the Wind Down Loan will be used to pay expenses of the administration of the Cases incurred after the closing of the Sale.

    In consideration of the premises and other valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

# ARTICLE I
## DEFINITIONS AND ACCOUNTING TERMS

1.01    <u>Defined Terms</u>.  As used in this Agreement, the following terms shall have the meanings set forth below:

"<u>Act</u>" has the meaning set forth in Section 8.12.

"<u>Affiliate</u>" means, with respect to any Person, any other Person Controlling, Controlled by or under common control with such particular Person.

"<u>Agreement</u>" means this Credit Agreement.

"<u>Avoidance Actions</u>" means any causes of action arising under Chapter 5 of the Bankruptcy Code, including, without limitation, any and all preference or avoidance claims of any of the Sellers, including, without limitation, all such claims and actions arising under Sections 544, 547, 548, 549 and 550, respectively, of the Bankruptcy Code, but excluding the proceeds realized from such claims and actions.

"<u>Bankruptcy Code</u>" means Title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Southern District of Florida, or such other court having jurisdiction over the Cases.

"<u>Bankruptcy Rules</u>" means the Federal Rules of Bankruptcy Procedure, the local rules of the Bankruptcy Court and the procedures and requirements of the UST.

"<u>Bid Procedures Order</u>" has the meaning assigned to it in Section 4.01(i).

"<u>Borrower</u>" has the meaning specified in the introductory paragraphs to this Agreement.

"<u>Borrowing</u>" means any borrowing or advance made to the Borrower by the Lender under the DIP Credit Facility or pursuant to a Notice of Borrowing.

"<u>Budget</u>" means, initially, the budget for the Loan Parties in form and substance satisfactory to the Lender and attached hereto as <u>Exhibit A</u>.

"<u>Business</u>" means the activities carried on by the Loan Parties, including the design, manufacturing, distribution and sale of products used for anti-ballistic and other protection for personnel and vehicles in the military and law enforcement markets.

"<u>Business Assets</u>" means all rights, titles and interests of every kind and nature of the Loan Parties (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise) of the Loan Parties, whether tangible or intangible, real, personal or mixed and wherever located and by whomever possessed.

"Business Day" means a day of the year on which banks are not required or authorized by law to close in the City of Toronto, Province of Ontario, Canada.

"Carve Out Expenses" means (i) amounts payable pursuant to 28 U.S.C. § 1930 and (ii) allowed reasonable fees and expenses of attorneys, accountants and other professionals retained in the Cases pursuant to Sections 327, 328, 330, 331 and 1103 of the Bankruptcy Code, in an aggregate amount not to exceed the amount set forth in the Budget for such fees and expenses.

"Capitalized Leases" means all leases that have been or should be, in accordance with GAAP, recorded as capitalized leases.

"Cases" means the cases of Borrower and the Guarantors currently pending under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Cash Collateral" means "cash collateral" as such term is defined in Section 363(a) of the Bankruptcy Code, or any successor provision.

"Cash Collateral Order" means to the extent such relief is not incorporated into the Interim Order or the Final DIP Order, a separate order authorizing the use of the Prepetition Lender's cash collateral, as defined in Section 363(a) of the Bankruptcy Code on terms and conditions acceptable to the Prepetition Lender in its sole discretion.

"Cash Equivalents" means any of the following types of Investments:

(a)      readily marketable obligations issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof having maturities of not more than 360 days from the date of acquisition thereof; provided that the full faith and credit of the United States of America is pledged in support thereof;

(b)      time deposits with, or insured certificates of deposit or bankers' acceptances of, any commercial bank that (i) (A) is a Lender or (B) is organized under the laws of the United States of America, any state thereof or the District of Columbia or is the principal banking subsidiary of a bank holding company organized under the laws of the United States of America, any state thereof or the District of Columbia, and is a member of the Federal Reserve System, (ii) issues (or the parent of which issues) commercial paper rated as described in clause (c) of this definition and (iii) has combined capital and surplus of at least $1,000,000,000, in each case with maturities of not more than 360 days from the date of acquisition thereof;

(c)      commercial paper in an aggregate amount of no more than $10,000,000 per issuer outstanding at any time issued by any Person organized under the laws of any state of the United States of America and rated at least "Prime-1" (or the then equivalent grade) by Moody's or at least "A-1" (or the then equivalent grade) by S&P, in each case with maturities of not more than 270 days from the date of acquisition thereof; and

(d)      Investments, classified in accordance with GAAP as Current Assets of any Loan Party, in money market investment programs registered under the Investment Company Act of 1940, which are administered by financial institutions that have the highest

rating obtainable from either Moody's or S&P, and the portfolios of which are limited solely to Investments of the character, quality and maturity described in clauses (a), (b) and (c) of this definition.

"Ceramic" means Ceramic Protection Corporation of America, a Delaware corporation and debtor and debtor in possession.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended.

"Change in Law" means the occurrence, after the date of this Agreement, of any of the following: (a) the adoption or taking effect of any law, rule, regulation or treaty, (b) any change in any law, rule, regulation or treaty or in the administration, interpretation or application thereof by any Governmental Authority or (c) the making or issuance of any request, guideline or directive (whether or not having the force of law) by any Governmental Authority.

"Change of Control" means, an event or series of events by which:

(a)     means, at any time (i) any Person or "group" (with the meaning of Rules 13d-3 and 13d-5 under the Exchange Act) shall have acquired beneficial ownership of the greater of 35% or more on a fully diluted basis of the voting and/or economic interests in the Equity Interests of the Borrower or (b) shall have obtained the power (whether or not exercised) to elect a majority of the members of the board of directors (or similar governing body) of the Borrower;

(b)     a majority of the members of the board of directors or other equivalent governing body of the Borrower cease to be composed of individuals who were members of that board or equivalent governing body on the Closing Date or who were approved by a majority of such directors; or

(c)     Borrower shall cease, directly or indirectly, to own and control legally and beneficially all of the Equity Interests in the Guarantors.

"Change of Management" means (i) at any time prior to the closing of the Sale, R. Patrick Caldwell, Jason Williams or Neil Schwartzman do not have the same positions and responsibilities with the Borrower, respectively, that such officers had as of the Filing Date, or (ii) any of the Borrower's board of directors are removed.

"Closing Date" means the first date all the conditions precedent in Section 4.01 are satisfied or waived in accordance with Section 8.03.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Collateral" means all of the "Collateral" and/or "DIP Collateral" referred to in the Orders or the Collateral Documents and all of the other property and assets that are or are intended under the terms of the Orders or the Collateral Documents to be subject to Liens in favor of the Lender; but expressly excluding the Avoidance Actions.

"Collateral Documents" means, collectively, the Orders, and any security agreement, pledge agreement, guaranty, mortgage, collateral assignment, security agreement supplement, deposit account control agreement or other similar agreement delivered to the Lender pursuant to or in connection with the Loans or this Agreement from time to time, and each of the other agreements, instruments or documents that creates or purports to create a Lien in favor of the Lender to secure the Loans; provided, however, that such agreements, instruments or documents shall not evidence or secure the Prepetition Facility.

"Commitment" means the commitment of Lender to make both the Operating Loan and Wind Down Loan in an aggregate amount not to exceed $740,000, subject to the terms and conditions of this Agreement.

"Company Intellectual Property" all Intellectual Property necessary for the operation of the Loan Parties' business as presently conducted.

"Compliance Certificate" means a certificate substantially in the form of Exhibit C.

"Contractual Obligation" means, as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "Controlling" and "Controlled" have meanings correlative thereto.

"CPC Holding" means CPC Holding Corporation of America, a Delaware corporation and debtor and debtor in possession.

"Creditor's Committee" means any official committee appointed in the Cases.

"Current Assets" means, with respect to any Person, all assets of such Person that, in accordance with GAAP, would be classified as current assets on the balance sheet of a company conducting a business the same as or similar to that of such Person, after deducting appropriate and adequate reserves therefrom in each case in which a reserve is proper in accordance with GAAP.

"Default" means any event or condition that constitutes an Event of Default or that, with the giving of any notice, the passage of time, or both, would be an Event of Default.

"Default Rate" means, with respect to any of the Obligations, an interest rate equal to the interest rate otherwise applicable to the Loans plus 3.0% per annum.

"Disposition" or "Dispose" means the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by any Person (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any Equity Interests owned by such

Person, or any notes or accounts receivable or any rights and claims associated therewith.

"Dollar" and "$" mean lawful money of the United States.

"Employee Benefit Plan" means any "employee benefit plan" (as defined in ERISA §3(3)) and any other benefit or compensation plan, program, agreement or arrangement maintained, sponsored, or contributed or required to be contributed to by a Loan Party or any ERISA Affiliate or with respect to which a Loan Party or any ERISA Affiliate has any Liability.

"Environmental Laws" means, whenever in effect, all federal, state, provincial, local and foreign statutes, Laws (including CERCLA and analogous state Laws), ordinances, directives and other provisions having the force or effect of law, all judicial and administrative orders and determinations, all contractual obligations and all common law, in each case concerning public health and safety, worker health and safety, or pollution or protection of the environment.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower, any other Loan Party directly or indirectly resulting from or based upon (a) violation of any Environmental Law, (b) the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Substances, (c) exposure to any Hazardous Substances, (d) the release or threatened release of any Hazardous Substances into the environment or (e) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Permit" means any permit, approval, identification number, license or other authorization required under any Environmental Laws.

"Equity Interests" means, with respect to any Person, all of the shares of capital stock of (or other ownership or profit interests in) such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of capital stock of (or other ownership or profit interests in) such Person, all of the securities convertible into or exchangeable for shares of capital stock of (or other ownership or profit interests in) such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including, without limitation, partnership, member or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

"ERISA Affiliate" means any trade or business (whether or not incorporated) under common control with any Loan Party within the meaning of Section 414(b) or (c) of the Code (and Sections 414(m) and (o) of the Code for purposes of provisions relating to Section 412 of the Code).

"ERISA Event" means (a) a Reportable Event with respect to a Pension Plan; (b)

a withdrawal by any Loan Party or any ERISA Affiliate from a Pension Plan subject to Section 4063 of ERISA during a plan year in which it was a substantial employer (as defined in Section 4001(a)(2) of ERISA) or a cessation of operations that is treated as such a withdrawal under Section 4062(e) of ERISA; (c) a complete or partial withdrawal by any Loan Party or any ERISA Affiliate from a Multiemployer Plan or notification that a Multiemployer Plan is in reorganization; (d) the filing of a notice of intent to terminate, the treatment of a Employee Benefit Plan amendment as a termination under Sections 4041 or 4041A of ERISA, or the commencement of proceedings by the PBGC to terminate a Pension Plan or Multiemployer Plan; (e) an event or condition which constitutes grounds under Section 4042 of ERISA for the termination of, or the appointment of a trustee to administer, any Pension Plan or Multiemployer Plan; (f) the imposition of any liability under Title IV of ERISA, other than for PBGC premiums due but not delinquent under Section 4007 of ERISA, upon any Loan Party or any ERISA Affiliate or (g) the failure of any Loan Party or any ERISA Affiliate to pay when due, after the expiration of any applicable grace period, any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan.

"Event of Default" has the meaning specified in Section 7.01.

"Exchange Act" means the Securities Exchange Act of 1934.

"Excluded Taxes" means, with respect to the Lender, Taxes imposed on or measured by its overall net income (however denominated), and franchise Taxes imposed on it (in lieu of net income Taxes), by the jurisdiction (or any political subdivision thereof) under the laws of which such recipient is organized or in which the Lender's Office is located.

"Existing Liens" means all Liens encumbering the Business Assets.

"Extraordinary Receipt" means any cash received by or paid to or for the account of any Person not included in a line item in the Budget or not in the ordinary course of business, including, without limitation, pension plan reversions, all tax refunds (including, without limitation, the Tax Refunds), proceeds of insurance, condemnation awards (and payments in lieu thereof), indemnity payments and any purchase price adjustments.

"Filing Date" has the meaning assigned in the recitals hereto.

"First Day Orders" has the meaning set forth in Section 4.01(f).

"Final DIP Order" means the Final DIP Order of the Bankruptcy Court in the Cases authorizing and approving this Credit Agreement and the other Loan Documents under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a final hearing, in form and substance satisfactory to the Lender.

"Foreign Lender" means any Lender that is not a "United States person" within the meaning of Section 7701(a)(30) of the Code.

"GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

"Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or taxing authority, or arbitral body.

"Guarantee" means, as to any Person, any (a) any obligation, contingent or otherwise, of such Person guaranteeing or having the economic effect of guaranteeing any Indebtedness payable by another Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of such Person, direct or indirect, (i) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness, (ii) to purchase or lease property, securities or services for the purpose of assuring the obligee in respect of such Indebtedness of the payment of such Indebtedness, (iii) to maintain working capital, equity capital or any other financial statement condition or liquidity or level of income or cash flow of the primary obligor so as to enable the primary obligor to pay such Indebtedness, or (iv) entered into for the purpose of assuring in any other manner the obligee in respect of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part), or (b) any Lien on any assets of such Person securing any Indebtedness of any other Person, whether or not such Indebtedness is assumed by such Person (or any right, contingent or otherwise, of any holder of such Indebtedness to obtain any such Lien). The amount of any Guarantee at any time shall be deemed to be an amount then equal to the stated or determinable amount of the related primary obligation, or portion thereof, in respect of which such Guarantee is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof as determined by the guaranteeing Person in good faith. The term "Guarantee" as a verb has a corresponding meaning.

"Guarantors" means, collectively, CPC Holding, Ceramic, PPIC, and PPNC each of which shall Guarantee the Obligations as set forth in the Orders.

"Hazardous Substances" means any wastes, pollutants, contaminants or chemicals, any industrial, toxic or otherwise hazardous materials, substances or wastes, any explosive or radioactive substances, and any other substance with respect to which Liability or standards of conduct may be imposed under applicable Law, including petroleum and petroleum related substances, products, by products and wastes, asbestos or asbestos containing materials, polychlorinated biphenyls, radon, urea, formaldehyde, mold, lead based paint, noise, odor and radiation.

"Indebtedness" means, without duplication, the aggregate amount of all obligations, liabilities and indebtedness of a Person which would be classified under GAAP as indebtedness for borrowed money upon the consolidated balance sheet of such Person, including without duplication, whether or not so classified, all long-term borrowings, the current portion of long-term borrowings, short-term borrowings, obligations under Capitalized Leases, obligations under any hedging agreement and all obligations, contingent or otherwise, of any of the foregoing arising from any Guarantee made by such Person in respect of any of the foregoing.

"Indemnified Taxes" means Taxes other than Excluded Taxes.

"<u>Indemnitee</u>" has the meaning specified in Section 8.04.

"<u>Intellectual Property</u>" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, divisionals, extensions and reexaminations thereof, (ii) trademarks, service marks, designs, trade dress, logos, slogans, trade names, internet domain names, corporate names, all applications, registrations and renewals in connection therewith, and all translations, adaptations, derivations and combinations of any of the foregoing, together with all goodwill associated with any of the foregoing, (iii) copyrights, mask works and copyrightable works, and all applications, registrations and renewals in connection therewith, (iv) trade secrets and confidential information (including formulations, ideas, research and development, information, know-how, inventions, technology, formulas, compositions, manufacturing and production processes and techniques, technical data, financial and marketing plans, customer and supplier lists and information, designs, drawings, plans, proposals and specifications), (v) computer software and systems (including source code, executable code, data, databases and related documentation), websites, URLs, email addresses, and telephone numbers, (vi) copies and tangible embodiments of any of the foregoing in whatever form or medium and (vii) other proprietary and intellectual property rights.

"<u>Interest Payment Date</u>" means the Maturity Date.

"<u>Interest Period</u>" means, with respect to (a) the Operating Loan, the period commencing on the Closing Date and ending on the applicable Maturity Date and (b) the Wind Down Loan, the period commencing on the funding of the Wind Down Loan and ending on the applicable Maturity Date.  Interest shall accrue from and including the first day of the Interest Period to but excluding the last day of the Interest Period.

"<u>Interim Order</u>" means the order of the Bankruptcy Court in the Cases in substantially the form attached hereto as <u>Exhibit D</u> authorizing and approving this Credit Agreement on an interim basis under Sections 364(c) and (d) of the Bankruptcy Code and entered at a preliminary hearing under Federal Rule of Bankruptcy Procedure 4001, in form and substance satisfactory to the Lender and the Borrower.

"<u>Investment</u>" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Equity Interests or debt of another Person, (b) a loan, advance or capital contribution to, Guarantee or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs debt of the type referred to in the definition of "Indebtedness" set forth in this Section 1.01 in respect of such Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit of, or all of a substantial part of the business being conducted by, such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"<u>Laws</u>" means, collectively, all international, foreign, federal, state and local

statutes, treaties, rules, guidelines, regulations, ordinances, codes and administrative or judicial precedents or authorities, including the interpretation or administration thereof by any Governmental Authority charged with the enforcement, interpretation or administration thereof, and all applicable administrative orders, directed duties, requests, licenses, authorizations and permits of, and agreements with, any Governmental Authority, in each case whether or not having the force of law.

"Lender" has the meaning specified in the introductory paragraph hereto.

"Lending Office" means the Lender's address, as set out in Section 8.02 (as may be changed pursuant thereto) and, as appropriate, the account maintained by the Lender identified in writing by the Lender to the Borrower.

"Liability" means any obligation or liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether determined or determinable, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes, product liability or infringement liability.

"Lien" means any mortgage, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other) or charge or preference or priority over assets or other security interest or preferential arrangement in the nature of a security interest of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, and any financing lease having substantially the same economic effect as any of the foregoing).

"Loans" means the Operating Loan and the Wind Down Loan and "Loan" means either of them.

"Loan Documents" means, collectively, this Agreement, the Collateral Documents and the Notice of Borrowing.

"Loan Parties" means, collectively, the Borrower and each Guarantor.

"Material Adverse Change" or "Material Adverse Effect" means, any event, change, condition or matter that, individually or in the aggregate is or could reasonably be expected to be materially adverse to, or materially impair the revenue or anticipated revenue of the Business or impairs the value of, the Business Assets or results in a material adverse effect or change in the operation, results of operations, condition (financial or otherwise) or prospects of the Business Assets or the Business, taken as a whole, or which materially impairs the ability of the Loan Parties to perform their obligations under the Agreement or any other Loan Document or has a material adverse effect on or prevents or materially delays the consummation of the transactions contemplated by the Loan Documents or impairs the rights or remedies of the Lender under any Loan Document.

"Material Customer" means the United States Marine Corps., Ibiley Manufacturing Corp. and Carter Enterprises LLC or any customer representing over ten percent (10%) of the aggregate revenue of the Loan Parties as of the date of determination.

"<u>Material Customer Termination Event</u>" means any material contract with any Material Customer is terminated or amended in a manner that is materially adverse to the Loan Parties.

"<u>Maturity Date</u>" means the Operating Loan Maturity Date or the Wind Down Loan Maturity Date, as applicable.

"<u>Maximum Rate</u>" has the meaning specified in Section 8.07.

"<u>Multiemployer Plan</u>" means any employee benefit plan of the type described in Section 4001(a)(3) of ERISA, to which any Loan Party or any ERISA Affiliate makes or is obligated to make contributions, or during the preceding five plan years, has made or been obligated to make contributions.

"<u>Net Cash Proceeds</u>" means with respect to any Disposition by any Loan Party, or any Extraordinary Receipt received or paid to the account of any Loan Party, the sum of cash and Cash Equivalents received in connection with such transaction (including any cash or Cash Equivalents received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received), net of the out-of-pocket expenses incurred by any Loan Party in connection with such transaction.

"<u>Notice of Borrowing</u>" means a written request by the Borrower for an advance under the Operating Loan or the Wind Down Loan, as applicable, substantially in the form of <u>Exhibit B</u>.

"<u>Obligations</u>" means all Borrowings, advances to, and debts, liabilities, obligations, covenants and duties of, any Loan Party arising under any Loan Document or otherwise with respect to the Loans, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including all Loans, interest, fees, expenses, charges and disbursements. Without limiting the generality of the foregoing, the Obligations of the Loan Parties under the Loan Documents include (a) the obligation to pay principal, interest, charges, expenses, fees, attorneys' fees and disbursements, indemnities and other amounts payable by any Loan Party under any Loan Document and (b) the obligation of any Loan Party to reimburse any amount in respect of any of obligation described in clause (a) that the Lender, in its sole discretion, may elect to pay or advance on behalf of such Loan Party.  In no event shall the term "Obligations" include any obligations of the Loan Parties under the Prepetition Facility.

"<u>Operating Loan</u>" means advances to the Borrower pursuant to Notices of Borrowing in an aggregate amount not to exceed $665,000 in accordance with this Agreement, the Budget and the Orders.

"<u>Operating Loan Maturity Date</u>" means the earliest of (i) February 26, 2010, (ii) the date of the closing of a Sale, (iii) the effective date of a Plan of Reorganization, as specified in such plan or plans, (iv) the date of the acceleration of the Operating Loan pursuant to Section 7.02, or (v) the dismissal, or conversion of one or more of the Cases to Chapter 7 of the Bankruptcy Code, pursuant to Section 1112 of the Bankruptcy Code.

"Orders" means the Interim Order, the Final DIP Order and, to the extent such relief is not incorporated into the Interim Order or the Final DIP Order, as applicable, the Cash Collateral Order.

"Organization Documents" means, (a) with respect to any corporation, the certificate or articles of incorporation and the bylaws (or equivalent or comparable constitutive documents); (b) with respect to any limited liability company, the certificate or articles of formation or organization and operating agreement; and (c) with respect to any partnership, joint venture, trust or other form of business entity, the partnership, joint venture or other applicable agreement of formation or organization and any agreement, instrument, filing or notice with respect thereto filed in connection with its formation or organization with the applicable Governmental Authority in the jurisdiction of its formation or organization and, if applicable, any certificate or articles of formation or organization of such entity.

"Other Taxes" means all present or future stamp or documentary Taxes or any other excise or property Taxes, charges or similar levies arising from any payment made under any Loan Document or from the execution, delivery or enforcement of, or otherwise with respect to any Loan Document.

"PBGC" means the Pension Benefit Guaranty Corporation.

"Pension Funding Rules" shall mean the rules of the Code and ERISA regarding minimum required contributions (including any installment payment thereof) to Pension Plans and Multiemployer Plans and set forth in, with respect to plan years ending prior to the effective date as to any such Plan of the Pension Protection Act of 2006, Sections 401(a)(29) and 412 of the Code and Part 3, Subtitle I, of Title I of ERISA each as in effect prior to the Pension Protection Act of 2006 and, thereafter, Sections 412 and 430 through 436 of the Code and Part 3, Subtitle I, of Title I of ERISA each as in effect from time to time.

"Pension Plan" means any "employee pension benefit plan" (as such term is defined in Section 3(2) of ERISA), other than a Multiemployer Plan, that is subject to Title IV of ERISA and is sponsored or maintained by any Loan Party or any ERISA Affiliate or to which any Loan Party or any ERISA Affiliate contributes or has an obligation to contribute, or in the case of a multiple employer or other plan described in Section 4064(a) of ERISA, has made contributions at any time during the immediately preceding five plan years.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan of Reorganization" means a plan of reorganization in respect of the Cases.

"PPIC" means Protective Products International Corp., a Florida corporation and debtor and debtor in possession.

"PPNC" means Protective Products of North Carolina LLC, a North Carolina limited liability company and debtor and debtor in possession.

"Prepetition Facility" means that certain Amended and Restated Credit

Agreement (as amended, restated, supplemented or otherwise modified from time to time (including any forbearance agreements thereto)), dated as of January 30, 2009, among Borrower and Canadian Imperial Bank of Commerce, as agent and lender, and all documents, instruments and agreements (including, without limitation, all collateral and security documents) executed or delivered in connection therewith (as the credit agreement and each other document, instrument and agreement has been amended, waived, modified, supplemented or restated prior to the Filing Date).

"Prepetition Lender" means Canadian Imperial Bank of Commerce as lender and agent under the Prepetition Facility.

"Primed Liens" has the meaning assigned in the recitals hereto.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the partners, directors, officers, employees, agents, sub-agents, servicers, trustees, attorneys and advisors of such Person and of such Person's Affiliates.

"Reportable Event" means any of the events set forth in Section 4043(c) of ERISA, other than events for which the 30-day notice period has been waived.

"Responsible Officer" means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer or other officer or manager of any Loan Party. Any document delivered hereunder that is signed by a Responsible Officer of a Loan Party shall be conclusively presumed to have been authorized by all necessary corporate, partnership and/or other action on the part of such Loan Party and such Responsible Officer shall be conclusively presumed to have acted on behalf of such Loan Party.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any capital stock or other Equity Interest of a Loan Party or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any such capital stock or other Equity Interest, or on account of any return of capital to a Loan Parties' stockholders, partners or members (or the equivalent of any thereof) other than to another Loan Party, or on account of any option, warrant or other right to acquire any such dividend or other distribution or payment.

"S&P" means Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. and any successor thereto.

"Sale" means the sale of the Loan Parties' assets pursuant to the Sale Order.

"Sale Order" means an order of the Bankruptcy Court authorizing the sale of substantially all of the assets of the Loan Parties to Sun Capital, or to a higher or better bidder pursuant to the Bid Procedures Order.

"SEC" means the Securities and Exchange Commission, or any Governmental Authority succeeding to any of its principal functions.

"Stalking Horse Bid" means the asset purchase agreement among Sun Capital and the Loan Parties for the purchase and sale of substantially all of the Loan Parties' assets, subject to entry of the Sale Order, or such other asset purchase agreement between the Loan Parties and a qualified third party entered into in accordance with the Bid Procedures Order and this Agreement.

"Sun Capital" means Protective Products Enterprises, Inc. or any Affiliate thereof submitting a Stalking Horse Bid.

"Superpriority Claim" means a claim under Section 364(c)(1) of the Bankruptcy Code against Borrower or any Guarantor in any of the Cases which is an administrative expense claim having priority over any or all administrative expenses, including, without limitation, administrative expenses of the kind specified in Sections 503(b), 506(c) or 507(b) of the Bankruptcy Code.

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated, gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock, franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, customs duty or other tax, governmental fee or other like assessment, charge or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (domestic or foreign) responsible for the imposition of any such tax, whether such Tax is disputed or not, (ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto).

"Tax Refunds" means the income tax refunds of the Loan Parties for the year ended December 31, 2006 (or any earlier or later period) from the United States Department of Treasury in connection with the Loan Parties' 2006 or 2007 form 1120X filings (or filings for any earlier or later period) as same may be adjusted from time to time, which income tax refunds are expected to be in the approximate aggregate amount of not less than $3,080,000, plus accrued interest thereon, and any other Tax refunds payable to the Loan Parties.

"Threshold Amount" means $100,000.

"Transaction" means the execution, delivery and performance by the Loan Parties of this Agreement and the other Loan Documents to which they may be a party, the creation of the Liens in the Collateral in favor of the Lender, the borrowing of the Loans and the use of the proceeds thereof.

"UCC" means the Uniform Commercial Code then in effect in each applicable jurisdiction.

"Unaccrued Indemnity Claims" means claims for indemnification that may be asserted by the Lender or any other Indemnitee under the Loan Documents that are unaccrued and contingent.

"United States" and "U.S." mean the United States of America.

"UST" means the United States Trustee appointed to serve in the Cases.

"Variance Report" has the meaning specified in Section 5.01(b).

"Wind Down Loan" means an advance to the Borrower pursuant to a Notice of Borrowing in an amount not to exceed $75,000 to be used to pay expenses of the administration of the Cases incurred after the closing of the Sale.

"Wind Down Loan Maturity Date" means the earliest of (i) March 31, 2010, (ii) the date of the receipt by Borrowers of the Tax Refunds, (iii) the effective date of a Plan of Reorganization, as specified in such plan or plans, (iv) the date of the acceleration of the Wind Down Loan pursuant to Section 7.02, or (v) the dismissal, or conversion of one or more of the Cases to Chapter 7 of the Bankruptcy Code, pursuant to Section 1112 of the Bankruptcy Code.

1.02    Other Interpretive Provisions.  With reference to this Agreement and each other Loan Document, unless otherwise specified herein or in such other Loan Document:

(a)    The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "or" is not exclusive.  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise, (i) any definition of or reference to any agreement, instrument or other document (including any Organization Document) shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein or in any other Loan Document), (ii) any reference herein to any Person shall be construed to include such Person's successors and assigns, (iii) the words "herein," "hereof" and "hereunder," and words of similar import when used in any Loan Document, shall be construed to refer to such Loan Document in its entirety and not to any particular provision thereof, (iv) all references in a Loan Document to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, the Loan Document in which such references appear, (v) any reference to any law shall include all statutory and regulatory provisions consolidating, amending replacing or interpreting such law and any reference to any law or regulation shall, unless otherwise specified, refer to such law or regulation as amended, modified or supplemented from time to time, and (vi) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

(b)      In the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including;" the words "to" and "until" each mean "to but excluding;" and the word "through" means "to and including."

(c)      Section headings herein and in the other Loan Documents are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other Loan Document.

1.03    Accounting Terms.

(a)      Generally.  All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, GAAP applied on a consistent basis, as in effect from time to time, except as otherwise specifically prescribed herein.

(b)      Changes in GAAP.  If at any time any change in GAAP would affect the computation of any financial ratio or requirement set forth in any Loan Document, and either the Loan Party or the Lender shall so request, the Lender and the Loan Party shall negotiate in good faith to amend such ratio or requirement to preserve the original intent thereof in light of such change in GAAP (subject to the approval of the Lender); provided that, until so amended, (i) such ratio or requirement shall continue to be computed in accordance with GAAP prior to such change therein and (ii) the Loan Party shall provide to the Lender financial statements and other documents required under this Agreement or as reasonably requested hereunder setting forth a reconciliation between calculations of such ratio or requirement made before and after giving effect to such change in GAAP.

1.04    Rounding.  Any financial ratios required to be maintained by the Loan Party pursuant to this Agreement shall be calculated by dividing the appropriate component by the other component, carrying the result to one place more than the number of places by which such ratio is expressed herein and rounding the result up or down to the nearest number (with a rounding-up if there is no nearest number).

1.05    Times Of Day.  Unless otherwise specified, all references herein to times of day shall be references to Eastern time (daylight or standard, as applicable).

## ARTICLE II
## THE LOANS

2.01    The Loans.

(a)      Subject to the terms and conditions of this Agreement, and during the term of this Agreement, the Lender agrees to make the Loans to the Borrower pursuant to Notices of Borrowing as follows: (i) the first Notice of Borrowing shall be in an amount not to exceed the amount of the Operating Loan authorized to be available to the Borrower pursuant to the Interim Order, (ii) the second Notice of Borrowing shall be in an amount not to exceed the unfunded portion of the Operating Loan, if any, authorized to be available to the Borrower pursuant to the Final Order, and (iii) the third Notice of Borrowing shall be in an amount not to

exceed the amount of the Wind Down Loan; provided that under no circumstance shall Lender be required to advance to the Borrower pursuant to Notices of Borrowing an aggregate amount greater than the sum of the principal amounts of the Operating Loan and Wind Down Loan.

(b)    Amounts borrowed pursuant to this Section 2.01 that are repaid subject to the terms and conditions of this Agreement may not be reborrowed at any time during the term of this Agreement.

(c)    Notwithstanding anything to the contrary contained in this Agreement, the Lender shall not be required to advance the Wind Down Loan to the Borrower if (i) the amount of the proceeds realized from the sale of assets pursuant to the Sale Order equal or exceed the aggregate of (x) the amount necessary to repay all Obligations arising under the Operating Loan, (y) the then outstanding amount owed in respect of the Prepetition Facility, and (z) $75,000, or (ii) the Loan Parties have received the Tax Refunds, and in each case of (i) or (ii), the Commitment shall be terminated.

2.02    Borrowing of the Loans.  Advances under the Loans shall be made upon the Borrower's irrevocable notice to the Lender pursuant to a written Notice of Borrowing, delivered not later than 1:00 p.m. on the Business Day prior to the requested date for the funding of Loans.  The Notice of Borrowing shall be appropriately completed and signed by a Responsible Officer of the Borrower.

2.03    Prepayments Optional.  The Borrower may, upon notice to the Lender at any time or from time to time, voluntarily prepay the Loans in whole or in part without premium or penalty; provided that (A) such notice must be received by the Lender not later than 1:00 p.m. one Business Day prior to any date of prepayment of the Loans; and (B) any partial prepayment shall be in a principal amount of $50,000 or a whole multiple of $50,000 in excess thereof or, if less, the entire principal amount thereof then outstanding. Each such notice shall specify the date and amount of such prepayment.  If such notice is given by the Borrower, the Borrower shall make such prepayment, the payment amount specified in such notice shall be due and payable on the date specified therein and each such prepayment shall be paid to the Lender.  Any repayment may not be re-borrowed.

(b)    Mandatory.

(i)    If any Loan Party Disposes of any Collateral (other than any Disposition of any Collateral permitted by Section 6.05 (b), (c), (d), (f), (g) or (h), the Borrower shall within one Business Day after receiving such proceeds prepay an aggregate principal amount of the Loans equal to 100% of such Net Cash Proceeds.

(ii)    Upon any Extraordinary Receipt received by or paid to or for the account of any Loan Party, and not otherwise included in clause (i) of this Section 2.03(b), the Borrower shall prepay an aggregate principal amount of the Loans equal to 100% of all Net Cash Proceeds received therefrom within one Business Day upon receipt thereof by any Loan Party.  Notwithstanding anything contained herein, the Loans shall be automatically and permanently reduced by the amount of any prepayments made or required to be made under this Section 2.03(b).

(iii)    Each prepayment of the Loans pursuant to this Section 2.03(b) shall be applied as follows: first, to reimburse the Lender for any reasonable costs and expenses incurred by it (including reasonable legal fees and expenses), and second, shall be applied to prepay the Loans outstanding at such time until the Loans and the Obligations (other than Unaccrued Indemnity Claims) are paid in full, the amount remaining, if any, after the prepayment in full of the Loans and Obligations may be retained by the Borrower for use in the ordinary course of its business, subject to the Orders, any other order of the Bankruptcy Court, the Bankruptcy Code and other applicable Laws.

2.04    Repayment of the Loans.  The Borrower shall repay to the Lender on the applicable Maturity Date the principal amount of the Operating Loan and Wind Down Loan, all interest accrued thereon, together with all other Obligations (other than Unaccrued Indemnity Claims) outstanding on such date.

2.05    Interest.Subject to the provisions of subsection (b) below, the Loans shall bear interest on the outstanding principal amount thereof for each Interest Period at a rate per annum equal to 14.0 %.

(b)    (i)    If any amount payable by any Loan Party under any Loan Document is not paid when due (with regard to any applicable grace periods), whether at stated maturity, by acceleration or otherwise, then such amount shall thereafter bear interest at the Default Rate to the fullest extent permitted by applicable Laws.

(ii)    Accrued and unpaid interest on past due amounts (including interest on past due interest) shall be due and payable upon demand.

(c)    Interest on the Loans shall be due and payable in arrears on the Maturity Date applicable thereto.  Interest hereunder shall be due and payable in accordance with the terms hereof.

2.06    Fees and Expenses.  (a)  On the Closing Date, the Borrower shall pay to the Lender from the proceeds of the initial Borrowing of the Operating Loan a commitment fee equal to 5.0 % of the amount of the Commitment.

(b)    Exit Fee.  The Borrower shall pay to the Lender an exit fee equal to 1.0 % of the Operating Loan or Wind Down Loan, as applicable, which exit fee shall be fully earned upon the Closing Date.

(c)    Expenses.  On the Closing Date, the Borrower shall pay to the Lender from the proceeds of the initial Borrowing of the Operating Loan all then accrued fees and expenses of the Lender arising under or relating to this Agreement, the Loan Documents and the Transaction (including the reasonable and documented fees and expenses of Blake, Cassels & Graydon LLP and Shutts & Bowen LLP).

2.07    Computation Of Interest And Fees.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.  Interest shall accrue on any Loan for the day on which the Loan is made, and shall not accrue on such Loan, or any

portion thereof, for the day on which the Loan or such portion is paid; provided that such Loan that is repaid on the same day on which it is made shall bear interest for one day. Each determination by the Lender of an interest rate or fee hereunder shall be conclusive and binding for all purposes, absent manifest error.

2.08    Evidence Of Indebtedness.    Any Loan made to the Borrower by the Lender shall be evidenced by one or more accounts or records maintained by the Lender in the ordinary course of business. The accounts or records maintained by the Lender shall be conclusive absent manifest error of the amount of such Loan made by the Lender to the Borrower and the interest and payments thereon. Any failure to so record or any error in doing so shall not, however, limit or otherwise affect the obligation of the Borrower hereunder to pay any amount owing with respect to the Obligations.

2.09    Payments Generally.    All payments to be made by the Borrower shall be made without condition or deduction for any counterclaim, defense, recoupment or setoff. All payments by the Borrower hereunder shall be made to the Lender, at the Lender's Lending Office in Dollars and in immediately available funds not later than 1:00 p.m. on the date specified herein. All payments received by the Lender after 1:00 p.m. shall be deemed received on the next succeeding Business Day and any applicable interest or fee shall continue to accrue.

(b)    Authorization.    The Borrower hereby authorizes the Lender, if and to the extent payment owed to the Lender is not made when due hereunder to charge from time to time against any or all of the Borrower's accounts with the Lender any amount so due. The Borrower hereby authorizes the Lender, from time to time without prior notice to the Borrower, to add all interest and fees (when due and payable), all fees and expenses required to be reimbursed by the Borrower under this Agreement and the other Loan Documents (as and when incurred), and all other payments as and when due and payable under any Loan Document, to the Loans, which amounts thereafter shall be included within the Loans and shall accrue interest at the rate then applicable to the Loans.

(c)    Insufficient Payment.    Whenever any payment received by the Lender under this Agreement or any of the other Loan Documents is insufficient to pay in full all amounts due and payable to the Lender under or in respect of this Agreement and the other Loan Documents on any date, such payment shall be applied by the Lender in the order of priority set forth in Section 8.03.

2.10    Security and Superpriority Claim.    Upon entry of the Interim Order or the Final DIP Order, whichever is then in effect, as security for the prompt payment and performance of all Obligations of the Loan Parties, the Loan Parties have granted, in accordance with the provisions of the Collateral Documents and the Interim Order or the Final DIP Order, whichever is then in effect, and Lender shall have, a security interest in all of the right, title and interest of the Loan Parties in and to all of the Collateral. This Agreement shall constitute a security agreement under the UCC. Additionally, upon entry of the Interim Order or the Final DIP Order, whichever is then in effect, the Lender shall have a Superpriority Claim for repayment of the Obligations. In the event and to the extent that the provisions of this Section 2.10 shall conflict with what is set forth in the Orders, the Orders shall govern.

## ARTICLE III
## TAXES AND YIELD PROTECTION

3.01    Taxes.

(a)    Any and all payments by or on account of any obligation of the Loan Parties hereunder or under any other Loan Document shall be made free and clear of and without reduction or withholding for any Indemnified Taxes or Other Taxes; provided that if the Borrower shall be required by applicable law to deduct any Indemnified Taxes (including any Other Taxes) from such payments, then (i) the sum payable shall be increased as necessary so that after making all required deductions (including deductions applicable to additional sums payable under this Section) the Lender receives an amount equal to the sum it would have received had no such deductions been made, (ii) the Loan Parties shall make such deductions and (iii) the Loan Parties shall timely pay the full amount deducted to the relevant Governmental Authority in accordance with applicable law.

(b)    Payment of Taxes By The Loan Parties.  Without limiting the provisions of subsection (a) above, the Loan Parties shall timely pay any Indemnified or Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(c)    Indemnification By The Borrower.  The Borrower shall indemnify the Lender, within 10 days after demand therefor, for the full amount of any Indemnified Taxes or Other Taxes (including Indemnified Taxes or Other Taxes imposed or asserted on or attributable to amounts payable under this Section 3.01) paid by the Lender, and any penalties, interest and reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes or Other Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Borrower by Lender shall be conclusive absent manifest error.

(d)    Evidence of Payments.  As soon as practicable after any payment of Indemnified Taxes or Other Taxes by the Loan Parties to a Governmental Authority, the Loan Parties shall deliver to the Lender the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Lender.

(e)    Status of Lender.  To the extent that the Lender is a Foreign Lender that is entitled to an exemption from or reduction of withholding Tax under the law of the jurisdiction in which the Borrower is resident for Tax purposes, any treaty to which such jurisdiction is a party, or the Bankruptcy Code with respect to payments hereunder or under any other Loan Document, such payments shall be made without withholding or at a reduced rate of withholding.

(f)    Compensation For Losses.  Upon demand of the Lender from time to time, the Borrower shall promptly compensate the Lender for and hold the Lender harmless from any loss, cost or expense incurred by it as a result of any failure by the Borrower (for a reason other than the failure of the Lender to make any Loan) to prepay or borrow the Loans on the date or in the amount notified by the Borrower; including any loss of anticipated profits and

any loss or expense arising from the liquidation or reemployment of funds obtained by it to maintain the Loans or from fees payable to terminate the deposits from which such funds were obtained.

        3.02    Survival.   This Article III shall survive repayment of all Obligations hereunder.

**ARTICLE IV**
**CONDITIONS PRECEDENT TO LOANS**

        4.01    Conditions Of Initial Borrowing.  The obligation of the Lender to fund the initial Borrowing of the Operating Loan to the Borrower is subject to satisfaction, or waiver in accordance with Section 8.03, of the following conditions precedent: The Lender shall have received each of the following, each of which shall be originals or telecopies (followed promptly by originals), each dated on or as of a recent date prior to the Closing Date, each in form and substance satisfactory to the Lender and in such number of copies as may be requested by the Lender:

           (i)     duly executed counterparts of this Agreement;

           (ii)    such duly executed certificates of resolutions or consents, incumbency certificates and/or other duly executed certificates of Responsible Officers of each Loan Party as the Lender may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents to which such Loan Party is a party or is to be a party;

           (iii)   such documents and duly executed certifications as the Lender may reasonably require to evidence that each Loan Party is duly organized or formed, and that each Loan Party is validly existing and in good standing in the jurisdiction where it is formed;

           (iv)   a certificate signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in Section 4.01 have been satisfied and (B) since December 29, 2009, there has been no change, event, circumstance or development that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect upon the Loan Parties, excluding their respective petitions for bankruptcy protection;

           (v)     the Budget; and

           (vi)    a Notice of Borrowing relating to the Loan;

        (b)     The Closing Date shall have occurred on or before January 20, 2010;

        (c)     All governmental authorizations and all third party consents and approvals necessary in connection with the Transaction and the other transactions contemplated

thereby shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Lender) and shall remain in effect; all applicable governmental filings shall have been made and all applicable waiting periods in connection with the Transaction shall have expired without, in either case, any action being taken by any Governmental Authority, and no Law or regulation shall be applicable in the reasonable judgment of the Lender that restrains, prevents or imposes materially adverse conditions upon the Transaction or the other transactions contemplated thereby or the rights of the Loan Parties freely to transfer or otherwise dispose of, or to create any Lien on, any properties now owned or hereafter acquired by any of them;

(d)     The Interim Order and Cash Collateral Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been amended, modified, stayed or reversed, without the prior written consent of the Lender;

(e)     All of the "first day orders" and related orders submitted on or about the date of the commencement of the Cases shall be in form and substance reasonably satisfactory to the Lender and, as entered, shall not deviate from the form thereof approved by the Lender in any material respect which is adverse to the interests of the Lender (such orders hereinafter being referred to as "First Day Orders");

(f)     The Lender shall have determined in its reasonable discretion that there has not occurred since December 29, 2009 any change, event, circumstance or development that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect, exclusive of the commencement of the Cases;

(g)     The Lender shall have been given access to all information it reasonably requests related to the Loan Parties, their business, customers, assets, liabilities, operations, financial condition and prospects (other than attorney-client privileged information) and the Loan Parties shall have made their advisors and senior management available to the Lender to discuss the same as the Lender may reasonably request;

(h)     The Loan Parties shall have received and, subject to Bankruptcy Court approval, accepted a Stalking Horse Bid in form and substance satisfactory to the Lender, to purchase all or substantially all of the assets and businesses of the Loan Parties, which bid provides for a purchase price consideration payable in cash in an amount not less than $8,000,000 with the closing of such transaction to occur on or before February 26, 2010;

(i)     There shall have been an order entered in the Cases, in form and substance satisfactory to the Lender, designating Sun Capital as the "stalking-horse" bidder to purchase all or substantially all of the Loan Parties' assets or businesses, pursuant to the asset purchase agreement dated as of January 13, 2010, which order (i) approves auction and sale procedures for the sale of such assets or businesses for a purchase price consideration payable in cash in an amount sufficient to repay in full all Obligations and all obligations owing under the Prepetition Facility, and (ii) provides that the hearing to approve such sale shall occur on or before February 19, 2010 (the "Bid Procedures Order");

(j)      There shall have been no amendment or revocation by any Loan Party of any of the Tax Refund documents and powers of attorney delivered by the Loan Parties to the Prepetition Lender and no Loan Party shall have taken any steps to do any of the foregoing;

(k)      The Orders shall contain a provision, in form and substance satisfactory to the Lender and the Prepetition Lender, providing for the payment of the Tax Refund to the Lender and the Prepetition Lender, to be applied against the Obligations and the obligations owing under the Prepetition Facility in accordance with this Agreement or as such parties may otherwise agree;

4.02    <u>Conditions To All Borrowings</u>.  In addition to the conditions set out in Section 4.01, the obligation of the Lender to fund any Borrowing to the Borrower under the DIP Credit Facility including the initial Borrowing of the Operating Loan is subject to satisfaction, or waiver in accordance with Section 8.03, of the following conditions precedent:

(a)      The representations and warranties of the Loan Parties contained in any Loan Document, or which are contained in any document furnished at any time under or in connection herewith or therewith, shall be true and correct in all material respects (provided that if any representation or warranty already includes a materiality or material adverse effect qualifier, such representation or warranty shall be true and correct in all respects) on and as of the date of such Borrowing, except to the extent that such representations and warranties specifically refer to an earlier date, in which case they shall be true and correct in all material respects (provided that if any representation or warranty already includes a materiality or material adverse effect qualifier, such representation or warranty shall be true and correct in all respects) as of such earlier date;

(b)      As of the date of the Loan, no Default or Event of Default has occurred and is continuing, or would result from such proposed Borrowing or from the application of the proceeds therefrom;

(c)      The Lender shall have received a Notice of Borrowing; and

(d)      The Interim Order, Final DIP Order and/or Cash Collateral Order, as applicable, shall be in full force and effect and shall not have been amended, modified, stayed or reversed without the prior written consent of the Lender or the Prepetition Lender, as applicable.

4.03    <u>Condition To The Wind Down Loan</u>.  In addition to the conditions set out in Sections 4.01 and 4.02, the obligation of the Lender to fund any Borrowing to the Borrower under the Wind Down Loan is subject to satisfaction, or waiver in accordance with Section 8.03, of the condition that the Sale authorized by the Sale Order shall have closed and all Obligations relating to the Operating Loan shall have been paid in full.

## ARTICLE V
## <u>AFFIRMATIVE COVENANTS</u>

So long as the Lender shall have any Commitment hereunder or any Loan or other

Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied each Loan Party shall:

        5.01    <u>Statements</u>.  Deliver to the Lender, in form reasonably satisfactory to the Lender:

        (a)    within 15 days after the end of each fiscal month commencing with the fiscal month ending January 31, 2010, an updated monthly operating report in the form required to be filed with the Bankruptcy Court pursuant to the Bankruptcy Rules and certified by a Responsible Officer in accordance with the requirements of the Bankruptcy Code and the Bankruptcy Rules;

        (b)    not later than Wednesday of each week (or if such day is not a Business Day, the next succeeding Business Day), a variance report, in form and substance satisfactory to the Lender (a "<u>Variance Report</u>") setting forth (i) actual cash receipts, (ii) actual disbursements, and (iii) a reconciliation of all cash on deposit (including all outstanding items), in each case for the calendar week period most recently ended prior to the date when such Variance Report is due, setting forth all variances from the correlated line item and period set forth in the Budget.  Each Variance Report shall  be certified by the Responsible Officer as being prepared in good faith and fairly presenting in all material respects the information set forth therein;

        (c)    within 5 days of receipt, copies of any requests by professionals for payment of fees and/or expenses under any interim compensation or similar procedures; and

        (d)    promptly after the same is available, copies of all pleadings, motions, applications, judicial information, financial information and other documents filed by or on behalf of a Loan Party with the Bankruptcy Court in the Cases, or distributed by or on behalf of a Loan Party to any official committee appointed in the Cases.

        As to any information contained in materials furnished pursuant to Section 5.01, the Borrower shall not be separately required to furnish such information under Section 5.02.

        5.02    <u>Certificates; Other Information</u>.  Deliver to the Lender, in form satisfactory to the Lender:

        (a)    concurrently with the delivery of the financial statements referred to in Section 5.01(a), a duly completed Compliance Certificate signed by a Responsible Officer of the Borrower;

        (b)    promptly after any written request by the Lender, copies of any detailed audit reports, final management letters or recommendations submitted to the board of directors (or the audit committee of the board of directors) of any Loan Party by independent accountants in connection with the accounts or books of any Loan Party, or any audit of any of them;

        (c)    promptly after the same are available, copies of each annual report, proxy or financial statement or other report or communication sent to the stockholders of any

Loan Party, and copies of all annual, regular, periodic and special reports and registration statements which any Loan Party may file or be required to file with the SEC under Section 13 or 15(d) of the Exchange Act, or with any Governmental Authority, or with any national securities exchange, and in any case not otherwise required to be delivered to the Lender pursuant hereto;

(d)       promptly after the furnishing thereof, copies of any statement or report furnished to any holder of debt securities of any Loan Party pursuant to the terms of any indenture, loan or credit or similar agreement and not otherwise required to be furnished to the Lender pursuant to any other clause of this Section 5.02;

(e)       promptly and in any event within three Business Days, notice of (i) any Material Customer Termination Event and (ii) if the same involves any substantial likelihood of having a Material Adverse Effect, any significant adverse change in any Loan Party's relationship with, or any significant event or circumstance which is likely to adversely affect any Loan Party's relationship with, any customer (or related group of customers), or any supplier which, in either case, is material to the operations of any Loan Party;

(f)       promptly and in any event within five Business Days after receipt thereof by any Loan Party, copies of each notice or other correspondence received from the SEC (or comparable agency in any applicable non-U.S. jurisdiction) concerning any investigation or possible investigation or other inquiry by such agency regarding financial or other operational results of any Loan Party;

(g)       promptly upon receipt thereof, copies of all notices, requests and other documents received by any Loan Party under or pursuant to any instrument, indenture, or loan or credit or similar agreement, in respect of Indebtedness having an aggregate principal amount in excess of the Threshold Amount;

(h)       promptly after the assertion or occurrence thereof, notice of any Environmental Liability of or any noncompliance by any Loan Party with any Environmental Law or Environmental Permit that could (i) exceed the Threshold Amount or (ii) cause any property to be subject to any material restrictions on ownership, occupancy, use or transferability under any Environmental Laws;

(i)       promptly after the assertion or occurrence thereof, notice of any action or claim or threatened action or claim by any Person against any Loan Party relating to any Intellectual Property of any Loan Party, or of any infringement of the Company Intellectual Property, or of any termination or revocation of, or default under, any license agreement.

(j)       promptly after the receipt thereof, copies of all Revenue Agent Reports (Internal Revenue Service Form 886), or other written proposals of the Internal Revenue Service, that propose, determine or otherwise set forth positive adjustments to the federal income Tax liability of the affiliated group (within the meaning of Section 1504(a)(1) of the Code) of which the Borrower is a member aggregating $100,000 or more; and

(k)       promptly, such additional non-privileged information regarding the business, financial, legal or corporate affairs (including, without limitation, customers, assets, liabilities, operations, financial condition and prospects (other than attorney-client privileged

information)) of a Loan Party, or compliance with the terms of the Loan Documents, as the Lender may from time to time reasonably request in writing.

5.03    Notices.  Promptly notify the Lender (in each case, in any event within two (2) Business Days after the Loan Party obtains knowledge thereof):

(a)    of the occurrence of any Default or Event of Default;

(b)    of any matter that has resulted or could reasonably be expected to result in a Material Adverse Effect;

(c)    of the occurrence of any ERISA Event;

(d)    of any material change in accounting policies or financial reporting practices by any Loan Party;

(e)    of the occurrence of any Disposition of property or assets, or receipt of any Extraordinary Receipt, for which the Borrower is required to make a mandatory repayment pursuant to Section 2.03(b)(iii); and

(f)    of any material setoff, claims (including with respect to any Environmental Liability), withholdings or other defenses to which any of the Collateral, or any of the Lender's rights with respect to the Collateral, in any material respect, are subject.

Each notice pursuant to Sections 5.03(a) through (f) shall be accompanied by a statement of a Responsible Officer of the Borrower setting forth details of the occurrence referred to therein and stating what action the Borrower has taken and proposes to take with respect thereto.  Each notice pursuant to Section 5.03(a) shall describe with particularity the nature of the Default or Event of Default any and all provisions of this Agreement and any other Loan Document that have been breached.

5.04    Preservation Of Existence; Business, Etc.    (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the Laws of the jurisdiction of its organization; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary in the normal conduct of its business, except to the extent that failure to do so could not reasonably be expected to have a Material Adverse Effect; (c) preserve or renew all of its registered patents, trademarks, trade names and service marks, the non-preservation of which could reasonably be expected to have a Material Adverse Effect; and (d) maintain and operate its business in substantially the manner in which it was conducted and operated as of the Filing Date, except as necessary to comply with the Bankruptcy Code.

5.05    Maintenance Of Properties.  Maintain, preserve, protect and repair all of its material properties and equipment necessary in the operation of its business so that same are in good working order and condition, ordinary wear and tear excepted.

5.06    Maintenance Of Insurance.  Maintain with financially sound and reputable insurance companies, insurance with respect to its properties and business against loss or damage of the kinds customarily insured against by the Loan Party consistent with its historical practice

and use commercially reasonable efforts to cause such insurance companies to agree to provide for not less than 30 days' prior notice to the Lender of termination, lapse or cancellation of such insurance.

5.07    Compliance With Laws.    Comply in all material respects with the requirements of all Laws applicable to it or its business or property and all orders, writs, injunctions and decrees binding on it or its business or property, except in such instances in which (a) such requirement of Law or order, writ, injunction or decree is being contested in good faith by appropriate proceedings diligently conducted; (b) the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect; (c) Borrower has disclosed in writing such non-compliance to the Prepetition Lender in connection with the Prepetition Facility; or (d) Borrower has disclosed such non-compliance by filing written notice thereof with the SEC.

5.08    Books and Records.    (a) Maintain proper books of record and account, in which full, true and correct entries in conformity with GAAP consistently applied shall be made of the financial transactions and matters involving the assets and business of the Loan Party; and (b) maintain such books of record and account in material conformity with all applicable requirements of any Governmental Authority having regulatory jurisdiction over the Loan Party.

5.09    Inspection Rights.    Permit representatives and independent contractors of the Lender to visit and inspect any of its properties, to examine its corporate, financial and operating records, and make copies thereof or abstracts therefrom, and to discuss its affairs, finances and accounts with its directors, officers, managers, and independent public accountants and advisors (at which an authorized representative of the Loan Party shall be entitled to be present), all at the expense of the Borrower and at such reasonable times during normal business hours and as often as may be reasonably desired, upon reasonable advance notice to the Loan Party; provided, however, that during the continuance of an Event of Default, the Lender (or any of their respective representatives or independent contractors) may do any of the foregoing at the reasonable expense of the Borrower (provided that it has been supplied with reasonable backup documentation) at any time during normal business hours and without advance notice.

5.10    Use Of Proceeds; Maximum Cash-On-Hand.    Use the proceeds of the Borrowings (i) to pay related fees and expenses associated with negotiation, execution and delivery of this Agreement and the other Loan Documents, (ii) for working capital and other general corporate purposes of the Borrower and the Guarantors consistent with the Budget and to the extent not prohibited hereunder, (iii) to pay fees and expenses of the Loan Parties' advisors and the advisors to any official committee, in each case associated with the Cases subject to the restrictions thereon set forth in the Orders and requirements of the Bankruptcy Code, (iv) to make other payments permitted to be made in the Orders or in the First Day Orders, and (v) to make such other payments as are authorized by the Bankruptcy Court and approved by the Lender.

5.11    Compliance With Environmental Laws.    Comply, and cause all lessees and other Persons operating or occupying its properties to comply, in all material respects, with all applicable Environmental Laws and Environmental Permits; obtain and renew all Environmental Permits necessary for its operations and properties; and conduct any

investigation, study, sampling and testing, and undertake any cleanup, removal, remedial or other action required under Environmental Laws.

5.12    Further Assurances.  Promptly upon request by the Lender, (i) correct any material defect or error in the execution, acknowledgment, filing or recordation of any Loan Document, and (ii) execute, acknowledge, deliver, record, re-record, file, re-file, register and re-register any and all such further deeds, certificates, assurances and other instruments as the Lender may reasonably require from time to time in order to (A) carry out more effectively the purposes of the Loan Documents and the Orders, (B) to the fullest extent permitted by applicable law, subject any Loan Party's properties, assets, rights or interests now or hereafter intended to be covered by any of the Collateral Documents to the Liens of the Collateral Documents and Orders, (C) perfect and maintain the validity, effectiveness and priority of any of the Collateral Documents and any of the Liens intended to be created thereunder and (D) assure, convey, grant, assign, transfer, preserve, protect and confirm more effectively unto the Lender the rights and Liens granted or now or hereafter intended to be granted to the Lender under the Orders, any Loan Document, or under any other instrument executed in connection with any Loan Document to which any Loan Party is or is to be a party.

5.13    Compliance With Terms Of Leaseholds.  Make all material post-petition payments and otherwise perform all material post-petition obligations in respect of all leases of real property to which any Loan Party is a party, as may be required pursuant to Section 365 of the Bankruptcy Code.

### ARTICLE VI
### NEGATIVE COVENANTS

So long as the Lender shall have any Commitment hereunder, or any Loan or other Obligation hereunder which is accrued and payable shall remain unpaid or unsatisfied, each of the Loan Parties shall not directly or indirectly:

6.01    Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction a financing statement that names the Borrower or any Loan Party as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, other than, the following:

(a)    Liens pursuant to any Loan Document and the Orders;

(b)    the Primed Liens;

(c)    Lien existing on the date hereof in favor of US Bancorp in respect of specific equipment;

(d)    Liens for Taxes not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(e)     landlords', carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which, to the extent not subject to Section 362 of the Bankruptcy Code, are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

(f)     pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA;

(g)     deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred or arising in the ordinary course of business;

(h)     Liens securing judgments for the payment of money not constituting an Event of Default under Section 7.01 or securing appeal or other surety bonds related to such judgments;

(i)     Liens securing Indebtedness permitted under Section 6.03(e); provided that (i) such Liens do not at any time encumber any property other than the property financed by such Indebtedness, (ii) the Indebtedness secured thereby does not exceed the cost of the property being acquired on the date of acquisition and (iii) with respect to Capitalized Leases, such Liens do not at any time extend to or cover any Collateral or assets other than the assets subject to such Capitalized Leases;

(j)     banker's liens, rights of setoff and other similar Liens in favor of depository institutions existing solely with respect to cash and Cash Equivalents on deposit in one or more accounts maintained by the Loan Parties;

(k)     any interest or title of a licensor, sublicensor, lessor or sublessor with respect to any assets under any license or lease agreement entered into in the ordinary course of business;

(l)     licenses, sublicenses, leases or subleases with respect to any assets granted to third Persons in the ordinary course of business; provided that the same (i) do not in any material respect interfere with the business of the Borrower or the Loan Parties or materially detract from the value of the relative assets of the Borrower or the Loan Parties;

(m)     Liens which arise under Article 4 of the Uniform Commercial Code in any applicable jurisdictions on items in collection and documents and proceeds related thereto; and

(n)     precautionary filings of financing statements under the Uniform Commercial Code of any applicable jurisdictions in respect of operating leases or consignments entered into by the Loan Parties in the ordinary course of business.

6.02    <u>Indebtedness</u>.  <u>Create, incur, assume or suffer to exist any Indebtedness, except</u>:

      (a)     Indebtedness under the Loan Documents;

      (b)     Indebtedness under the Prepetition Facility;

      (c)     Indebtedness for Carve-Out Expenses;

      (d)     Guarantees in respect of Indebtedness otherwise permitted hereunder;

      (e)     Indebtedness in respect of Capitalized Leases and purchase money obligations for fixed or capital assets existing on the Filing Date and not to exceed the amount of such Indebtedness on the Filing Date; and

      (f)     other Indebtedness outstanding on the Filing Date and not to exceed the amount of such Indebtedness on the Filing Date.

6.03    <u>Investments</u>.  Make or hold any Investments, except:

      (a)     Investments held by the Loan Party in the form of cash or Cash Equivalents;

      (b)     advances to officers, directors and employees of the Loan Parties in an aggregate amount not to exceed $20,000 at any time outstanding, for travel, entertainment, and analogous ordinary business purposes to the extent consistent with the Budget;

      (c)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss;

      (d)     Guarantees permitted by Section 6.02(d);

      (e)     other Investments existing on the Filing Date and not to exceed the amount of such Investments on the Filing Date; and

      (f)     prepaid expenses or lease, utility and other similar deposits, in each case made in the ordinary course of business and to the extent provided for in the Budget.

6.04    <u>Fundamental Changes</u>.  Without the consent of the Lender, merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person, except as contemplated by the Sale Order.

6.05    Dispositions.  Without the consent of the Lender and except as permitted or contemplated by the Sale Order, make any Disposition or enter into any agreement to make any Disposition, except:

(a)    Dispositions of obsolete or worn out property or property no longer used or useful in the business of the Loan Parties, whether now or hereafter owned or leased, in the ordinary course of business of such Loan Party;

(b)    Dispositions of inventory in the ordinary course of business;

(c)    Dispositions of equipment, software or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property;

(d)    the licensing of intellectual property to third Persons other than an Affiliate on customary terms in the ordinary course of business;

(e)    the sale, lease, sub-lease, license, sub-license or consignment of personal property of the Loan Parties in the ordinary course of business;

(f)    the settlement or write-off of accounts receivable or sale of overdue accounts receivable for collection in the ordinary course of business consistent with past practice;

(g)    sale, exchange or other disposition of cash and Cash Equivalents in the ordinary course of business in accordance with the Budget;

(h)    Dispositions by the Loan Parties not otherwise permitted under this Section 6.05; provided that (i) at the time of such Disposition, no Default shall exist or would result from such Disposition, (ii) the aggregate book value of all property Disposed of in reliance on this clause (h) shall not exceed $50,000 and (iii) 100% of the purchase price for such asset shall be paid to the Loan Parties in cash; and

provided, however, that any Disposition pursuant to Section 6.05(a) through Section 6.05(h) shall be for fair market value.

6.06    Restricted Payments.    Declare or make, directly or indirectly, any Restricted Payment, or incur any obligation (contingent or otherwise) to do so, or issue or sell any Equity Interests or accept any capital contributions.

6.07    Change in Nature of Business.  Engage in any line of business different from the lines of business currently conducted by such Loan Party on the Filing Date.

6.08    Transactions With Affiliates.  Enter into, amend, waive or terminate any transaction of any kind with any Affiliate, whether or not in the ordinary course of business, unless such act is done on fair and reasonable terms substantially as favorable to the Loan Party as would be obtainable by the Loan Party in a comparable arm's length transaction with a Person

other than an Affiliate; provided that the foregoing restriction shall not apply to (a) transactions between or among the Borrower and any of the Loan Parties or between and among any Loan Parties and (b) transactions, arrangements, fees reimbursements and indemnities specifically and expressly permitted between or among such parties under this Agreement.

6.09    <u>Burdensome Agreements</u>.  Enter into or permit to exist any Contractual Obligation (other than this Agreement, any other Loan Document, and the loan documents under the Prepetition Facility) that conflicts with the provisions of this Agreement or the Loan Documents.

6.10    <u>Budget Compliance</u>.  Except as authorized in writing by the Lender, permit the cumulative total of actual disbursements for any line item in the Budget as of the end of any weekly period to be more than 110% of the cumulative total disbursements projected in the Budget for such line item through the end of such weekly period.

6.11    <u>Amendments Of Organization Documents</u>.    Amend any of its Organization Documents in a manner that would be adverse to the rights or interests of the Lender.

6.12    <u>Accounting Changes</u>.  Make any change in (i) its accounting policies or reporting practices in a manner that could materially affect the results of computation of any financial ratio or data for a given reporting period, except (x) as required by generally accepted accounting principles, (y) as required for compliance with the Sarbanes-Oxley Act or (z) as pre-approved by the Lender, or (ii) its fiscal year.

6.13    <u>Partnerships, Etc.</u>  Become a general partner in any general or limited partnership or joint venture.

6.14    <u>Speculative Transactions</u>.    Engage in any transaction involving commodity options or futures contracts for speculative purposes or any similar speculative transactions, which are, in any case, inconsistent with prior practice and not otherwise made in the ordinary course of business.

6.15    <u>Formation Of Subsidiaries</u>.  Organize or invest in any new Subsidiary.

6.16    <u>Other Action</u>.  Take or omit to take any action that would result in a breach of any of the representations or warranties under the Loan Documents.

## ARTICLE VII
## EVENTS OF DEFAULT AND REMEDIES

7.01    <u>Events Of Default</u>.  Any of the following shall constitute an Event of Default:

(a)    <u>Non-Payment</u>.  The Borrower or any other Loan Party fails to pay (i) when and as required to be paid herein, any amount of principal of, or accrued interest upon, the Loan, or (ii) within five (5) Business Days after the same becomes due, any other amount payable hereunder or under any other Loan Document; or

(b)  <u>Covenants</u>.  The Borrower or any Loan Party fails to perform or observe any term, covenant or agreement contained in any Loan Agreement and such failure continues for five (5) Business Days after notice thereof is delivered by Lender; or

(c)  <u>Representations and Warranties</u>.  Any representation, warranty, certification or statement of fact made or deemed made by or on behalf of the Borrower or any other Loan Party herein, in any other Loan Document, or in any document delivered in connection herewith or therewith shall be incorrect or misleading in any material respect when made or deemed made; or

(d)  <u>Cross-Default</u>.  Any Loan Party (A) fails to make any payment when due (whether by scheduled maturity, required prepayment, acceleration, demand, or otherwise) and, except in the case of any such payment due at scheduled maturity or by acceleration, such payment is not made within any applicable grace period, in respect of any Indebtedness or Guarantee incurred postpetition (other than Indebtedness hereunder), having an aggregate principal amount (including undrawn committed or available amounts and including amounts owing to all creditors under any combined or syndicated credit arrangement) of more than the Threshold Amount, or (B) fails to observe or perform any other agreement or condition relating to any such Indebtedness or Guarantee or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event occurs, the effect of which default or other event is to cause, or to permit the holder or holders of such Indebtedness or the beneficiary or beneficiaries of such Guarantee (or a trustee or agent on behalf of such holder or holders or beneficiary or beneficiaries) to cause, with the giving of notice if required, such Indebtedness to be demanded or to become due or to be repurchased, prepaid, defeased or redeemed (automatically or otherwise), or an offer to repurchase, prepay, defease or redeem such Indebtedness to be made, prior to its stated maturity, or such Guarantee to become payable or cash collateral in respect thereof to be demanded; or

(e)  <u>License Agreements</u>.  Any Loan Party defaults under any royalty agreement or license agreement (other than a default not enforceable as a result of the Cases); or any material royalty agreement or license agreement of any Loan Party is terminated.

(f)  <u>Inability To Pay Postpetition Debts</u>.  Any Loan Party becomes unable or admits in writing its inability or fails generally to pay its debts incurred postpetition as they become due; or

(g)  <u>Judgments</u>.  After the Filing Date, there is entered against any Loan Party (i) a final judgment or order for the payment of money in an aggregate amount exceeding $100,000 (to the extent not covered by independent third-party insurance as to which the insurer is rated at least "A" by A.M. Best Company, has been notified of the potential claim and has not disputed coverage), or (ii) any one or more non-monetary final judgments that have, or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect and, such judgment or order is not subject to a stay of enforcement by virtue of Section 362(a) of the Bankruptcy Code or an applicable order.

(h)  <u>ERISA</u>.  Any Loan Party shall; (i) engage, or permit any ERISA Affiliate to engage, in any non-exempt "prohibited transaction", as that term is defined in Section

406 of ERISA and Section 4975 of the Code, (ii) terminate, or permit any member of the Controlled Group to terminate, any Pension Plan, (iii) (x) maintain, or permit any ERISA Affiliate to maintain, or (y) become obligated to contribute to or permit any ERISA Affiliate to become obligated to contribute to, any Multiemployer Plan or Pension Plan not disclosed on Schedule 7.01(h), (iv) incur, or permit any ERISA Affiliate to incur, any withdrawal liability to any Multiemployer Plan; (v) suffer any ERISA Event or fail promptly to notify the Lender of the occurrence of any ERISA Event, (vi) fail to comply, with the requirements of ERISA or the Code or other applicable laws in respect of any Employee Benefit Plan, (vii) fail to meet, or permit any ERISA Affiliate to fail to meet, any minimum funding requirements under ERISA or the Code or postpone or delay any funding requirement with respect of any Employee Benefit Plan, (viii) receive an unfavorable determination letter from the Internal Revenue Service regarding the qualification of a Employee Benefit Plan under Section 401(A) of the Code, or (ix) fail to make a required payment under the Pension Funding Rules applicable to any Pension Plan on or before the due date for such payment, and, as a result of any event or condition described in clauses (i) - (ix) above, together with all other such events or conditions described in clauses (i) - (ix) above, any Loan Party shall incur, or in the opinion of the Lender be reasonably likely to incur, a liability to any Loan Party in excess of $100,000 or result in the imposition of a Lien on the property of any Loan Party pursuant to the Pension Funding Rules or Section 4068 of ERISA; or

(i)    Invalidity Of Loan Documents.  Any material provision of any Loan Document, at any time after its execution and delivery and for any reason other than as expressly permitted hereunder or thereunder or satisfaction in full of all the Obligations, ceases to be in full force and effect; or any Loan Party or any other Person contests in any manner the validity or enforceability of any provision of any Loan Document; or any Loan Party denies that it has any or further liability or obligation under any Loan Document, or purports to revoke, terminate or rescind any Loan Document; or

(j)    Change Of Management/Control.  There occurs any (i) Change of Management or (ii) Change of Control; or

(k)    Collateral Document.  Any Collateral Document, after delivery thereof, and after giving effect to the Interim Order and the Final DIP Order shall for any reason (other than pursuant to the terms thereof) cease to create a valid and perfected first priority Lien on and security interest in the Collateral purported to be covered thereby pursuant to the terms and conditions herein and therein; or any Loan Party contests in any manner the validity, perfection or priority of any lien or security interest in the Collateral purported to be covered thereby; or

(l)    Appointment of Trustee or Examiner.  An order (which has not been stayed) with respect to any of the Cases shall be entered by the Bankruptcy Court appointing, or any Loan Party, without the consent of the Lender, shall file an application for an order with respect to any Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner under Section 1106(b) of the Bankruptcy Code; or

(m)    Chapter 7 Order.  An order with respect to any of the Cases shall be entered by the Bankruptcy Court converting such Case to a Chapter 7 case or any Loan Party

shall file a motion or not oppose a motion seeking such relief, unless such motion is consented to by the Lender; or

(n)    <u>Relief from Automatic Stay</u>.    Other than with respect to the Prepetition Facility, the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest (other than the Lender) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on or affecting any Collateral of any Loan Party, or relating to any leased premises where any Collateral is located, in any case which has a value in excess of the Threshold Amount in the aggregate or permits any Person (other than the Lender) to commence or continue any litigation against any of the Loan Parties involving a potential liability not covered by insurance in excess of the Threshold Amount in the aggregate; or

(o)    <u>Modifications to Bankruptcy Court Orders; Priority; Liens</u>.    An order with respect to any of the Cases shall be entered by the Bankruptcy Court without the express prior written consent of the Lender (i) to revoke, reverse, stay, modify, supplement or amend the Orders, the Bid Procedures Order or the Sale Order, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to any Loan Party equal or superior to the Superpriority Claim, except as set forth in the Orders, or (iii) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien or any Lien in favor of the Lender; or

(p)    <u>Payment of Prepetition Indebtedness</u>.    Any Loan Party shall make any payment of principal or interest or otherwise on account of any prepetition Indebtedness or trade payable (excluding payments on account of the Prepetition Facility and payments effected by a setoff of obligations as permitted by Section 553 of the Bankruptcy Code) without the express prior written consent of the Lender and the approval of the Bankruptcy Court, other than as provided for in any First Day Orders; or

(q)    <u>Collateral</u>.    Any Loan Party or other Person shall file a motion in the Cases (i) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, or (ii) to take any other action or actions materially adverse to the Lender or its rights and remedies hereunder or under any of the other Loan Documents or the Lender's interest in any of the Collateral; or

(r)    <u>Use of Cash Collateral</u>.    The Lender under the Prepetition Facility shall have delivered written notice to the Borrower of any failure to comply by the Borrower or any of the Loan Parties with the material terms, conditions or covenants of the Cash Collateral Order; or

(s)    <u>Challenges</u>.    The Borrowers, any creditor, the UST or any other party in interest in the Cases shall (a) challenge, contest, object to or dispute the extent, validity, priority or enforceability of, or seek to avoid, as the case may be (i) the Liens securing the Loans or the Prepetition Facility, (ii) the amounts owed to the Lender or the Prepetition Lender in respect of the Loans and the Prepetition Facility, other than disputes limited solely to manifest errors in mathematical calculation, or (iii) repayment of the Loans or the Prepetition Facility, or

(b) request that the payment of the respective claims of the Lender or the Prepetition Lender be subordinated to the payment of any other creditor or party in interest, other than as provided with respect to the Carve-Out Expenses.

(t)     <u>Bankruptcy Court Orders</u>.    An order shall be entered by the Bankruptcy Court (i) confirming a Plan of Reorganization in any of the Cases which does not (A) contain a provision and payment in full in cash of all Obligations of the Loan Parties hereunder and under the other Loan Documents on or before the effective date of such plan or plans upon entry thereof and (B) provide for the continuation of the Liens and security interests granted to the Lender for the benefit of the Lender and priorities until the Plan of Reorganization's effective date; or (ii) dismissing any of the Cases, which order does not contain a provision for payment in full in cash of all Obligations of the Borrower hereunder and under the other Loan Documents upon entry thereof, or any of the Loan Parties shall file a motion or not oppose a motion seeking such relief, unless such motion is consented to by the Lender; or

(u)     <u>Final DIP Order</u>.  The Final DIP Order shall not have been entered by the Bankruptcy Court on or before February 9, 2010; or

(v)     <u>Filing of Motion for Entry of Bid Procedure Order</u>.  The Loan Parties shall fail to file on the Filing Date a motion in form and substance satisfactory to the Lender requesting entry of a Bid Procedures Order; or

(w)     <u>Approval of Bid Procedures Motion</u>.  The Loan Parties shall fail to obtain entry of the Bid Procedures Order in form or substance satisfactory to the Lender on or before January 19, 2010; or

(x)     <u>Stalking Horse Bid</u>.  The Loan Parties or Sun Capital have terminated the Stalking Horse Bid and, as of the effective date of such termination, the Loan Parties have not entered into a replacement Stalking Horse Bid;

(y)     <u>Replacement Stalking Horse Bid</u>.  Prior to entering into any replacement Stalking Horse Bid, the Loan Parties fail to provide Lender with at least two (2) Business Days notice of the identity of the Person submitting the replacement Stalking Horse Bid, the terms thereof, and such other information as Lender may reasonably request in regard to the replacement Stalking Horse Bid;

(z)     <u>Auction</u>.  The Loan Parties shall fail to conduct an auction in compliance with the requirements of the Bid Procedures Order on or before February 18, 2010; <u>provided</u> that if there are no qualified bidders other than the "stalking-horse" bidder, it shall not constitute an Event of Default if an auction is not conducted;

(aa)     <u>Sale Closing Date</u>.  The closing of the Sale pursuant to the Sale Order shall have not occurred on or before February 26, 2010; or

(bb)     <u>Sale Proceeds</u>.  The Loan Parties shall have accepted as a bid or bids that, when aggregated, would fail to provide the Loan Parties on the closing date or dates thereof with an amount in cash equal to or greater than the amount provided under the Stalking Horse Bid submitted by Sun Capital.

7.02    Remedies Upon Event of Default.  If any Event of Default occurs and is continuing, with five (5) Business Days' prior written notice to the Borrower (with a copy to counsel for the Borrower, counsel for the Creditor's Committee, and the UST) and without further order of or application to the Bankruptcy Court, the Lender may take any or all of the following actions:

(a)    terminate the Commitment hereunder and declare the unpaid principal amount of the Loans, all interest accrued and unpaid thereon, and all other amounts owing or payable hereunder or under any other Loan Document to be immediately due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived by the Borrower; and

(b)    exercise all rights and remedies with respect to the Collateral available to the Lender under the Loan Documents, the Orders, the UCC and other applicable Laws including taking possession of and selling all or any part of the Collateral and applying the proceeds realized from such sale to repayment of the Loans in accordance with Section 7.03; and

In the event and to the extent that the provisions of this Section 7.02 conflict with what is set forth in the Orders, the Orders shall govern.

7.03    Application of Funds.  After the exercise of remedies provided for in Section 7.02, any amounts received on account of the Obligations shall be applied by the Lender in the following order:

First, to payment of that portion of the Obligations constituting fees, indemnities, expenses and other amounts (other than principal and interest but including fees, charges and disbursements of counsel to the Lender and amounts payable under Article III) payable to the Lender;

Second, to payment of that portion of the Obligations constituting accrued and unpaid interest on the Loans, and other Obligations;

Third, to payment of that portion of the Obligations constituting unpaid principal of the Loans;

Fourth, to the payment of all other Obligations of the Loan Parties owing under or in respect of the Loan Documents that are then due and payable to the Lender on such date; and

Last, the balance, if any, after all of the Obligations have been indefeasibly paid in full (excluding, for this purpose, any Unaccrued Indemnity Claims), shall be held and applied by the Borrower in accordance with the Orders of the Bankruptcy Court including the Cash Collateral Order, the Bankruptcy Code or as otherwise required by Law.

## ARTICLE VIII
## MISCELLANEOUS

8.01    Amendments, Etc.  No amendment or waiver of any provision of this Agreement or any other Loan Document, and no consent to any departure by the Borrower or

any other Loan Party therefrom, shall be effective unless in writing signed by the Lender and the Borrower or the applicable Loan Party, as the case may be, and each such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

8.02    Notices and Other Communications; Facsimile Copies;Notices Generally. Except as provided in Subsection (b) below, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail, sent by telecopier as follows:

(i)      if to the Borrower or the Loan Parties c/o the Borrower:

Protective Products of America, Inc.
1649 Northwest 136th Avenue
Sunrise, Florida
USA  33323

Attention:        R. Patrick Caldwell
Fax:               (954) 846-8306
E-Mail:            pcaldwell@body-armor.com

with a copy to:

Berger Singerman
200 South Biscayne Boulevard
Suite 1000
Miami, FL  33131

Attention:        Jordi Guso
Fax:               (305) 714-4340
E-mail:            JGuso@bergersingerman.com

(ii)     if to the Lender:

Canadian Imperial Bank of Commerce
199 Bay Street, 6th floor
Commerce Court West, Toronto, ON
M5L 1A2

Attention:        Jack McMurray
                   General Manager, Special Loans
Fax:               (416) 214-8749
E-mail:            jack.mcmurray@cibc.ca

with copies to (which shall not constitute a notice hereunder):

Shutts & Bowen LLP
1500 Miami Center

201 South Biscayne Boulevard
Miami, FL  33131

| Attention: | Larry Glick |
|---|---|
| Fax: | (305) 347-7831 |
| E-Mail: | lglick@shutts.com |

and

Blake, Cassels & Graydon LLP
199 Bay Street
Suite 2800
Commerce Court West
Toronto, ON  M5L 1A9

| Attention: | Milly Chow |
|---|---|
| Fax: | 416-863-2653 |
| Email: | milly.chow@blakes.com |

Notices sent by hand or overnight courier service, or mailed by certified or registered mail, shall be deemed to have been given when received.  Notices sent by telecopier shall be deemed to have been given when sent (except that, if not given during normal business hours for the recipient, shall be deemed to have been given at the opening of business on the next business day for the recipient).  Notices delivered through electronic communications to the extent provided in Subsection (b) below shall be effective as provided in such Subsection (b).

(b)    Electronic Communications.  Notices and other communications may be delivered or furnished by e-mail.  Notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement), provided that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next business day for the recipient.

(c)    Change Of Address, Etc.  Each of the Loan Parties and the Lender may change its address, telecopier number or email address for notices and other communications hereunder by notice to the other parties hereto.

(d)    Reliance By Lender.  The Lender shall be entitled to rely and act upon any notices purportedly given by or on behalf of the Loan Parties even if such notices were not made in a manner specified herein, were incomplete or were not preceded or followed by any other form of notice specified herein.  The Borrower shall indemnify the Lender and the Related Parties of each of them from all losses, costs, expenses and liabilities resulting from the reliance by such Person on each notice purportedly given by or on behalf of the Borrower.

8.03    No Waiver; Cumulative Remedies.  No failure by the Lender to exercise, and no delay in exercising, any right, remedy, power or privilege hereunder or any other Loan Document shall operate as a waiver thereof; nor shall any single or partial exercise of any right,

remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege. The rights, remedies, powers and privileges herein provided, and provided under each other Loan Document, are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

8.04    Expenses; Indemnity; Damage; WaiverCosts and Expenses. The Loan Parties agree to pay on demand (i) all reasonable documented out-of-pocket costs and expenses of the Lender (including any sub-agent or servicer of the Lender) in connection with the preparation, execution, delivery, administration, modification and amendment of, or any consent or waiver under, the Loan Documents (whether or not the transactions contemplated hereby or thereby shall be consummated) (including, without limitation, (A) all reasonable documented fees and expense of counsel due diligence, collateral review, arrangement, syndication (other than fees payable to syndicate members), transportation, computer, duplication, appraisal, audit, insurance, consultant, search, filing and recording fees and expenses and (B) the reasonable documented out-of-pocket fees and expenses of counsel for the Lender, with respect to advising the same as to its rights and responsibilities, or the perfection, protection, interpretation or preservation of rights or interests, under the Loan Documents, with respect to negotiations with any Loan Party or with other creditors of any Loan Party and with respect to presenting claims in or otherwise participating in or monitoring any bankruptcy, insolvency or other similar proceeding involving creditors' rights generally and any proceeding ancillary thereto), and (ii) all reasonable documented out-of-pocket costs and expenses of the Lender in connection with the enforcement or protection of its rights in connection with the Loan Documents, whether in any action, suit or litigation, or any bankruptcy, insolvency or other similar proceeding affecting creditors' rights generally and all reasonable documented out-of-pocket costs and expenses of the Lender with respect to any negotiations arising out of any Default (including, without limitation, the fees and expenses of counsel for the Lender with respect thereto). The Borrower further agrees to pay any stamp or Other Taxes that may be payable in connection with the execution or delivery of any Loan Document.

(b)    Indemnification by the Borrower. The Loan Parties shall indemnify the Lender and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), incurred by any Indemnitee or asserted against any Indemnitee by any third party or by any Loan Party arising out of, in connection with, or as a result of (i) the execution or delivery of any Loan Document or any agreement or instrument contemplated thereby, the performance by the parties hereto of their respective obligations thereunder or the consummation of the transactions contemplated thereby, (ii) any Loan or the use or proposed use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Substances on or from any property owned or operated by the Loan Parties, or any Environmental Liability related in any way to the Loan Parties, or (iv) any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by the any Loan Party or any of the Loan Parties' directors, shareholders or creditors, and regardless of whether any Indemnitee is a party thereto and whether or not any of the transactions contemplated under any of the Loan Documents is consummated, in all cases, whether or not caused by or arising, in whole or in part, out of the negligence of the Indemnitee; provided that

such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

(c)    Waiver of Consequential Damages, Etc.    To the fullest extent permitted by applicable law, the Loan Parties shall not assert, and hereby waive, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, any Loan Document, the transactions contemplated thereby, any Loan or the use of the proceeds thereof.  No Indemnitee referred to in Subsection (b) above shall be liable for any damages arising from the use by unintended recipients of any information or other materials distributed by it through telecommunications, electronic or other information transmission systems.

(d)    Payment of Costs.    If any Loan Party fails to pay when due any costs, expenses or other amounts payable by it under any Loan Document, including, without limitation, fees and expenses of counsel and indemnities, such amount may be paid on behalf of such Loan Party by the Lender, in its sole discretion, and added to the Obligations.

(e)    Payments.    All amounts due under this Section 8.04 shall be payable not later than ten (10) Business Days after written demand therefor.

(f)    Survival.    The agreements in this Section 8.04 shall survive the repayment, satisfaction or discharge of the Loans and all other Obligations.

8.05    Payments Set Aside.    To the extent that any payment by or on behalf of a Loan Party is made to the Lender, or the Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender) to be repaid to a trustee, receiver or any other party, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

8.06    Successors and Assigns Generally.    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns, except that no Loan Party may assign or otherwise transfer any of its rights or obligations under the Loan Documents without the prior written consent of the Lender.

8.07    Right of Setoff.    If an Event of Default shall have occurred and be continuing, and subject to the Orders, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by the Lender to or for the credit or the account of any Loan Party against any and all of the Obligations, irrespective of whether or not the Lender shall have made any demand under the Loan Documents.  The rights of the

Lender under this Section are in addition to other rights and remedies (including other rights of setoff) that the Lender may have.  The Lender agrees to notify the Loan Party promptly after any such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application.

8.08    <u>Interest Rate Limitation</u>.    Notwithstanding anything to the contrary contained in any Loan Document, the interest paid or agreed to be paid under the Loan Documents shall not exceed the maximum rate of non-usurious interest permitted by applicable Law (the "<u>Maximum Rate</u>").  If the Lender shall receive interest in an amount that exceeds the Maximum Rate, the excess interest shall be applied to the principal of the Loans or, if it exceeds such unpaid principal, refunded to the Loan Party.    In determining whether the interest contracted for, charged, or received by the Lender exceeds the Maximum Rate, such Person may, to the extent permitted by applicable Law, (a) characterize any payment that is not principal as an expense, fee, or premium rather than interest, (b) exclude voluntary prepayments and the effects thereof, and (c) amortize, prorate, allocate, and spread in equal or unequal parts the total amount of interest throughout the contemplated term of the Obligations hereunder.

8.09    <u>Counterparts; Integration; Effectiveness</u>.    This Agreement may be executed in counterparts (and by different parties hereto in different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.  This Agreement and the other Loan Documents constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.  Except as provided in Section 4.01, this Agreement shall become effective when it shall have been executed by the Lender and when the Lender shall have received counterparts hereof that, when taken together, bear the signatures of each of the other parties hereto.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy or electronic mail in portable document format (.pdf) shall be effective as delivery of a manually executed counterpart of this Agreement.

8.10    <u>Survival Of Representations and Warranties</u>.    All representations and warranties made in any Loan Document or other document delivered pursuant thereto or in connection therewith shall survive the execution and delivery thereof.  Such representations and warranties have been or will be relied upon by the Lender, regardless of any investigation made by the Lender or on its behalf and notwithstanding that the Lender may have had notice or knowledge of any Default at the time of any Borrowing, and shall continue in full force and effect as long as any Loan or any other Obligation hereunder shall remain unpaid or unsatisfied.

8.11    <u>Severability</u>.  If any provision of the Loan Documents is held to be illegal, invalid or unenforceable, (a) the legality, validity and enforceability of the remaining provisions of the Loan Documents shall not be affected or impaired thereby and (b) the parties shall endeavor in good faith negotiations to replace the illegal, invalid or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the illegal, invalid or unenforceable provisions.    The invalidity of a provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.12    <u>USA Patriot Act Notice</u>.  The Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law

October 26, 2001)) (the "Act"), it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Lender to identify the Borrower in accordance with the Act.

8.13    Governing Law; Jurisdiction; Etc.

(a)    GOVERNING LAW.  THIS AGREEMENT AND EACH OTHER LOAN DOCUMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF, AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.

(b)    SUBMISSION TO JURISDICTION.  EACH LOAN PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE JURISDICTION OF THE BANKRUPTCY COURT, OR IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION OVER ANY MATTER OR IF IT HAS JURISDICTION BUT DOES NOT EXERCISE SUCH JURISDICTION FOR ANY REASON, THEN TO THE NONEXCLUSIVE JURISDICTION OF ANY NEW YORK STATE COURT OR FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN NEW YORK CITY, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO ANY LOAN DOCUMENT TO WHICH IT IS A PARTY, OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT, ANY SUCH NEW YORK STATE COURT OR, TO THE EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING HEREIN SHALL AFFECT ANY RIGHT THAT LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO ANY LOAN DOCUMENT IN THE COURTS OF ANY JURISDICTION.

(c)    WAIVER OF VENUE.  THE BORROWER AND EACH OTHER LOAN PARTY HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY IN ANY NEW YORK STATE OR FEDERAL COURT.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(d)    SERVICE OF PROCESS.    EACH LOAN PARTY IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED

FOR NOTICES IN SECTION 8.02. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF THE LENDER, OR ITS AGENT, TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

        8.14   <u>WAIVER OF JURY TRIAL</u>.  EACH OF THE LOAN PARTIES AND THE LENDER IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO ANY OF THE LOAN DOCUMENTS OR THE ACTIONS OF THE LENDER IN THE NEGOTIATION, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT THEREOF.

*[Remainder of Page Intentionally Left Blank; Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed as of the date first above written.

**Loan Parties**:

**PROTECTIVE PRODUCTS OF AMERICA, INC.**

By: _____
Name: R. Patrick Caldwell
Title:   Chief Executive Officer


By: _____
Name: Jason Williams
Title:   Chief Financial Officer


**CPC HOLDING CORPORATION OF AMERICA**

By: _____
Name: R. Patrick Caldwell
Title:   Chief Executive Officer


By: _____
Name: Jason Williams
Title:   Chief Financial Officer


**CERAMIC PROTECTION CORPORATION OF AMERICA**

By: _____
Name: R. Patrick Caldwell
Title:   Chief Executive Officer


By: _____
Name: Jason Williams
Title:   Chief Financial Officer

**PROTECTIVE PRODUCTS
INTERNATIONAL CORP.**


By: _____
Name: R. Patrick Caldwell
Title:   Chief Executive Officer



By: _____
Name: Jason Williams
Title:   Chief Financial Officer


**PROTECTIVE PRODUCTS OF NORTH
CAROLINA, LLC**


By: _____
Name: R. Patrick Caldwell
Title:   Chief Executive Officer



By: _____
Name: Jason Williams
Title:   Chief Financial Officer

2557224-1

**Lender**:

**CANADIAN IMPERIAL BANK OF COMMERCE**


By: _____
          Authorized Officer

## **EXHIBIT B**

Budget

2556533-2

**Protective Products of America, Inc**
Rolling 13-Week Cash Flow Forecast

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 15-Jan-10 | 22-Jan-10 | 29-Jan-10 | 05-Feb-10 | 12-Feb-10 | 19-Feb-10 | 26-Feb-10 | 05-Mar-10 | 12-Mar-10 | 19-Mar-10 | 26-Mar-10 | 02-Apr-10 | 09-Apr-10 |
| **Beginning Cash Balance** | 338,129 | 461,440 | 948,897 | 1,061,747 | 1,312,653 | 1,450,144 | 1,416,644 | 964,844 | 604,176 | 584,368 | 635,535 | 459,902 | 451,201 |
| *Cash Inflows* | | | | | | | | | | | | | |
| Collections (Accts Rec) [1] | 216,667 | 703,717 | 377,350 | 582,325 | 501,966 | 300,000 | 300,000 | 300,000 | 366,667 | 366,667 | 366,667 | 366,667 | 366,667 |
| Customer Deposits [2] | - | 777,600 | - | - | - | - | - | - | - | - | - | - | - |
| Other Sources | - | - | - | - | - | - | - | - | - | - | - | - | - |
| CIBC DIP Financing | 250,000 | - | 415,000 | - | - | - | - | - | - | - | - | - | - |
| Total Cash Inflows | 466,667 | 1,481,317 | 792,350 | 582,325 | 501,966 | 300,000 | 300,000 | 300,000 | 366,667 | 366,667 | 366,667 | 366,667 | 366,667 |
| *Compensation and Employee Benefits* | | | | | | | | | | | | | |
| Payroll - Florida Operations | 82,000 | 82,000 | 82,000 | 82,000 | 82,000 | 82,000 | 82,000 | 82,000 | 82,000 | 82,000 | 82,000 | 82,000 | 82,000 |
| Payroll - North Carolina Operations | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Payroll - Commissions | - | - | - | 65,000 | - | - | - | - | 65,000 | - | - | - | - |
| Employee Health Insurance | - | - | 45,000 | - | - | - | 45,000 | - | - | - | 45,000 | - | - |
| Outside (Dealer) Commissions | - | 129,600 | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | - |
| *Facilities and Capital Assets* | | | | | | | | | | | | | |
| Rent | - | - | 150,000 | - | - | - | 150,000 | - | - | - | 150,000 | - | - |
| Utilities | - | - | 25,000 | - | - | - | 25,000 | - | - | - | 25,000 | - | - |
| CAPEX | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Repairs & Maintenance | 2,250 | 5,000 | - | - | 2,250 | 5,000 | - | - | 2,250 | 5,000 | - | - | - |
| *Material Purchases and Production* | | | | | | | | | | | | | |
| Military Programs | - | - | - | - | - | - | - | - | - | - | - | - | - |
| International | - | 444,960 | - | - | - | - | - | - | - | - | - | - | - |
| Law Enforcement/Government Agency | 187,500 | 187,500 | 187,500 | 150,000 | 150,000 | 150,000 | 150,000 | 150,000 | 187,500 | 187,500 | 187,500 | 187,500 | 187,500 |
| Materials (Aged Payables) | 1,881 | | | | | | | | | | | | |
| Contract Labor/Subcontractors/Outside Svcs | 18,750 | 18,750 | 18,750 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 18,750 | 18,750 | 18,750 | 18,750 | 18,750 |
| Production, Supplies and Related Expenses | 3,750 | 3,750 | 3,750 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,750 | 3,750 | 3,750 | 3,750 | 3,750 |
| *Shipping and Handling* | | | | | | | | | | | | | |
| Freight | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 |
| Packaging and Supplies | - | - | - | 2,000 | - | - | 2,000 | - | - | - | 2,000 | - | - |
| *General and Administrative Expenses* | | | | | | | | | | | | | |
| Administrative and Office | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 |
| Advertising and Marketing | - | 40,000 | - | - | - | - | - | - | - | - | - | 5,000 | - |
| Bank and Credit Card Fees | - | - | 5,000 | - | - | - | 5,000 | - | - | - | 5,000 | - | - |
| Directors Fees | - | - | - | - | - | - | - | - | - | - | - | - | - |
| IT, Telephone and Communications | 8,725 | 3,800 | - | 918 | 8,725 | - | 3,800 | 918 | 8,725 | - | 3,800 | 618 | 300 |
| Liability Insurance | - | - | - | - | - | - | 93,750 | 31,250 | - | - | - | 31,250 | - |
| Office Equipment Lease Payments | - | - | 1,000 | - | - | - | 1,000 | - | - | - | - | 1,000 | - |
| Professional Services | - | 25,000 | - | 25,000 | - | 25,000 | - | 25,000 | - | - | - | - | - |
| Research/Development/Testing | - | - | 20,000 | - | - | - | 20,000 | - | - | - | 20,000 | - | - |
| Settlements | - | - | - | - | - | 66,750 | - | - | - | - | - | - | - |
| Taxes, Licenses and Registrations | - | - | 3,000 | - | - | - | 3,000 | - | - | 3,000 | - | - | - |
| Travel and Employee Expenses | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 |
| *Restructuring Costs* | | | | | | | | | | | | | |
| Bankruptcy Counsel | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | - | - | - | - | - |
| Creditors' Committee | - | 15,000 | - | 15,000 | - | 15,000 | - | 15,000 | - | - | - | - | - |
| Investment Bankers | - | - | 25,000 | - | - | - | 25,000 | 300,000 | - | - | - | - | - |
| Lender's Fees and Costs | - | - | 65,000 | - | - | - | - | - | - | - | - | - | - |
| United States Trustee Services | - | - | - | - | - | - | 13,000 | - | - | - | - | - | - |
| Other | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | - | - | - | - | - |
| Total Cash Outflows | 343,356 | 993,860 | 679,500 | 331,418 | 364,475 | 333,500 | 751,800 | 660,668 | 386,475 | 315,500 | 542,300 | 375,368 | 310,800 |
| Net Inflows (Outflows) | 123,311 | 487,457 | 112,850 | 250,907 | 137,491 | (33,500) | (451,800) | (360,668) | (19,808) | 51,167 | (175,633) | (8,701) | 55,867 |
| **Ending Cash Balance** | 461,440 | 948,897 | 1,061,747 | 1,312,653 | 1,450,144 | 1,416,644 | 964,844 | 604,176 | 584,368 | 635,535 | 459,902 | 451,201 | 507,068 |