**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov**

In re:

PROTECTIVE PRODUCTS OF                          Case No. 10-
AMERICA, INC., *et al.*,[1]                      Chapter 11 Cases
                                                (Joint Administration Pending)

                 Debtors.

_____/

**DEBTORS' EMERGENCY MOTION FOR ENTRY OF ORDER (A) APPROVING
COMPETITIVE BIDDING AND SALE PROCEDURES; (B) APPROVING FORM AND
MANNER OF NOTICES; (C) APPROVING FORM OF ASSET PURCHASE
AGREEMENT, INCLUDING BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (D)
SCHEDULING DATES TO CONDUCT AUCTION AND HEARING TO CONSIDER
FINAL APPROVAL OF SALE, INCLUDING TREATMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; (E)APPROVING SALE OF SUBSTANTIALLY
ALL THE DEBTORS' ASSETS FREE AND CLEAR OF ALL
LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND
(F) GRANTING RELATED RELIEF**

**Basis for Emergency Relief**

**The Debtors request that the Court consider this Motion before
January 15, 2010.  The Debtors have very limited liquidity.  They
are cash constrained and require an expeditors sale process in
order to preserve going concern value.  The Debtors' secured
lender has agreed to provide the Debtors with additional liquidity
through February 28, 2010.  The Debtors seek approval of bid
and sale procedures that will permit the sale to close before
February 28, 2010.**

PROTECTIVE PRODUCTS OF AMERICA, INC. ("PPA"), and its subsidiaries who are

debtors and debtors in possession (collectively, the "Debtors" or the "Companies"), by and through

undersigned counsel, file this *Emergency Motion For Entry of Order (A) Approving Competitive*

---

[1] The name and last four digits of the taxpayer identification number for each of the Debtors follows in parenthesis:  (i) Protective Products of America, Inc. (9709); (ii) CPC Holding Corporation of America (8086); (iii) Ceramic Protection Corporation of America (7305); (iv) Protective Products International Corp. (7373); and (v) Protective Products of North Carolina, LLC (0927).  The address for the Debtors is 1649 NW 136th Avenue, Sunrise, FL 33323.

*Bidding and Sale Procedures; (B) Approving Form and Manner of Notices; (C) Approving Form of Asset Purchase Agreement, including Break-up Fee and Expense Reimbursement; (D) Scheduling Dates To Conduct Auction and Hearing to Consider Final Approval of Sale, including Treatment of Executory Contracts and Unexpired Leases; (E) Approving Sale of Substantially All The Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (E) Granting Related Relief* (the "Motion"), seeking entry of an order:

(i)     substantially in the form annexed hereto as **Exhibit A** to the Agreement (as defined below) (the "Bidding Procedures Order") approving (a) certain bidding procedures (the "Bidding Procedures"), substantially in the form annexed as **Exhibit 1** to the Bidding Procedures Order annexed hereto, to govern the sale (the "Sale") of substantially all of the Debtors' assets, including, without limitation, the Break-Up Fee and the Expense Reimbursement (each as defined and described below); (b) scheduling a hearing to consider approval of the Sale (the "Sale Hearing"); (c) approving the forms and manner of notice of the Bidding Procedures, the auction of the Property (the "Auction") and the Sale Hearing, substantially in the form annexed hereto as **Exhibit 2** to the Bidding Procedures Order (the "Sale Notice"); and (d) approving the form and manner of the notice of the assumption and assignment of the Contracts (as defined and described below), substantially in the form attached to the motion as **Exhibit 3** to the Bidding Procedures Order (the "Contract Notice"); and

(ii)     substantially in the form annexed hereto as **Exhibit B** to the Agreement (the

"Sale Order") (a) authorizing and approving the Sale of substantially all of

the Debtors' assets free and clear of all liens, claims, encumbrances and

interests; (b) authorizing the assumption and assignment of the Contracts; and

(c) granting certain related relief.

In support of the Motion, the Debtors rely on the *Declaration of Neil E. Schwartzman In Support of The Debtors' Chapter 11 Petitions And Request For First Day Relief* (the "First Day Declaration"), and respectfully represent as set forth below.[2] *Notably, the Proposed Purchaser (as defined below) will not acquire the Debtors' cash and certain intangible assets, leaving, the Debtors believe, sufficient assets to satisfy the Debtors' administrative claims and likely provide recoveries to unsecured creditors.*

## THE CHAPTER 11 PROCEEDINGS

1.     On the date hereof (the **"Petition Date"**), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

2.     The Debtors continue in possession of their property and are operating and managing their business as Debtors in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

3.     No request has been made for the appointment of a trustee or examiner and a creditors' committee has yet to be appointed in this case.

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Agreement (as defined below).

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. §157(b)(2).  Venue of this case and this Motion is proper before this Court pursuant to 28 U.S.C. §§1408 and 1409.

5.      The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") and Rules 2002, 3017 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

## THE DEBTORS' BUSINESS OPERATIONS

6.      The Debtors design, manufacture and market advanced products that provide ballistic protection for personnel and vehicles in the military and law enforcement markets. Their product portfolio includes a full line of soft armor police and military protective products, including vests, special purpose armor plates, shields, helmets and law enforcement vehicle door protection systems. One of their signature products is the Modular Tactical Vest, or MTV, which was selected in 2006 by the U.S. Marine Corps in a competitive process, to replace its previous Interceptor body armor system. The Debtors are capable of providing customers with an integrated armoring system of soft ballistic material, vests and plates for military personnel.

7.      The Debtors' customers include agencies of the U.S. Government, international militaries, prime government contractors who integrate the Debtors' products into their armor systems, distributors and law enforcement agencies. During the nine months ended September 30, 2009, approximately 95% of their products were sold to customers in the United States.

8.      The Debtors maintain their headquarters and primary manufacturing and research and development facilities in Sunrise, Florida.

9.    For a detailed description of the Debtors and their operations, the Debtors respectfully refers the Court and parties in interest to the First Day Declaration.

## PRE-PETITION SECURED INDEBTEDNESS

10.    PPA, as borrower, the other Debtors, as guarantors, and Canadian Imperial Bank of Commerce ("CIBC" or "Lender"), as lender, are parties to that credit agreement dated as of September 21, 2004, as amended and restated pursuant to an amended and restated credit agreement dated as of January 30, 2009, as further amended by a second amending agreement to the forbearance agreement executed December 29, 2009, as the same may be further amended, supplemented, restated, replaced or otherwise modified from time to time, collectively, the "Credit Agreement").  Pursuant to the Credit Agreement, CIBC provided working capital and term loans to the Debtors.

11.    As of the Petition Date, the Debtors were indebted to CIBC in the approximate amount of $7,600,000.

12.    CIBC asserts that its indebtedness is secured by senior liens in and upon substantially all of the assets of the Debtors.

## MARKETING AND SALE EFFORTS

13.    The Debtors' assets have been significantly marketed over more than six months. Beginning on June 16, 2009, the Debtors retained Bayshore Partners, LLC, the broker dealer affiliate of Farlie Turner & Co. ("Bayshore Partners"), in order to assist the Debtors in evaluating their strategic options with respect to the sale or recapitalization of their businesses and related assets both as a going concern outside of bankruptcy or in the context of a potential chapter 11 bankruptcy filing.

14.     Bayshore, among other things, prepared a confidential investment memorandum (the "CIM") to assist in marketing the Debtors' assets for sale or in raising additional debt or equity capital.  The CIM contains detailed information on the Debtors' business, strategy, market position, growth opportunities, and historical and projected financial performance.

15.     Bayshore conducted an extensive marketing process, contacting over 100 parties, including potential strategic buyers operating within the Debtors' industry as well as private equity firms, various lending institutions and the Debtors' existing debt and equity security holders.  As a result of these efforts, approximately 28 parties entered into confidentiality agreements with the Debtors and were provided with the CIM.  Bayshore was significantly involved in various due diligence activities including creating management presentations, assembling data requests, and answering specific requests by potential buyers and capital providers.  Several parties conducted extensive due diligence, visited the Debtors' facilities, and had discussions with various members of the management team and board of directors.  Thereafter, Bayshore transmitted detailed bid instructions to interested parties and 6 parties submitted written indications of interest contemplating the acquisition of substantially all of the Debtors' assets to be effected in a bankruptcy setting, while 2 parties indicated an interest in providing subordinated debt capital to the Debtors outside of bankruptcy.

16.     After analyzing the offers, the Debtors in consultation with their advisors and CIBC, determined that Sun Capital Partners Group V, Inc.'s - ("Sun Capital") offer provided the greatest value to the Debtors and their key constituents.  On December 21, 2009, the Debtors and Sun Capital executed a non-binding letter of intent (the "Letter of Intent") pursuant to which Sun Capital proposed to acquire, subject to due diligence, certain of the Debtors' assets for approximately

$8,000,000 in cash plus the assumption of specified liabilities.  Importantly, the Letter of Intent permitted the Debtors to retain certain assets, including their interest in several tax refunds valued by the Debtors at approximately $5.5 million.

17.    To ensure that the assets were appropriately marketed and that the Debtors receive the highest and best price, the Letter of Intent contemplated that the assets would ultimately be sold through a Court approved auction and sale process under section 363 of the Bankruptcy Code.

18.    Following entry into the Letter of Intent, the Debtors and Sun Capital moved forward with the negotiation and documentation of a purchase and sale agreement.

19.    After arm's length negotiations over both price and contract terms, on January 13, 2010 the Debtors, as sellers, and Protective Products Enterprises, Inc., an affiliate of Sun Capital (the "Proposed Purchaser"), as purchaser, entered into the Asset Purchase Agreement in the form attached hereto as **Exhibit A** (the "Agreement").

20.    The Agreement provides for the sale of the assets identified in the Agreement (the "Acquired Assets") to the Proposed Purchaser, or to a higher bidder pursuant to the bidding procedures for which approval is sought in this Motion.  The Sale Motion also requests authority to assume and assign certain unexpired leases and executory contracts as provided in the Agreement.

21.    The Agreement provides for a purchase price of $8,000,000 in cash for the Acquired Assets, and for the Proposed Purchaser to assume certain liabilities, including the Cure Costs of the Assumed Contracts (subject to the limitations set forth in the Agreement) (collectively, the "Purchase Price").  Pursuant to the Agreement, the Proposed Purchaser has posted a deposit of $500,000.  The Debtors believe that the consummation of the Agreement will yield net proceeds sufficient to pay all of the allowed secured claims in the cases and make a distribution to the holders

of allowed unsecured claims.    Importantly, the Agreement provides for the Debtors' estates to retain Excluded Assets, including certain Avoidance Actions and tax refunds.  The Debtors believe the latter have a value of approximately $5.5 million.

22.    The Agreement also contemplates bidding procedures and an auction process and allows the Debtors to seek a higher and better purchase offer for the Acquired Assets.

### RELIEF REQUESTED

23.    By this Motion, the Debtors seek the entry of an Order pursuant to sections 363 and 365 of the Bankruptcy Code, and Rules 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure: (i) approving the Bidding Procedures; (ii) approving the form of the Agreement for use in connection with the Bidding Procedures; (iii) approving the form and manner of notices; (iv) scheduling a hearing date no later than February 19, 2010 (the "Sale Hearing") or one business day after the Debtors conduct the Auction to consider final approval of the sale of the Acquired Assets (the "Sale") and treatment of executory contracts and unexpired leases; and (v) granting related relief.

24.    The Debtors are cash-constrained and require an immediate and significant cash infusion.  In order to maximize the value of their estates and ensure continued and uninterrupted operations, it is in the best interests of the Debtors and their creditors to complete the marketing and sale of the Acquired Assets through an organized auction process (the "Auction") on an expedited basis.

25.    The Debtors submit that the Auction would be conducted at the offices of counsel for the Debtors and request that the Court conduct a hearing to approve the Sale to the Successful Bidder (as defined below) approximately one business day thereafter.

26.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or by public auction.  The Debtors have determined that the sale of the Acquired Assets to the Proposed Purchaser under the Agreement as a "stalking horse" and an auction governed by the procedures proposed herein will enable the Debtors to obtain the highest and best offer for the Acquired Assets and maximize the value of its estate, and is in the best interest of the Debtors, its creditors and other parties-in-interest.

**A.    <u>Proposed Bidding Procedures</u>**

27.    To participate in the Auction, the Debtors propose that all interested persons comply with the Bidding Procedures, including the requirement that all bids be submitted in writing so as to be received by no later than 4:00 p.m., Prevailing Eastern Time, two (2) business day prior to the date of the Auction.

**B.    <u>Qualified Bids and Bidders</u>[3]**

28.    Pursuant to the Bidding Procedures, only qualified bidders (the "Qualified Bidders") may submit bids for the Acquired Assets or otherwise participate in the Auction.  Qualified Bidders are those entities who (i) have executed and delivered to the Debtors a confidentiality agreement (the terms of which shall be no more favorable to the prospective bidder than those contained in the confidentiality agreement executed by the Proposed Purchaser) in form and substance satisfactory to the Debtors in their sole discretion, (ii) have delivered to the Debtors the potential bidder's most recent audited financial statements, or in the case of a  potential bidder formed for the purpose of acquiring the Acquired Assets, current financial statements of the equity holder(s) of the potential bidder or such other financial disclosure, acceptable to, and requested by, the Debtors, which

---

[3]  The summary of the Bidding Procedures provided herein is qualified in its entirety by the Bidding Procedures.  In the case of any inconsistency between this summary and the Bidding Procedures, the Bidding Procedures shall govern.

information shall demonstrate the financial capability of the potential bidder to purchase the Acquired Assets, and provide "adequate assurance of future performance" within the meaning of section 365(f)(2)(B) of the Bankruptcy Code with respect to Assumed Contracts should the potential bidder be the Successful Bidder; provided, however, if the prospective bidders (or the equity holders of an acquisition entity formed to be a prospective bidder) have financial statements that are audited by outside accountants, the financial statements required hereby shall be audited financial statements, and in all events an authorized representative of the bidder shall certify the financial statements required hereby as true and correct, (iii) have provided evidence that the bidder has the necessary internal authorizations and approvals necessary to engage in the transaction without the consent of any entity that has not already been obtained or that if any consent is required it can be obtained, and (iv) have delivered a cashier's check made payable to Berger Singerman, P.A.  ("Berger Singerman"), or wire transfer in an amount not less than $500,000 (the "Qualified Bidder Deposit").

29.    Within one (1) business day of each potential bidders' delivery of all of the materials in the immediately preceding paragraph, Berger Singerman will notify such potential bidder in writing as to whether such potential bidder shall be considered a Qualified Bidder.

30.    Any Qualified Bidder who desires to make a competing offer for the Acquired Assets must submit a written copy of its bid to (i) Debtors' counsel, Berger Singerman, 200 South Biscayne Boulevard, Suite 1000, Miami, FL 33131, Attn: Jordi Guso, Esq., Fax: (305) 714-4340, email: jguso@bergersingerman.com; and (ii) Debtors' investment banker, Bayshore Partners, LLC, 401 East Las Olas Blvd., Suite 1160, Fort Lauderdale, Florida, 33301, Fax: (954) 358-3838, e-mail: szuckerman@farlieturner.com; and (iii) Proposed Purchaser's counsel, Kirkland & Ellis LLP, 300

North LaSalle Street, Chicago, Illinois, 60654, Attn: Patrick Nash and Paul Wierbicki and

Greenberg Traurig, P.A., 1221 Brickell Avenue, Miami, Florida 33131, Attn: Scott Grossman.

31.    To constitute a qualified competing bid (a "Qualified Bid") the requirements listed

below must be satisfied.

(a)    The bid must include an executed definitive purchase agreement which shall be for the purchase of all or substantially all of the Acquired Assets and the assumption of substantially all of the assumed liabilities and must be marked to show changes (including changes in the Acquired Assets and assumed liabilities) from the Agreement (the "Marked Agreement").    All modifications or amendments to the proposed Agreement that are contained in the Marked Agreement must be "red lined" in order to be enforceable against the Debtors.

(b)    The Marked Agreement must provide for consideration to the Debtors' estates of not less than $8,870,000 in cash, plus and the assumption of the assumed liabilities, exclusive of any post closing adjustments provided for in the Marked Agreement that do not guarantee additional cash to the Debtors' estates.

(c)    The Marked Agreement must not be conditioned on the ability of the bidder to obtain financing or the outcome of unperformed due diligence by the bidder; provided, that a bid may be subject to the satisfaction of specified conditions in all material respects at the closing of the Sale.  Notwithstanding anything herein, the Marked Agreement must provide for the closing of the Sale on a date no later than the date set forth in the Agreement.

(d)    The Marked Agreement must be accompanied by a letter affirmatively (i) setting forth the identity of the bidder and the contact information for such bidder and full disclosure of any affiliates or insiders of the Debtors involved in such bid, (ii) stating that the bidder offers to purchase the Acquired Assets upon the terms and conditions set forth in the Marked Agreement, (iii) summarizing the proposed consideration the bidder proposes to pay under the Marked Agreement (e.g., cash and assumed liabilities), (iv) stating the aggregate value of the consideration the bidder proposes to pay under the Marked Agreement (which statement of value shall not be binding on the Debtors or the Court), (v) stating the form of the Qualified Bidder Deposit (i.e., cashier's check or wire transfer) made by the bidder, and (vi) further providing that such offer shall be binding and irrevocable until 20 days after the entry of an order approving the Sale.

(e)    The foregoing materials must be received by Berger Singerman, Bayshore Partners, LLC and Kirkland & Ellis on or before 4:00 p.m., Prevailing Eastern Time, on February 15, 2010 (the "Initial Bid Deadline").

32.    If the Debtors receive a Qualified Bid by the Initial Bid Deadline, the Debtors will conduct the Auction at the offices of Berger Singerman, 350 E. Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301 (or such other place selected by the Debtors), on February 18, 2010 at 10:00 a.m., Prevailing Eastern Time.  Bidding at the Auction will commence with the highest Qualified Bid and continue in increments of not less than $100,000 until all parties have made their final offers.  At the conclusion of the Auction, the Debtors shall review and consider each of the Qualified Bids and any increased Qualified Bids and shall determine, in its sole discretion, which of the Qualified Bid(s) or increased Qualified Bid(s) constitute the highest and best offer for the Acquired Assets and which of the Qualified Bids or increased Qualified Bids constitutes the second highest and best bid for the Acquired Assets; provided, that in the event that the Debtors receive competing bids with different economic terms (e.g., alternative forms of consideration as to the Purchase Price or different bundles of Acquired Assets or assumed liabilities), the Debtors shall have one business day after the Auction concludes to evaluate such competing bids for the sole purpose of determining and announcing the highest and best bid (and the Seller shall not in such time solicit from any competing bidders additional consideration, terms or conditions). The bidder making the bid that is selected as the highest or best by the Debtors or any bid that is ultimately selected by the Debtors in accordance with the Bidding Procedures pursuant to an Alternative Transaction, shall be considered the "Successful Bidder," and the bidder that is selected as the second highest and best bid by the Debtors shall be considered the "Second Highest Bidder," provided that the Proposed Purchaser will not be the Second Highest Bidder unless it so elects at the time.  The Debtors shall inform each of the bidders of the decision regarding who are the Successful

Bidder and the Second Highest Bidder.  The Qualified Bidder Deposit of the Successful Bidder shall be considered the "Successful Bidder Deposit."

## C.    Bidding Protection

33.    The Proposed Purchaser has expended, and likely will continue to expend, considerable time, money and energy pursuing the Sale and has engaged in extended arm's length and good faith negotiations.  In recognition of this expenditure of time, energy and resources, and the benefits of securing a stalking horse or opening bid, the Debtors has agreed to provide the Bidding Protections to the Proposed Purchaser.  Specifically, the Bidding Protections require, among other things, (i) Court approval of a break-up fee (the "Break-Up Fee") of  $320,000 plus reimbursement (the "Expense Reimbursement"), subject to Court approval as to reasonableness, of documented out-of-pocket costs, fees and other expenses incurred in connection with the Sale not to exceed $350,000 (including without limitation the negotiation of the Agreement, drafting, review and comments on drafts, attendance at hearings and due diligence); (ii) the Break-Up Fee and Expense Reimbursement will be payable by the Debtors subject to the terms of the Agreement; (iii) the Break-Up Fee and Expense Reimbursement shall be paid at closing to the Proposed Purchaser in accordance with the terms of the Asset Purchase Agreement and shall be allowed as a superpriority administrative expense claim in favor of the Proposed Purchaser having superpriority under sections 503(b) and 507(c) of the Bankruptcy Code, and which shall be senior to any and all claims of any creditors of or holders of equity interests in the Debtors, including prepetition and postpetition amounts owing to the Debtors' prepetition and postpetition senior secured lenders, and which, in accordance with the Bidding Procedures, the Proposed Purchaser shall be a "carve out" form the collateral securing the obligations owed to the Debtors' prepetition and postpetition senior secured lenders but which shall be payable solely from the proceeds of an Acquisition Proposal, or

the date any Debtor consummates a plan of reorganization; (iv) establishing a date by which initial Qualified Bids must be submitted; (v) establishing the Bidding Procedures for an auction at which only Qualified Bidders who have previously submitted a Qualified Bid may bid; and (vi) setting the minimum amount of the incremental bids at $100,000.

34.     The Bidding Protections were a material inducement for, and a condition of, the Proposed Purchaser's entry into the Agreement.  The Debtors believe that they are fair and reasonable in view of among other things (a) the intensive analysis, due diligence investigation, and negotiation undertaken by the Proposed Purchaser in connection with the Sale in a short period of time, and (b) the fact that the efforts of the Proposed Purchaser have increased the chances that the Debtors will receive the highest and best offer for the Acquired Assets, to the benefit of the Debtors, their estates, their creditors, and all other parties-in-interest.  The Proposed Purchaser is unwilling to commit to hold open its offer to purchase the Acquired Assets under the terms of the Agreement unless the Bidding Procedures Order authorizes payment of the Break-Up Fee and Expense Reimbursement.  Thus, absent entry of the Bidding Procedures Order and approval of the Bidding Protections, the Debtors may lose the opportunity to obtain what they believe to be the highest and best, and perhaps the only, available offer for the Acquired Assets.  The Debtors believe that the Bidding Procedures and Bidding Protections are fair and reasonable and, combined with the Proposed Purchaser's offer to acquire the Acquired Assets, will maximize the value realized by the Debtors' estate.

35.     The Debtors propose that the Court shall retain jurisdiction to hear and determine all matters arising from or relating to the implementation of the Bidding Procedures Order.

**D.      Notice of Auction and Bidding Procedures, Sale Motion and Sale Hearing**

36.     Within three (3) business days after the entry of the Bidding Procedures Order, the

Debtors will cause the Sale Notice to be sent by first-class mail postage prepaid, to the following: (a) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest or encumbrance of record against all or any portion of the Acquired Assets; (b) the Office of the United States Trustee; (c) the Environmental Protection Agency; (d) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Acquired Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Acquired Assets or have any known interest in the relief requested by the Motion; (e) the state and local environmental agencies in the jurisdictions where the Debtors own or lease real property; (f) counsel to the Proposed Purchaser; (g) counsel to the prepetition and postpetition secured lenders; (h) the United States Attorney's office; (i) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (j) counsel to the Committee; (k) all parties to any litigation involving the Debtors; (l) all of the Debtors' current employees and former employees, if any, who were terminated immediately prior to the commencement of these cases, (m) all counterparties to any executory contract or unexpired lease of the Debtors; (n) all other known creditors and interest holders of Debtors; and (o) all potential bidders previously identified or otherwise known to the Debtors.  In addition, the Debtors shall publish the Sale Notice (in summary form) in The Wall Street Journal (National Edition) or another publication of national circulation selected by the Debtors.  The Debtors submit that service and publication of the Sale Notice constitutes good and sufficient notice, pursuant to Bankruptcy Rule 2002, of the Bidding Procedures, the Auction, the Bidding Procedures Order, the Sale Motion and the Sale Hearing (and any proceedings to be held thereon).

37.    Objections, if any, to the Sale Motion (other than with respect to the Bidding Procedures and related matters approved pursuant to the Bidding Procedures Order) shall be in writing, shall conform to the Bankruptcy Rules, the Local Rules and orders of the Bankruptcy Court, shall set forth: (i) the nature of the objector's claims against or interests in the Debtors' estates; (ii) the basis for the objection; (iii) the specific grounds therefor; and (iv) all evidence in support of said objection, and shall be filed and served so as to be received on or prior to February 15, 2010 at 4:00 p.m. Prevailing Eastern Time, by: (a) all parties in interest on the Master Service List; and (b) counsel for Proposed Purchaser.  The Debtors propose that any person objecting to the Sale Motion that has not complied with the requirements of this paragraph shall not be heard at the Sale Hearing.  If the Proposed Purchaser or a Qualified Bidder objects to the Debtors' determination of an offer as a higher or better bid for the Assets, the sole and exclusive remedy of the Proposed Purchaser or such Qualified Bidder shall be to bid under protest at the Auction and, upon compliance with this paragraph, have standing at the Sale Hearing to contest the Debtors' determination.

38.    If a party other than the Proposed Purchaser is the Successful Bidder at the Auction, all counterparties to executory contracts which the Debtors intends to assume and assign pursuant to the proposed sale of the Acquired Assets will be served within two business days after the entry of the Sale Order with a notice of the winning bid, including sufficient information for the counterparty to evaluate the proposed assignee's ability to comply with section 365 of the Bankruptcy Code (the "Post-Auction Notice").  A counterparty to such an executory contract or unexpired lease who receives a Post-Auction Notice may file and serve an objection to such assumption and assignment based solely on adequate assurance of future performance grounds

within ten days after service of the Post-Auction Notice.  If no objection is timely filed, such assumption and assignment shall be deemed authorized without any further order of this Court.  If a timely objection is properly filed and served, a hearing shall be held before the Court promptly.

### E.    The Proposed Assumption Procedures

39.    To facilitate and effect the Sale, the Debtors seek authority to assume and assign the Contracts designated in the Agreement, consistent with the procedures established in the Bidding Procedures Order.  The Debtors propose that the procedures set forth in the Bidding Procedures Order (the "Assumption Procedures") apply whether the Proposed Purchaser or another party is the Successful Bidder.  The proposed Assumption Procedures are as follows:

a)    **Notice**.  As soon as practicable after entry of the Bidding Procedures Order, but in no event later than January 15, 2010 the Debtors will serve the Contract Notice on the counterparties to the Contracts, the Committee and the United States Trustee for the Southern District of Florida (the "US Trustee").

b)    **Content of Contract Notice**.  The Contract Notice will contain the following information: (a) the title of the Contract to be assumed; (b) the name of the counterparty to the Contract; (c) any applicable cure amounts, whether arising prepetition or postpetition (the "Cure Amount"); (d) the identity of the proposed assignee; (e) the proposed form of order approving the assumption and assignment of the Contract; and (f) the deadline by which any such Contract counterparty must object.

c)    **Objections**.  Objections to the proposed Cure Amount and adequate assurance of future performance of obligations to counterparties to the Contracts must: (a) be in writing; (b) set forth the nature of the objector's claims against or interests in the Debtors' estates, and the basis for the objection and the specific grounds therefore; (c) comply with the Bankruptcy Rules and the Local Bankruptcy Rules and Orders of this Court; and (d) be filed with the Court and served upon the Debtors, the Proposed Purchaser, the Committee and the US Trustee, so as to be received no later than 4:00 p.m. (Eastern time) on February 15, 2010.

d)    **Effects of Filing an Objection to a Contract Notice**. A properly filed and served objection to a Contract Notice will reserve such objecting party's rights against the Debtors with respect to the relevant cure objection, but will not constitute an objection to the remaining relief requested in the motion.

**F.    Sale Hearing**

40.    The Debtors propose that the Sale Hearing to consider the relief requested in the Sale Motion and, if the Auction is conducted, to consider whether to approve the Successful Bidder(s) (the "Sale Hearing") shall be held on or about February 19, 2010.

41.    Provided that one or more Qualified Bids are received prior to the Initial Bid Deadline, the Debtors may thereafter establish such modified or additional Bidding Procedures as the Debtors deem appropriate based on the circumstances; provided that such modifications and additions shall not be materially inconsistent with the Bidding Procedures contained herein.  The Debtors may seek adjournment of the Sale Hearing without further notice.  The Debtors shall file with the Court appropriate notices of adjournment with respect to any such adjournment.

**AUTHORITY FOR RELIEF REQUESTED**

42.    The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate.  *See, e.g.*, *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand"); *In re Integrated Resources, Inc.*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.").  To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of

bankruptcy sales.  *See id.* (such procedures "encourage biding and maximize the value of the Debtors's assets").

43.    Historically, bankruptcy courts have approved bid protections similar to those proposed pursuant to the Bidding Procedures proposed here under the "business judgment rule," under which the courts defer to the actions of corporations taken in good faith and in the exercise of honest judgment.  *See, e.g.*, *In re 955 Fifth Ave. Associates, L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1992).

44.    The bid protections set forth herein satisfy the "business judgment rule."  The bid protections proposed encourage a potential purchaser to act as a "stalking horse," who invests time, money and effort to negotiate with the Debtors despite the risks and uncertainties of the Chapter 11 bankrtupcy process.

45.    One important component of the proposed Bidding Procedures is the "overbid" provision, pursuant to which any initial offer for the Acquired Assets must be in an amount of at least $100,000 more than (i) the Purchase Price, plus (ii) the Break-Up Fee and Expense Reimbursement, and each minimum bid increment thereafter must be at least $100,000.  A minimum initial overbid is necessary both to compensate a prospective purchaser for the risk that it assumes in foregoing a known outcome, and to ensure that there is an increase in the net proceeds received by the estate, after deducting the break-up fee and expense reimbursement to be paid to the prospective purchaser in the event of a prevailing overbid.  Case law supports minimum overbids that are up to 10% of the initial purchase price as fair and reasonable.  See, *In re Wintex, Inc.*, 158 B.R. 540, 543 (D. Mass. 1992) (observing, in the context of a 10% overbid provision, that "Debtors may avoid the increased cost and complexity associated with considering additional bids unless the

additional bids are high enough to justify their pursuit"); *In re Tempo Technology Corp,* 202 B.R. 363, 369 (D. Del. 1996) (overbid price of $1.4 million in cash where original purchase price was $150,000 cash plus $3 million in stock of the purchaser and $500,000 of assumed liabilities). The proposed overbid here is approximately 4% of the Agreement Purchase Price (assuming the Proposed Purchaser increases its deposit to $1 millon and the Court grants the 3% fee, or much less if the deposit remains at $300,000), well-within precedential cases.

46.    In order to compensate the Proposed Purchaser for the time, effort, expense, and risk that it has incurred and will incur in conducting due diligence and negotiating, documenting, and seeking to consummate the sale transaction, the Bidding Procedures also provide that, if a Sale of the Acquired Assets to a party other than the Proposed Purchaser is consummated by the Debtors, then the Debtors will pay the Proposed Purchaser the Break-Up Fee and Expense Reimbursement.

47.    To compensate Proposed Purchaser for serving as the "stalking horse," thereby subjecting its bid to higher or better offers, the Debtors seek authority to pay the Break-Up Fee and the Expense Reimbursement if Proposed Purchaser is not the Successful Bidder. Bankruptcy courts in numerous districts, including this District, have routinely approved bidding incentives similar to the requested Break-Up Fee and the Expense Reimbursement under the "business judgment rule," which, as described above, proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. *See In re Tousa, Inc., et al.,* No. 08-10928-JKO (Bankr. S.D. Fla. December 21, 2009) (approving break-up fee and expense reimbursement in connection with section 363 asset sale of real property); *In re Gemini Cargo Logistics, Inc.*, No. 06-10870 (Bankr. S.D. Fla. Apr. 17, 2006) (approving break-up fee payable in connection with exit financing and expense reimbursement of reasonable out-of-pocket

expenses); *In re Picadilly Cafeterias, Inc.*, No. 03-27976 (Bankr. S.D. Fla. Sept. 14, 2004) (approving payment of expense reimbursement as bidder protection); *see also In re Solutia Inc.*, Case No. 03-17949 (PCB) (Bankr. S.D.N.Y. Oct. 19, 2005) (Order Authorizing Solutia to Sell Assets of Astaris LLC) (approving termination fee of $7.5 million (2.94 percent) and reimbursement of expenses up to $2 million); *In re Magellan Health Servs., Inc.*, Case No. 03-405115 (PCB) (Bankr. S.D.N.Y. Sept. 8, 2003) (approving termination fee of $4 million (2.6 percent) and reimbursement of expenses up to $1 million); *In re Genuity Inc.*, Case No. 02-43558 (PCB) (Bankr. S.D.N.Y. Dec. 16, 2002) (approving breakup fee of $10 million (4.1 percent) and expense reimbursement up to $3 million); *see also In re Integrated Res., Inc.*, 147 B.R. at 658 ("[a] bankruptcy court should uphold a break-up fee which was not tainted by self-dealing and was the product of arm's length negotiations."); *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991) (applicable principal of law for the use of assets pursuant to section 363(b)(1) of the Bankruptcy Code is that it is appropriate in circumstances where a transaction represents a reasonable business judgment on the part of a Debtors).

48.     Indeed, the use of a stalking horse in a public auction process for sales pursuant to section 363 of the Bankruptcy Code is an encouraged practice in chapter 11 cases since the use of a stalking horse bid is in many circumstances the best way to maximize value in an auction process by locking in a purchase price "floor" before exposing an asset to auction.  As a result, stalking horse bidders virtually always require topping fees and other forms of bidding protections as an inducement for holding their purchase offer open while it is exposed to overbids in an auction process.  Thus, the use of bidding protections, including break-up fees and expense reimbursements, has become an established practice in chapter 11 cases.  *See, e.g. In re Gemini Cargo Logistics,*

*Inc.*, No. 06-10870 (Bankr. S.D. Fla. Apr. 17, 2006) (approving break-up fee payable in connection with exit financing and expense reimbursement of reasonable out-of-pocket expenses); *In re Picadilly Cafeterias, Inc.*, No. 03-27976 (Bankr. S.D. Fla. Sept. 14, 2004) (approving payment of expense reimbursement as bidder protection); *see also In re Loral Space & Commc'ns, Ltd.*, Case No. 03-41710 (RDD) (Bankr. S.D.N.Y. Aug. 19, 2003) (approving termination fee and reimbursement of expenses); *Adelphia Bus. Solutions, Inc.*, Case No. 02-11389 (REG) (Bankr. S.D.N.Y. Jan. 24, 2003) (approving termination fee and reimbursement of expenses); *In re Bradlees Stores, Inc.*, Case No. 00-16035 (BRL) (Bankr. S.D.N.Y. Jan. 11, 2001) (approving termination fee and reimbursement of expenses); *In re Integrated Res., Inc.*, 147 B.R. at 662 (approving termination fee and reimbursement of expenses); *In re Marrose Corp.*, 1992 WL 33848 at *5 (Bankr. S.D.N.Y. 1992) (bidding incentives are "meant to compensate the potential acquirer who serves as a catalyst or 'stalking horse' which attracts more favorable offers."); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding procedures may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.") (citation omitted).

49.     The proposed Break-Up Fee and Expense Reimbursement is necessary and provides an actual benefit to the Debtors' estates. Specifically, the Proposed Purchaser has indicated that it is a condition to its obligations under the Agreement that the Bidding Procedures, including, without limitation, payment of the Break-Up Fee and Expense Reimbursement, as proposed in this Motion, be approved by the Court. As explained above, the Proposed Purchaser's offer represents the Highest Bid for the Acquired Assets that the Debtors have been able to garner in the course of its substantial pre-petition sales and marketing efforts. Unless the Bidding Procedures proposed herein

are approved, the Debtors are not confident that the Auction will generate superior offers. Moreover, the Debtors submit that the willingness of the Proposed Purchaser to commit to purchase the Acquired Assets under the terms and conditions of the Agreement, subject to higher and better offers, may encourage third parties to submit higher bids for the Acquired Assets.

50.     Consistent with the legal standards articulated above, the Debtors believe that the Break-Up Fee (equal to 4% of the Purchase Price) and the Expense Reimbursement are reasonable and appropriate in view of, among other things, the size and nature of the transactions contemplated by the Agreement and the extensive and expedited due diligence, analysis and negotiation undertaken by Sun Capital in connection with the transactions contemplated by the Agreement.  The Bid Protections, the product of good faith, arm's-length dealings, are a material inducement for, and a condition of, the Proposed Purchaser's entry into the Agreement, and cover little more than the costs and expenses incurred as a result of the extensive analysis, due diligence investigation and negotiations undertaken by the Purchaser in connection with the Sale.  Were the Proposed Purchaser to decide not to go forward with the Sale because it was not afforded the Bid Protections, the Debtors would lose the benefits that would inure to their estates by having the stalking horse bid, including higher bids that, absent such a floor, might not have otherwise been realized.

51.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property free and clear of liens, claims, encumbrances and other interests if one of the following conditions is satisfied:

(a)     applicable nonbankruptcy law permits the sale of such property free and clear of such interest;

(b)     the [lienholder or claimholder] consents;

(c)     such interest is a lien and the price at which such property is to be

     sold is greater than the aggregate value of all liens on such property;

  (d)  such interest is in *bona fide* dispute; or

  (e)  [the lienholder] or claimholder could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

*See* 11 U.S.C. § 363(f); *see also In re South Florida Heart Group*, 342 B.R. 639, 643 (Bankr. M.D. Fla. 2006). Because section 363(f) is stated in the disjunctive, satisfaction of any one of its five requirements will suffice to warrant approval of the proposed sale of homes. *See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (stating that court may approve sale "free and clear" provided at least one of the subsections of 363(f) is met); *In re Gulf States*, 285 B.R. 497 (Bankr. N.D. Ala. 2002); *In re 18th Ave. Dev. Corp. v. Modular Paving, Inc.* (*In re 18th Ave. Dev. Corp.*), 14 B.R. 862, 863-4 (Bankr. S.D. Fla. 1981) (stating that section 363(f) indicates that before sale of property may be authorized "free and clear" only one of five conditions must be met).

   52.  In the instant case, the Agreement satisfies several of the requirements under section 363(f) of the Bankruptcy Code. In the first instance the Debtors have no reason to believe that holders of liens, claims or encumbrances would not consent to the terms of the Agreement pursuant to section 363(f)(2) of the Bankruptcy Code. Further, the Debtors reasonably believe that the purchase price for the Property will yield a greater value than the aggregate value of all liens on the property pursuant to section 363(f)(3) of the Bankruptcy Code. Specifically, the Debtors' estimate that liens assertable against the Property total approximately $7,600,000, plus the amount of the post-petition financing the Debtors proposed to obtain from CIBC. In addition, the Debtors believe that all holders of liens, claims or encumbrances on the Property could be compelled to accept a money satisfaction of their interests in legal or equitable proceedings in accordance with section

363(f)(5) of the Bankruptcy Code, to the extent that such interests are sought to be discharged in the order approving the relief sought in this motion. Such legal or equitable proceedings include proceedings to confirm a plan of reorganization, under which the holder of a lien may be compelled to accept payment in satisfaction of its lien pursuant to section 1129(b)(2)(a) of the Bankruptcy Code. Accordingly, the Debtors submit that any existing encumbrances will attach to the net proceeds recognized at the sale of the Property.

53.    Based upon the foregoing, the Sale free and clear of liens, claims, encumbrances, and interests should be approved by the Court upon the terms requested under section 363(f) of the Bankruptcy Code.

### NO PRIOR REQUEST

54.    No previous request for the requested relief has been made to this or any other court.

### CONCLUSION

55.    The Debtors believe that the Bidding Procedures provide a necessary and actual benefit to the Debtors' estates. The Bidding Procedures establish the parameters under which the value of the Acquired Assets may be tested at a public auction. The terms and conditions of the Auction will enable the Debtors to realize the maximum value of the Acquired Assets, and thus ensure that the Auction is in the best interests of the Debtors, their estates, and their creditors.

### REQUEST FOR WAIVER OF LOCAL RULE 9075-1(B) CERTIFICATION

56.    The Debtors respectfully request that the Court waive the provisions of Local Rule 9075-1(B) which requires an affirmative statement that a bona fide effort was made in order to resolve the issues raised in this Motion, as the relief requested herein is urgent in nature and does not lend itself to advance resolution.

**WHEREFORE**, the Debtors respectfully request the entry of an Order:

(a)    Scheduling a hearing date on this Motion and the approval of the Bidding Procedures, on or about January 15, 2010;

(b)    Setting February 15, 2010 as the deadline for the submission of Qualified Bids.

(c)    Scheduling the Auction on or about February 18, 2010 to take place at the offices of Debtors' counsel or such other location designated by the Debtors;

(d)    Scheduling a hearing date to conduct a hearing on ratification of the Debtors' selection of the Highest and Best Offer on or about February 19, 2010;

(e)    Approving the form and manner of notices;

(f)    Approving the form of the Agreement as the basis for a Marked Agreement from an Alternative Purchaser;

(g)    Approving the bid and sale procedures described herein, including the Break-Up Fee and Expense Reimbursement; and

(h)    Granting any other and further relief that this Court deems just and proper.

Dated: January 13, 2010                              Respectfully submitted,

                                                     BERGER SINGERMAN, P.A.
                                                     *Counsel for the Debtors*
                                                     200 South Biscayne Boulevard, Suite 1000
                                                     Miami, FL  33131
                                                     Telephone:  (305) 755-9500
                                                     Facsimile:   (305) 714-4340

                                                     By:  /s/  Jordi Guso
                                                             Jordi Guso
                                                             Florida Bar No. 863580
                                                             jguso@bergersingerman.com

**<u>Exhibit A</u>**

Asset Purchase Agreement

EXECUTION COPY

ASSET PURCHASE AGREEMENT

dated as of January 13, 2010

among

PROTECTIVE PRODUCTS ENTERPRISES, INC.,

PROTECTIVE PRODUCTS OF AMERICA, INC.,

AND

THE OTHER SELLERS NAMED HEREIN

# TABLE OF CONTENTS

**Page**

ARTICLE I DEFINITIONS AND RULES OF CONSTRUCTION ...............................................4
    1.1    Definitions...............................................................................................................4
    1.2    Rules of Construction ...........................................................................................14

ARTICLE II PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES ............15
    2.1    Purchase and Sale of Assets..................................................................................15
    2.2    Excluded Assets ....................................................................................................16
    2.3    Assignment and Assumption of Liabilities............................................................17
    2.4    No Other Liabilities Assumed. ..............................................................................18
    2.5    Limited Right to Make Revisions to Schedules to Sections 2.1 to 2.4.................21
    2.6    Sellers Actions With Respect to Contracts ...........................................................22
    2.7    Cure Amounts .......................................................................................................24
    2.8    Deemed Consents and Cures .................................................................................24

ARTICLE III BASIC TRANSACTION....................................................................................25
    3.1    Purchase Price........................................................................................................25
    3.2    Payment of Purchase Price at Closing. ..................................................................25
    3.3    Valuation Firm ......................................................................................................26
    3.4    Purchaser's Deposit...............................................................................................26
    3.5    Allocation of Purchase Price..................................................................................27

ARTICLE IV CLOSING ..........................................................................................................27
    4.1    Closing ..................................................................................................................27
    4.2    Closing/Post-Closing Payments.............................................................................27
    4.3    Deliveries by Sellers .............................................................................................28
    4.4    Deliveries by Purchaser .........................................................................................29
    4.5    Form of Instruments..............................................................................................29
    4.6    Further Assurances................................................................................................30
    4.7    Withholding ..........................................................................................................30

ARTICLE V REPRESENTATIONS AND WARRANTIES OF SELLERS................................30
    5.1    Organization, Standing ..........................................................................................30
    5.2    Subsidiaries ...........................................................................................................30
    5.3    Validity of Agreement; Power ...............................................................................31
    5.4    No Conflicts or Violations .....................................................................................31
    5.5    Title to Assets; Assets Necessary to Business. ......................................................32
    5.6    Brokers..................................................................................................................32
    5.7    Contracts ...............................................................................................................32
    5.8    Financial Statements and Related Matters..............................................................32
    5.9    Bank Accounts Schedule .......................................................................................33
    5.10   Closing Date..........................................................................................................33

ARTICLE VI REPRESENTATIONS AND WARRANTIES OF PURCHASER.......................33
   6.1      Organization................................................................33
   6.2      Authority....................................................................33
   6.3      Consents.....................................................................33
   6.4      Financing....................................................................33
   6.5      No Additional Representations .......................................34

ARTICLE VII PRE-CLOSING COVENANTS ...........................................34
   7.1      Consents and Approvals. ..............................................34
   7.2      Access to Information and Facilities................................35
   7.3      Notification of Certain Matters.......................................35
   7.4      Bankruptcy Actions .....................................................36
   7.5      Other Bids .................................................................37
   7.6      Non-Seller Subsidiaries ...............................................37
   7.7      Bankruptcy Matters .....................................................38
   7.8      Financial Statements ....................................................38
   7.9      Real Property. ............................................................38
   7.10    Settlement Action........................................................39

ARTICLE VIII CONDITIONS TO CLOSING.............................................39
   8.1      Conditions to Parties' Obligations...................................39
   8.2      Conditions to Purchaser's Obligations .............................39
   8.3      Conditions to Sellers' Obligations ..................................43

ARTICLE IX TERMINATION............................................................43
   9.1      Termination ...............................................................43
   9.2      Breakup Fee and Expense Reimbursement........................46
   9.3      Effect of Termination or Breach .....................................47

ARTICLE X POST-CLOSING COVENANTS .............................................47
   10.1    Employees.................................................................47
   10.2    Employee Benefit Plans ...............................................48
   10.3    WARN Act................................................................48
   10.4    Payroll Reporting and Withholding .................................48
   10.5    Certain Consents ........................................................49
   10.6    Name Changes ...........................................................49
   10.7    Accounts Receivable; Collections ...................................49
   10.8    Confidentiality ...........................................................49
   10.9    Access to Records and Information ..................................50
   10.10  Taxes ......................................................................50

ARTICLE XI MISCELLANEOUS .........................................................51
   11.1    Non-Survival of Representations and Warranties.................51
   11.2    Expenses. .................................................................51
   11.3    Amendment...............................................................52
   11.4    Waivers ...................................................................52
   11.5    Notices ....................................................................52

| 11.6 | Counterparts; Electronic Execution | 54 |
|------|------------------------------------|----|
| 11.7 | Headings | 54 |
| 11.8 | SUBMISSION TO JURISDICTION; WAIVER OF TRIAL BY JURY | 54 |
| 11.9 | Governing Law | 54 |
| 11.10 | Binding Nature; Assignment | 54 |
| 11.11 | No Third Party Beneficiaries | 55 |
| 11.12 | Construction | 55 |
| 11.13 | Public Announcements | 55 |
| 11.14 | Disclosure Schedules | 55 |
| 11.15 | Entire Understanding | 56 |
| 11.16 | Closing Actions | 56 |
| 11.17 | Conflict Between Transaction Documents | 56 |
| 11.18 | Time Periods | 56 |
| 11.19 | Final Schedules | 56 |

**EXHIBITS**

| Exhibit A | Form of Bidding Procedures Order |
|-----------|----------------------------------|
| Exhibit B | Form of Sale Order |
| Exhibit C | Form of Assignment and Assumption Agreement |
| Exhibit D | Form of Bill of Sale |
| Exhibit E | Form of Intellectual Property Assignments |

**SCHEDULES**

| Schedule 1.1 | Cure Amounts |
|--------------|--------------|
| Schedule 2.1(ii) | Assumed Avoidance Actions |
| Schedule 2.1(iii) | Assumed Bank Accounts |
| Schedule 2.1(v) | Assumed Facility Leases |
| Schedule 2.1(vi) | Assumed Equipment Leases |
| Schedule 2.1(x) | Assumed Contracts |
| Schedule 2.2(i) | Excluded Facility Leases |
| Schedule 2.2(ii) | Excluded Equipment Leases |
| Schedule 2.2(iii) | Miscellaneous Excluded Contracts |
| Schedule 2.2(xii) | Other Excluded Assets |
| Schedule 2.6(c) | Designated Contracts |
| Schedule 5.1 | Foreign Qualifications |
| Schedule 5.2 | Subsidiaries |
| Schedule 5.4 | No Conflicts or Violations |
| Schedule 5.7 | Contracts |
| Schedule 5.8 | Financial Statements and Related Matters |
| Schedule 5.9 | Bank Accounts |
| Schedule 8.2(e) | Required Approvals, Consents and Novations |

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT is made and entered into as of this 13th day of January, 2010 (the "Effective Date"), by and among Protective Products Enterprises, Inc., a Delaware corporation ("Purchaser"), Protective Products of America, Inc., a Delaware corporation ("ParentCo"), CPC Holding Corporation of America, a Delaware corporation ("CPC"), Ceramic Protection Corporation of America, a Delaware corporation ("Ceramic Protection"), Protective Products International Corp., a Florida corporation ("PPIC"), and Protective Products of North Carolina LLC, a North Carolina limited liability company ("PPNC", and together with ParentCo, CPC, Ceramic Protection and PPIC, "Sellers", and each individually, a "Seller").

In consideration of the mutual covenants, agreements and warranties herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## DEFINITIONS AND RULES OF CONSTRUCTION

1.1 Definitions.   Unless otherwise defined herein, terms used herein shall have the meanings set forth below:

"Accounts Receivable" means all accounts and notes receivable (whether current or non-current) in respect of goods shipped, products sold or services rendered by any of the Sellers prior to the Closing Date.

"Acquired Assets" has the meaning set forth in Section 2.1 hereof.

"Acquisition Proposal" means a proposal (other than by Purchaser or its Affiliates) relating to any merger, consolidation, business combination, sale or other disposition of ten percent (10%) or more of the Acquired Assets pursuant to one (1) or more transactions, the sale of ten percent (10%) or more of the outstanding shares of capital stock or equity interests of any Seller (including by way of a tender offer, or plan of reorganization or liquidation) or a similar transaction or business combination involving one (1) or more Third Parties and any Seller.

"Actual Current Assets Amount" has the meaning set forth in Section 3.1 hereof.

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession, directly or indirectly, of the power to direct the management and policies of a Person whether by contract, through the ownership of voting securities or otherwise.

"Affiliated Group" means an "affiliated group" as defined in Section 1504 of the Code (or any analogous combined, consolidated or unitary group defined under state, local or foreign income Tax Law) of which any Seller is or has been a member.

4

"Agreement" means this Asset Purchase Agreement, including all of the Exhibits and the Schedules hereto, as the same may be amended from time to time in accordance with its terms.

"Allocation" has the meaning set forth in Section 3.5 hereof.

"Assignment and Assumption Agreements" has the meaning set forth in Section 4.3(b) hereof.

"Assumed Contracts" has the meaning set forth in Section 2.1(x).

"Assumed Equipment Leases" has the meaning set forth in Section 2.1(vi).

"Assumed Executory Contracts" means the Assumed Contracts and the Assumed Leases.

"Assumed Facility Leases" has the meaning set forth in Section 2.1(v).

"Assumed Leased Facilities" means the Leased Facilities identified in the Assumed Facility Leases.

"Assumed Leases" has the meaning set forth in Section 2.1(vi).

"Assumed Obligations" has the meaning set forth in Section 2.3(a) hereof.

"Assumption Notice" has the meaning set forth in Section 2.6(c) hereof.

"Auction" means the auction conducted by Sellers pursuant to the Bidding Procedures Order for substantially all of the Acquired Assets in the event a Qualified Bid is timely received prior to the Bid Deadline (as defined in the Bidding Procedures Order).

"Auction Deadline Date" means February 18, 2010.

"Avoidance Actions" means any causes of action arising under Chapter 5 of the Bankruptcy Code, including, without limitation, any and all preference or avoidance claims and actions of any of the Sellers, including, without limitation, all such claims and actions arising under Sections 544, 547, 548, 549, and 550, respectively, of the Bankruptcy Code.

"Bankruptcy Code" means Title 11 of the United States Code.

"Bankruptcy Court" means the United States Bankruptcy Court for the Southern District of Florida.

"Bid Deadline" means February 15, 2010, as such date may be extended by the Bankruptcy Court up to an additional five (5) Business Days.

"Bidding Procedures Order" means the order of the Bankruptcy Court, in the form of Exhibit A.

5

"Bidding Procedures Order Deadline Date" means January 19, 2010, as such date may be extended by the Bankruptcy Court up to an additional five (5) Business Days.

"Books and Records" means all records and lists of the Business, including (i) all inventory, merchandise, analysis reports, marketing reports, research and development materials and creative material pertaining to the Acquired Assets, the Facilities or the Business, (ii) all records relating to customers, suppliers or personnel of Sellers or of the Business (including customer lists, mailing lists, e-mail address lists, recipient lists, sales records, correspondence with customers, customer files and account histories, supply lists and records of purchases from and correspondence with suppliers), (iii) all records relating to all product, business and marketing plans of Sellers, (iv) all accounting records, Tax records and Tax Returns and (v) all books, ledgers, files, reports, plans, drawings and operating records of every kind; provided, however, that "Books and Records" shall not include the originals of any Seller's minute books, stock books or Tax Returns, or any attorney client communication or attorney work product relating to the negotiation and consummation of the transactions contemplated hereby.

"Breakup Fee" has the meaning set forth in Section 8.2(d)(iii) herein.

"Business" means the activities carried on by Sellers, including the design, manufacturing, distribution and sale of products used for anti-ballistic and other protection for personnel and vehicles in the military and law enforcement markets.

"Business Day" means any day other than Saturday, Sunday and any day that is a legal holiday or a day on which banking institutions in the State of Florida are authorized by Law to close.

"Cash Amount" has the meaning set forth in Section 3.1 hereof.

"Ceramic Protection" has the meaning set forth in the preamble hereto.

"CERCLA" means the Comprehensive Environmental Response, Compensation and Liability Act of 1980, as amended (42 U.S.C. §9601 et seq.) and any Laws promulgated thereunder.

"Chapter 11 Cases" means the cases commenced by Sellers under Chapter 11 of the United States Bankruptcy Code in the Bankruptcy Court.

"Claim" has the meaning set forth in Section 101(5) of the Bankruptcy Code.

"Closing" has the meaning set forth in Section 4.1 hereof.

"Closing Date" has the meaning set forth in Section 4.1 hereof.

"Code" means the United States Internal Revenue Code of 1986, as amended.

"Collective Bargaining Agreement" means any Contract or other binding agreement or arrangement (written or oral) with any labor union or organization, works council or other employee representative.

6

"Company Systems" means the computer systems, including software, hardware, networks, interfaces, platforms and related systems owned or used by Sellers.

"Contract" means any agreement, license, contract, commitment, Collective Bargaining Agreement or other binding arrangement or understanding, whether written or oral, and with respect to any Contract to which any Seller is a party, such contract which any Seller is permitted under the Bankruptcy Code to assume and assign other than an Employee Benefit Plan.

"Contract Retention Period" has the meaning set forth in Section 2.6(c) hereof.

"CPC" has the meaning set forth in the preamble hereto.

"Cure Amount" means any costs of cure with respect to the Assumed Executory Contracts and the Designated Contracts that become an Assumed Executory Contract pursuant to Section 2.6(c), which estimates of amounts are set forth next to each Contract of the Sellers on Schedule 1.1 (the "Cure Amounts", or with respect to an individual Assumed Executory Contract, the "Cure Amount") (for the avoidance of doubt, it is agreed and understood that to the extent no amount is set forth next to an Assumed Executory Contract or Designated Contract on Schedule 1.1, the Cure Amount is deemed to be zero).

"Current Assets Amount" means an amount determined as of the Closing equal to the amount (valued at the lesser of book or fair market value) of receivables and inventory.

"Deferred Prosecution Agreement" means the agreement entered into between Ceramic Protection and the United States of America on January 12, 2010 regarding Ceramic Protection's supply Agreement dated March 10, 2005 with ArmorWorks, Inc.

"Deposit" has the meaning set forth in Section 3.4(a) hereof.

"Designated Contracts" has the meaning set forth in Section 2.6(c) hereof.

"Designated Remaining Executory Contract Obligations" has the meaning set forth in Section 2.6(c) hereof.

"DIP Credit Agreement" means that certain Superpriority Priming Debtor-In-Possession Credit Agreement, dated as of January 13, 2010, among ParentCo, the guarantors named therein and Canadian Imperial Bank of Commerce as lender.

"DIP Facility" means the credit facility governed by the DIP Credit Agreement and the DIP Order which is provided to the Sellers by the existing lenders of Sellers.

"DIP Order" means, collectively, those certain interim and or final orders entered by the Bankruptcy Court approving the DIP Facility in form acceptable to Sellers.

"Disclosure Schedules" has the meaning set forth in Section 11.14 hereof.

"Effective Date" has the meaning set forth in the preamble hereto.

"Electronic Delivery" has the meaning set forth in Section 11.6 hereof.

"Employee Benefit Plan" means any "employee benefit plan" (as defined in ERISA §3(3)) and any other benefit or compensation plan, program, agreement or arrangement maintained, sponsored, or contributed or required to be contributed to by any Seller or any ERISA Affiliate or with respect to which any Seller or any ERISA Affiliate has any Liability.

"Environmental Laws" means, whenever in effect, all federal, state, provincial, local and foreign statutes, Laws (including CERCLA and analogous state Laws), ordinances, directives and other provisions having the force or effect of law, all judicial and administrative Orders and determinations, all contractual obligations and all common law, in each case concerning public health and safety, worker health and safety, or pollution or protection of the environment.

"ERISA Affiliate" means any Person that, at any relevant time, is or was treated as a single employer with any Seller for purposes of Code § 414.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended, and all Laws issued thereunder.

"Escrow Agent" has the meaning set forth in Section 3.4(a) hereof.

"Escrow Agreement" has the meaning set forth in Section 3.4(a) hereof.

"Excluded Assets" has the meaning set forth in Section 2.2 hereof.

"Excluded Contracts" has the meaning set forth in Section 2.2(iii) hereof.

"Excluded Environmental Liabilities" means any Liability (including any investigatory, corrective or remedial obligation) arising under Environmental Laws and relating to (i) Sellers or any predecessor or Affiliate of any Seller, (ii) the operation of the Business prior to the Closing, (iii) any Excluded Asset, (iv) any property, facility, or location other than the Assumed Leased Facilities, or (v) any operations, events, conditions, or circumstances occurring or existing on or prior to the Closing Date, including any Release, threatened Release, treatment, storage, disposal, or arrangement for disposal of or any exposure of any Person to Hazardous Substances occurring or existing on or prior to the Closing Date (whether or not constituting a breach of any representation or warranty herein and whether or not set forth on any Disclosure Schedule).

"Excluded Equipment Leases" has the meaning set forth in Section 2.2(ii) hereof.

"Excluded Facility Leases" has the meaning set forth in Section 2.2(i) hereof.

"Excluded Leases" has the meaning set forth in Section 2.2(ii) hereof.

"Excluded Liabilities" has the meaning set forth in Section 2.4 hereof.

"Exhibits" means the exhibits attached hereto.

"Expense Reimbursement" has the meaning set forth in Section 8.2(d)(iii)(B) hereof.

"Facilities" means collectively the premises at which Sellers operate.

"Facility Leases" means all right, title and interest of Sellers in all leases, subleases, licenses, concessions and other agreements (written or oral) and all amendments, modifications, extensions, renewals, guaranties and other agreements with respect thereto, including the right to all security deposits and other amounts and instruments deposited by or on behalf of any Seller thereunder, pursuant to which a Seller holds a leasehold or subleasehold estate in, or is granted the right to use or occupy, a Leased Facility.

"Final Order" means an Order as to which the time to file an appeal, a motion for rehearing or reconsideration or a petition for writ of certiorari has expired and no such appeal, motion or petition is pending.

"GAAP" means, at a given time, United States generally accepted accounting principles, consistently applied.

"Government Contract" means any Contract (including but not limited to any prime contract, subcontract, letter contract, purchase order, task order, delivery order, teaming agreement or letter of intent) that is (a) between ParentCo or any of its Subsidiaries and a Governmental Authority or (b) is entered into by ParentCo or any of its Subsidiaries as a subcontractor (at any tier) in connection with a Contract between another entity and a Governmental Authority.

"Governmental Authority" means any federal, state, local, municipal, foreign, supranational or other governmental or quasi-governmental authority of any nature (including any governmental agency, branch, bureau, commission, department, official or entity and any court or other tribunal), or any administrative, executive, judicial, legislative, police, regulatory or taxing authority, or arbitral body.

"Hazardous Substances" means any wastes, pollutants, contaminants or chemicals, any industrial, toxic or otherwise hazardous materials, substances or wastes, any explosive or radioactive substances, and any other substance with respect to which Liability or standards of conduct may be imposed under applicable Law, including petroleum and petroleum related substances, products, by products and wastes, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon, urea, formaldehyde, mold, lead based paint, noise, odor and radiation.

"Highest and Best Bid" has the meaning set forth in Section 8.2(d)(iii)(H) hereof.

"Indebtedness" means, with respect to any Person as of any date of determination, without duplication: (i) all obligations of such Person for borrowed money or in respect of loans or advances, (ii) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments or debt securities, (iii) all obligations in respect of letters of credit and bankers' acceptances issued for the account of such Person, (iv) all obligations arising from cash/book overdrafts, (v) all obligations arising from deferred compensation arrangements,

(vi) all obligations of such Person secured by (or for which the holder of such indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, (vii) all Guaranties of such Person in connection with any of the foregoing, (viii) all capital lease obligations, (ix) all deferred rent, (x) all indebtedness for the deferred purchase price of property or services with respect to which a Person is liable, contingently or otherwise, as obligor or otherwise (other than trade payables incurred in the Ordinary Course of Business which are not past due), (xi) all obligations under conditional sale or other title retention agreements relating to property or assets purchased by such Person, (xii) all obligations (determined on the basis of actual, not notional, obligations) with respect to interest rate protection agreements, interest rate swap agreements, foreign currency exchange agreements, or other interest or exchange rate hedging agreements or arrangements, (xiii) all other liabilities classified as non-current liabilities in accordance with GAAP as of the date of determination of such Indebtedness, (xiv) all trade or other payables more than thirty (30) days past due and (xv) all fees, accrued and unpaid interest, premiums or penalties related to any of the foregoing.

"Intellectual Property" means all of the following in any jurisdiction throughout the world: (i) patents, patent applications and patent disclosures, together with all reissuances, continuations, continuations in part, revisions, divisionals, extensions and reexaminations thereof, (ii) trademarks, service marks, designs, trade dress, logos, slogans, trade names, internet domain names, corporate names, all applications, registrations and renewals in connection therewith, and all translations, adaptations, derivations and combinations of any of the foregoing, together with all goodwill associated with any of the foregoing, (iii) copyrights, mask works and copyrightable works, and all applications, registrations and renewals in connection therewith, (iv) trade secrets and confidential information (including formulations, ideas, research and development, information, know-how, inventions, technology, formulas, compositions, manufacturing and production processes and techniques, technical data, financial and marketing plans, customer and supplier lists and information, designs, drawings, plans, proposals and specifications), (v) computer software and systems (including source code, executable code, data, databases and related documentation), websites, URLs, email addresses, and telephone numbers, (vi) copies and tangible embodiments of any of the foregoing in whatever form or medium and (vii) other proprietary and intellectual property rights.

"Inventory" means all inventory of any kind or nature, whether or not prepaid, and wherever located, held or owned by any Seller, including all raw materials, work in process, semi-finished and finished products, replacement and spare parts, packaging materials, operating supplies, in-transit or consigned inventory, and fuels and other and similar items.

"Law" means any law, statute, regulation, code, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Governmental Authority.

"Leased Facilities" means any land, buildings, structures, improvements, fixtures or other interest in real property which any Seller has the right to use, or which is used or intended to be used by any Seller or used or intended to be used in, or otherwise related to, the Business.

"Liability" means any obligation or liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether determined or determinable, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes, product liability or infringement liability.

"Lien" or "Liens" means any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, right of pre-emption, right of first refusal or other Third Party right, Tax (including foreign, federal, state and local Tax), Order of any Governmental Authority, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any claim based on any theory that any Purchaser is a successor, transferee or continuation of Sellers or the Business, and (iv) any leasehold interest, license or other right, in favor of a Third Party or a Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"Material Adverse Change" or "Material Adverse Effect" means, any event, change, condition or matter that, individually or in the aggregate is or could reasonably be expected to be materially adverse to, or materially impair the revenue or anticipated revenue of the Business or impairs the value of, the Acquired Assets or results in a material adverse effect or change in the operation, results of operations, condition (financial or otherwise) or prospects of the Acquired Assets or the Business, taken as a whole, or which materially impairs the ability of Sellers to perform their obligations under this Agreement or has a material adverse effect on or prevents or materially delays the consummation of the transactions contemplated hereby; excluding, however, any effect resulting, whether directly or indirectly, from the bankruptcy, insolvency or deteriorating financial condition of Seller, but specifically including, however, (i) the failure of any of R. Patrick Caldwell, Jason Williams or Neil Schwartzman to remain employed by any of the Sellers and (ii) any event, change, condition or matter that, individually or in the aggregate is or could reasonably be expected to cause the aggregate revenue of Purchaser from Ibiley Manufacturing Corp., Carter Enterprises LLC and the U.S. Marine Corp. from the Closing Date through February 28, 2011 to be less than Seventeen Million Five Hundred Thousand Dollars ($17,500,000).  For avoidance of doubt the occurrence of any of the events set forth in (i) or (ii) above shall be a "Material Adverse Change" and "Material Adverse Effect".

"Minimum Cash Amount" has the meaning set forth in Section 8.2(d)(iii)(G).

"Miscellaneous Excluded Contracts" has the meaning set forth in Section 2.2(iii) hereof.

"Notice" means any summons, citation, directive, Order, claim, litigation, proceeding, letter or other communication, written or oral, actual or threatened, from the United States Environmental Protection Agency or any other Governmental Authority, or any other

entity or any individual, and shall include the imposition of any Lien on property owned, leased, occupied or used by any Seller pursuant to any Environmental Law.

"Order" means any award, decision, decree, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Governmental Authority.

"Ordinary Course of Business" means the operation of the Business by Sellers in the usual and ordinary course in the manner Sellers operated prior to the commencement of the Chapter 11 Cases (including with respect to quantity and frequency).

"ParentCo" has the meaning set forth in the preamble hereto.

"Permits" means licenses, permits, approvals, franchises, bonds, accreditations, certificates of occupancy, authorizations, operating permits, registrations, plans and the like.

"Person" means any corporation, partnership (including any limited partnership and any limited liability partnership), joint venture, limited liability company, organization, trust, entity, authority or natural person.

"Petition Date" means January 13, 2010, which is the date of the filing of the Chapter 11 petitions of Sellers.

"PPIC" has the meaning set forth in the preamble hereto.

"PPNC" has the meaning set forth in the preamble hereto.

"Proceeding" means any action, claim, charge, complaint, dispute, demand, grievance, action, litigation, audit, investigation, review, inquiry, arbitration, liability, damage, suit in equity or at law, administrative, regulatory or quasi-judicial proceeding, account, cost, expense, setoff, contribution, attorney's fee or cause of action of whatever kind or character.

"Proration Items" has the meaning set forth in Section 10.10(e) hereof.

"Purchase Price" has the meaning set forth in Section 3.1 hereof.

"Purchaser" has the meaning set forth in the preamble hereto.

"Purchaser Cure Amounts Cap" has the meaning set forth in Section 2.3(a)(i).

"Qualified Bid" or "Qualified Bids" has the meaning set forth in Section 7.4(c) hereof.

"Qualifying Bid" has the meaning set forth in Section 8.2(d)(iii)(G) hereof.

"Release" means any release, emission, disposal, leaching or migration into the environment (including the abandonment or disposal of any barrels, containers or other closed receptacles containing any Hazardous Substances) or any structure, facility or property.

"Rehired Employees" means each employee of Sellers who accepts an offer of employment by Purchaser as described in Section 10.1 hereof.

"Rejection Notice" has the meaning set forth in Section 2.6(c) hereof.

"Restricted Names" has the meaning set forth in Section 10.6 hereof.

"Rule" or "Rules" means the Federal Rules of Bankruptcy Procedure.

"Sale Motion" has the meaning set forth in Section 7.4(a) hereof.

"Sale Order" means the Order of the Bankruptcy Court, in substantially the same form (but with the same substance, including, for avoidance of doubt, all provisions that would in any manner impact Purchaser) of Exhibit B, to be entered by the Bankruptcy Court pursuant to Sections 363, 365 and 1146(c) of the Bankruptcy Code, which Order, amongst other approvals, approves the sale of the Business and the Acquired Assets to Purchaser or the applicable Bidder with the Highest and Best Bid, free and clear of all Liens pursuant to Section 363(f) of the Bankruptcy Code and finds that the Purchaser has acted in "good faith" within the meaning of section 363(m) of the Bankruptcy Code.

"Sale Order Deadline" means February 22, 2010, as such date may be extended by the Bankruptcy Court up to an additional five (5) Business Days.

"Scheduled Contracts" has the meaning set forth in Section 2.6(a) hereof.

"Schedules" means the schedules attached hereto (including the Disclosure Schedules).

"Seller" or "Sellers" have the meanings set forth in the preamble hereto.

"Seller Termination for Purchaser Breach" has the meaning set forth in Section 8.2(d)(iii)(A).

"Subsidiary" means, with respect to any Person, any corporation a majority of the total voting power of shares of stock of which is entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by that Person or one (1) or more of the other Subsidiaries of that Person or a combination thereof, or any partnership, limited liability company, association or other business entity a majority of the partnership or other similar ownership interest of which is at the time owned or controlled, directly or indirectly, by that Person or one (1) or more Subsidiaries of that Person or a combination thereof.  For purposes of this definition, a Person is deemed to have a majority ownership interest in a partnership, limited liability company, association or other business entity if such Person is allocated a majority of the gains or losses of such partnership, limited liability company, association or other business entity or is or controls the managing director or general partner of such partnership, limited liability company, association or other business entity.

"Target Current Assets Amount" means Seven Million Nine Hundred Thousand Dollars ($7,900,000).

"Tax" and, with correlative meaning, "Taxes" mean with respect to any Person (i) all federal, state, local, county, foreign and other taxes, assessments or other government charges, including any income, alternative or add-on minimum tax, estimated, gross income, gross receipts, sales, use, *ad valorem*, value added, transfer, capital stock, franchise, profits, license, registration, recording, documentary, intangibles, conveyancing, gains, withholding, payroll, employment, social security (or similar), unemployment, disability, excise, severance, stamp, occupation, premium, property (real and personal), environmental or windfall profit tax, customs duty or other tax, governmental fee or other like assessment, charge or tax of any kind whatsoever, together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (domestic or foreign) responsible for the imposition of any such tax, whether such Tax is disputed or not, (ii) Liability for the payment of any amounts of the type described in clause (i) above relating to any other Person as a result of being party to any agreement to indemnify such other Person, being a successor or transferee of such other Person, or being a member of the same affiliated, consolidated, combined, unitary or other group with such other Person, or (iii) Liability for the payment of any amounts of the type described in clause (i) arising as a result of being (or ceasing to be) a member of any Affiliated Group (or being included (or required to be included) in any Tax Return relating thereto).

"Tax Return" means any report, return, declaration, claim for refund or other information or statement supplied or required to be supplied by any Person relating to Taxes, including any schedules or attachments thereto and any amendments thereof.

"Third Party" means any Person other than Sellers, Purchaser or any of their respective Affiliates.

"Transaction Documents" means this Agreement, and all other agreements, instruments, certificates and other documents to be entered into or delivered by any party in connection with the transactions contemplated to be consummated pursuant to this Agreement.

"Undisputed Payment" has the meaning set forth in Section 3.3 hereof

"Valuation Firm" means a valuation firm mutually agreed upon by Purchaser and Sellers as determined in good faith, which valuation firm shall not be one of the ten largest accounting firms in the United States.

"WARN Act" means the Worker Adjustment and Refraining Notification Act of 1988, as amended.

1.2 Rules of Construction.   Unless the context otherwise clearly indicates, in this Agreement:

(a) the singular includes the plural;

(b) "includes" and "including" are not limiting;

(c)  "may not" is prohibitive and not permissive; and

(d)  "or" is not exclusive.

## ARTICLE II
## PURCHASE AND SALE; ASSUMPTION OF CERTAIN LIABILITIES

2.1 <u>Purchase and Sale of Assets</u>.  Subject to the terms and conditions set forth in this Agreement, at the Closing, Sellers shall sell, contribute, convey, assign, transfer and deliver to Purchaser, free and clear of all Liens, whether arising prior to, on or subsequent to the Petition Date, and Purchaser shall purchase, acquire and take assignment and delivery of, for the consideration specified in <u>Article III</u>, all rights, titles and interests of every kind and nature of Sellers (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise) of Sellers as of the Closing Date other than the Excluded Assets, whether tangible or intangible, real or personal and wherever located and by whomever possessed, whether or not listed below but including for the avoidance of doubt all of the following properties, assets and rights of the Sellers (all of the assets to be sold, assigned, transferred and delivered pursuant to this <u>Section 2.1</u> shall be referred to herein as the "<u>Acquired Assets</u>"):

(i)  all Accounts Receivable and all claims, including deposits, advances, prepaid and other current assets, rights under warranties and guaranties, rights in respect of promotional allowances, vendor rebates and to other refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature (whether known or unknown or contingent or non-contingent); the right to receive and retain mail, Accounts Receivable payments and other communications of Sellers; and the right to bill and receive payment for products shipped or delivered and services performed but unbilled or unpaid as of the Closing;

(ii)  any rights, claims or causes of action of Sellers against third parties arising out of events occurring prior to the Closing Date (including, for the avoidance of doubt, those arising out of events occurring prior to the Petition Date), including any rights under or pursuant to any and all warranties, representations and guarantees made by suppliers, manufacturers and contractors relating to products sold, or services provided, to Sellers, including all Avoidance Actions against or otherwise involving any counterparty to any Assumed Contract or the Persons set forth on <u>Schedule 2.1(ii)</u>;

(iii)  all bank accounts set forth on <u>Schedule 2.1(iii)</u>, safety deposit boxes, lock boxes and the like;

(iv)  all Inventory;

(v)  all of Sellers' rights existing under the Facility Leases set forth on <u>Schedule 2.1(v)</u> (the "<u>Assumed Facility Leases</u>"), including all rights to security deposits held pursuant thereto;

(vi)  the equipment leases set forth on <u>Schedule 2.1(vi)</u> (the "<u>Assumed Equipment Leases</u>", together with the Assumed Facility Leases, the "<u>Assumed Leases</u>");

15

(vii)    all tangible personal property, including all machinery, equipment (including all transportation and office equipment), vehicles, computers, mobile phones, personal digital assistants, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, furniture, office supplies, production supplies, spare parts, other miscellaneous supplies, and other tangible personal property of any kind owned by Sellers, wherever located, including all such items which are located in any building, warehouse, office or other space leased, owned or occupied by Sellers or any other space where any of Sellers' properties and or any other assets may be situated;

(viii)    all Intellectual Property owned, licensed, used or held for use by Sellers, along with all income, royalties, damages and payments due or payable to Sellers as of the Closing or thereafter, including damages and payments for past, present or future infringements or misappropriations thereof or other conflicts therewith, the right to sue and recover for past, present or future infringements or misappropriations thereof or other conflicts therewith, and any and all corresponding rights that, now or hereafter, may be secured throughout the world, including all copies and tangible embodiments of any such Intellectual Property in Sellers' possession or control;

(ix)    all Company Systems;

(x)    all rights of Sellers under the Contracts of each Seller set forth on Schedule 2.1(x) (the "Assumed Contracts"), including all security deposits thereunder, all contractual rights of Sellers to indemnification, exculpation, advancement or reimbursement of expenses, and all rights to proceeds under insurance policies;

(xi)    all Books and Records and all advertising, marketing and promotional materials and all other printed or written materials;

(xii)    all Permits, licenses, certifications and approvals from all permitting, licensing, accrediting and certifying agencies, and the rights to all data and records of Sellers held by such permitting, licensing and certifying agencies;

(xiii)    all goodwill as a going concern and all other intangible property of Sellers; and

(xiv)    all such other properties, assets and rights (contractual or otherwise) of Sellers as of the Closing Date, whether tangible or intangible, real or personal and wherever located and by whomever possessed which are not otherwise expressly set forth above as Acquired Assets and are not Excluded Assets.

2.2  Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, the following assets of Sellers shall be retained by Sellers and are not being sold or assigned to Purchaser hereunder (all of the following are referred to collectively as the "Excluded Assets"):

(i)    all Facility Leases of Sellers other than the Assumed Facility Leases (the "Excluded Facility Leases"), including the Facility Leases set forth on Schedule 2.2(i);

16

(ii)    all equipment leases of Sellers other than the Assumed Equipment Leases (the "Excluded Equipment Leases", together with the Excluded Facility Leases, the "Excluded Leases"), including the equipment leases set forth on Schedule 2.2(ii);

(iii)    all Contracts of Sellers other than the Assumed Contracts, including those set forth on Schedule 2.2(iii) (the "Miscellaneous Excluded Contracts", and together with the Excluded Leases, the "Excluded Contracts"), together with all claims and causes of actions with respect to or arising in connection with such Excluded Contracts;

(iv)    all cash (including checking account balances, certificates of deposit and other time deposits and petty cash) net of overdrafts and marketable and other securities;

(v)    all assets, rights, pre-payments, deposits and refunds of any Employee Benefit Plan of each Seller;

(vi)    originals of each Seller's minute books, stock books and corporate seals;

(vii)    the equity securities or other ownership interest of each of Sellers;

(viii)    all Tax refunds, rebates, credits and similar items relating to any period, or portion of any period, on or prior to the Closing Date or any Tax Return;

(ix)    all Avoidance Actions other than Avoidance Actions which are against or otherwise involving any counterparty to any Assumed Contract or the Persons set forth on Schedule 2.1(ii);

(x)    all assets and properties located at 101 Lake Drive, Newark, Delaware, 19702 and 465 Pencader Drive, Newark, Delaware, 19702 other than saleable and useable soft body armor products located therein (which such soft body armor products shall, for avoidance of doubt, be an Acquired Asset);

(xi)    all bank accounts other than those set forth on Schedule 2.1(iii); and

(xii)    all other assets listed on Schedule 2.2(xii).

2.3 Assignment and Assumption of Liabilities.

(a) Subject to the terms and conditions set forth in this Agreement, including Section 2.3 hereto, Purchaser shall assume from Sellers and thereafter be responsible for the payment, performance or discharge of only the following liabilities and obligations of Sellers (all such liabilities and obligations assumed pursuant to this Section 2.3(a) shall be referred to herein as the "Assumed Obligations"):

(i)    Cure Amounts in an aggregate amount up to but not to exceed (i) Fifty Thousand Dollars ($50,000) plus (ii) any costs of cure with respect to that certain Leased

Facility located at 1649 NW 136th Ave, Building J, Sunrise, Florida 33323-2802 <u>if and only if</u> such Facility Lease is ultimately determined by Purchaser to be an Assumed Executory Contract (or a Designated Contract that becomes an Assumed Executory Contract pursuant to <u>Section 2.6(c)</u>) (the aggregate amount of (i) plus (ii), the "<u>Purchaser Cure Amounts Cap</u>");

       (ii)    all obligations under the Assumed Executory Contracts first arising after the Closing Date but specifically excluding any liability or obligation relating to or arising out of such Assumed Executory Contracts as a result of (A) any breach of such Assumed Executory Contracts occurring on or prior to the Closing Date, (B) any violation of Law, breach of warranty, tort or infringement occurring on or prior to the Closing Date; or (C) any charge, complaint, action, suit, proceeding, hearing, investigation, Claim or demand based on any occurrence prior to the Closing Date;

       (iii)    with respect to the Rehired Employees, the obligations with respect to any unpaid wages and salaries, unused vacation or sick leave earned and accrued (to the extent not paid) as of the Closing Date, but not including any wages, bonus, retention or severance obligations or arising from any violation of Law by a Seller prior to the Closing Date;

       (iv)    all Liabilities and obligations relating to the Acquired Assets that first arise after the Closing Date as a result of, or in connection with, Purchaser's ownership and/or use of the Acquired Assets after the Closing;

       (v)    the Designated Remaining Executory Contract Obligations; and

       (vi)    Ceramic Protection's obligations to pay Two Hundred Sixty Seven Thousand Dollars ($267,000) to the U.S. Attorney's Office for the District of Delaware under the Deferred Prosecution Agreement.

       For the avoidance of doubt, the Assumed Obligations shall not include any item listed in <u>Sections 2.4(a)(i)-2.4(a)(xxi)</u>.

       (b) <u>Section 2.3(a)</u> shall not limit any claims or defenses Purchaser may have against any party other than Sellers.  The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any Third Party against Purchaser or Sellers as compared to the rights and remedies which such Third Party would have had against Sellers absent the Chapter 11 Cases and had Purchaser not assumed such Assumed Obligations.

     2.4  <u>No Other Liabilities Assumed</u>.

       (a) Purchaser shall not be the successor to any or all of Sellers, and each Seller acknowledges and agrees that pursuant to the terms and provisions of this Agreement, Purchaser will not assume, nor in any way be liable or responsible for, any claim or Liability of any Seller (including Liabilities relating to the pre-petition or post-petition operation of the Business, the Excluded Assets or to the Acquired Assets (and the use thereof)), whether relating to or arising out of the Business, the Excluded Assets, the Acquired Assets or otherwise, and whether or not listed below, including any Indebtedness, Employee Benefit Plan, Collective Bargaining Agreement or other Liability of any Seller or any predecessor or Affiliate of any Seller whatsoever or any ERISA Affiliate other than the Assumed Obligations (any such obligations,

the "Excluded Liabilities"); provided, that, in furtherance and not in limitation of the foregoing, the Assumed Obligations do not include, and Purchaser is expressly not assuming, any of the following Liabilities, whenever or wherever arising:

(i)    all claims or Liabilities of any Seller that relate to any of the Excluded Assets, including executory Contracts and unexpired Leases that are not Assumed Executory Contracts;

(ii)    all Liabilities of any Seller relating to Taxes (including with respect to the Business or the Acquired Assets or otherwise) including Taxes that may arise as a result of (i) any claim, audit, investigation, assessment, or adjustment for any amount of Tax proposed, asserted, or assessed by any taxing authority, court or other Governmental Authority against any Seller or (ii) the sale of the Acquired Assets or the assumption of the Assumed Obligations pursuant to this Agreement and any deferred Taxes of any nature;

(iii)    all Liabilities for Taxes now or hereafter attributable to the Acquired Assets or the Business for any taxable periods (or the portion thereof) ending on or before the Closing Date;

(iv)    all accounts payable of Sellers or any predecessor or Affiliate of Sellers arising prior to the Closing, except for Cure Amounts payable by Purchaser pursuant to Section 2.7;

(v)    all Liabilities in respect of Indebtedness of Sellers or any predecessor or Affiliate of any Seller;

(vi)    all Excluded Environmental Liabilities (regardless of whether such Liabilities accrue to Sellers or to Purchaser in the first instance);

(vii)    all Liabilities pursuant to the WARN Act relating to any action or inaction of Sellers prior to or upon the Closing;

(viii)    except for Cure Amounts payable by Purchaser as contemplated in Section 2.7 of this Agreement, all Liabilities of Sellers resulting from, caused by or arising out of, or which relate to, directly or indirectly, the conduct of Sellers (or any of their current or former officers, directors, employees or agents) anywhere or ownership or lease of any properties or assets or any properties or assets previously used by Sellers at any time, or other actions, omissions or events occurring prior to the Closing and which (i) constitute, may constitute or are alleged to constitute a tort, breach of contract or violation of any Law or (ii) relate to any and all Proceedings against Sellers whether past, present, future, known or unknown, liquidated or unliquidated, accrued or unaccrued, pending or threatened, including, for avoidance of doubt, all Liabilities arising out of or relating to the litigation filed in (A) the Ontario Superior Court of Justice, with the caption ArmorWorks Enterprises, LLC v. Ceramic Protection Corporation, CPC Holding Corporation of America, Ceramic Protection Corporation of America, Protective Products International Corp., Protective Products of North Carolina, LLC, Larry Moeller, Stephen Giordanella, Keith J. Engel, Brian Stafford, Henry H. Shelton, Richard Torykian, Sr., and Dennis DeConcini, 08-CV-351396PD1 and (B) the United States District

Court for the Eastern District of Virginia, with the caption Marcus Treiber and Alvin S. Church v. Protective Products International Corp., 3:09CV303;

    (ix) all Liabilities arising out of any Proceeding commenced against Sellers or any predecessor or Affiliate of any Seller after the Closing and arising out of or relating to any occurrence or event happening prior to the Closing;

    (x) all Liabilities under any Assumed Executory Contract which arises after the Closing but arises out of or relates to any breach that occurred prior to the Closing;

    (xi) all Liabilities arising out of or relating to any infringement or misappropriation of, or other conflict with, the Intellectual Property of any Third Party arising out of or related to the conduct of the Business or any act or omission of any Seller or any predecessor or Affiliate of any Seller prior to the Closing;

    (xii) all Liabilities arising out of, or relating to, any indemnification obligations of any Seller, including indemnification obligations pursuant to supply agreements, service agreements, purchase agreements, leases and any other type of Contract, and Liabilities to indemnify, reimburse or advance amounts to any officer, director, employee or agent of Sellers;

    (xiii) all Liabilities with respect to the employees or former employees, or both (or their representatives) of any Seller arising prior to the Closing Date, including payroll, wages, salaries, bonuses, commissions, benefits, retention or stay bonus arrangements, other compensation, sick leave, worker's compensation, unemployment benefits, pension benefits, employee stock option or profit sharing plans, health care plans or benefits, or any other employee plans or benefits or other compensation of any kind to any employee, and obligations of any kind, including Liabilities arising under any Collective Bargaining Agreement, the WARN Act, or employment, severance, retention or termination agreement with any employee, consultant or contractor (or their representatives) of any Seller;

    (xiv) all Liabilities relating to or arising under or in connection with any Employee Benefit Plan or any other employee benefit or compensation plan, program, agreement or arrangement at any time maintained, sponsored or contributed or required to be contributed to by any Seller or any ERISA Affiliate, or with respect to which any Seller or any ERISA Affiliate has any Liability;

    (xv) all Liabilities arising out of or relating to services, products or product or service warranties of Sellers or any predecessor(s) or Affiliate(s) of any Seller to the extent provided, developed, designed, manufactured, marketed, sold or distributed prior to the Closing;

    (xvi) all Liabilities of any Seller to any current, former or prospective shareholder or other equity interest holder of any Seller, including all Liabilities of Sellers related to the right to or issuance of any capital stock or other equity securities;

    (xvii) all Liabilities for any legal, accounting, investment banking, reorganization, restructuring (including bankruptcy administrative expenses), brokerage or

similar fees or expenses incurred by any Seller in connection with, resulting from or attributable to the transactions contemplated by this Agreement, the Chapter 11 Cases or otherwise;

(xviii) except for the Designated Remaining Executory Contract Obligations, all Liabilities of Sellers arising out of, or relating to, any Designated Contract, unless and until (and only to the extent that) such Designated Contract is assumed by Purchaser;

(xix)  all Liabilities of Sellers or any predecessor or Affiliate of any Seller based upon such Person's acts or omissions occurring after the Closing;

(xx)  all Cure Amounts in excess of the Purchaser Cure Amounts Cap; and

(xxi)  all Liabilities of Sellers to Purchaser, its Affiliates, and its Affiliates' agents, advisors and representatives, whether under the Transaction Agreements or otherwise.

(b) The parties acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement or otherwise shall not create an Assumed Obligation or other Liability of Purchaser, except where such disclosed obligation has been expressly assumed by Purchaser as an Assumed Obligation and is not listed in Sections 2.4(a)(i)-2.4(a)(xxi).

(c) Subsequent to the Closing, Sellers jointly and severally agree to indemnify and hold Purchaser harmless with respect to the Excluded Assets and Excluded Liabilities, including any loss, Liability, Tax, cost or expense (including legal fees and expenses and court costs) arising out of or in connection with, or otherwise relating to, the Excluded Assets, the Excluded Environmental Liabilities (regardless of whether such Liabilities are technical Liabilities of any Seller or Affiliate) and the Excluded Liabilities.

2.5 Limited Right to Make Revisions to Schedules to Sections 2.1 to 2.4. Notwithstanding anything in this Agreement to the contrary, Purchaser may revise the Schedules to Sections 2.1 to 2.4 at any time on or before five (5) days prior to the Auction for the following purposes (but for no other purpose without the consent of the Sellers): (i) to exclude from the definition of Acquired Asset, (ii) to exclude from the definition of Excluded Liabilities, (iii) to add to the definition of Excluded Asset or Assumed Obligation, as applicable, any asset or property, or any portion, part or parcel of any such asset or property (other than Scheduled Contracts, which shall be governed by Section 2.6) or Excluded Liability not otherwise included therein, as the case may be, and as a result thereof, Sellers agree to give required notice to any Third Party that should receive notice with respect to such asset or property or as otherwise reasonably requested by Purchaser.  In no event shall Purchaser be entitled (other than with respect to Scheduled Contracts, which shall be governed by Section 2.6): (i) to add to the definition of Acquired Assets, (ii) to exclude from the definition of Excluded Assets, (iii) to exclude from the definition of Assumed Obligations, in each case, any asset, property or obligation, as the case may be, without the consent of the Sellers and the lender under the DIP Credit Facility.  For purposes of clarification, nothing in this Section 2.5 shall limit Purchaser's rights under Section 2.6.

2.6 <u>Sellers Actions With Respect to Contracts</u>.

(a) <u>Sellers' Obligation to Maintain Scheduled Contracts Until Closing</u>.  From and after the Effective Date, Sellers shall not reject or alter (or attempt to alter) the terms of any executory Contracts or unexpired leases to which any Seller is a party (collectively, the "<u>Scheduled Contracts</u>") unless otherwise agreed to in writing by Purchaser or as provided below in <u>Section 2.6(d)</u> of this Agreement.  Sellers shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to Scheduled Contracts and take all other actions necessary to cause such Scheduled Contracts to be assumed by Sellers and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code to the extent that such Scheduled Contracts are Assumed Executory Contracts at Closing or are assumed and assigned to Purchaser pursuant to <u>Section 2.6(c)</u> of this Agreement.

(b) <u>Excluding or Adding Assumed Executory Contracts Prior to Closing</u>.  At the Closing, Sellers shall, pursuant to the Sale Order and the Assignment and Assumption Agreement(s) and other transfer and assignment documents reasonably requested by Purchaser, assume and sell and assign to Purchaser (the consideration for which is included in the Purchase Price), all Assumed Executory Contracts which may be assigned by any such Seller to Purchaser pursuant to Sections 363 and 365 of the Bankruptcy Code and which shall be set forth on the Schedules delivered pursuant to <u>Section 2.1</u> of this Agreement.  Purchaser shall have the right in its sole and absolute discretion to notify Sellers in writing of (i) any Assumed Executory Contract that it does not wish to assume up to two (2) days prior to Closing or (ii) a Scheduled Contract that it wishes to add as an Assumed Executory Contract up to five (5) days prior to the Closing.  At the sole discretion and instruction of Purchaser, any such previously considered Assumed Executory Contract that Purchaser no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assumed Executory Contracts, automatically deemed added to the Schedules related to Excluded Contracts, and rejected by Sellers in accordance with <u>Section 2.6(d)</u>.  At the sole discretion and instruction of Purchaser, any such previously considered Excluded Contract that Purchaser wishes to assume as an Assumed Executory Contract shall be automatically deemed added to the Schedules related to Assumed Executory Contracts, automatically deemed removed from the Schedules related to Excluded Contracts, and assumed by Sellers to sell and assign to Purchaser.

(c) <u>Designated Contracts</u>.  At least two (2) days prior to the Closing, Purchaser shall deliver to Sellers <u>Schedule 2.6(c)</u>, which shall comprise a list of Scheduled Contracts that Purchaser wishes to designate as "<u>Designated Contracts</u>".  The Designated Contracts shall be automatically deemed removed from all Schedules related to Assumed Executory Contracts and Excluded Contracts, and shall not be Assumed Executory Contracts or Excluded Contracts as of the Closing Date.  Except as otherwise set forth in <u>Section 2.6(d)</u>, Sellers shall not seek to reject the Designated Contracts for a period of ninety (90) days following the Closing Date (the "<u>Contract Retention Period</u>").  Purchaser may, at its sole discretion and at any time during the Contract Retention Period, deliver to Sellers one (1) or more written notices (each, a "<u>Rejection Notice</u>") notifying Sellers of its intent not to assume any Designated Contract(s).  Upon receipt of a Rejection Notice, notwithstanding anything in this Agreement to the contrary, the Designated Contract(s) identified in such Rejection Notice shall automatically be deemed Excluded Contracts for all purposes under this Agreement.  Purchaser may, at its sole discretion and at any time during the Contract Retention Period, deliver to Sellers one (1) or more written

22

notices (each, an "Assumption Notice") requesting assumption and assignment of any Designated Contract(s).   Upon receipt of an Assumption Notice, Sellers shall, subject to Purchaser's demonstrating adequate assurance of future performance thereunder, take all actions reasonably necessary to seek to assume and assign to Purchaser pursuant to Section 365 of the Bankruptcy Code the Designated Contract(s) set forth in the applicable Assumption Notice.   To the extent that any Designated Contract is a Facility Lease, Seller hereby grants Purchaser a license to use and possess the Facility which is leased pursuant to such Facility Lease.   Such license shall commence on the Closing Date and shall terminate on the earlier of the date such Facility Lease is rejected and the last day of the Contract Retention Period.   Notwithstanding anything in this Agreement to the contrary, on the date any Designated Contract is assumed and assigned to Purchaser pursuant to this Section 2.6(c), such Contract shall be deemed an Assumed Executory Contract for all purposes under this Agreement.   With respect to any Designated Contract (including, without limitation, any Facility Lease covered by the license set forth above), (i) Purchaser shall perform all of Sellers' ordinary course obligations under such Designated Contract from and after the Closing Date, (ii) with respect to any Facility Lease which is a Designated Contract, Purchaser shall pay all rent (including without limitation, all base rent, additional rent and other rent under such Facility Lease) owing under the Lease from and after the Closing Date, (iii) with respect to any Facility Lease which is a Designated Contract, Purchaser shall indemnify and hold Seller harmless from any liability of Sellers under such Facility Lease first arising from and after the Closing Date until the later of (a) the earlier of the date such Designated Contract is assigned to Purchaser, the date Purchaser delivers a Rejection Notice with respect to such Designated Contract, or the last day of the Contract Retention Period and (b) the date Purchaser vacates the licensed premises under such Facility Lease and (iv) Purchaser shall compensate Sellers for the ordinary course costs of such Designated Contract in accordance with the terms of such contract, in each case first arising after the Closing Date and actually incurred by Sellers in performing obligations after the Closing under such Designated Contract until the earlier of the date such Designated Contract is assigned to Purchaser, the date Purchaser delivers a Rejection Notice with respect to such Designated Contract, or the last day of the Contract Retention Period (provided that with respect to any Facility Lease which is a Designated Contract, Purchaser shall continue to pay all such costs until Purchaser has actually vacated the licensed premises covered by such Facility Lease) (the "Designated Remaining Executory Contract Obligations"); provided, however, Purchaser shall not be responsible for any liability or obligation relating to or arising out of such Designated Contracts as a result of (A) any breach by Sellers of such Designated Contracts occurring on or prior to the Closing Date or during the Contract Retention Period (provided that such breach is not caused by the breach by Purchaser of its obligations under this Section), (B) any violation of Law, breach of warranty, tort or infringement, in each case by Sellers, occurring on or prior to the Closing Date or during the Contract Retention Period (provided that such violation is not caused by any act or omission of Purchaser after the Closing), or (C) any charge, complaint, action, suit, proceeding, hearing, investigation, Claim or demand against the Sellers (provided that such matters do not arise from the act or omission of the Purchaser after the Closing).   The covenants set forth in this Section 2.6(c) shall survive the Closing.

(d) Rejection of Excluded Contracts.   As soon as practicable after the Closing Date, Seller shall reject all Excluded Contracts.   With respect to the Designated Contracts, on the date that Purchaser provides a Rejection Notice with respect to any Designated Contract, such Designated Contract will be deemed an Excluded Contract for all purposes under this

Agreement, Sellers shall immediately reject such Excluded Contract, and all obligations arising thereafter in connection with such Excluded Contract shall be considered Excluded Liabilities under this Agreement.  Upon the expiration of the Contract Retention Period, all Designated Contracts that have not been deemed Assumed Executory Contracts pursuant to an Assumption Notice and have not been subject of a Rejection Notice shall be automatically deemed to be Excluded Contracts, Sellers shall immediately reject such Excluded Contracts, and all obligations arising thereafter in connection with such Excluded Contracts shall be considered Excluded Liabilities under this Agreement.  To the extent that any executory Contract or unexpired lease relating to the Business is not identified prior to the Closing Date or is not an Assumed Executory Contract, an Excluded Contract or a Designated Contract on the Closing Date, Purchaser shall, upon discovery of such executory Contract or unexpired lease, in its sole discretion, determine whether such executory Contract or unexpired lease shall be deemed an Assumed Executory Contract, an Excluded Contract or a Designated Contract and, if determined by Purchaser to be an Excluded Contract, Sellers shall immediately reject any such executory Contract or unexpired lease.  The covenants set forth in this Section 2.6(d) shall survive the Closing.

2.7 Cure Amounts.  Purchaser will be responsible for paying all Cure Amounts set forth on Schedule 1.1 in an aggregate amount up to but not to exceed the Purchaser Cure Amounts Cap in connection with the assignment and assumption of the Assumed Executory Contracts and any Designated Contract which is assumed and assigned to Purchaser pursuant to Section 2.6(c). Sellers will be responsible for paying all Cure Amounts set forth on Schedule 1.1 in excess of the Purchaser Cure Amounts Cap in connection with the assignment and assumption of the Assumed Executory Contracts and any Designated Contract which is assumed and assigned to Purchaser pursuant to Section 2.6(c).  Within three (3) days after the Bid Deadline, Sellers shall provide to Purchaser an update to Schedule 1.1.  Sellers hereby agree that Purchaser, at its option, may pay any such cure in excess of the Purchaser Cure Amounts Cap and deduct the amount of any such cures paid by Purchaser in excess of the Purchaser Cure Amounts Cap from the amount otherwise payable to Sellers at the Closing.  To the full extent that any cure obligations are asserted against Purchaser (other than those Purchaser agrees to pay pursuant to the terms of this Agreement), Sellers agree to pay such amounts and to fully indemnify for and hold Purchaser harmless from any costs, expenses or other Liabilities resulting from such assertion.  In the event that Sellers fail to pay such amount(s), Purchaser may pay such amount(s) (on behalf of Sellers) and offset such amount(s) against any amount(s) Purchaser may owe Sellers.  Sellers hereby agree and acknowledge that the foregoing provision is in addition to, and not in derogation of, any statutory or other remedy that Purchaser may have against Sellers.

2.8 Deemed Consents and Cures.  For all purposes of this Agreement (including all representations and warranties of Sellers contained herein), Sellers shall be deemed to have obtained all required consents in respect of the assignment of any Assumed Executory Contract if, and to the extent that, pursuant to the Sale Order or other Bankruptcy Court Order, Sellers are authorized to assume and assign to Purchaser, and Purchaser is authorized to accept, such Assumed Executory Contracts pursuant to Section 365 of the Bankruptcy Code, and any applicable Cure Amount has been satisfied by Purchaser or Sellers as provided in this Agreement.  If the consent required to effectuate the assignment of any Assumed Executory Contracts to Purchaser cannot be obtained pursuant to the Sale Order or other Bankruptcy Court

Order, then the parties shall endeavor to obtain such consent pursuant to Sections 4.6, 7.1 and 10.5.

## ARTICLE III
## BASIC TRANSACTION

3.1 <u>Purchase Price</u>.  The aggregate purchase price for the Acquired Assets (the "<u>Purchase Price</u>") is the sum of (a) (i) cash in an amount of Eight Million Dollars ($8,000,000) <u>minus</u> (ii) if and only if, the Actual Current Assets Amount as mutually agreed by the Sellers and Purchaser as of the Closing (the "<u>Actual Current Assets Amount</u>") is less then an amount equal to the Target Current Assets Amount <u>minus</u> One Hundred Thousand Dollars ($100,000), the amount equal to (X) the Target Current Assets Amount <u>minus</u> (Y) the Actual Current Assets Amount <u>minus</u> (Z) One Hundred Thousand Dollars ($100,000), <u>plus</u> (iii) if and only if, the Actual Current Assets Amount is greater then amount equal to the Target Current Assets Amount <u>plus</u> One Hundred Thousand Dollars ($100,000), the amount equal to (X) the Actual Current Assets Amount <u>minus</u> (Y) the Target Current Assets Amount <u>minus</u> (Z) One Hundred Thousand Dollars ($100,000), payable as set forth in <u>Section 3.2</u> below (the "<u>Cash Amount</u>") <u>plus</u> (b) the Cure Amounts to be made by Purchaser pursuant to the terms hereof, <u>plus</u> (c) Purchaser's assumption of the Assumed Obligations.  For the avoidance of doubt and by way of example of the calculation of the adjustment to the Cash Amount:

(i)    Assume the Actual Current Assets Amount is $7,500,000.  Since $7,500,000 is less than $7,800,000 (i.e. $7,900,000 less $100,000), the Cash Amount would be decreased by $300,000, which is equal to $7,900,000 minus $7,500,000 minus $100,000.

(ii)    Assume the Actual Current Assets Amount is $8,200,000.  Since $8,200,000 is greater than $8,000,000 (i.e. $7,900,000 plus $100,000), the Cash Amount would be increased by $200,000, which is equal to $8,200,000 minus $7,900,000 minus $100,000.

(iii)    If the Actual Current Assets Amount is between $8,000,000 and $7,800,000 (i.e. $7,900,000 plus or minus $100,000), then, the Cash Amount shall be $8,000,000.

3.2 <u>Payment of Purchase Price at Closing</u>.  At the Closing, Purchaser shall be assigned the Acquired Assets and Assumed Obligations, and (i) an amount equal to the Cash Amount less Two Hundred Sixty Seven Thousand Dollars ($267,000) less the Deposit shall be paid by Purchaser by wire transfer of immediately available funds to an account designated by ParentCo and (ii) Two Hundred Sixty Seven Thousand Dollars ($267,000) shall be paid, in full and absolute satisfaction of Purchaser's Assumed Obligation under <u>Section 2.3(a)(vi)</u> by electronic funds transfer of immediately available funds to the account set forth in writing by the U.S. Attorney's Office for the District of Delaware.  At the Closing, the Deposit shall be delivered to Sellers and shall be applied as a credit to the Cash Amount.  At the Closing, Purchaser shall pay the Cash Amount taking into consideration and paying to Sellers the undisputed portion (if any) of the difference, whether positive or negative, between the Actual Current Assets Amount and the Target Current Assets Amount (plus or minus One Hundred Thousand Dollars ($100,000), as applicable as set forth in <u>Section 3.1</u>).

3.3 <u>Valuation Firm</u>.  If at Closing the Sellers and Purchaser are unable to mutually agree upon the Actual Current Assets Amount, the parties shall submit to the Valuation Firm for review and resolution all matters (but only such matters) that remain in dispute with respect to the determination of the Actual Current Assets Amount and Purchaser shall pay to Sellers the minimum of cash included in the Cash Amount which is not disputed by Purchaser (such minimum amount, the "<u>Undisputed Payment</u>").  The parties shall instruct the Valuation Firm to make a final determination of the Actual Current Assets Amount and the Cash Amount in accordance with the guidelines and procedures set forth in this Agreement.  The parties will cooperate with the Valuation Firm during the term of its engagement.  The parties shall instruct the Valuation Firm not to assign a value to any item in dispute greater than the greatest value for such item assigned by Purchaser, on the one hand, or Sellers, on the other hand, or less than the smallest value for such item assigned by Purchaser, on the one hand, or Sellers, on the other hand.  The parties shall also instruct the Valuation Firm to make its determination based solely on presentations by Purchaser and Sellers which are in accordance with the guidelines and procedures set forth in this Agreement (*i.e.*, not on the basis of an independent review).  The Actual Current Assets Amount, and the resulting Cash Amount calculated with reference thereto shall become final and binding on the parties on the date the Valuation Firm delivers its final resolution in writing to the parties (which final resolution shall be requested by the parties to be delivered not more than 15 days following submission of such disputed matters).  An amount equal to the difference between the Cash Amount less the Undisputed Payment shall be paid by Purchaser to Sellers within three (3) Business Days after such final and binding determination by wire transfer in immediately available funds.   The fees and expenses of the Valuation Firm shall be allocated to the parties as determined (as set forth in the final determination) by the Valuation Firm based upon the relative success (in terms of percentages) of each party's claims.  For example, if the final determination reflects a 60-40 compromise of the parties' claims, the Valuation Firm would allocate expenses 40% to the party whose claims were determined to be 60% successful and 60% to the party whose claims were determined to be 40% successful.  All amounts to be paid to Sellers hereunder may be paid directly to ParentCo (on behalf of and for the benefit of Sellers) and any rights and decisions of Sellers may be made by ParentCo on behalf of and for the benefit of Sellers.

3.4 <u>Purchaser's Deposit</u>.

(a) In order to secure the performance by Purchaser of its obligations under this Agreement, within one (1) Business Day after the execution and delivery of this Agreement by Sellers and Purchaser, Purchaser shall deliver to Sellers' counsel, as escrow agent, a cash earnest money deposit in the amount of Five Hundred Thousand Dollars ($500,000) (the "<u>Deposit</u>").  Upon receipt of a W-9 form executed by Purchaser, together with an escrow agreement (the "<u>Escrow Agreement</u>") in form satisfactory to the parties and Berger Singerman, P.A., (the "<u>Escrow Agent</u>"), Escrow Agent shall invest same in accordance with the Escrow Agreement.

(b) Notwithstanding anything to the contrary set forth in this Agreement or otherwise, the Deposit shall be delivered to Purchaser in the event the Bidding Procedures Order fails to be issued by the Bankruptcy Court on or before January 19, 2010.  If the Bidding Procedures Order is issued by the Bankruptcy Court on or before January 19, 2010, then, <u>Sections 3.2</u>, <u>3.4</u>, <u>9.2</u>, and <u>9.3</u> shall govern the disposition of the Deposit.

3.5 <u>Allocation of Purchase Price</u>.  Purchaser shall, within the later of (i) ninety (90) days after the Closing Date, or (ii) thirty (30) days prior to the date by which Sellers' federal income Tax Returns must be filed, prepare and deliver to Sellers a schedule allocating the Purchase Price (and any other items that are required for federal, state and other applicable income tax purposes to be treated as part of the Purchase Price) among the Acquired Assets (such schedule, the "<u>Allocation</u>"), in accordance with Section 1060 of the Code and the treasury regulations thereunder (and any similar provision of state, local, or foreign Law).  The Allocation shall be binding upon Sellers.  Purchaser and Sellers shall report and file all Tax Returns (including amended Tax Returns and claims for refund) in a manner that is consistent with the Allocation, and shall take no position contrary thereto or inconsistent therewith unless required by applicable Law (including as a result of a successful challenge to the allocation in any audits or examinations by any Governmental Authority or any other Proceeding).  Purchaser and Sellers shall cooperate in the filing of any forms (including Internal Revenue Service Form 8594 under Section 1060 of the Code) with respect to such Allocation.  Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 3.5</u> shall survive the Closing without limitation.

## ARTICLE IV
## CLOSING

4.1 <u>Closing</u>.  Upon the terms and subject to the satisfaction of the conditions contained in this Agreement, the closing of the transaction contemplated by this Agreement (the "<u>Closing</u>") will take place at the offices of Berger Singerman P.A., Florida, 350 Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301, at 10:00 A.M. Eastern Time as soon as practicable after the date on which the conditions set forth in <u>Article VIII</u> have been satisfied or waived but no later than three (3) days thereafter; or on such other date or place as Purchaser and ParentCo may determine (the "<u>Closing Date</u>").

4.2 <u>Closing/Post-Closing Payments</u>.

(a) On the Closing Date:

(i)  Purchaser shall pay the Cash Amount or, if the Cash Amount is not agreed to, the Undisputed Payment less Two Hundred Sixty Seven Thousand Dollars ($267,000) less the Deposit by wire transfer of immediately available funds to an account designated by ParentCo at least two (2) Business Days prior to Closing;

(ii)  Purchaser shall pay Two Hundred Sixty Seven Thousand Dollars ($267,000) in full and absolute satisfaction of Purchaser's Assumed Obligation under <u>Section 2.3(a)(vi)</u> by electronic funds transfer of immediately available funds to the account set forth in writing by the U.S. Attorney's Office for the District of Delaware;

(iii)  Purchaser shall pay Cure Amounts with respect to the Assumed Executory Contracts in an aggregate amount not to exceed the Purchaser Cure Amounts Cap;

(iv)  Sellers shall pay all Cure Amounts with respect to the Assumed Executory Contracts in excess of the Purchaser Cure Amounts Cap; provided at Purchaser's

election any Cure Amounts required to be paid by Sellers hereunder may be assumed by Purchaser and paid directly by Purchaser when due and deducted from the Purchase Price.

(b) After the Closing Date, Sellers shall pay all Cure Amounts with respect to all Designated Contracts that Purchaser assumes in accordance with <u>Section 2.6(c)</u> hereof, provided, however, with respect to such Designated Contracts assumed and assigned to Purchaser in accordance with <u>Section 2.6(c)</u> hereof, Purchaser shall pay the portion of the Cure Amounts, if any, equal to the difference between the Purchaser Cure Amounts Cap and the Cure Amounts paid by Purchaser pursuant to <u>Section 4.2(a)(iii)</u>.

4.3 <u>Deliveries by Sellers</u>.  At the Closing, Sellers shall deliver or procure delivery to Purchaser of:

(a) physical possession of all of the Acquired Assets capable of passing by delivery with the intent that title in such Acquired Assets shall pass by and upon delivery;

(b) one (1) or more assignments and assumptions of the Assumed Obligations, in the form attached hereto as <u>Exhibit C</u> (collectively, the "<u>Assignment and Assumption Agreements</u>"), duly executed by the applicable Seller or Sellers;

(c) one (1) or more bills of sale, in the form attached hereto as <u>Exhibit D</u>, conveying in the aggregate all of the owned personal property of Sellers included in the Acquired Assets, duly executed by Sellers;

(d) Intellectual Property assignments in the forms attached hereto as <u>Exhibit E</u> each duly executed by the applicable Seller or Sellers and each in recordable form to the extent necessary to assign such rights;

(e) an assignment and assumption of lease with respect to each of the Assumed Facility Leases;

(f)  a certified copy of the Sale Order;

(g) certificates of title and title transfer documents to all titled motor vehicles;

(h) an assignment and assumption agreement with respect to Sellers' Permits and warranties, whereby Sellers shall assign to Purchaser all of their respective rights in and to any Permits and warranties relating (directly or indirectly) to the Acquired Assets or the Business;

(i)  such documentation as may be necessary to change the authorized signatories on any bank accounts or powers of attorney relating (directly or indirectly) to the Acquired Assets;

(j)  certified copies of the resolutions of the board of directors of each Seller authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby;

(k) an affidavit from each Seller, sworn under penalty of perjury and dated as of the Closing Date, in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code stating that such Seller is not a foreign person as defined in Section 1445 of the Code;

(l) copies of all Third Party approvals and governmental approvals obtained pursuant to Section 7.1 or otherwise required by Section 8.2(e);

(m) all of the Books and Records;

(n) originals (or, to the extent originals are not available, copies) of all Assumed Executory Contracts (together with all amendments, supplements or modifications thereto);

(o) evidence of the required name changes of Sellers and their Affiliates as more fully set forth in Section 10.6 of this Agreement;

(p) the certificate required by Section 8.2(c).

(q) such other instruments as are necessary to transfer all of Sellers' rights and title in and to the Acquired Assets to Purchaser in accordance with the provisions hereof; and

(r) such other documents or instruments as are required to be delivered by any Seller at the Closing pursuant to the terms hereof or that Purchaser reasonably requests prior to the Closing Date to effect the transactions contemplated hereby.

4.4 Deliveries by Purchaser. At the Closing, Purchaser will deliver to Sellers:

(a) the Assignment and Assumption Agreements duly executed by Purchaser;

(b) certified copies of the resolutions of the board of directors of Purchaser authorizing the execution, delivery and performance of this Agreement and the other agreements contemplated hereby and the consummation of the transactions contemplated hereby and thereby;

(c) the certificate required by Section 8.3(c);

(d) the payments required to be made by Purchaser to Sellers (or ParentCo) as set forth in Section 4.2(a) of this Agreement; and

(e) such other documents or instruments as are required to be delivered by Purchaser at the Closing pursuant to the terms hereof or that any Seller reasonably requests prior to the Closing Date to effect the transactions contemplated hereby.

4.5 Form of Instruments. To the extent that a form of any document to be delivered hereunder is not attached as an Exhibit hereto, such documents shall be in form and substance, and shall be executed and delivered in a manner, reasonably satisfactory to Purchaser and Sellers.

4.6 <u>Further Assurances</u>.   From time to time prior to and after the Closing and without further consideration, (i) Sellers, upon the request of Purchaser, shall execute and deliver such documents and instruments of conveyance and transfer as Purchaser may reasonably request in order to consummate more effectively the purchase and sale of the Acquired Assets as contemplated hereby, to transfer to Purchaser all of Sellers' rights in and to the Acquired Assets and to permit Purchaser to perfect, record or protect its interests in the Acquired Assets, or to otherwise more fully consummate the transactions contemplated by this Agreement and (ii) Purchaser, upon the reasonable request of Sellers, shall execute and deliver such documents and instruments of contract or lease assumption as Sellers may reasonably request in order to confirm any Purchaser's Liability for the Assumed Obligations or otherwise to more fully consummate the transactions contemplated by this Agreement.   Sellers shall provide notice of the transactions contemplated by this Agreement and the Chapter 11 Cases to all parties entitled to such notice, including all environmental authorities in jurisdictions applicable to Sellers and all other Persons with current or potential claims with respect to any Excluded Environmental Liabilities or other Liabilities or obligations arising under Environmental Laws.

4.7 <u>Withholding</u>.   Notwithstanding anything herein to the contrary, Purchaser shall be entitled to deduct and withhold from the consideration otherwise payable pursuant to this Agreement to each Seller such amounts as it is required to deduct and withhold with respect to the making of such payment under the Code and the rules and regulations promulgated thereunder, or any provision of state, local or foreign Tax Law.   To the extent that amounts are so withheld by Purchaser, as the case may be, such withheld amounts shall be treated for all purposes of this Agreement as having been paid to each Seller in respect of which such deduction and withholding was made by Purchaser.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers jointly and severally represent and warrant on the date of this Agreement and on the Closing Date to Purchaser as follows:

5.1 <u>Organization, Standing</u>.   Each Seller is a legal entity duly organized, validly existing and in good standing under the Laws of the state of its organization, to the Knowledge of Seller, is qualified to do business in every jurisdiction in which it is required to be qualified and has all requisite corporate or similar power and authority and all Permits necessary to own, lease and operate its respective properties and assets and to carry on its business as presently conducted and is qualified to do business and is in good standing or with active status as a foreign corporation in each jurisdiction where the ownership, leasing or operation of its assets or properties or conduct of its business requires such qualification, except where the failure to be so qualified, in good standing or to have such power or authority, has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.   All jurisdictions in which Sellers are qualified to do business are set forth on <u>Schedule 5.1</u>.

5.2 <u>Subsidiaries</u>.   <u>Schedule 5.2</u> sets forth each Subsidiary of ParentCo (i) its name and jurisdiction of organization, (ii) the number of authorized, issued and outstanding shares or equivalent thereof for each class of its capital stock or other equity interests and the holders thereof and (iii) the names and titles of its officers and directors.   All of the issued and

30

outstanding shares of capital stock or other equity interests of each Subsidiary of ParentCo have been duly authorized and are validly issued, fully paid, and non-assessable. Except as set forth on Schedule 5.2, ParentCo or one (1) or more of its Subsidiaries hold of record and own beneficially all of the outstanding shares of each Subsidiary of Sellers free and clear of any restrictions on transfer, Taxes, Liens, options, warrants, purchase rights, Contracts, commitments, equities, claims, and demands. There are no outstanding or authorized options, warrants, purchase rights, subscription rights, conversion rights, exchange rights, or other contracts or commitments that could require ParentCo or any of its Subsidiaries to sell, transfer, or otherwise dispose of any capital stock or other equity interests of any of its Subsidiaries or that could require any Subsidiary of ParentCo to issue, sell, or otherwise cause to become outstanding any of its own capital stock or other equity interest (other than pursuant to this Agreement). There are no outstanding stock appreciation, phantom stock, profit participation, or similar rights with respect to any Subsidiary of ParentCo. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting of any capital stock of any Subsidiary of ParentCo. No Seller is in default under or in violation of any provision of its charter or bylaws or other similar organizational documents. Neither ParentCo nor any of its Subsidiaries controls directly or indirectly or has any direct or indirect equity participation in any corporation, partnership, trust, or other business association that is not a Subsidiary of ParentCo. Except as set forth on Schedule 5.2, no Seller is a member of (nor is any portion of the Business conducted through) any partnership or a participation in any joint venture or similar arrangement. Except as set forth on Schedule 5.2, neither ParentCo nor any of its Subsidiaries owns or has any right to acquire, directly or indirectly, any outstanding capital stock of, or other equity interests in, any Person.

5.3 Validity of Agreement; Power. Subject to any necessary authorization from the Bankruptcy Court, each Seller has full power and authority to execute and deliver the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The board of directors (or similar governing body) of each Seller has duly approved the Transaction Documents to which such Person is a party and has duly authorized the execution and delivery of such Transaction Documents and the consummation of the transactions contemplated thereby. No other corporate or organizational proceedings on the part of any Seller are necessary to approve and authorize the execution and delivery of the Transaction Documents to which such Person is a party and the consummation of the transactions contemplated thereby. All Transaction Documents to which any Seller is a party have been duly executed and delivered by such Person, except such Transaction Documents that are required by the terms hereof to be executed and delivered by such Person after the date hereof, in which case such Transaction Documents will be duly executed and delivered by such Person at or prior to the Closing, and, subject to any necessary authorization from the Bankruptcy Court, all Transaction Documents constitute, or will constitute, as the case may be, the valid and binding agreements of Sellers, enforceable against Sellers in accordance with their terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting creditors' rights generally from time to time in effect, and to general equitable principles.

5.4 No Conflicts or Violations. Except as set forth on Schedule 5.4, and to the extent any of the foregoing is not enforceable due to operation of the Sale Order, the execution, delivery and performance of the Transaction Documents and the consummation of the transactions contemplated thereby by Sellers do not and shall not conflict with, result in any breach, default

31

or violation of, give rise to a right of modification, termination, acceleration or loss of a material benefit under, result in the creation of any Lien or Liability under, require any authorization, consent, approval, exemption or other action by or notice or declaration to, or filing with, any Governmental Authority, under (i) any provision of the articles of incorporation or bylaws or other equivalent organizational document of any Seller, (ii) any Contract to which any Seller is a party to or by which it is bound or (iii) any determination or Order of any Governmental Authority or Law applicable to any Seller or its property or assets.

5.5 <u>Title to Assets; Assets Necessary to Business</u>.

(a) Sellers have good and valid title to, or a valid leasehold interest in or all rights to use, all assets reflected under the heading "assets" on the face of the Sellers' unaudited consolidated and consolidating balance sheet as of November 30, 2009, and as such balance sheet will be adjusted through the Closing Date to reflect transactions occurring in the Ordinary Course of Business since such date.

(b) The Acquired Assets constitute all of the assets, including all Contracts, Permits and properties, necessary to conduct the Business as presently conducted.  Following the Closing, Purchaser shall have the right to use all of the Acquired Assets free and clear of any Liens of any kind.  Each asset that is material to the operation of the Business as presently conducted is an Acquired Asset.

(c) Subject to Bankruptcy Court approval and the Sale Order, Sellers have the power and the right to sell, assign and transfer and, at the Closing, Sellers will sell and deliver to Purchaser all of Sellers' rights in and to the Acquired Assets, free and clear of all Liens.

(d) The Transaction Documents, when duly executed and delivered by Sellers to Purchaser at the Closing, will effectively transfer to Purchaser all of Sellers' rights and title to the Acquired Assets, subject only to the Assumed Obligations and the Assumed Contracts.

5.6 <u>Brokers</u>.  Bayshore Partners, LLC, the broker dealer affiliate of Farlie Turner & Co., is the Sellers' exclusive financial advisor and investment banker and the only intermediary broker entitled to a transaction fee in connection with the transactions contemplated hereby and will be paid from the proceeds of the sale in accordance with the terms of the Bankruptcy Court's order approving the retention by the Sellers of Bayshore Partners, LLC.

5.7 <u>Contracts</u>.  Schedule 5.7 sets forth each Contact and Government Contract to which any Seller is a party or bound by involving more than Ten Thousand Dollars ($10,000) or that is otherwise material to the assets, operations or financial condition of Sellers, taken as a whole. Set forth on <u>Schedule 5.7</u> next to each Contract is the related Cure Amount as set forth on <u>Schedule 1.1</u>.   <u>Schedule 5.7</u> sets forth the following information with respect to each of the Government Contracts: contract name; contract number; contracting agency or prime contractor (as applicable); contract award date; and basis of payment.

5.8 <u>Financial Statements and Related Matters</u>.  Set forth on <u>Schedule 5.8</u> are copies of Sellers' (i) unaudited consolidated and consolidating balance sheet as of November 30, 2009 and the related statements of income and cash flows for the eleven (11)-month period then ended, (ii) audited consolidated and consolidating balance sheets and statements of income and cash

flows for the fiscal year ended December 31, 2008, and (iii) unaudited consolidated and consolidating balance sheets and statements of income and cash flows for the fiscal year ended December 31, 2008. Each of the foregoing financial statements (including in all cases the notes thereto, if any) is accurate and complete in all material respects, is consistent with the Books and Records (which, in turn, are accurate and complete), presents fairly Sellers' financial condition and results of operations as of the times and for the periods referred to therein, and has been prepared in accordance with GAAP, subject in the case of unaudited financial statements to changes resulting from normal year-end adjustments for recurring accruals (which shall not be material individually or in the aggregate) and to the absence of footnote disclosure.

5.9 <u>Bank Accounts Schedule</u>.  <u>Schedule 5.9</u> lists all bank accounts, safety deposit boxes and lock boxes (designating each authorized signatory with respect thereto) for each Seller and specifically identifies which bank accounts are for collection or disbursement of payables and receivables from third parties and which are for payroll purposes.

5.10    <u>Closing Date</u>.  All of the representations and warranties contained in this <u>Article V</u> and elsewhere in this Agreement and all information delivered in any Schedule, attachment or Exhibit hereto or in any writing delivered by Sellers to Purchaser are true and correct on the date of this Agreement and shall be true and correct on the Closing Date as though then made and as though the Closing Date was substituted for the date of this Agreement throughout such representations and warranties.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Sellers on the date of this Agreement and on the Closing Date that the statements contained in this <u>Article VI</u> are correct and complete.

6.1 <u>Organization</u>.  Purchaser is a corporation validly existing and in good standing under the Laws of the State of Delaware and has the full power and authority to execute, deliver and perform this Agreement and to consummate all transactions contemplated hereby.

6.2 <u>Authority</u>.  The execution, delivery and performance by Purchaser of this Agreement and the consummation of the transactions contemplated hereby have been duly authorized by all necessary action on the part of Purchaser and do not and will not violate any provisions of its organizational documents, any applicable Law or any contract or Order binding upon Purchaser. This Agreement constitutes a valid and binding agreement of Purchaser, enforceable against Purchaser in accordance with its terms, subject to applicable bankruptcy, reorganization, insolvency, moratorium and other Laws affecting creditors' rights generally from time to time in effect, and to general equitable principles.

6.3 <u>Consents</u>.  No notice to, filing with, authorization of, exemption by, or consent (other than the approval of the Bankruptcy Court) of any Person is required in order for Purchaser to consummate the transactions contemplated hereby.

6.4 <u>Financing</u>. Purchaser shall have at the Closing sufficient cash or other sources of immediately available funds (not conditioned on third party approvals or other commitments) to enable it to fulfill its obligations hereunder.

6.5 <u>No Additional Representations</u>.  Purchaser acknowledges that Purchaser has had the opportunity to independently and personally inspect and conduct its due diligence with respect to the Acquired Assets and the Business of Sellers and that Purchaser has entered into this Agreement based upon its ability to conduct such due diligence and to make such examination and inspection.  The Acquired Assets are to be accepted by Purchaser at Closing in their then present condition, **"AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED"**.  Notwithstanding anything contained herein to the contrary, except as expressly set forth in <u>Article V</u>, it is understood and agreed that Sellers, Sellers' agents, brokers, directors, officers or employees have not made and are not now making, and they specifically disclaim, any warranties, representations or guaranties of any kind or character, express or implied, oral or written, past, present or future, with respect to the Acquired Assets.  EXCEPT AS EXPRESSLY SET FORTH IN <u>Article V</u>, SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES (EXPRESS OR IMPLIED) OF ANY KIND TO PURCHASER, INCLUDING, WITHOUT LIMITATION, THE PHYSICAL OR FINANCIAL CONDITION OF THE ACQUIRED ASSETS OR THEIR SUITABILITY FOR ANY PARTICULAR PURPOSE OR OF MERCHANTABILITY OR THE FINANCIAL PROSPECTS FOR THE BUSINESS AND PURCHASER SHALL RELY ON ITS OWN DUE DILIGENCE AND INVESTIGATIONS OF THE ACQUIRED ASSETS AND THE BUSINESS OF SELLERS IN DETERMINING WHETHER TO ACQUIRE THE ACQUIRED ASSETS. THE PROVISIONS OF THIS <u>SECTION 6.5</u> ARE A MATERIAL PART OF THE CONSIDERATION FOR SELLERS ENTERING INTO THIS AGREEMENT, AND SHALL SURVIVE CLOSING.  Nothing in this <u>Section 6.5</u> shall in anyway or under any legal theory limit Purchaser's right to terminate this Agreement pursuant to <u>Section 9</u>.1 hereof.

### ARTICLE VII
### PRE-CLOSING COVENANTS

7.1 <u>Consents and Approvals</u>.

(a) <u>Consents</u>.  Sellers shall, at their sole cost and expense, use reasonable best efforts (i) to obtain all necessary consents and approvals, as reasonably requested by Purchaser, to consummate the purchase and sale of the Acquired Assets and the assignment of the Assumed Obligations, together with any other necessary consents and approvals to consummate the transactions contemplated hereby, including obtaining entry of the Bidding Procedures Order and Sale Order without modification except as Purchaser may consent, (ii) to make, as reasonably requested by Purchaser, all filings, applications, statements and reports to all authorities that are required to be made prior to the Closing Date by or on behalf of Sellers or any of their Affiliates pursuant to any applicable Law in connection with this Agreement and the transactions contemplated hereby and (iii) to obtain, as requested by Purchaser, all required consents and approvals (if any) necessary to assign and transfer Sellers' Permits to Purchaser at Closing and, to the extent that one (1) or more of Sellers' Permits are not transferable, to assist Purchaser in obtaining replacements therefor.  In the event that any of Sellers' Permits or any Assumed Contracts are not transferable or replacements therefor are not obtainable on or before the Closing, but such Permits, Assumed Contracts, consents and approvals to transfer, or replacements therefore are obtainable after the Closing, Sellers shall continue to use such commercially reasonable efforts in cooperation with Purchaser after the Closing as may be required to obtain all required consents and approvals to transfer, or obtain replacements for,

such Permits or Assumed Contracts after Closing and shall do all things necessary to give Purchaser the benefits that would be obtained under such Permits and Assumed Contracts, in each case at Sellers' sole cost and expense.  Purchaser shall give any other notices to, make any other filings with, and use reasonable best efforts to cooperate with Sellers to obtain, any other authorizations, consents and approvals in connection with the matters contemplated by this Section 7.1(a).

(b) Governmental Consents.  Each of the parties shall give any other notices to, make any other filings with, and use reasonable best efforts to obtain, any other authorizations, consents and approvals of any Governmental Authority (including any novation necessary in respect of any Government Contract) in connection with the matters contemplated by this Agreement.

7.2  Access to Information and Facilities.  Sellers agree that, prior to the Closing Date, Purchaser, each lender to Purchaser, if any, and their respective representatives shall, upon reasonable notice and so long as such access does not unreasonably interfere with the business operations of any Seller, have reasonable access during normal business hours to all Facilities and shall be entitled to make such reasonable investigation of the properties, businesses and operations of Sellers (including conducting a physical inventory of the Inventory) and such examination of the Books and Records and financial condition of Sellers as it reasonably requests and to make extracts and copies to the extent necessary of the Books and Records; provided, that no investigation pursuant to this Section 7.2 shall affect any representations or warranties made herein or the conditions to the obligations of the respective parties to consummate the transactions contemplated by this Agreement.

7.3  Notification of Certain Matters.

(a)  Sellers shall give notice to Purchaser of (i) the occurrence or nonoccurrence of any event that would be likely to cause either (A) any representation or warranty of Sellers contained in this Agreement, or in connection with the transactions contemplated hereunder, to be untrue or inaccurate in any material respect at any time from the date hereof to the Closing or (B) directly or indirectly, any Material Adverse Effect on any Seller, or (ii) any material failure of any Seller to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder.  Notwithstanding the foregoing, the delivery of any notice pursuant to this Section 7.3(a) shall not (x) be deemed to amend or supplement any of the Disclosure Schedules contemplated hereby, (y) be deemed to cure any breach of any representation, warranty, covenant or agreement or to satisfy any condition, or (z) limit or otherwise affect the remedies available hereunder to the party receiving such notice.  Further, Sellers shall give notice to Purchaser of any breach of, default, or event of default under (regardless of whether such breach, default or event of default is otherwise waived by the lender under the DIP Credit Facility), the DIP Facility or if the DIP Facility is otherwise terminated.

(b)  To the extent not already included, Sellers shall add Purchaser, and Purchaser's counsel, to Sellers' so-called "Rule 2002 notice list" and otherwise provide notice to Purchaser of all matters that are required to be served on Sellers' creditors pursuant to the Bankruptcy Code and Rules.

(c) Purchaser and Sellers acknowledge that certain of the representations and warranties of Sellers affirmatively require that Sellers list certain factual information on the Disclosure Schedules.  Sellers shall be permitted to update the Disclosure Schedules on or prior to the Closing Date.   No additional disclosure or update by Sellers pursuant to this Section 7.3(c), however, shall be deemed to amend or supplement the Disclosure Schedules or to prevent or cure any misrepresentation, breach of warranty, breach of covenant, or right of Purchaser to terminate this Agreement.

7.4 Bankruptcy Actions.

(a) Sellers shall commence the Chapter 11 Cases not later than two (2) Business Days after the Effective Date.

(b) Simultaneously with the filing of the motion for entry of the Bidding Procedures Order on the Bankruptcy Court's docket or such earlier time as Sellers shall determine, Sellers shall file with the Bankruptcy Court a motion, in form and substance approved by Purchaser, to approve the transaction contemplated hereby ("Sale Motion"), which motion shall seek the Bankruptcy Court's approval of this Agreement, Sellers' performance under this Agreement and the assumption and the assignment of the Assumed Executory Contracts, which shall be set forth on an exhibit thereto and include the amounts necessary to cure defaults under each of such Assumed Executory Contracts, and shall provide that the applicable Purchaser's promise to perform following the Closing obligations under the Assumed Executory Contracts constituting the only required adequate assurance of future performance required pursuant to Section 365(f)(2) of the Bankruptcy Code, and shall provide that Purchaser's promise to perform following the Closing all obligations under the Assumed Executory Contracts shall constitute the only required adequate assurance of future performance required pursuant to Section 365(f)(2) of the Bankruptcy Code.

(c) Sellers shall use their reasonable best efforts to: (i) file a motion for entry of the Bidding Procedures Order by January 13, 2010, (i) obtain entry of the Bidding Procedures Order by the Bidding Procedures Order Deadline Date, (iii) require that Bids are due no later than the Bid Deadline, (iv) require that the Auction (to the extent required by the Bankruptcy Court), during which Sellers will solicit qualified bids ("Qualified Bids") from other prospective purchasers for the sale of all or substantially all of the Acquired Assets, on terms and conditions, in each instance, no less favorable to Sellers in any respects then contained in this Agreement and in accordance with the procedures set forth in the Bidding Procedures Order, shall be held no later than the Auction Deadline Date, (v) obtain entry of the Sale Order by no later than the Sale Order Deadline, and (vi) consummate the Closing as soon as practicable after the approval of the Sale Order and no later than February 22, 2010, provided that the Sale Order has been entered by the Bankruptcy Court and no request for stay of the Sale Order is pending.

(d) Sellers will provide Purchaser with a reasonable opportunity to review and comment upon all motions, applications, petitions, schedules and supporting papers, in each case which relate to or affect the transactions contemplated by this Agreement, prepared by Sellers (including forms of Orders and Notices to interested parties) prior to the filing thereof in the Chapter 11 Cases.  All motions, applications, petitions, schedules and supporting papers prepared by Sellers and relating (directly or indirectly) to the transactions contemplated by this Agreement

to be filed on behalf of Sellers after the date hereof must be reasonably satisfactory in form and substance to Purchaser in its own discretion.

(e) Sellers agree that they will promptly take such actions as are reasonably requested by Purchaser to assist in obtaining entry of the Sale Order and the Bidding Procedures Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of providing necessary assurances of performance by Sellers of their obligations under this Agreement and the Transaction Documents and demonstrating that Purchaser is a good faith buyer under Section 363(m) of the Bankruptcy Code.

(f) Sellers shall execute such documents and use their reasonable best efforts to take or cause to be taken all actions and do or cause to be done all things reasonably necessary, proper or advisable to consummate the transactions contemplated by this Agreement (including to put Purchaser in actual possession and operating control of the Acquired Assets, to effectuate, record or perfect the transfer of the Acquired Assets to Purchaser, to confirm the title of the Acquired Assets in Purchaser, to assist Purchaser in exercising rights relating thereto, to use commercially reasonable efforts to obtain all consents, approvals and authorizations of Third Parties, to make all filings with and give all notices to Third Parties which may be necessary or required in order to effectuate the transactions contemplated hereby, and to use commercially reasonable efforts to obtain landlords' estoppels and landlords' lenders' waivers).  Sellers shall use commercially reasonable efforts to fulfill or obtain the fulfillment of the conditions set forth in Sections 8.1 and 8.2 of this Agreement.

7.5 Other Bids.  Purchaser acknowledges that pursuant to the Bidding Procedures Order, and after entry of the Bidding Procedures Order on the Bankruptcy Court's docket, Sellers will solicit bids ("Bids") from other prospective purchasers (collectively, "Bidders") for the sale of all or substantially all of the Acquired Assets, on terms and conditions containing representations and warranties, covenants, termination rights, financing and due diligence contingencies substantially similar to (and in no way less favorable to Sellers than) those in this Agreement (it being agreed and understood that such Bid shall modify this Agreement as needed to comply in all respects with the Bidding Procedures Order in accordance with the procedures set forth in the Bidding Procedures Order; provided, however, that following completion of the Auction (at which Purchaser is the successful bidder) until the Closing, no Seller shall, directly or indirectly, through any officer, director, employee, agent, professional or advisor, solicit any Acquisition Proposal or participate in any negotiations or discussions with respect to any Acquisition Proposal except with a Person designated as the Backup Bidder (as defined in the Bidding Procedures Order) at the Auction, and no Seller nor any of the Sellers' Affiliates shall (i) execute an agreement with respect to an Acquisition Proposal or (ii) seek or support Bankruptcy Court approval of a motion or Order inconsistent in any material respect with the transactions contemplated by this Agreement.

7.6 Non-Seller Subsidiaries.  To the extent that any Affiliate of any Seller (other than an Affiliate which is a Seller) owns any property, assets, rights, titles or interests of any kind and nature relating to the Business, each Seller hereby covenants that it will (and it will cause its Affiliates to), from time to time, prior to or subsequent to the Closing, without further consideration, do, execute, acknowledge and deliver, or cause to be done, executed,

acknowledged and delivered, all further acts, conveyances, transfers, assignments and assurances as reasonably may be required to convey or transfer to Purchaser or, at its option, one (1) of its Subsidiaries, any such property, assets, rights, titles or interests free and clear of all Liens and Liabilities.

7.7 <u>Bankruptcy Matters</u>.

(a) Sellers and Purchaser acknowledge that this Agreement and the sale of the Acquired Assets and the assumption and assignment of the Assumed Contracts are subject to Bankruptcy Court approval. Sellers and Purchaser acknowledge that (i) to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and otherwise best offer possible for the Acquired Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and interested parties as ordered by the Bankruptcy Court, and (ii) Purchaser must provide adequate assurance of future performance under the to-be-assigned Executory Contracts.

(b) In the event an appeal is taken or a stay pending appeal is requested, from either the Bidding Procedures Order or the Sale Order, Sellers shall immediately notify Purchaser of such appeal or stay request and shall promptly provide to Purchaser a copy of the related Notice of appeal or Order of stay. Sellers shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such Orders.

(c) From and after the Effective Date, Sellers shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of Bidding Procedures Order or this Agreement. If Purchaser is the Successful Bidder (as defined in the Bidding Procedures Order) at the Auction, Sellers shall not take any action which is intended to (or is reasonably likely to), or fail to take any action the intent (or the reasonably likely result) of which failure to act is to, result in the reversal, voiding, modification or staying of the Sale Order or this Agreement.

7.8 <u>Financial Statements</u>. Sellers shall promptly deliver to Purchaser copies of all financial statements and other information Sellers are required to deliver to the lenders under the DIP Facility.

7.9 <u>Real Property</u>. From and after the date of this Agreement through (i) the effective date of assignment for the leases that are Designated Contracts assumed by Purchaser after the Closing, and (ii) the Closing for all Facility Leases that are not Designated Contracts:

(a) <u>Maintenance of Real Property</u>. Sellers shall maintain the Lease Facilities, including all of the improvements thereon, in substantially the same condition as of the date of this Agreement, ordinary wear and tear excepted, and shall not demolish or remove any of the existing improvements, or erect new improvements on the real property or any portion thereof, without the prior written consent of Purchaser.

(b) <u>Leases</u>. Seller shall not amend, modify, extend, renew or terminate any Facility Lease, and shall not enter into any new lease, sublease, license or other agreement for the use or occupancy of any real property, without the prior written consent of Purchaser.

7.10    <u>Settlement Action</u>.  Prior to Closing, the Sellers shall communicate and cooperate with the Purchaser and the United States in every respect to facilitate the dismissal with prejudice of all court proceedings related to the Deferred Prosecution Agreement.  Following the Closing, Sellers shall communicate and cooperate with the Purchaser and the United States in every respect to facilitate the dismissal with prejudice of all court proceedings related to the Deferred Prosecution Agreement.

**ARTICLE VIII**
**CONDITIONS TO CLOSING**

8.1 <u>Conditions to Parties' Obligations</u>.  The obligations of Purchaser and Sellers under this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived (but only in writing) by Purchaser or Sellers (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

(a) <u>Required Approvals</u>.  All authorizations, consents, filings and approvals necessary to permit the parties to perform the transactions contemplated hereby shall have been duly obtained, made or given, shall be in form and substance, reasonably satisfactory to Parties, shall not be subject to the satisfaction of any condition that has not been satisfied or waived and shall be in full force and effect.  All terminations or expirations of waiting periods imposed (and any extension thereof) by any Governmental Authority necessary for the transactions contemplated under this Agreement, if any, shall have occurred.

(b) <u>No Order or Proceeding</u>.  No Order shall be issued by and no Proceeding shall be pending before any Governmental Authority seeking or threatening to restrain or prohibit the consummation of the transactions contemplated by this Agreement, or involving a claim that consummation thereof would result in the violation of any Law of any Governmental Authority having appropriate jurisdiction.

8.2 <u>Conditions to Purchaser's Obligations</u>.  The obligations of Purchaser under this Agreement are subject to satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived (but only in writing) by Purchaser (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

(a) <u>Accuracy of Representations and Warranties</u>.  Sellers shall make all of the representations and warranties set forth in <u>Article V</u> on and as of the Closing Date, and such representations and warranties shall be true and correct as of the Closing Date in all material respects.

(b) <u>Performance of Covenants</u>.  Sellers shall have performed and complied in all respects with the obligations and covenants required by this Agreement to be performed or complied with by Sellers on or prior to the Closing Date.

(c) <u>Officer's Certificate</u>.  Sellers shall deliver to Purchaser a certificate signed by each Seller, dated the date of the Closing Date, (in form and substance reasonably satisfactory to

Purchaser), certifying that the conditions specified in Sections 8.1 and 8.2 have been satisfied as of the Closing;

(d) <u>Bankruptcy Condition</u>.

(i)  The Bidding Procedures Order shall have been entered on the docket of the Bankruptcy Court as soon as practicable and no later than the Bidding Procedures Order Deadline Date.  The Sale Order shall have been entered on the docket of the Bankruptcy Court as soon as practicable and no later than the Sale Order Deadline shall become effective immediately, notwithstanding Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure, and no request for stay of the Sale Order is pending, and no such stay is in effect.

(ii)  The Sale Order shall approve and authorize the assumption and assignment of the Assumed Executory Contracts and the Assumed Executory Contracts shall have been actually assumed and assigned to Purchaser such that the Assumed Executory Contracts will be in full force and effect from and after the Closing with non-debtor parties being barred and enjoined from asserting against Purchaser, among other things, defaults, breaches or claims of pecuniary losses existing as of the Closing or by reason of the Closing.

(iii)  The Bidding Procedures Order shall provide:

(A) Upon the first to occur of (i) the date any Seller consummates an Acquisition Proposal or (ii) the date any Seller consummates a plan under the Bankruptcy Code, and only if the first to occur of (i) or (ii) above shall have occurred on or prior to the date which is the one (1) year anniversary of the date of termination of this Agreement, then, Sellers shall immediately pay (in cash) to Purchaser a breakup fee equal to Three Hundred and Twenty Thousand Dollars ($320,000) (the "<u>Breakup Fee</u>") with Sellers being jointly and severally liable for such payment; <u>provided</u>, <u>however</u>, that the Breakup Fee shall not be payable to Purchaser if this Agreement is terminated by Sellers pursuant to <u>Section 9.1(c)</u> or <u>Section 9.1(l)</u> and the Purchaser does not have a right to terminate this Agreement pursuant to <u>Article IX</u> (such termination by Sellers pursuant to <u>Section 9.1(c)</u> or <u>Section 9.1(l)</u> when Purchaser does not have a right to terminate this Agreement pursuant to <u>Article IX</u>, a "<u>Seller Termination for Purchaser Breach</u>").

(B) If the transactions contemplated hereby are not consummated for any reason other than the material breach by Purchaser of this Agreement, Sellers shall pay (in cash) to Purchaser, upon the first to occur of (i) the date any Seller consummates an Acquisition Proposal or (ii) the date any Seller consummates a plan under the Bankruptcy Code, an amount equal to all reasonable costs and out-of-pocket expenses incurred by Purchaser in connection with its legal, environmental, accounting and business due diligence and the preparation and negotiation of this Agreement (the "<u>Expense Reimbursement</u>") with Sellers being jointly and severally liable for such payment, not to exceed in the aggregate the sum of $350,000; <u>provided</u>, <u>however</u>, that the Expense Reimbursement shall not be payable to Purchaser if this Agreement is terminated by a Seller Termination for Purchaser Breach.

(C) That Sellers are authorized without further Bankruptcy Court action to pay any amounts that become due and payable to Purchaser pursuant to this Agreement

(including the Breakup Fee and Expense Reimbursement), and that pursuant to Section 364(c)(1) of the Bankruptcy Code, Purchaser shall have a super-priority administrative expense priority claim payable out of Sellers' cash or other collateral securing Sellers' obligations (which shall be senior to any and all claims of any creditors of or holders of equity interests in Sellers, including pre-petition and post-petition amounts owing to Sellers' pre-petition and post-petition senior secured lenders) for such amounts that shall be due and payable as provided in Sections 8.2(d)(iii)(A) and (B) of this Agreement;

(D) No party submitting any other offer to purchase the Acquired Assets or a Qualifying Bid shall be entitled to any expense reimbursement, breakup, or termination or similar fee or payment;

(E) Prior to receipt by a prospective Bidder of any information (including business and financial information and access to representatives of Sellers) from Sellers, each Bidder will be required to execute an appropriate confidentiality agreement and deliver evidence reasonably satisfactory to Sellers establishing such potential Bidders' financial capability to timely consummate a purchase of the all the Acquired Assets;

(F) As part of any Bid, each Bidder shall submit a copy of this form of asset purchase agreement marked to show changes, along with any other bid package requirements to ParentCo and Purchaser and place into escrow a cash deposit of no less than Five Hundred Thousand Dollars ($500,000);

(G)(1)  a Bid will not be considered by Sellers as qualified for the Auction unless such Bid is for an amount equal to or more than the aggregate of the sum of (w) Eight Million Dollars ($8,000,000) in cash; (x) the dollar value of the Breakup Fee in cash, (y) the dollar value of the Expense Reimbursement in cash, and (z) One Hundred Thousand Dollars ($100,000) in cash (such amount, the "Minimum Cash Amount"), (2) any overbid Bids thereafter must be higher than the then existing lead Bid in increments valued at not less than One Hundred Thousand Dollars ($100,000), provided, however, that the consideration for such overbids in excess of the Minimum Cash Amount need not be cash, provided, further, however, any overbid Bids by Purchaser thereafter shall only be required to be equal to the sum of (A) the then existing leading Bid, plus (B) consideration valued at One Hundred Thousand Dollars ($100,000) less (C) the dollar value of the Breakup Fee less (D) the dollar value of the Expense Reimbursement; provided, further, however, a higher Bid will not be considered by Sellers as qualified for the Auction if (I) such Bid contains additional representations and warranties, covenants, closing conditions, termination rights other than as may be included in this Agreement (it being agreed and understood that such Bid shall modify this Agreement as needed to comply in all respects with the Bidding Procedures Order and will remove provisions that apply only to the Purchaser as the stalking horse bidder such as breakup fee and expense reimbursement); (II) such Bid is not received by Sellers and Purchaser in writing on or prior to the Bid Deadline, and (III) such Bid does not contain evidence that the Person submitting it has received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby, including proof of deposit into escrow of no less than Five Hundred Thousand Dollars ($500,000) in cash.  (Each Bid which meets the foregoing criteria constitutes, as applicable, a "Qualifying Bid");

(H) If one (1) or more Qualifying Bids are submitted in accordance with the Bidding Procedures Order, Sellers will conduct the Auction no later than the Auction Deadline Date in accordance with the Bidding Procedures Order. At the Auction, Sellers shall have the right to select the highest and best Bid from Purchaser and any Person who submitted a Qualifying Bid pursuant to Section 8.2(d)(iii)(G) (the "Highest and Best Bid"), which will be determined by Sellers considering, among other things: (1) the number, type and nature of any changes to this Agreement requested by each Bidder; (2) the extent to which such modifications are likely to delay closing of the sale of the Acquired Assets and the cost to Sellers of such modifications or delay; (3) the total consideration to be received by Sellers; (4) the likelihood of the Bidder's ability to close a transaction and the timing thereof; and (5) the net benefit to the estate, taking into account Purchaser's rights to the Breakup Fee and Expense Reimbursement (for the avoidance of doubt, Sellers hereby agree that the value attributed by Sellers to any Bid made by Purchaser at the Auction shall at least be equal to the sum of the following (w) the dollar value of the cash consideration contained in such Bid, (x) the dollar value of any additional consideration contained in such Bid), (y) the dollar value of the Breakup Fee, and (z) the dollar value of the Expense Reimbursement. For avoidance of doubt, the Highest and Best Bid must include cash in an amount no less then the Minimum Cash Amount (it being agreed that the Minimum Cash Amount for Purchaser shall be reduced by the dollar value of the Expense Reimbursement and Breakup Fee);

(I) At the Auction, Purchaser shall have the right to submit further higher Bids based upon the terms and provisions of this Agreement;

(J) Unless otherwise agreed to by Purchaser in its sole discretion, only the Persons who submitted Qualified Bids and Purchaser may participate in the Auction;

(K) Sellers shall not contest that Purchaser has the right to assert that it has standing to contest the Highest and Best Bid selected by Sellers;

(L) Sellers are authorized and directed to instruct the successful bidder at the Auction to pay the Breakup Fee and Expense Reimbursement directly to Purchaser by wire transfer of immediately available good funds to an account specified by Purchaser at the Closing of such transaction with the successful bidder. To the extent for any reason the successful bidder at Auction fails to pay the Breakup Fee and Expense Reimbursement directly to Purchaser at the Closing of such transaction with the successful bidder, the Sellers are authorized and directed to pay the Breakup Fee and Expense Reimbursement to Purchaser in accordance with the terms of this Agreement without further order of the Bankruptcy Court.

(e) Receipt of Required Consents. Sellers shall have delivered duly executed copies of all Third Party approvals and governmental approvals, consents and novations listed on Schedule 8.2(e).

(f) Closing Deliveries. Sellers shall have delivered to Purchaser the items set forth in Section 4.3 of this Agreement.

(g) Cure Costs. If a cure obligation (pursuant to Section 365 of the Bankruptcy Code) is not set forth on Schedule 1.1, or if any Assumed Executory Contract is subject to a cure

in excess of the amount set forth next to such Assumed Executory Contract on <u>Schedule 1.1</u>, Sellers shall have paid the amount of such cure or the excess of such cure over the amount set forth on <u>Schedule 1.1</u>.

(h) <u>No Material Adverse Change</u>.  There shall not have been a Material Adverse Change since November 30, 2009.

8.3 <u>Conditions to Sellers' Obligations</u>.  The obligations of Sellers under this Agreement are subject to the satisfaction of the following conditions precedent on or before the Closing Date, any one or more of which may be waived (but only in writing) by Sellers (provided that no such waiver shall be deemed to have cured any breach of any representation, warranty or covenant made in this Agreement):

(a) <u>Accuracy of Representations and Warranties</u>.  Purchaser shall make all of the representations and warranties set forth in <u>Article VI</u> on and as of the Closing Date, and such representations and warranties shall be true and correct as of the Closing Date in all material respects (except for those representations and warranties made as of a specified date, which shall be true and correct as of that date).

(b) <u>Performance of Covenants</u>.  Purchaser shall have performed and complied in all respects with the obligations and covenants required by this Agreement to be performed or complied with by Purchaser on or prior to the Closing Date.

(c) <u>Officer's Certificate</u>.  Purchaser shall deliver to Sellers a certificate signed by Purchaser, dated the date of the Closing Date (in form and substance reasonably satisfactory to Sellers), certifying that the conditions specified in <u>Sections 8.1</u> and <u>8.3</u> have been satisfied as of the Closing;

(d) <u>Bankruptcy Court Approval</u>.  The Bankruptcy Court shall have entered an order approving the execution of this Agreement by Sellers and the consummation by Sellers of the transactions contemplated herein that is not subject to Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

(e) <u>Consideration</u>.  Purchaser shall have delivered the payments specified in <u>Section 3.1</u>.

(f) <u>Closing Deliveries</u>.  Purchaser shall have delivered to Sellers the items set forth in <u>Section 4.4</u> of this Agreement.

**ARTICLE IX**
**TERMINATION**

9.1 <u>Termination</u>.  This Agreement may be terminated prior to the Closing as follows:

(a) by mutual written agreement of Purchaser and Sellers;

(b) by Purchaser or Sellers if there shall be in effect a Final Order restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby;

(c) by Purchaser or Sellers (provided that the terminating party is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if there shall have been a material breach or misrepresentation of any of the representations or warranties or a material breach of any of the covenants set forth in this Agreement on the part of the other party, which breach is not cured within ten (10) days following written notice to the party committing such breach or which breach, by its nature, cannot be cured prior to the Closing (provided, for avoidance of doubt, that such ten 10-day cure period shall not apply to the termination rights described in Section 9.1(k) and Section 9.1(l) of this Agreement);

(d) by Purchaser (provided that Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one (1) or more conditions set forth in Section 8.2 has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied);

(e) by Purchaser if any Seller (i) designates any Person other than Purchaser as the successful bidder of the Auction, (ii) seeks or supports Bankruptcy Court approval of an Acquisition Proposal (other than to or by Purchaser) or (iii) executes and delivers an agreement or understanding of any kind with respect to an Acquisition Proposal;

(f) by Purchaser or Sellers (i) if the Bankruptcy Court enters an order approving any Acquisition Proposal (other than the sale of the Business and the Acquired Assets to Purchaser) or (ii) any Seller files with the Bankruptcy Court and seeks approval from the Bankruptcy Court of a "plan of reorganization" pursuant to the Bankruptcy Code;

(g) by Purchaser as a result of (i) the failure of the Bankruptcy Court to have entered an order in a form reasonably satisfactory to Purchaser approving the DIP Credit Agreement by January 19, 2010, (ii) Sellers not filing a motion for approval of the DIP Credit Agreement within one day of commencement of the Chapter 11 Cases, or (iii) the Bankruptcy Court entering an order approving any debtor in possession financing other than the financing under the DIP Credit Agreement;

(h) by Purchaser as a result of (i) the failure of the Bankruptcy Court to have entered the Bidding Procedures Order by no later than the Bidding Procedures Order Deadline Date (or such later date as Purchaser may determine in its sole discretion), or (ii) following the entry of the Bidding Procedures Order but prior to the entry of the Sale Order, the Bidding Procedures Order ceases to be in full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction;

(i) by Purchaser if the Sellers fail to comply with the terms of the Bidding Procedures Order, including the failure of Sellers to (i) require that Bids be due no later than the date set forth in the Bidding Procedures Order or (ii) have held the Auction by no later than the date set forth in the Bidding Procedures Order;

(j) by Purchaser as a result of (i) the failure of the Bankruptcy Court to enter the Sale Order by no later than the Sale Order Deadline, or (ii) the date the Sale Order ceases to be in

44

full force and effect, or is revoked, rescinded, vacated, materially modified, reversed or stayed, or otherwise rendered ineffective by a court of competent jurisdiction;

(k) by Purchaser on any day on or after February 25, 2010 if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Purchaser and Sellers in writing), unless the Closing has not occurred due to a material failure of Purchaser to perform or observe its obligations as set forth in this Agreement required to be performed or observed by it on or before the Closing Date;

(l) by Sellers on any day on or after February 22, 2010, provided that Sellers are not then in material breach of any representation, warranty, covenant or other agreement contained herein and Purchaser does not have any right to terminate this Agreement pursuant to this Article IX, if all of the conditions set forth in Article VIII have been satisfied or waived in writing by the appropriate parties hereto on the date of termination, and the Closing shall not have been consummated within three (3) Business Days following the date that written notice is provided by Sellers to Purchaser specifically indicating that all of the conditions set forth in Article VIII have been satisfied or waived in writing by the appropriate parties hereto, including, as applicable, by Sellers' delivery of final and fully executed documents listed in Section 4.3 in .pdf or electronic form to Sellers' and Purchaser's respective legal counsel to be held in "escrow" pending Closing, other than (i) the deliveries required by Purchaser pursuant to Section 8.3(f) of this Agreement (and other than deliverables referenced in Section 4.4(e) of this Agreement) and (ii) the payment by Sellers of the amounts required to be paid pursuant to Section 8.2(g) of this Agreement, and pending (A) the physical transfer from Sellers to Purchaser of the deliveries required pursuant to Sections 4.3(a), (m), and (n) of this Agreement simultaneously with the Closing and (B) release of the other deliveries required by Article VIII of this Agreement from "escrow" upon receipt by Sellers of the payments required to be made by Purchaser in satisfaction of Section 8.3(e) of this Agreement and delivery by Purchaser of the documents listed in Sections 4.4(a), (b) and (c) of this Agreement;

(m) by Purchaser if there has been a breach of, default under, or event of default under Section 7.01(b) of the DIP Credit Agreement specifically relating to Sections 5.04, 5.05, 5.07, 5.11, 5.13, 6.04, 6.05, 6.07, 6.08, 6.13, 6.14 or 6.15 of the DIP Credit Agreement or an event of default under Sections 7.01(a), (j), (l), (m), (n) or (u) of the DIP Credit Agreement (regardless of whether such breach, default or event of default is otherwise waived by the lender under the DIP Credit Facility but provided that such breach, default or event of default is not cured by Sellers within two (2) days of the date on which Sellers receive notice of such breach) or if the DIP Facility is otherwise terminated, provided that if one (1) or more Qualifying Bids are submitted in accordance with the Bidding Procedures Order, Purchaser must exercise the termination right set forth in this Section 9.1(m) for such specified breach of, default of or event of default under the DIP Credit Facility on the date such Qualifying Bid(s) are submitted;

(n) by Sellers (provided that no Seller is then in material breach of any representation, warranty, covenant or other agreement contained herein) if it shall have reasonably determined that one (1) or more conditions set forth in Section 8.3 has not been or cannot be fulfilled or satisfied prior to the date specified in such condition (if such condition specifies a date other than the Closing Date by which such condition must be satisfied);

45

(o) by Purchaser if any of the Chapter 11 Case is dismissed or converted into a case under Chapter 7 of the Bankruptcy Code and neither such dismissal nor conversion expressly contemplates the transactions provided for in this Agreement, or a trustee is appointed for Sellers and such trustee rejects the transactions contemplated by this Agreement;

(p) by Purchaser, if Sellers withdraw or seek authority to withdraw the motion for entry of the Bidding Procedures Order or the Sale Motion, or announce any stand-alone plan of reorganization or liquidation (or supporting any such plan filed by any other party);

(q) by Purchaser, if the Chapter 11 Cases are not commenced within five (5) Business Days of the Effective Date;

(r) by Purchaser within two (2) days of receipt of a written good faith notice from Sellers that the Disclosure Schedules to be provided to Purchaser pursuant to Section 11.19 are final, if Purchaser is not satisfied with the Disclosure Schedules in its sole discretion.

9.2 Breakup Fee and Expense Reimbursement.

(a) Upon the first to occur of (i) the date any Seller consummates an Acquisition Proposal or (ii) the date any Seller consummates a plan under the Bankruptcy Code, and only if the first to occur of (i) or (ii) above shall have occurred on or prior to the date which is the one (1) year anniversary of the date of termination of this Agreement, Sellers, jointly and severally, shall immediately pay (in cash) to Purchaser the amount of the Breakup Fee; provided, however, that the Breakup Fee shall not be payable to Purchaser if this Agreement has been terminated by a Seller Termination for Purchaser Breach.

(b) Sellers shall pay (in cash) to Purchaser the Expense Reimbursement upon the first to occur of (i) the date any Seller consummates an Acquisition Proposal or (ii) the date any Seller consummates a plan under the Bankruptcy Code; provided, however, that the Expense Reimbursement shall not be payable to Purchaser if this Agreement has been terminated by a Seller Termination for Purchaser Breach.

(c) Sellers' obligation to pay the Breakup Fee and the Expense Reimbursement pursuant to this Section 9.2 shall survive termination of this Agreement and shall constitute an administrative expense (which shall be a super-priority administrative expense claim senior to all other administrative expense claims and payable out of Sellers' cash or other collateral securing Sellers' obligations to its senior secured lenders, prior to any recovery by such lenders) of Sellers under Section 364(c)(1) of the Bankruptcy Code.

(d) In the event Sellers properly terminate this Agreement by a Seller Termination for Purchaser Breach, then, Sellers shall receive the Deposit as liquidated damages and as Sellers' sole and exclusive remedy for the breach by Purchaser of this Agreement as further described in Section 9.3 below.

(e) In addition to any rights the Purchaser may have to the Breakup Fee and Expense Reimbursement as set forth herein, in the event Purchaser or Sellers properly terminate this Agreement for any reason other than by Sellers by a Seller Termination for Purchaser

46

Breach, then, Purchaser shall receive a return of the Deposit upon such termination and neither party shall have any liability under this Agreement.

9.3 <u>Effect of Termination or Breach</u>.  If the transactions contemplated hereby are not consummated (a) this Agreement shall become null and void and of no further force and effect, except (i) for this <u>Section 9.3</u>, (ii) for the provisions of <u>Sections 11.1</u>, <u>11.8</u>, <u>11.9</u>, <u>11.10</u>, <u>11.11</u>, and <u>11.12</u> hereof, and (iii) that, subject to any applicable limitations set forth in this Agreement, the termination of this Agreement for any cause shall not relieve any party hereto from any Liability which at the time of termination had already accrued to any other party hereto or which thereafter may accrue in respect of any act or omission of such party prior to such termination; and (b) if this Agreement is terminated by Purchaser pursuant to a termination right set forth in this <u>Article IX</u> or by Sellers for any reason other than the termination of this Agreement by a Seller Termination for Purchaser Breach, Sellers shall not be entitled to any damages, losses, or payment from Purchaser, and Purchaser shall have no further Liability of any kind to Sellers, any of their Affiliates, or any Third Party on account of this Agreement.  The parties hereby agree that is impossible to determine accurately the amount of damages that Sellers would suffer if the transactions contemplated hereby were not consummated as a result of a breach of this Agreement by the Purchaser.  As a result, notwithstanding anything in this Agreement to the contrary, Sellers hereby agree that, in the event of a termination of this Agreement by a Seller Termination for Purchaser Breach, (i) the Deposit shall be delivered to Sellers as liquidated damages against the Purchaser for all Liabilities of Purchaser under this Agreement and (ii) such liquidated damages shall be the sole and exclusive remedy, at Law and equity, of the Sellers against the Purchaser for the Purchaser's breach and such termination and Purchaser shall have no further Liability of any kind to Sellers, any of their Affiliates, or any third Party on account of this Agreement.

**ARTICLE X**
**POST-CLOSING COVENANTS**

10.1    <u>Employees</u>.  Prior to the Closing, Sellers shall terminate the employment of all employees of the Business.  Purchaser shall offer employment immediately prior to the Closing (but contingent on the occurrence of the Closing) to such employees of Sellers actively employed or engaged principally in the Business as of the Closing Date as determined by Purchaser in its sole discretion (such employees who accept such offer of employment and commence active employment with Purchaser, the "Rehired Employees") on terms and conditions of employment (including compensation and benefits) as determined by Purchaser in its sole discretion.  Nothing contained in this Agreement shall confer upon any Rehired Employee any right to any term or condition of employment or to continuance of employment by Purchaser or any of its Affiliates, nor shall anything herein interfere with the right of Purchaser or any of its Affiliates to terminate the employment of any employee, including any Rehired Employee, at any time, with or without notice and for any or no reason, or restrict Purchaser or any of its Affiliates in modifying any of the terms or conditions of employment of any employee, including any Rehired Employee, after the Closing.  Except for the Assumed Obligations, Sellers shall be responsible for (and Sellers shall jointly and severally indemnify and hold Purchaser harmless from and against), any and all wages, bonuses, commissions, employee benefits, retention or stay bonus arrangements, and other compensation (including all obligations under any Employee Benefit Plans other than the

47

accrued vacation specifically assumed under <u>Section 2.3(a)(iii)</u>) due to the employees of Sellers arising out of their employment with Sellers prior to and as of the Closing.

10.2    <u>Employee Benefit Plans</u>.  Except for accrued vacation specifically assumed under <u>Section 2.3(a)(iii)</u>, Purchaser shall not assume any Employee Benefit Plan or any Liability thereunder or related thereto and Purchaser shall provide only those benefits to Rehired Employees as of or after the Closing as Purchaser shall determine.  Except for obligations relating solely to accrued vacation specifically assumed under <u>Section 2.3(a)(iii)</u> (and other than any Liability arising as a result of any breach of any representation or warranty or covenant hereunder), Sellers shall jointly and severally indemnify, defend and hold harmless Purchaser from and against any and all obligations, claims, or Liabilities at any time arising under or in connection with any Employee Benefit Plan.  With respect to all claims by or benefits due to current and former employees, officers, directors or contractors of any Seller whenever arising under or in connection with any Employee Benefit Plan, whether insured or otherwise (including life insurance, medical and disability programs, retirement and pension plans), Sellers shall, at their own expense, honor, process, administer or pay or cause their respective insurance carriers (as applicable) to honor, process, administer or pay such claims or benefits, regardless of whether such claims are made or such benefits are due before or after the Closing, in accordance with the terms and conditions of such Employee Benefit Plans without regard to the employment by Purchaser of any such employees after the Closing.  Nothing contained in this Agreement, express or implied: (a) shall be construed to establish, amend, or modify any benefit or compensation plan, program, agreement or arrangement; (b) shall alter or limit the ability of Purchaser or any of its Affiliates to amend, modify or terminate any benefit or compensation plan, program, agreement or arrangement at any time assumed, established, sponsored or maintained by any of them; or (c) is intended to confer upon any Person (including employees, retirees, or dependents or beneficiaries of employees or retirees) any rights as a third party beneficiary of this Agreement.

10.3    <u>WARN Act</u>.  Sellers will indemnify and hold Purchaser harmless from any Liability with respect to any employees of the Sellers under the WARN Act due solely to Sellers' actions or omissions occurring prior to or upon the Closing.  Provided that the Company provides Purchaser with a true and accurate list, by date and location, of employee layoffs implemented by Sellers in the ninety (90) days preceding the Closing, Purchaser will indemnify and hold Sellers harmless from any Liability with respect to any employees employed by Purchaser after the Closing under the WARN Act due, in whole or in part, to Purchaser's actions or omissions occurring after the Closing Date.

10.4    <u>Payroll Reporting and Withholding</u>.  Purchaser shall adopt the "standard procedure" for preparing and filing IRS Forms W-2 (Wage and Tax Statements), as described in Revenue Procedure 2004-53.  Under this procedure, Purchaser as the successor employer shall provide Forms W-2 to all Rehired Employees reflecting all wages paid and Taxes withheld by Purchaser as the successor employer for the portion of the calendar year beginning on the day after the Closing Date.  Sellers as the predecessor employer shall provide Forms W-2 to all Rehired Employees reflecting all wages paid and Taxes withheld by Sellers for the portion of the calendar year ending on the Closing Date.  Purchaser shall adopt the "standard procedure" of Rev. Proc. 2004-53 for purposes of IRS Forms W-4 (Employee's Withholding Allowance Certificate) and W-5 (Earned Income Credit Advance Payment Certificate).  Under this

procedure, Sellers shall keep on file the Forms W-4 and W-5 provided by the Rehired Employees for the period required by applicable Law concerning record retention.  Purchaser shall obtain new IRS Forms W-4 and W-5 with respect to each Rehired Employee.

10.5     Certain Consents.  If a consent of a Third Party which is required in order to assign any Acquired Asset (or claim, right or benefit arising thereunder or resulting therefrom) is not obtained prior to the Closing Date, or if an attempted assignment would be ineffective or would adversely affect the ability of any Seller to convey its interest in question to Purchaser, Sellers will cooperate with Purchaser and use commercially reasonable efforts in any lawful arrangement to provide that Purchaser shall receive the interests of any Seller in the benefits of such Acquired Asset.  If any consent or waiver is not obtained before the Closing Date and the Closing is nevertheless consummated, each Seller agrees to continue to use commercially reasonable efforts to obtain all such consents as have not been obtained prior to such date.

10.6     Name Changes.  At or prior to the Closing, each Seller shall take all necessary action to change its name and the names of all Affiliates of Sellers to a name that does not include the word "Protective", "Ceramic" or any other name or mark included in the Intellectual Property used in the conduct of the Business as presently conducted by Sellers (including any name set forth on the signature pages to this Agreement) or any translations, adaptations, derivations or combinations of any of the foregoing or any name or mark confusingly similar thereto (collectively, the "Restricted Names").  Sellers shall promptly notify Purchaser of such name change(s) and the new name(s) chosen by each Seller and all Affiliates of Seller, as applicable.  From and after Closing, Sellers and all Affiliates of Sellers shall cease all use of any Restricted Name, including by removing all Restricted Names from all letterhead, stationary, signage and tangible assets included in the Excluded Assets.

10.7     Accounts Receivable; Collections.  After the Closing, Sellers shall permit, and hereby authorize, Purchaser to collect, in the name of Sellers, all Accounts Receivable constituting part of the Acquired Assets and to endorse with the name of any applicable Seller for deposit in Purchaser's account any checks or drafts received in payment thereof.  Sellers shall promptly deliver to Purchaser any cash, checks or other property that they may receive after the Closing in respect of any Accounts Receivable or other asset constituting part of the Acquired Assets.

10.8     Confidentiality.  Following the Closing, Sellers shall maintain as confidential and shall not use or disclose (except as required by Law or as authorized in writing by Purchaser) (a) any information or materials relating to the Business, operations and affairs of Sellers, and (b) any materials developed by Purchaser or any of its representatives (including its accountants, advisors, environmental, labor, employee benefits and any other consultants, lenders and legal counsel).  Except as otherwise permitted and provided above, in the event any Seller is required by Law to disclose any such confidential information, such Seller shall promptly notify Purchaser in writing, which notification shall include the nature of the legal requirement and the extent of the required disclosure, and shall cooperate with Purchaser to obtain a protective order and otherwise preserve the confidentiality of such information consistent with applicable Law.  Information subject to the confidentiality obligations in this Section 10.8 does not include any information which (x) at the time of disclosure is generally available to or known by the public (other than as a result of its disclosure in breach of this Agreement) or (y) becomes available on a

non-confidential basis from a Person who is not known to be bound by a confidentiality agreement with Purchaser or its Affiliates, or who is not otherwise prohibited from transmitting the information.

10.9    Access to Records and Information.    Between the Closing Date and the fifth anniversary of the Closing Date, Sellers shall have reasonable access to all of the books and records relating to the Business or the Acquired Assets, including all information pertaining to the Assumed Contracts, in the possession of Purchaser to the extent that such access may reasonably be required by Seller in connection with the Assumed Liabilities or the Excluded Liabilities, or other matters relating to or affected by the operation of the Business and the Acquired Assets.  Such access shall be afforded by Purchaser upon receipt of reasonable advance notice and during normal business hours; provided, however, that (i) any such access shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of Purchaser or its Affiliates, and (ii)  Purchaser shall not be required to take any action which would constitute a waiver of the attorney-client privilege, and (iii) Purchaser need not supply Sellers with any information which Buyer is under a legal obligation not to supply.  Sellers shall be solely responsible for any costs or expenses incurred by Sellers pursuant to this Section 10.9 and for all out-of-pocket expenses incurred by Purchaser pursuant to this Section 10.9.   If Purchaser shall desire to dispose of any such books and records upon or prior to the expiration of such period, Purchaser shall, prior to such disposition, give Sellers a reasonable opportunity at Sellers' expense, to segregate and remove such books and records as Sellers may select.  After the Closing, Sellers and the Canadian Imperial Bank of Commerce (as lender under the DIP Credit Facility and pre-petition lender to Sellers) shall have reasonable access to the senior management personnel of Purchaser to the extent that such access may reasonably be required in connection with any Tax refunds, rebates, credits and similar items which are Excluded Assets hereunder and which relate to any period, or portion of any period, on or prior to the Closing Date.  Such access shall be afforded by Purchaser upon receipt of reasonable advance notice and during normal business hours; provided, however, that (i) any such access shall be conducted in such a manner as not to interfere unreasonably with the operation of the business of Purchaser or its Affiliates, and (ii)  Purchaser shall not be required to take any action which would constitute a waiver of the attorney-client privilege, and (iii) Purchaser need not supply Sellers or the Canadian Imperial Bank of Commerce with any information which Purchaser is under a legal obligation not to supply.  Sellers and the Canadian Imperial Bank of Commerce shall be responsible for their respective costs or expenses incurred by them pursuant to this Section 10.9.  All out-of-pocket expenses incurred by Purchaser pursuant to this Section 10.9 shall be reimbursed by Sellers or the Canadian Imperial Bank of Commerce, as the case may be, to the extent such expenses were incurred by Purchaser as a result of the exercise or rights by Sellers or the Canadian Imperial Bank of Commerce under this Section 10.9.

10.10    Taxes.

(a) On or prior to the Closing, Sellers shall pay all sales taxes, use taxes, payroll taxes, and other Taxes owed or owing with respect to the Acquired Assets or the Business and attributable to taxable periods or portions thereof prior to the Closing.

(b) Any  sales,  use,  purchase,  transfer,  franchise,  deed,  fixed asset,  stamp, documentary stamp, use or other Taxes and recording charges due and which may be payable by

reason of the sale of the Acquired Assets or the assumption of the Assumed Obligations under this Agreement or the transactions contemplated herein shall be borne fifty percent (50%) by Purchaser and fifty percent (50%) by Sellers and timely paid.

(c) All Tax-sharing agreements or similar agreements with respect to or involving any Seller shall be terminated as of the Closing Date and, on and after the Closing Date, Purchaser shall not be bound thereby or have any Liability thereunder.

(d) Purchaser and Sellers shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns and any audit, litigation or other Proceeding with respect to Taxes. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information that are reasonably relevant to any such audit, litigation or other Proceeding and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. All costs and expenses incurred in connection with this Section 10.10(d) shall be borne by the party who is subject to such Proceeding.

(e) Personal property Taxes, real property Taxes and other similar Taxes (the "Proration Items") with respect to the Acquired Assets for any taxable period commencing before the Closing Date and ending after the Closing Date shall be prorated on a per diem basis between the Purchaser and the Sellers as of the Closing Date. The amount of the Proration Items attributable to the Sellers shall be equal to the amount of Tax for the period multiplied by a fraction, the numerator of which shall be the number of days from the beginning of the period through and including the Closing Date and the denominator of which shall be the number of days in the period. The amount of all such Proration Items attributable to the Sellers shall be estimated as of the Closing Date and paid over to Purchaser at the Closing; provided, however, that final payments with respect to the Proration Items that are not able to be calculated as of the Closing Date shall be calculated and Sellers shall pay over any additional amount as soon as practicable after the Closing Date but no later than five (5) Business Days after determination of such addition amounts.

## ARTICLE XI
## MISCELLANEOUS

11.1   Non-Survival of Representations and Warranties.  The representations and warranties respectively made by Sellers and Purchaser in this Agreement and in any certificate delivered hereunder will expire as of the Closing. Subsequent to Closing, no claim with respect to any breach of any representation or warranty contained in this Agreement may be pursued or maintained (either hereunder or otherwise) against any other party. The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive the Closing hereunder, and each party hereto shall be liable to the other after the Closing for any breach thereof.

11.2   Expenses.

(a) Except as otherwise provided herein, each party hereto shall bear its own costs and expenses, including attorneys' fees, with respect to the transactions contemplated hereby.

Notwithstanding the foregoing, in the event of any Proceeding to interpret or enforce this Agreement, the prevailing party in such Proceeding (i.e., the party who, in light of the issues contested or determined in the Proceeding, was more successful) shall be entitled to have and recover from the non-prevailing party such costs and expenses (including all court costs and reasonable attorneys' fees) as the prevailing party may incur in the pursuit or defense thereof.

(b) The parties hereto agree that if any claims for commissions, fees or other compensation, including brokerage fees, finder's fees, or commissions are ever asserted against Purchaser or Sellers in connection with this transaction, all such claims shall be handled and paid by the party whose actions form the basis of such claim and such party shall indemnify (with counsel reasonably satisfactory to the party(ies) entitled to indemnification) and hold the other harmless from and against any and all such claims or demands asserted by any Person, firm or corporation in connection with the transaction contemplated hereby.

11.3    Amendment.  This Agreement may not be amended, modified or supplemented except by a written instrument signed by ParentCo (on behalf of itself and Sellers) and Purchaser.

11.4    Waivers.  The failure of a party hereto at any time or times to require performance of any provision hereof shall in no manner affect its right at a later time to enforce the same.  No waiver by a party of any condition or of any breach of any term, covenant, representation or warranty contained in this Agreement shall be effective unless in writing by ParentCo, in the case of a waiver by any Seller, or Purchaser, in the case of any waiver by Purchaser, and no waiver in any one (1) or more instances shall be deemed to be a further or continuing waiver of any such condition or breach of other instances or a waiver of any other condition or breach of any other term, covenant, representation or warranty.

11.5    Notices.  All notices, requests, demands and other communications permitted or required to be given or delivered under or by reason of the provisions of this Agreement shall be in writing and shall be deemed conclusively to have been given (a) when personally delivered, (b) when sent by facsimile (with hard copy to follow) during a Business Day (or on the next business day if sent after the close of normal business hours or on any non-Business Day), (c) when sent by electronic mail (with hard copy to follow) during a business day (or on the next Business Day if sent after the close of normal business hours or on any non-Business Day), (d) one (1) Business Day after being sent by reputable overnight express courier (charges prepaid), or (e) three (3) Business Day following mailing by certified or registered mail, postage prepaid and return receipt requested.  Unless another address is specified in writing, notices, requests, demands and communications to the parties shall be sent to the addresses indicated below:

To Sellers:        Protective Products of America, Inc.
                   1649 NW 136th Avenue
                   Sunrise, FL 33323
                   Attn:   R. Patrick Caldwell, CEO
                           Jason A. Williams, CFO
                   Fax:    (954) 846-8306
                   E-mail: pcaldwell@body-armor.com

jwilliams@body-armor.com

with copy to:        Berger Singerman, P.A.
200 South Biscayne Boulevard
10th Floor
Miami, Florida 33131
Attn:   Jordi Guso, Esq.
Fax:   (305) 714-4340
E-mail: jguso@bergersingerman.com

With a copy to:     Farlie Turner & Co.
401 East Las Olas Boulevard
Suite 1160
Fort Lauderdale, Florida 33301
Attn:   Steven Zuckerman
        Scott Saunders
Fax:   (954) 358-3838
Email: szuckerman@farlieturner.com
       ssaunders@farlieturner.comTo Purchaser:

To Purchaser:      Protective Products Enterprises, Inc.
5200 Town Center Circle, Suite 600
Boca Raton, FL 33486
Attn:   C. Deryl Couch
        Jason H. Neimark
        G. Brian McGee
Fax:   (561) 394-0540
E-mail: dcouch@suncappart.com
      jneimark@suncappart.com
      bmcgee@suncappart.com

With copies to:     Sun Capital Partners Management V, Inc.
5200 Town Center Circle, Suite 600
Boca Raton, FL 33486
Attn:   C. Deryl Couch
        Jason H. Neimark
        G. Brian McGee
Fax:   (561) 394-0540
E-mail: dcouch@suncappart.com
      jneimark@suncappart.com
      bmcgee@suncappart.com

and            Kirkland & Ellis LLP
300 North LaSalle Street
Chicago, IL 60654

Attn:  Douglas C. Gessner, P.C.
       Jeremy S. Liss
Fax:  (312) 861-2200
E-mail: douglas.gessner@kirkland.com
       jeremy.liss@kirkland.com

11.6    Counterparts; Electronic Execution.  This Agreement and any signed agreement or instrument entered into in connection with this Agreement, and any amendments hereto or thereto, may be executed in one (1) or more counterparts, all of which shall constitute one and the same instrument.  Any such counterpart, to the extent delivered by means of a facsimile machine or by .pdf, .tif, .gif, .peg or similar attachment to electronic mail (any such delivery, an "Electronic Delivery") shall be treated in all manner and respects as an original executed counterpart and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.  At the request of any party hereto, each other party hereto or thereto shall re-execute the original form of this Agreement and deliver such form to all other parties.  No party hereto shall raise the use of Electronic Delivery to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of Electronic Delivery as a defense to the formation of a contract, and each such party forever waives any such defense, except to the extent such defense relates to lack of authenticity.

11.7    Headings.  The headings preceding the text of the Articles and Sections of this Agreement and the Exhibits and the Schedules are for convenience only and shall not be deemed part of this Agreement.

11.8    SUBMISSION TO JURISDICTION; WAIVER OF TRIAL BY JURY.  THE PARTIES HEREBY AGREE THAT ANY AND ALL CLAIMS, ACTIONS, CAUSES OF ACTION, SUITS, AND PROCEEDINGS RELATING TO THIS AGREEMENT OR THE OTHER AGREEMENTS CONTEMPLATED HEREIN SHALL BE FILED AND MAINTAINED ONLY IN THE BANKRUPTCY COURT, AND THE PARTIES HEREBY CONSENT TO THE JURISDICTION OF SUCH COURT.  EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES ALL RIGHT TO TRIAL BY JURY IN ANY LITIGATION, ACTION, PROCEEDING, CROSS-CLAIM, OR COUNTERCLAIM IN ANY COURT (WHETHER BASED ON CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF, RELATING TO OR IN CONNECTION WITH (I) THIS AGREEMENT OR THE VALIDITY, PERFORMANCE, INTERPRETATION, COLLECTION OR ENFORCEMENT HEREOF OR (II) THE ACTIONS OF THE PARTIES IN THE NEGOTIATION, AUTHORIZATION, EXECUTION, DELIVERY, ADMINISTRATION, PERFORMANCE OR ENFORCEMENT HEREOF.

11.9    Governing Law.  This Agreement shall be governed by and construed in accordance with the Laws of the Delaware (regardless of the Laws that might otherwise govern under applicable Delaware principles of conflicts of Law) as to all matters, including matters of validity, construction, effect, performance and remedies.

11.10    Binding Nature; Assignment.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, but neither this Agreement nor any of the rights, interests or obligations hereunder shall be assigned by any

of the parties hereto without prior written consent of the other parties (which shall not be unreasonably withheld or delayed); except (a) that Purchaser may assign any of its rights and obligations hereunder to any Affiliate or Subsidiary of Purchaser (whether wholly owned or otherwise) or to its lender and, following the Closing, in whole or in part to any successor-in-interest to any Person acquiring all or any portion of the Business or the Acquired Assets; (b) the rights and interests of Sellers hereunder may be assigned to a trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code; (c) this Agreement may be assigned to any entity appointed as a successor to Sellers pursuant to a confirmed Chapter 11 plan; and (d) as otherwise provided in this Agreement.  Sellers hereby agree that Purchaser may grant a security interest in its rights and interests hereunder to its lenders, and Sellers will sign a consent with respect thereto if so requested by Purchaser or its lender, and that the terms of this Agreement shall be binding upon any subsequent trustee appointed under Chapter 11 or Chapter 7 of the Bankruptcy Code.

11.11    No Third Party Beneficiaries.  This Agreement is solely for the benefit of the parties hereto and nothing contained herein, express or implied, is intended to confer on any Person other than the parties hereto or their successors and permitted assigns, any rights, remedies, obligations, claims, or causes of action under or by reason of this Agreement.  Neither Sellers, nor their successors and permitted assigns, shall have any right to specific performance hereunder.

11.12    Construction.  The language used in this Agreement will be deemed to be the language chosen by the parties to this Agreement to express their mutual intent, and no rule of strict construction shall be applied against any party.  Any reference to any federal, state, local or foreign statute or Law shall be deemed also to refer to all rules and Laws promulgated thereunder, unless the context requires otherwise. Whenever a party's consent, approval or satisfaction is required under this Agreement, the decision as to whether or not to consent or approve or be satisfied shall be in the sole and exclusive discretion of such party, and such party's decision shall be final and conclusive.

11.13    Public Announcements.  Except as required by Law or in connection with the Chapter 11 Cases, neither Sellers nor Purchaser shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other parties hereto relating to the contents and manner of presentation and publication thereof, which approval will not be unreasonably withheld, delayed or conditioned.  Prior to making any public disclosure required by applicable Law, the disclosing parties shall give the other party a copy of the proposed disclosure and reasonable opportunity to comment on the same.  Notwithstanding the foregoing, Purchaser shall not be restricted from making any public announcements or issuing any press releases after the Closing.

11.14    Disclosure Schedules.  The information disclosed in any Schedules provided pursuant to this Agreement (collectively, the "Disclosure Schedules") shall be deemed to relate to and to qualify, if applicable, only the particular representation or warranty set forth in the corresponding numbered Section in this Agreement and shall not be deemed to relate to or to qualify any other representation or warranty.  Nothing in the Disclosure Schedules shall be deemed adequate to disclose an exception, if applicable, to a representation or warranty made

herein, however, unless the Disclosure Schedules identify the exception with reasonable particularity and describe the relevant facts in reasonable detail.  The mere listing (or inclusion of a copy) of a document or other item shall not be deemed adequate to disclose an exception to a representation or warranty made herein (unless the representation or warranty has to do with the existence of the document or other item itself).

      11.15   <u>Entire Understanding</u>.  This Agreement, the Exhibits and the Schedules set forth the entire agreement and understanding of the parties hereto in respect to the transactions contemplated hereby and the Agreement, the Exhibits and the Schedules supersede all prior agreements, arrangements and understandings relating to the subject matter hereof and are not intended to confer upon any other Person any rights or remedies hereunder.

      11.16   <u>Closing Actions</u>. All deliveries, payments and other transactions and documents relating to the Closing shall be interdependent, and none shall be effective unless and until all are effective (except to the extent that the party entitled to the benefit thereof has waived satisfaction or performance thereof as a condition precedent to the Closing).

      11.17   <u>Conflict Between Transaction Documents</u>.   The parties hereto agree and acknowledge that to the extent any terms and provisions of this Agreement are in any way inconsistent with or in conflict with any term, condition or provision of any other agreement or document referred to herein, this Agreement shall govern and control.

      11.18   <u>Time Periods</u>. Unless specified otherwise, any action required hereunder to be taken within a certain number of days shall be taken within that number of calendar days (and not Business Days); <u>provided</u>, <u>however</u>, that if the last day for taking such action falls on a day that is not a Business Day, the period during which such action may be taken shall be automatically extended to the next Business Day.

      11.19   <u>Final Schedules</u>.  Notwithstanding anything to the contrary, Purchaser and Sellers acknowledge that as of the date of this Agreement the Disclosure Schedules have not been finalized.  Sellers hereby agree and acknowledge that Purchaser may terminate this Agreement pursuant to <u>Section 9.1(r)</u> if it is not satisfied with the contents of the Disclosure Schedules. Sellers agree to provide Purchaser with a final draft of the Disclosure Schedules within five (5) days after the date hereof.

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**PURCHASER:**

**PROTECTIVE PRODUCTS ENTERPRISES, INC.**

By: _____

Name: Brian McGee

Its:    Vice President

**SELLERS:**

PROTECTIVE PRODUCTS OF AMERICA, INC.

By: _____

Name: _____

Its: _____

CPC HOLDING CORPORATION OF AMERICA

By: _____

Name: _____

Its: _____

CERAMIC PROTECTION CORPORATION OF AMERICA

By: _____

Name: _____

Its: _____

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed and delivered on the date first above written.

**PURCHASER:**

**PROTECTIVE PRODUCTS ENTERPRISES, INC.**

By:    _____
Name:  Brian McGee
Its:    Vice President

**SELLERS:**

PROTECTIVE PRODUCTS OF AMERICA, INC.

By:    _____
Name:  R. Patrick Caswell
Its:    CEO

CPC HOLDING CORPORATION OF AMERICA

By:    _____
Name:  R. Patrick Caswell
Its:    CEO

CERAMIC PROTECTION CORPORATION OF AMERICA

By:    _____
Name:  R. Patrick Caswell
Its:    CEO

*Signature Page to Asset Purchase Agreement*

PROTECTIVE PRODUCTS INTERNATIONAL
CORP.

By: _____

Name: _____

Its: _____


PROTECTIVE PRODUCTS OF NORTH
CAROLINA LLC

By: _____

Name: _____

Its: _____

# EXHIBIT A

# FORM OF BIDDING PROCEDURES ORDER

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
<ins>www.flsb.uscourts.gov</ins>**

In re:                                                  Chapter 11

PROTECTIVE PRODUCTS OF                     Case No. _____
AMERICA, INC. et al.,[1]

                         Debtors.               Jointly Administered
_____/

**ORDER (A) APPROVING COMPETITIVE BIDDING AND
SALE PROCEDURES; (B) APPROVING FORM AND MANNER OF NOTICES;
(C) APPROVING FORM OF ASSET PURCHASE AGREEMENT, INCLUDING
BREAK-UP FEE AND EXPENSE REIMBURSEMENT; (D) SCHEDULING DATES TO
CONDUCT AUCTION AND HEARING TO CONSIDER FINAL APPROVAL OF SALE,
INCLUDING TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES; (E)APPROVING SALE OF SUBSTANTIALLY ALL THE DEBTORS'
ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
<ins>AND INTERESTS; AND (F) GRANTING RELATED RELIEF</ins>**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Protective Products of America, Inc. (9709); CPC Holding Corporation of America (8086); Ceramic Protection Corporation of America (7305); Protective Products International Corp. (7373); and Protective Products of North Carolina, LLC (0927).  The mailing address of each of the Debtors is 1649 Northwest 136th Avenue, Sunrise, Florida 33323.

**THIS CAUSE** came before the Court on January ___, 2010 at _____a.m. in Fort Lauderdale, Florida upon the *Emergency Motion For Entry of Order (A) Approving Competitive Bidding and Sale Procedures; (B) Approving Form and Manner of Notices; (C) Approving Form of Asset Purchase Agreement, Including Break-up Fee and Expense Reimbursement; (D) Scheduling Dates To Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; (E) Approving Sale of Substantially All The Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (E) Granting Related Relief* (the "Bid Procedures Motion")[1] [D.E. ___] filed by PROTECTIVE PRODUCTS OF AMERICA, INC., ("PPA") and each of the other above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Companies"). Having reviewed the Bid Procedures Motion, and the record in these cases, having considered the statements of counsel for the Debtors and the Proposed Purchaser (defined below) the Court finds that establishing procedures for a sale of the Acquired Assets (defined below), in accordance with the provisions contained in this Order, is in the best interests of the Debtors' estates. Accordingly,

---

[1]    Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion, the bidding procedures attached hereto as Exhibit 1 (the "Bidding Procedures") or that certain Asset Purchase Agreement dated as of January 13, 2010 among Protective Products Enterprises, Inc., as purchaser (the "Proposed Purchaser"), and Protective Products of America, Inc. and the other sellers named therein, as sellers thereto (the "Asset Purchase Agreement"), as applicable.

IT IS HEREBY FOUND AND DETERMINED THAT:

A.      The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

B.      The Court has jurisdiction over the Motion and the transaction contemplated by the Asset Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.      The statutory bases for the relief requested in the Motion are (i) sections 105, 363, 364 and 365 of the Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"); (ii) Bankruptcy Rules 2002(a)(2), 6004, 6006 and 9014; and (iii) Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida (the "Local Rules").

D.      Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, and no other or further notice is required except as set forth herein with respect to the Sale Hearing.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.

E.      The Debtors' proposed notice of the Bidding Procedures is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the Auction, the sale of substantially all of the Debtors' assets (the "Acquired Assets"), and the Bidding Procedures to be employed in connection therewith.

F.      The Debtors have articulated good and sufficient reasons for the Court to: (i) approve the Bidding Procedures; (ii) set the Sale Hearing and approve the manner of notice of the Motion and the Sale Hearing; (iii) approve the procedures for the assumption and assignment

2

of certain executory contracts and unexpired leases (collectively, the "Assumed Executory Contracts"), including notice of proposed cure amounts; and (iv) grant certain bid protections as provided in the Asset Purchase Agreement and in the Bidding Procedures Order.

G.    The entry of this Bidding Procedures Order is in the best interests of the Debtors, their estates, their creditors and other parties in interest.

H.    The Bidding Procedures are reasonably designed to maximize the value to be achieved for the Acquired Assets.

I.    The Breakup Fee and the Expense Reimbursement (collectively, the "Bid Protections") shall be paid in accordance with the Asset Purchase Agreement, and (i) if triggered, shall be deemed an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of sections 364(c)(1) and 503(b)(1) of the Bankruptcy Code, payable solely as provided in sections 8.2(d)(iii)(B) and (C) of the Asset Purchase Agreement, (ii) are of substantial benefit to the Debtors' estates, (iii) are reasonable and appropriate, including in light of the size and nature of the sale and the efforts that have been or will be expended by the Proposed Purchaser notwithstanding that the proposed sale is subject to higher and better offers for the Acquired Assets, (iv) were negotiated by the parties at arm's-length and in good faith, and (v) are necessary to ensure that the Proposed Purchaser will continue to pursue its proposed acquisition of the Acquired Assets contemplated by the Asset Purchase Agreement.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

1.    The Motion is GRANTED.

2.    All objections to the Motion or the relief provided herein that have not been withdrawn, waived or settled, and all reservations of rights included therein, hereby are overruled and denied on the merits.

3

3.      The Bidding Procedures, attached hereto as <u>Exhibit 1</u>, are hereby approved in their entirety.  The Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures.

4.      The Debtors may sell the Acquired Assets and enter into the transactions contemplated by the Asset Purchase Agreement by conducting an Auction in accordance with the Bidding Procedures.

5.      The Auction shall take place on February 18, 2010 at 10:00 a.m. (prevailing Eastern Time) at the offices of Berger Singerman, P.A., 350 East Las Olas Blvd., Suite 1000, Fort Lauderdale, 33301, or such other place and time as the Debtors shall notify all Qualified Bidders, including the Proposed Purchaser, any official committee of unsecured creditors appointed in these chapter 11 cases (the "<u>Committee</u>"), counsel for the Proposed Purchaser and other invitees.  The Auction shall be conducted in accordance with the Bidding Procedures.

6.      The Sale Hearing shall be held before the Court on February 19, 2010 at _____ (prevailing Eastern Time), or at such earlier date as counsel and interested parties may be heard.

7.      Objections, if any, to the sale of the Acquired Assets and the transaction contemplated by the Asset Purchase Agreement, or the relief requested in the Motion must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court for the Southern District of Florida, Fort Lauderdale Division, 299 East Broward Boulevard, Room 112, Fort Lauderdale, Florida 33301 (or filed electronically via CM/ECF), on or before 4:00 p.m. (prevailing Eastern Time) on February 15, 2010 (the "<u>Sale Objection Deadline</u>"); and (d) be served upon (i) counsel to the Debtors, Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn:  Jordi Guso, Esq.; (ii) counsel to the Committee; (iii) counsel to the Proposed Purchaser, Kirkland &

4

Ellis LLP, 300 North LaSalle Street, Chicago, Illinois 60654, Attn: Patrick Nash and Paul Wierbicki**,** and Greenberg Traurig, P.A., 1221 Brickell Avenue, Miami, Florida 33131, Attn: Scott Grossman; and (iv) the Office of the United States Trustee, in each case, so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day.

8.    The notice, substantially in the form attached hereto as <u>Exhibit 2</u> (the "<u>Sale Notice</u>"), is hereby approved.

9.    On or before three (3) business days after entry of this Bidding Procedures Order, the Debtors will cause the Sale Notice to be sent by first-class mail postage prepaid, to the following: (a) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest or encumbrance of record against all or any portion of the Acquired Assets; (b) the Office of the United States Trustee; (c) the Environmental Protection Agency; (d) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Acquired Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Acquired Assets or have any known interest in the relief requested by the Motion; (e) the state and local environmental agencies in the jurisdictions where the Debtors own or lease real property; (f) counsel to the Proposed Purchaser; (g) counsel to the prepetition and postpetition secured lenders; (h) the United States Attorney's office; (i) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (j) counsel to the Committee; (k) all parties to any litigation involving the Debtors; (l) all of the Debtors' current employees and former employees, if any, who were terminated immediately prior to the commencement of these cases, (m) all counterparties to any executory contract or unexpired lease of the Debtors; (n) all

5

other known creditors and interest holders of Debtors; and (o) all potential bidders previously identified or otherwise known to the Debtors.

10.     In addition to the foregoing, as soon as practicable, but in any event no later than five (5) business days after the entry of this Bidding Procedures Order, the Debtors shall publish the Sale Notice (modified for publication, as necessary) in *The Wall Street Journal*, national edition.

11.     The notice of potential assumption and assignment of the Scheduled Contracts, substantially in the form attached hereto as Exhibit 3 (the "Cure Notice"), is hereby approved.

12.     On or before three (3) business days after the entry of this Bidding Procedures Order, the Debtors shall serve by first class mail or hand delivery the Cure Notice on all non-Debtor parties to the Scheduled Contracts.  The Cure Notice shall identify the Scheduled Contract and provide the cure amount that the Debtors believe must be paid to cure all prepetition defaults under the Scheduled Contracts (the "Cure Amounts").

13.     Unless the non-Debtor party to a Scheduled Contract files an objection (the "Cure Amount Objection") to its scheduled Cure Amount, the assumption and assignment to the Proposed Purchaser of the Scheduled Contracts or the ability of the Proposed Purchaser to provide adequate assurance of future performance by the Sale Objection Deadline and serves a copy of the Cure Amount Objection so as to be received no later than the Sale Objection Deadline on the same day to:   (a) the Debtors, Protective Products of America, Inc., 1649 Northwest 136th Avenue, Sunrise, Florida, 33323; (b) counsel for the Debtors, Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn:  Jordi Guso, Esq.; (c) counsel to the Committee; (d) counsel to the Proposed Purchaser, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn:  Patrick Nash and Paul

6

Wierbicki and Greenberg Traurig, P.A., 1221 Brickell Avenue, Miami, Florida 33131, Attn: Scott Grossman; and (e) the Office of the United States Trustee; such non-Debtor party should be forever barred and estopped from objecting (i) to the Cure Amount and from asserting that any additional amounts are due or defaults exist, (ii) that any conditions to assumption and assignment must be satisfied under such Scheduled Contract before it can be assumed and assigned to the Proposed Purchaser or that any required consent to assignment has not been given or (iii) that the Proposed Purchaser has not provided adequate assurance of future performance.

14.     If the Proposed Purchaser is not the Successful Bidder, the non-Debtor parties to the Scheduled Contracts shall have until the Sale Hearing (the "Adequate Assurance Objection Deadline") to object to the assumption and assignment of such Scheduled Contract solely on the issue of whether the Successful Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code (an "Adequate Assurance Objection"); provided, however, that if the Proposed Purchaser is the Successful Bidder, all Adequate Assurance Objections must be filed by the Sale Objection Deadline; provided, further, however, that all objections to the assumption and assignment of Scheduled Contracts that do not relate to the issue of whether the Successful Bidder can provide adequate assurance of future performance must be filed by the Sale Objection Deadline.

15.     In the event of a dispute regarding:  (a) any Cure Amount with respect to any Scheduled Contract; (b) the ability of the Successful Bidder (including the Proposed Purchaser) to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code, if applicable, under such Scheduled Contract; or (c) any other matter pertaining to assumption, the Cure Amounts shall be paid as soon as reasonably practicable after

7

the Closing and following the entry of a final order resolving the dispute and approving the assumption of such Scheduled Contract; provided, however, that the Debtors are authorized to settle any dispute regarding the amount of any Cure Amount or assignment to the Successful Bidder (including the Proposed Purchaser) without any further notice to or action, order or approval of the Court.

16.    Within two (2) business days after the Closing Date, the Debtors will file a complete list of the Scheduled Contracts that were assumed and assigned as Assumed Executory Contracts, as of the Closing Date, to the Proposed Purchaser or to the Successful Bidder, to the extent that the Successful Bidder is not the Proposed Purchaser.  In addition, the Debtors will file a complete list of Designated Contracts.

17.    The procedures with respect to the assignment and assumption or rejection of Designated Contracts are approved in all respects.

18.    The notice of assumption and assignment of the Scheduled Contracts, substantially in the form attached hereto as Exhibit 4 (the "Assumption Notice"), is hereby approved.

19.    To the extent that the Proposed Purchaser requests assumption and assignment of any Designated Contract after the Closing Date, the Debtors shall serve the non-Debtor counterparty to such Designated Contract with the Assumption Notice.  As soon as practicable after a period of ninety (90) days following the closing date during which the Proposed Purchaser shall not seek to reject the Designated Contracts (the "Contract Retention Period"), the Debtors shall file a final and complete list of all Assumed Executory Contracts.

8

20.    The Sale Hearing may be continued, from time to time, without further notice to creditors or other parties in interest other than by announcement of said continuance before the Court on the date scheduled for such hearing or in the hearing agenda for such hearing.

21.    Section 9.2 of the Asset Purchase Agreement is hereby approved and binding upon the Debtors and their estates.  In connection therewith, the Debtors' obligation to pay the Bid Protections, as provided by the Asset Purchase Agreement, shall survive termination of the Asset Purchase Agreement and, until paid in accordance with the Asset Purchase Agreement, shall constitute a superpriority administrative expense claim in favor of the Proposed Purchaser having superpriority under section 364(c) of the Bankruptcy Code over any and all administrative expenses of the kind specified in sections 503(b) and 507(c) of the Bankruptcy Code, and which shall be senior to any and all claims of any creditors of or holders of equity interests in Sellers, including prepetition and postpetition amounts owing to Sellers' prepetition and postpetition senior secured lenders, and which, in accordance with the bidding procedures, shall be a "carve out" from the collateral securing the obligations owed to the Debtors' prepetition and postpetition senior secured lenders, and which shall be payable solely as provided in sections 8.2(d)(iii)(A) and (B) of the Asset Purchase Agreement.  To the extent that the Proposed Purchaser is not the Successful Bidder, the Successful Bidder is authorized and directed to pay the Bid Protections directly to the Proposed Purchaser by wire transfer of immediately available good funds to an account specified by the Proposed Purchaser at the Closing of any Competing Transaction with the Successful Bidder.  To the extent for any reason the Successful Bidder fails to pay the Bid Protections directly to the Proposed Purchaser, the Debtors are authorized and directed to pay the Bid Protections to the Proposed Purchaser in accordance with the terms of the Asset Purchase Agreement without further order of the Court.

K&E 16139699.6
K&E 16179691.1

22.     Except for the Proposed Purchaser, no other party submitting an offer or Bid for the Acquired Assets or a Qualifying Bid shall be entitled to any expense reimbursement, breakup, termination or similar fee or payment.

23.     Except as otherwise provided in the Asset Purchase Agreement or this Bidding Procedures Order, the Debtors further reserve the right as they may reasonably determine to be in the best interests of their estates, in consultation with the Committee, to:  (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and their estates; (e) remove some or all of the Acquired Assets from the Auction; (f) waive terms and conditions set forth herein with respect to all potential bidders; (g) impose additional terms and conditions with respect to all potential bidders; (h) extend the deadlines set forth herein; (i) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (j) modify the Bidding Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

24.     The Proposed Purchaser shall have standing to contest the Debtors' selection of the Highest and Best Bid.

25.     To the extent that any chapter 11 plan confirmed in these cases or any order confirming any such plan or any other order in these cases (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) alters, conflicts with or derogates from the provisions of this Bidding Procedures Order, the provisions of this Bidding

10

Procedures Order shall control.  The Debtors' obligations under this Bidding Procedures Order, the provision of this Bidding Procedures Order and the portions of the Asset Purchase Agreement pertaining to the Bidding Procedures shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Debtors, and the reorganized or reconstituted debtors, as the case may, after the effective date of a confirmed plan or plans in the Debtors' cases (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code).

26.    The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived and this Bidding Procedures Order shall be effective immediately upon its entry.

27.    All time periods set forth in this Bidding Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

28.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

29.    The Court shall retain jurisdiction over any matters related to or arising from the implementation of this Bidding Procedures Order.

# # #

Submitted by:

Jordi Guso, Esq.
Berger Singerman, P.A.
200 South Biscayne Boulevard, Suite 1000
Miami, FL  33131
Tel.:  (305) 755-9500
Fax:  (305) 714-4340
Email:  jguso@bergersingerman.com

Copy furnished to:

11

Jordi Guso, Esq.

*(Attorney Guso is directed, pursuant to Local Rule 5005-1, to serve conformed copies of this Order upon all parties in interest, and to file a Certificate of Service with the Court confirming such service.)*

K&E 16139699.6

K&E 16179691.1

**EXHIBIT 1 to the Bidding Procedures Order**

**(Bidding Procedures)**

## BIDDING PROCEDURES[1]

By the Bidding Procedures Motion dated January 13, 2010, Protective Products of America, Inc., and its affiliated debtors and debtors in possession (collectively, the "Debtors"),[2] sought approval of, among other things, the procedures through which they will determine the highest or otherwise best price for the sale of substantially all of their assets (the "Acquired Assets") described in the Asset Purchase Agreement by and among Protective Products Enterprises, Inc., as purchaser (the "Proposed Purchaser"), and Protective Products of America, Inc. and other sellers named therein, as sellers thereto, dated as of January 13, 2010 (the "Asset Purchase Agreement"), a copy of which is attached to the proposed Sale Order as Exhibit 1, attached as Exhibit B to the Bidding Procedures Motion.

On January [__], 2010, the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") entered an order (the "Bidding Procedures Order"), which, among other things, authorized the Debtors to determine the highest or otherwise best price for the Acquired Assets through the process and procedures set forth below (the "Bidding Procedures").

### Marketing Process

#### Contact Parties

The Debtors, in consultation with their investment banker Bayshore Partners, LLC ("Bayshore Partners") have developed a list of parties who the Debtors believe may potentially be interested in and who the Debtors reasonably believe would have the financial resources to consummate a competing transaction to that of the Proposed Purchaser (a "Competing Transaction"), which list includes both potential strategic investors and potential financial investors (each, individually, a "Contact Party", and collectively, the "Contact Parties"). The Debtors and Bayshore Partners are already in the process of contacting the Contact Parties to explore their interest in pursuing a Competing Transaction. The Contact Parties may include parties whom the Debtors or their advisors have previously contacted regarding a transaction, regardless of whether such parties expressed any interest, at such time, in pursuing a transaction. The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

---

[1]    Capitalized terms used but not defined herein shall have the meanings set forth in the motion to approve these Bidding Procedures (the "Bidding Procedures Motion") or the Asset Purchase Agreement, as applicable.

[2]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Protective Products of America, Inc. (9709); CPC Holding Corporation of America (8086); Ceramic Protection Corporation of America (7305); Protective Products International Corp. (7373); and Protective Products of North Carolina, LLC (0927).  The mailing address of each of the Debtors is 1649 Northwest 136th Avenue, Sunrise, Florida 33323.

The Debtors may distribute to each Contact Party an "Information Package," comprising:

(a)    A cover letter;

(b)    A copy of these Bidding Procedures; and

(c)    A copy of a confidentiality agreement.

### *Access to Diligence Materials*

To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtors an executed confidentiality agreement in the form and substance satisfactory to the Debtors and evidence demonstrating the party's financial capability with respect to the Competing Transaction as determined by the Debtors.

A party who qualifies for access to Diligence Materials shall be a "Preliminary Interested Investor." All due diligence requests must be directed to Bayshore Partners.

For any Preliminary Interested Investor who is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold any Diligence Materials that the Debtors, in their sole discretion, determine are business-sensitive or otherwise not appropriate for disclosure to such Preliminary Interested Investor.

### **Auction Qualification Process**

To be eligible to participate in the Auction (defined below), each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), must be determined by the Debtors to satisfy each of the following conditions:

(d)    Good Faith Deposit: Each Bid must be accompanied by a deposit in the amount of $500,000 to an interest bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit"). The deposit made by the Proposed Purchaser pursuant to the Asset Purchase Agreement is a Good Faith Deposit.

(e)    Same or Better Terms: The Bid must be on terms that, in the Debtors' business judgment, are substantially the same or better than the terms of the Asset Purchase Agreement. A Bid must include executed transaction documents pursuant to which the Bidder proposes to effectuate the Competing Transaction (the "Modified Asset Purchase Agreement"). A Bid shall include a copy of the Asset Purchase Agreement marked to show all changes requested by the Bidder (including those related to purchase price); provided, however, that the terms of the Modified Asset Purchase Agreement are substantially similar, the same or better than the terms of the Asset Purchase Agreement. A Bid must propose a Competing Transaction involving substantially all of the Debtors' assets or operations. A Bid must propose a purchase price equal to or greater than the aggregate of the sum of (i) $8,000,000 in cash; (ii) the dollar value of the Breakup Fee in cash, (iii) the dollar value of the Expense Reimbursement in cash, and

2

(iv) $100,000 in cash.  A Bid will not be considered by Sellers as qualified for the Auction if (i) such Bid contains additional representations and warranties, covenants, closing conditions, termination rights other than as may be included in this Agreement (it being agreed and understood that such Bid shall modify this Agreement as needed to comply in all respects with the Bidding Procedures Order and will remove provisions that apply only to the Proposed Purchaser as the stalking horse bidder such as breakup fee and expense reimbursement); (ii) such Bid is not received by Sellers and Purchaser in writing on or prior to the Bid Deadline, and (iii) such Bid does not contain evidence that the Person submitting it has received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby, including proof of deposit into escrow of no less than $500,000 in cash.  A Bid must obligate the Bidder to pay, to the extent provided in the Asset Purchase Agreement, all Cure Amounts and any cure amounts with respect to the Designated Contracts for which an Assumption Notice is provided.  The Competing Transaction Documents shall also identify any executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and assigned to it pursuant to the Competing Transaction.

(f)     <u>Corporate Authority</u>:    The Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Competing Transaction; <u>provided</u>, <u>however</u>, that, if the Bidder is an entity specially formed for the purpose of effectuating the Competing Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Competing Transaction by the equity holder(s) of such Bidder.

(g)     <u>Proof of Financial Ability to Perform</u>:  The Bid must include written evidence that the Debtors reasonably conclude demonstrates that the Bidder has the necessary financial ability to close the Competing Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Competing Transaction.  Such information must include, *inter alia*, the following:

   (i)     contact names and numbers for verification of financing sources;

   (ii)    evidence of the Bidder's internal resources and proof of unconditional debt or equity funding commitments, from a recognized banking institution in the amount of the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Competing Transaction;

   (iii)   the Bidder's current financial statements (audited if they exist); and

   (iv)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors

3

demonstrating and in accordance with the Asset Purchase Agreement that such Bidder has the ability to close the Competing Transaction; <u>provided</u>, <u>however</u>, that the Debtors shall determine, in their reasonable discretion, in consultation with the Debtors' advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications.

(h) <u>Contingencies</u>: A Bid may not (i) contain representations and warranties, covenants, termination rights, financing, due diligence contingencies other than as may be included in the Asset Purchase Agreement (it being agreed and understood that such Bid shall modify the Asset Purchase Agreement as needed to comply in all respects with the Bidding Procedures Order (including removing any termination rights in conflict with the Bidding Procedures Order) and will remove provisions that apply only to the Proposed Purchaser as the stalking horse bidder, such as breakup fee and expense reimbursement) and (ii) be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

(i) <u>Irrevocable</u>: A Bid must be irrevocable through the Auction, <u>provided</u>, <u>however</u>, that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(j) <u>Bid Deadline</u>: Regardless of when a party qualifies as a Preliminarily Interested Investor, the following parties must receive a Bid in writing, on or before February 15, 2010 at 4:00 p.m. (prevailing Eastern Time) or such earlier date as may be agreed to by the Debtors (the "<u>Bid Deadline</u>"): (i) the Debtors, Protective Products of America, Inc., 1649 Northwest 136th Avenue, Sunrise, Florida, 33323; (ii) counsel for the Debtors, Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn: Jordi Guso, Esq.; (iii) counsel to the official committee of unsecured creditors appointed in these chapter 11 cases (the "<u>Committee</u>"); (iv) counsel to the Proposed Purchaser, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn: Patrick Nash and Paul Wierbicki and Greenberg Traurig, P.A., 1221 Brickell Avenue, Miami, Florida 33131, Attn: Scott Grossman; and (v) Bayshore Partners, 401 East Las Olas Boulevard, Suite 1160, Fort Lauderdale, Florida 33301, Attn: Scott J. Saunders and Steve Zuckerman.

A Bid received from a Bidder before the Bid Deadline that meets the above requirements shall constitute a "<u>Qualified Bid</u>," and such Bidder shall constitute a "<u>Qualified Bidder</u>." Notwithstanding anything herein to the contrary, the Asset Purchase Agreement submitted by the Proposed Purchaser shall be deemed a Qualified Bid, and the Proposed Purchaser is a Qualified Bidder. In accordance with the Bidding Procedures, the Proposed Purchaser will receive, from each Bidder, a copy of any Bids at the time such Bid is submitted to the Debtors. The Debtors shall inform counsel to the Proposed Purchaser whether the Debtors will consider such Bids to be Qualified Bids within one (1) calendar day after the Bid Deadline.

**Auction**

If one or more Qualified Bids (other than the Asset Purchase Agreement submitted by the Proposed Purchaser) are received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the highest and best Qualified Bid.  This determination shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estate, including, among other things, the following:  (a) the amount and nature of the consideration; (b) the number, type and nature of any changes to this Agreement requested by each Bidder; (c) the extent to which such modifications are likely to delay closing of the sale of the Acquired Assets and the cost to Sellers of such modifications or delay; (d) the total consideration to be received by Sellers; (e) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (f) the net benefit to the estate, taking into account Purchaser's rights to the Breakup Fee and Expense Reimbursement; (g) the impact of the transaction on any actual or potential litigation; and (h) the net after-tax consideration to be received by the Debtors' estates (for the avoidance of doubt, any Bid made by the Proposed Purchaser at the Auction shall at least be equal to the sum of the following:  (w) the dollar value of the cash consideration contained in such Bid, (x) the dollar value of any additional consideration contained in such Bid, (y) the dollar value of the Breakup Fee, and (z) the dollar value of the Expense Reimbursement), (collectively, the "Bid Assessment Criteria").  For avoidance of doubt, the Highest and Best Bid must include cash in an amount no less then the Minimum Cash Amount (it being agreed that the Minimum Cash Amount for Purchaser shall be reduced by the dollar value of the Expense Reimbursement and Breakup Fee).  If no Qualified Bid (other than the Asset Purchase Agreement) is received by the Bid Deadline, the Debtors may determine not to conduct the Auction.  Unless otherwise agreed to by the Proposed Purchaser in its sole discretion, only Qualified Bidders may participate in the Auction.

The Auction shall take place on February 18, 2010 at 10:00 a.m. (prevailing Eastern Time) at the offices of Berger Singerman, P.A., 350 East Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301, or such other place and time as the Debtors shall notify all Qualified Bidders, including the Proposed Purchaser, the Committee, counsel for the Proposed Purchaser and other invitees in accordance with the Asset Purchase Agreement. The Auction shall be conducted according to the following procedures:

(k)     The Debtors Shall Conduct the Auction.

The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the highest and best Qualified Bid received prior to the Bid Deadline, (such Qualified Bid the "Auction Baseline Bid").  Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or sale of the Acquired Assets.

The Proposed Purchaser shall be permitted to credit bid the full amount of the Expense Reimbursement and the Breakup Fee pursuant to any Overbid in connection with each round of bidding.

Only the Debtors, representatives of the Senior Lenders and their counsel, members of the Committee and its counsel, the Proposed Purchaser and any other Qualified Bidder, in each

case, along with their representatives, shall attend the Auction in person, and only the Proposed Purchaser and such other Qualified Bidders will be entitled to make any Bids at the Auction.

    (l)    Terms of Overbids.

An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

    (i)    Minimum Overbid Increment.

Any Overbid after the Auction Baseline Bid shall be made in increments valued at not less than $100,000. Additional consideration in excess of the amount set forth in the Auction Baseline Bid may include cash and/or noncash consideration, and, in the case of a Bid by the Proposed Purchaser, a credit bid of the Expense Reimbursement and the Breakup Fee.

    (ii)    Remaining Terms Are the Same as for Qualified Bids.

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply. Any Overbid must remain open and binding on the Bidder until and unless the Debtors accept a higher Overbid.

To the extent not previously provided (which shall be determined by the Debtors), a Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Bidder's ability to close the Competing Transaction proposed by such Overbid.

    (iii)    Announcing Overbids.

The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid and the resulting benefit to the Debtors' estates based on, inter alia, the Bid Assessment Criteria.

    (iv)    Consideration of Overbids.

The Debtors reserve the right, in their reasonable business judgment to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Bidders; allow individual Bidders to consider how they wish to proceed; and give Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment may require, that the Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Competing Transaction at the prevailing Overbid amount.

K&E 16139699.6
K&E 16179691.1

(m)    Backup Bidder.

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest or otherwise best Qualified Bid at the Auction, as determined by the Debtors, in the exercise of their business judgment, will be designated as the potential backup bidder (the "Potential Backup Bidder").  In the event that a Qualified Bidder other than the Proposed Purchaser is identified by the Debtors as the Potential Backup Bidder, such party shall be required to serve as the backup bidder (the "Backup Bidder").  If the Proposed Purchaser is determined to be the Potential Backup Bidder, the Proposed Purchaser may, in its sole discretion, elect not to serve as the Backup Bidder, and the Debtors may identify the Qualified Bidder with the next highest or otherwise best Qualified Bid, if any, as the Backup Bidder.  The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is sixty (60) days after the date of the Auction (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder (defined herein).  Following the Sale Hearing, if the Successful Bidder (defined herein) fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Successful Bidder (defined herein), the Debtors may designate the Backup Bidder to be the new Successful Bidder (defined herein), and the Debtors will be authorized, but not required, to consummate the transaction, with the Backup Bidder without further order of the Bankruptcy Court.  In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Successful Bidder (defined herein).  The deposit of the Backup Bidder shall be held by the Debtors until the earlier of 24 hours after (i) the closing of the transaction with the Successful Bidder (defined herein) and (ii) the Outside Backup Date.

(n)    Additional Procedures.

The Debtors may announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time to make subsequent Overbids) for conducting the Auction so long as such rules are not inconsistent with these Bidding Procedures or the Asset Purchase Agreement.

(o)    Consent to Jurisdiction as Condition to Bidding.

The Proposed Purchaser, all Qualified Bidders and all Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the Asset Purchase Agreement, the Auction or the construction and enforcement of any Competing Transaction Documents.

(p)    Sale Is As Is/Where Is.

The Acquired Assets shall be conveyed at Closing free and clear of all liens, claims, interests and encumbrances, and in their then present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED.**"

(q)    Closing the Auction.

The Auction shall continue until there is only one Qualified Bid that the Debtors determine in their reasonable business judgment, after consultation with their financial and legal advisors and the Committee, is the highest and best Qualified Bid at the Auction (the "Successful Bid" and the Bidder submitting such Successful Bid, the "Successful Bidder"). In making this decision, the Debtors, in consultation with their financial and legal advisors, shall consider the Bid Assessment Criteria. The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbid and the Successful Bidder has submitted fully executed sale and transaction Documents memorializing the terms of the Successful Bid.

The Debtors shall not consider any Bids submitted after the conclusion of the Auction.

## Bid Protections

The Proposed Purchaser is entitled to: (a) the Breakup Fee in the amount of $320,000; and (b) the Expense Reimbursement, in each case, pursuant to the terms of the Asset Purchase Agreement.

Except for the Proposed Purchaser, no other party submitting an offer or Bid for the Acquired Assets or a Qualifying Bid shall be entitled to any expense reimbursement, breakup fee, termination or similar fee or payment.

## Sale Hearing

The Debtors will seek a hearing (the "Sale Hearing") on or before **February 19, 2010**, at which the Debtors will seek approval of the transactions contemplated by the Asset Purchase Agreement with the Successful Bidder. Objections, if any, to the sale of the Acquired Assets to the Successful Bidder and the transaction contemplated by the Asset Purchase Agreement must be in writing and filed with the Court no later than 4:00 p.m. (prevailing Eastern time) on **February 15, 2010** and be served such that they are actually received by (a) counsel to the Debtors, Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn: Jordi Guso, Esq.; (b) counsel to the Committee; (c) counsel to the Proposed Purchaser, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn: Patrick Nash and Paul Wierbicki and Greenberg Traurig, P.A., 1221 Brickell Avenue, Miami, Florida 33131, Attn: Scott Grossman; and (d) the Office of the United States Trustee.

## Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Court. The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than two (2) business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder shall be returned to the Backup Bidder on the date that is the earlier of 24 hours after (a) the closing of the transaction with the Successful Bidder (defined herein) and (b) the Outside Backup

K&E 16139699.6
K&E 16179691.1

Date.  Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon.  If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards its purchase price.

## **Reservation of Rights**

Except as otherwise provided in the Asset Purchase Agreement or the Sale Order, the Debtors further reserve the right as they may reasonably determine to be in the best interest of their estates, in consultation with the Committee, to:  (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and their estates; (e) remove some or all of the Acquired Assets from the Auction; (f) waive terms and conditions set forth herein with respect to all potential bidders; (g) impose additional terms and conditions with respect to all potential bidders; (h) extend the deadlines set forth herein; (i) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (j) modify the Bidding Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.

K&E 16139699.6

K&E 16179691.1

**EXHIBIT 2 to the Bidding Procedures Order**

**(Sale Notice)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:                                                     Chapter 11

PROTECTIVE PRODUCTS OF                    Case No. _____
AMERICA, INC. et al.,[1]

                        Debtors.                    Jointly Administered

                                                          **Auction:  February 18, 2010 at 10:00 a.m. ET**
                                                          **Sale Objection Deadline:  February 15, 2010 at**
                                                          **4:00 p.m. ET**
_____/    **Sale Hearing:  February 19, 2010 at _____ ET**

**NOTICE OF AUCTION AND SALE HEARING**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

          1.       On January 13, 2010, Protective Products of America,, Inc., and its
affiliated debtors and debtors in possession in the above-captioned cases (collectively, the
"Debtors"), filed their Motion[2] for entry of an order (the "Bidding Procedures Order"), among
other things, (a) approving Bidding Procedures for the sale of substantially all of the assets
owned by the Debtors (the "Acquired Assets"), as described in the Asset Purchase Agreement by
and between Protective Products Enterprises, Inc. (the "Proposed Purchaser") and the Debtors
dated as of January 13, 2010 (the "Asset Purchase Agreement"); (b) approving the Asset
Purchase Agreement and payments to the stalking horse bidder thereunder; (c) approving the
form and manner of notice of the auction on the Acquired Assets and the Sale Hearing;
(d) approving procedures relating to the assumption and assignment of contracts and leases; and
(e) scheduling a sale hearing (the "Sale Hearing") to consider the sale of the Acquired Assets and
setting objection and bidding deadlines with respect to the Sale.   The Motion additionally
requests entry of an order (the "Sale Order") approving (i) the sale of the Acquired Assets free
and clear of liens, claims, encumbrances and interests contemplated by the Asset Purchase

---

[1]     The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are
        as follows:   Protective Products of America, Inc. (9709); CPC Holding Corporation of America (8086);
        Ceramic Protection Corporation of America (7305); Protective Products International Corp. (7373); and
        Protective Products of North Carolina, LLC (0927).   The mailing address of each of the Debtors is
        1649 Northwest 136th Avenue, Sunrise, Florida 33323.

[2]     Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the
        Motion.

Agreement; (ii) assumption and assignment of certain executory contracts and unexpired leases; and (iii) certain related relief.

2.      On January [__] 2010, the United States Bankruptcy Court for the Southern District of Florida entered the Bidding Procedures Order [DE # ___]. Pursuant to the Bidding Procedures Order, the auction for the Acquired Assets shall take place on **February 18, 2010 at 10:00 a.m. (prevailing Eastern Time)** at the offices of Berger Singerman, P.A., 350 East Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301.  Only parties that have submitted a Qualified Bid in accordance with the Bidding Procedures, attached to the Bidding Procedures Order as Exhibit 1, by no later than **February 15, 2010 at 4:00 p.m. (Eastern Time)** (the "Bid Deadline") may participate at the auction.  Any party that wishes to take part in this process and submit a bid for the Acquired Assets must submit their competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures.  Parties interested in receiving information regarding the sale of the Acquired Assets should contact the Debtors' investment bankers, Bayshore Partners, LLC, 401 East Las Olas Boulevard, Suite 1160, Fort Lauderdale, Florida 33301, Attn:  Scott S. Saunders and Steve Zuckerman, Telephone: (954) 358-3800, Email: ssaunders@farlieturner.com and/or szuckerman@farlieturner.com.

3.      The Sale Hearing to consider approval of the Sale of the Acquired Assets to the Proposed Purchaser or Successful Bidder (as defined in the Bidding Procedures) free and clear of all liens, claims and encumbrances will be held before the Honorable **[TO COME]**, United States Bankruptcy Judge, 299 East Broward Boulevard, **[TO COME]**, Fort Lauderdale, Florida 33301 on **February 19, 2010 at _____ (prevailing Eastern Time)**, or at such earlier date as counsel may be heard.  The Sale Hearing may be continued from time to time without further notice to creditors or parties in interest other than by announcement of the continuance in open court on the date scheduled for the Sale Hearing (or in agenda).

4.      Objections, if any, to the sale of the Acquired Assets contemplated by the Asset Purchase Agreement, or the relief requested in the Motion (including with respect to cure amounts and adequate assurance) must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court for the Southern District of Florida, 299 East Broward Boulevard, Room 112, Fort Lauderdale, Florida 33301 (or filed electronically via CM/ECF), on or before **4:00 p.m. (prevailing Eastern Time) on February 15, 2010**, or such earlier date and time as the Debtors may agree and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon:  (i) counsel to the Debtors, Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn:  Jordi Guso; (ii) counsel to the official committee of unsecured creditors appointed in these chapter 11 cases (the "Committee"); (iii) counsel to the Proposed Purchaser, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn: Patrick Nash and Paul Wierbicki and Greenberg Traurig, P.A., 1221 Brickell Avenue, Miami, Florida 33131, Attn: Scott Grossman; and (iv) the Office of the United States Trustee.

5.      In the event that the Proposed Purchaser is not the Successful Bidder at the Auction, the non-Debtor party to any Scheduled Contract(s) will have until the Sale Hearing to object to the Successful Bidder's ability to perform under such Scheduled Contract(s).

2

6.      This Notice and the Sale Hearing are subject to the fuller terms and conditions of the Motion, the Bidding Procedures Order and the Bidding Procedures, which shall control in the event of any conflict and the Debtors encourage parties in interest to review such documents in their entirety.  Copies of the Motion, the Asset Purchase Agreement, the Bidding Procedures, and/or the Bidding Procedures Order may be obtained by written request to counsel to the Debtors, c/o Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn:  Jordi Guso.  In addition, copies of the aforementioned pleadings may be found on the Pacer's website, http://ecf.flsb.uscourts.gov, and are on file with the Clerk of the Bankruptcy Court, 299 East Broward Boulevard, Room 112, Fort Lauderdale, Florida 33301.

Dated: January __, 2010

Respectfully submitted,

BERGER SINGERMAN, P.A.
*Counsel for the Debtors*
200 South Biscayne Boulevard, Suite 1000
Miami, FL  33131
Telephone:  (305) 755-9500
Facsimile:   (305) 714-4340

By:  /s/  Jordi Guso
        Jordi Guso
        Florida Bar No. 863580
        jguso@bergersingerman.com

K&E 16139699.6
K&E 16179691.1

**EXHIBIT 3 to the Bidding Procedures Order**

**(Cure Notice)**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:                                                    Chapter 11

PROTECTIVE PRODUCTS OF                    Case No. _____
AMERICA, INC. et al.,[1]

           Debtors.                          Jointly Administered
_____/

**NOTICE TO COUNTERPARTIES TO POTENTIALLY ASSUMED**
**EXECUTORY CONTRACTS AND UNEXPIRED LEASES[2]**

     **PLEASE TAKE NOTICE** that on January 13, 2010, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed a motion [DE # _____] (the "Sale Motion") with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") which seeks approval of key dates, times and procedures related to the sale of substantially all of the Debtors' assets (the "Acquired Assets") to Protective Products Enterprises, Inc. (the "Proposed Purchaser") contemplated by the Asset Purchase Agreement. On January [__], 2010, the Bankruptcy Court approved the Bidding Procedures. On February 19, 2010, the Debtors intend to seek approval of, among other things, the sale of the Acquired Assets, including the assumption and assignment of certain executory contracts and unexpired leases. To the extent that there are any inconsistencies between the Bidding Procedures and the summary description of the terms and conditions contained in this Notice, the terms of the Bidding Procedures shall control.

     **YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN EXECUTORY CONTRACT OR**

---

[1]    The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Protective Products of America, Inc. (9709); CPC Holding Corporation of America (8086); Ceramic Protection Corporation of America (7305); Protective Products International Corp. (7373); and Protective Products of North Carolina, LLC (0927). The mailing address of each of the Debtors is 1649 Northwest 136th Avenue, Sunrise, Florida 33323.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures or the Bidding Procedures Order, as applicable.

**UNEXPIRED LEASE WITH ONE OR MORE OF THE DEBTORS AS SET FORTH ON EXHIBIT A ATTACHED HERETO.**[3]

      **PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures, the Debtors **may** assume and assign to the Proposed Purchaser the executory contract(s) or unexpired lease(s) listed on Exhibit A attached hereto (each, an "Scheduled Contract") to which you are a counterparty. The Debtors have conducted a review of their books and records and have determined that the cure amount for unpaid monetary obligations under such Scheduled Contract is as set forth on Exhibit A attached hereto (the "Cure Amount"). **If you disagree with the proposed Cure Amount, object to the proposed assignment to the Proposed Purchaser of the Scheduled Contract(s) or object to the Proposed Purchaser' ability to provide adequate assurance of future performance with respect to any Scheduled Contracts, you must file an objection with the Bankruptcy Court no later than 4:00 p.m. (prevailing Eastern Time) on February 15, 2010, (the "Objection Deadline") and serve such objection on (a) the Debtors, Protective Products of America, Inc., 1649 Northwest 136th Avenue, Sunrise, Florida, 33323; (b) counsel for the Debtors, Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn: Jordi Guso, Esq.; (c) counsel to the official committee of unsecured creditors appointed in these chapter 11 cases (the "Committee"); (d) counsel to the Proposed Purchaser, Kirkland & Ellis LLP, 300 North LaSalle Street, Chicago, Illinois, 60654, Attn: Patrick Nash and Paul Wierbicki and Greenberg Traurig, P.A., 1221 Brickell Avenue, Miami, Florida 33131, Attn: Scott Grossman; and (e) the Office of the United States Trustee, so that it is actually received no later than 4:00 p.m. (prevailing Eastern Time) on February 15, 2010.**

      **PLEASE TAKE FURTHER NOTICE** that the Debtors propose that if no objection to (a) the Cure Amount(s), (b) the proposed assignment of the Scheduled Contract(s) to the Proposed Purchaser or (c) adequate assurance of the Proposed Purchaser' ability to perform is filed by Objection Deadline, (i) you will be deemed to have stipulated that the Cure Amount(s) as determined by the Debtors is correct, (ii) you shall be forever barred, estopped and enjoined from asserting any additional cure amount under the Scheduled Contract(s) and (iii) you will be forever barred from objecting to the assignment of the Assumed Executory Contract(s) to the Proposed Purchaser adequate assurance of future performance.

      **PLEASE TAKE FURTHER NOTICE** that in the event the Proposed Purchaser is not the Successful Bidder at the Auction, any counterparty to a Scheduled Contract shall have the right to object to the Successful Bidder's ability to perform on or before the Sale Hearing scheduled for February 19, 2010 at __.m. (prevailing Eastern Time). To the extent such counterparty does not object in accordance herewith, the Bankruptcy Court may enter an order forever barring such counterparty to a Scheduled Contract from objecting to the adequate assurance of the Successful Bidder's ability to perform.

---

[3]    This Notice is being sent to counterparties to Executory Contracts and Unexpired Leases. This Notice is not an admission by the Debtors that such contract or lease is executory or unexpired.

K&E 16139699.6
K&E 16179691.1

PLEASE TAKE FURTHER NOTICE that with respect to any Scheduled Contract assumed and assigned to the Successful Bidder (including the Proposed Purchaser), all Cure Amounts shall be satisfied by payment of the Cure Amounts as soon as reasonably practicable after Bankruptcy Court approval of the sale of the Acquired Assets to the Successful Bidder (including the Proposed Purchaser) or on such other terms as the parties to each such Scheduled Contract may otherwise agree without any further notice to or action, order or approval of the Bankruptcy Court.  In addition, the assumption of each such Scheduled Contract may be conditioned upon the disposition of all issues with respect to such Scheduled Contract.

PLEASE TAKE FURTHER NOTICE that pursuant to the Bidding Procedures, with respect to any Scheduled Contract, in the event of a dispute regarding: (a) the amount of any Cure Amount; (b) the ability of the Successful Bidder (including the Proposed Purchaser) to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under such Scheduled Contract; or (c) any other matter pertaining to assumption, the Cure Amounts shall be paid as soon as reasonably practicable following the entry of a final order resolving the dispute and approving the assumption of such Scheduled Contract; provided, however, that the Debtors may settle any dispute regarding the amount of any Cure Amount or assignment to the Successful Bidder (including the Proposed Purchaser) without any further notice to or action, order or approval of the Bankruptcy Court.

PLEASE THAT FURTHER NOTICE THAT notwithstanding anything herein, this Notice shall not be deemed to be an assumption, adoption, rejection or termination of the Scheduled Contracts.  Moreover, the Debtors explicitly reserve their rights, in their sole discretion, to reject or assume each Scheduled Contract pursuant to section 365(a) of the Bankruptcy Code and nothing herein (a) alters in any way the prepetition nature of the Scheduled Contracts or the validity, priority or amount of any claims of a counterparty to an Scheduled Contract against the Debtors that may arise under such Scheduled Contract, (b) creates a postpetition contract or agreement or (c) elevates to administrative expense priority any claims of an counterparty to an Scheduled Contract against the Debtors that may arise under such Scheduled Contract.

Dated: January __, 2010

Respectfully submitted,

BERGER SINGERMAN, P.A.
*Counsel for the Debtors*
200 South Biscayne Boulevard, Suite 1000
Miami, FL  33131
Telephone:  (305) 755-9500
Facsimile:  (305) 714-4340

By:  /s/  Jordi Guso
　　　　Jordi Guso
　　　　Florida Bar No. 863580
　　　　jguso@bergersingerman.com

3

## EXHIBIT A

[Counterparty Name]                    [Contract/Lease]                              Cure Amount

**EXHIBIT 4 to the Bidding Procedures Order**

**(Assumption Notice)**

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA
## FORT LAUDERDALE DIVISION
### www.flsb.uscourts.gov

In re:                                          Chapter 11

PROTECTIVE PRODUCTS OF                          Case No. _____
AMERICA, INC. et al.,[1]

                    Debtors.                         Jointly Administered
_____/

## NOTICE OF ASSUMPTION AND ASSIGNMENT
## OF EXECUTORY CONTRACT OR UNEXPIRED LEASE

**PLEASE TAKE NOTICE THAT**:

1.      A hearing (the "Sale Hearing")[2] was held at [_____] __m. on February 19, 2010 before the Honorable **[TO COME]**, United States Bankruptcy Judge, in the Bankruptcy Court, 299 East Broward Boulevard, Room **[TO COME]**, Fort Lauderdale, Florida 33301.  At the Sale Hearing, the Bankruptcy Court entered an order (the "Sale Order") (a) approving the sale of the Acquired Assets to Protective Products Enterprises, Inc. (the "Purchaser") in accordance with the Asset Purchase Agreement, and (b) authorizing, among other things, the Debtors, pursuant to the terms of the Asset Purchase Agreement, to assume and assign the Assumed Executory Contracts to the Purchaser, as defined in the Asset Purchase Agreement.

2.      Pursuant Section 2.6(c) of the Asset Purchase Agreement, the Purchaser was permitted, up to ninety (90) days after the closing of the sale of the Acquired Assets to the Purchaser, to designate additional Assumed Executory Contracts (collectively, the "Assumed Designated Contracts").

3.      The Purchaser has elected to take assignment of the contracts and leases as set forth on Exhibit A hereto.

_____

[1]   The Debtors in these cases, along with the last four digits of each Debtor's federal tax identification number, are as follows:  Protective Products of America, Inc. (9709); CPC Holding Corporation of America (8086); Ceramic Protection Corporation of America (7305); Protective Products International Corp. (7373); and Protective Products of North Carolina, LLC (0927).   The mailing address of each of the Debtors is 1649 Northwest 136th Avenue, Sunrise, Florida 33323.

[2]   Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures or the Bidding Procedures Order, as applicable.

# EXHIBIT A

[Counterparty Name/Address]          [Contract/Lease]                              Cure Amount

**EXHIBIT B**

**FORM OF SALE ORDER**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**
**www.flsb.uscourts.gov**

In re:                                          Case No. _____

PROTECTIVE PRODUCTS OF AMERICA,
INC. et al.,[1]

                                                Chapter 11

        Debtors.
_____/             Jointly Administered

**ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE**
**DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES,**
**AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING THE ASSET**
**PURCHASE AGREEMENT; (III) APPROVING PROCEDURES AND RIGHTS**
**RELATED TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY**
**CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

---

[1]     The Debtors in these jointly-administered chapter 11 cases are:  Protective Products of America, Inc., CPC Holding Corporation of America, Ceramic Protection Corporation of America, Protective Products International Corp., and Protective Products of North Carolina LLC.

Upon the motion (the "Motion")[2] of the above-captioned debtors and debtors in possession (collectively, the "Debtors") pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida (the "Local Rules"), for entry of an order (the "Order") (a) approving the sale of substantially all of the Debtors' assets free and clear of liens, claims, encumbrances and other interests, with such sale to be consummated in accordance with the terms and conditions of the Asset Purchase Agreement (as defined below), (b) authorizing and approving the execution and delivery of the Asset Purchase Agreement (as defined below); (c) approving procedures and rights related to the assumption and assignment of certain executory contracts and unexpired leases; and (d) granting related relief, all as more fully described in the Motion; and the Debtors having determined that the highest and otherwise best offer for Acquired Assets was made by Protective Products Enterprises, Inc. (the "Purchaser") in the form of the Asset Purchase Agreement among Protective Products Enterprises, Inc., one the one hand, and Protective Products of America, Inc. and the other sellers named therein, on the other hand, dated as of January 13, 2010, a copy of which is attached hereto as Exhibit 1 (together with the exhibits and schedules thereto (each as may be amended or supplemented from time to time), collectively, the "Asset Purchase Agreement"); and the Court having conducted a hearing on February _____, 2010 (the "Sale Hearing") to consider the approval of the sale of the Acquired Assets and consummation of the transactions contemplated in the Asset Purchase Agreement (the "Transactions") pursuant to the terms and

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement (as defined below).

condition of the Asset Purchase Agreement, and the Court having considered:  (a) the Motion and any objections thereto, (b) the proposed sale of the Acquired Assets by Debtors to the Purchaser pursuant to the Asset Purchase Agreement and the Transactions contemplated thereby, (c) the arguments of counsel made, and evidence adduced, related thereto, and (d) the full record in these chapter 11 cases, including the record related to the hearing to consider the Bidding Procedures Order and the Sale Hearing held before the Court; all parties in interest having been heard, or having had the opportunity to be heard, regarding the approval of the Asset Purchase Agreement and sale of the Acquired Assets and other transactions contemplated by the Asset Purchase Agreement; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors and other parties in interest; that reasonable and adequate notice of the Motion, the Bidding Procedures Order, the Transactions contemplated by the Asset Purchase Agreement, this Order and the Sale Hearing have been provided to all persons required to be served in accordance with the Bankruptcy Code and the Bankruptcy Rules; and after due deliberation thereon; and good and sufficient cause appearing therefor, it is hereby

**FOUND, CONCLUDED AND DETERMINED THAT:**[3]

      A.     The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

---

[3]     All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Motion are hereby incorporated herein to the extent not inconsistent herewith.

B.      To the extent that any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      The Court has jurisdiction over the Motion and over the property of Debtors, including the Acquired Assets to be sold, transferred and conveyed pursuant to the Asset Purchase Agreement, and the Transactions contemplated by the Asset Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue of these chapter 11 cases and the Motion in this district and Court is proper under 28 U.S.C. §§ 1408 and 1409.

D.      This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

E.      The Acquired Assets constitute property of the Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section 541(a) of the Bankruptcy Code.

F.      The statutory bases for the relief requested in the Motion are sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

G.      On January 13, 2010 (the "Petition Date"), each of the Debtors filed voluntary petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court" or this "Court").  Since the Petition Date,

5

the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

H.    The Court entered the Bidding Procedures Order on January ___, 2010 [DE # ____], (i) establishing bidding and auction procedures (the "Bidding Procedures"); (ii) approving proposed bid protections to the Purchaser in accordance with the Asset Purchase Agreement; (iii) scheduling an auction and the Sale Hearing to consider the sale of the Debtors' assets; (iv) establishing procedures for noticing and determining cure amounts related to the Debtors' executory contracts and unexpired leases; (v) approving the form and manner of notice of all procedures, protections, schedules and agreements; and (vi) granting certain related relief.

I.    Actual written notice of, and a reasonable opportunity to object or be heard with respect to, the Sale Hearing, the Auction, the Motion and the Transactions has been afforded to all known interested entities, including, but not limited to the following parties:  (i) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest or encumbrance of record against all or any portion of the Acquired Assets; (ii) the Office of the United States Trustee; (iii) the Environmental Protection Agency; (iv) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Acquired Assets, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Acquired Assets or have any known interest in the relief requested by the Motion; (v) the state and local environmental agencies in the jurisdictions where the Debtors own or lease real property; (vi) counsel to the Purchaser; (vii) counsel to the prepetition and postpetition secured lenders; (viii) the United States Attorney's office; (ix) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (x) counsel to the Official Committee of Unsecured Creditors

6

appointed in these cases in accordance with section 1102 of the Bankruptcy Code (the "Committee"); (xi) all parties to any litigation involving the Debtors; (xii) all of the Debtors' current employees and former employees, if any, who were terminated immediately prior to the commencement of these cases, (xiii) all counterparties to any executory contract or unexpired lease of the Debtors; (xiii) all other known creditors and interest holders of Debtors; and (xiv) all potential bidders previously identified or otherwise known to the Debtors.

J.      The Debtors have articulated good and sufficient reasons for the Court to grant the relief requested in the Motion regarding the sales process, including, without limitation, approval and authorization to serve the Sale Notice (as defined in the Bidding Procedures Order).

K.      The Sale Notice (as defined in the Bidding Procedures Order) provided all interested parties with timely and proper notice of the Transactions contemplated by the Asset Purchase Agreement, the Sale Hearing and the Auction.

L.      As evidenced by the affidavits of service previously filed with the Court, proper, timely, adequate and sufficient notice of the Motion, the Auction, the Sale Hearing and the Transactions has been provided in accordance with sections 102(1), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.  The Debtors also have complied with all obligations to provide notice of the Motion, the Auction, the Sale Hearing and the Transactions required by the Bidding Procedures Order, including with respect to notice of the assumption, sale and assignment of each Assumed Executory Contract.  Notice of the Sale Hearing, the Auction, the Motion and the sale of the Acquired Assets was also published in *The Wall Street Journal*, national edition on _____, 2010.  The notices described above were good, sufficient and appropriate under the circumstances, and no other or further notice of the

Motion, the Auction, the Sale Hearing or the Transactions contemplated by the Asset Purchase Agreement is required.

M.    The disclosures made by the Debtors concerning the Asset Purchase Agreement, the Auction, the Transactions contemplated by the Asset Purchase Agreement and the Sale Hearing were good, complete and adequate.

N.    The Bidding Procedures set forth in the Bidding Procedures Order were non-collusive, proposed and executed in good faith as a result of arm's length negotiations between the Debtors and the Purchaser, and were substantively and procedurally fair to all parties.

O.    The Debtors conducted the sale and auction process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order.  The sale and auction process set forth in the Bidding Procedures Order afforded a full, fair and reasonable opportunity for any entity to make a higher or otherwise better offer to purchase the Acquired Assets.

P.    The Asset Purchase Agreement and the Transactions contemplated thereby constitute the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination that the Asset Purchase Agreement constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

Q.    The Asset Purchase Agreement and the Transactions contemplated thereby represent a fair and reasonable offer to purchase the Acquired Assets under the circumstances of the chapter 11 cases.  No other entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Purchaser.

R.     Approval of the Motion and the Asset Purchase Agreement and the consummation of the Transactions contemplated thereby is in the best interests of the Debtors, their creditors, their estates and other parties in interest.

S.     The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the sale of the Acquired Assets and Transactions outside the ordinary course of business.  Such business reasons include, but are not limited to, the following (i) the Asset Purchase Agreement constitutes the highest and best offer for the Acquired Assets; (ii) the Asset Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Acquired Assets on a going concern basis and avoid decline and devaluation of the Acquired Assets; and (iii) any other transaction, including pursuant to a plan of reorganization, would not have yielded as favorable an economic result.

T.     The Purchaser is purchasing the Acquired Assets in good faith and is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code, and are therefore entitled to the full protections of that provision, and otherwise have proceeded in good faith in all respects in connection with this proceeding in that, *inter alia*:  (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (ii) the Purchaser complied with the provisions in the Bidding Procedures Order; (iii) the Purchaser agreed to subject their bid to the competitive bidding procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Purchaser and other agreements or arrangements entered into by the Purchaser in connection with the Transactions have been disclosed; (v) the Purchaser has not violated section 363(n) of the Bankruptcy Code by any action or inaction; and (vi) the negotiation and execution of the Asset Purchase Agreement, including all Transactions contemplated thereby, was at arms-length and in good faith.

U.      The Debtors and the Purchaser have not engaged in any conduct that would permit the Asset Purchase Agreement or the sale of the Acquired Assets or the Transactions contemplated thereby to be avoided under section 363(n) of the Bankruptcy Code.

V.      The consideration provided by the Purchaser pursuant to the Asset Purchase Agreement is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

W.      By consummating the sale pursuant to the Transactions contemplated by the Asset Purchase Agreement, the Purchaser is not a mere continuation of the Debtors or their estates and there is no continuity between the Purchaser and Debtors.  The Purchaser is not holding itself out to the public as a continuation of the Debtors.  The Purchaser is not a successor to the Debtors or their estates, and the Transactions do not amount to a consolidation, merger or de facto merger of the Purchaser and the Debtors.

X.      The sale of the Acquired Assets and the Transactions contemplated by the Asset Purchase Agreement outside a plan of reorganization pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization of the Debtors.  The sale does not constitute a *sub rosa* plan.

Y.      The Debtors, acting by and through their existing agents, representatives and officers, have full corporate power and authority to execute and deliver the Asset Purchase Agreement and all other documents contemplated thereby, and no further consents or approvals are required for the Debtors to consummate the Transactions contemplated by the Asset Purchase Agreement, except as otherwise set forth in the Asset Purchase Agreement.

Z.      The Purchaser has not agreed to assume and shall have no obligations with respect to any liabilities of the Debtors or their subsidiaries or Affiliates other than as expressly set forth in the Asset Purchase Agreement.

AA.     The transfer of each of the Acquired Assets to the Purchaser will be as of the Closing Date a legal, valid and effective transfer of such assets, and vests or will vest the Purchaser with all right, title and interest of the Debtors to the Acquired Assets free and clear of all encumbrances, claims, interests and Liens accruing, arising or relating thereto any time prior to the Closing Date, unless otherwise assumed in the Asset Purchase Agreement.

BB.     The Debtors may sell the Acquired Assets free and clear of all encumbrances, claims, interests and Liens against the Debtors, their estates or any of the Acquired Assets (unless otherwise assumed in the Asset Purchase Agreement) because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code has been satisfied. Those holders of encumbrances, claims, interests and Liens against the Debtors, their estates or any of the Acquired Assets who did not object, or who withdrew their objections, to the Transactions or the Motion are deemed to have consented thereto pursuant to section 363(f)(2) of the Bankruptcy Code.  Those holders of such encumbrances, claims, interests and Liens who did object fall within one or more of the other subsections of section 363(f) and are adequately protected by having their encumbrances, claims, interests and Liens, if any, in each instance against the Debtors, their estates or any of the Acquired Assets, attach to the cash proceeds of the Transactions ultimately attributable to the Acquired Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Transactions, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

11

CC.    If the sale of the Acquired Assets to the Purchaser were not free and clear of all encumbrances, claims, interests and Liens, or if the Purchaser would, or in the future could, be liable for any of the encumbrances, claims, interests and Liens, the Purchaser would not have entered into this Asset Purchase Agreement and would not consummate the sale or the Transactions contemplated by the Asset Purchase Agreement, thus adversely affecting the Debtors, their estates and their creditors.

DD.    The assumption and assignment of the Assumed Executory Contracts, including any Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement, if any, pursuant to the terms of this Order is integral to the Asset Purchase Agreement and is in the best interests of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

EE.    The Debtors and Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), (B) and 365(f), in connection with the sale and assumption and assignment of the Assumed Executory Contracts to the extent provided under the Asset Purchase Agreement, including any Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement.  The Purchaser is able to demonstrate adequate assurance of future performance with respect to any Assumed Executory Contracts pursuant to section 365(b)(1)(C) of the Bankruptcy Code, including any Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement.  Except as provided by in the Asset Purchase Agreement, the Assumed Executory Contracts, including any Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset

12

Purchase Agreement, are assignable notwithstanding any provisions contained therein to the contrary.

FF.     To maximize the value of the Acquired Assets, it is essential that the closing of the Transactions occurs within the time constraints set forth in the Asset Purchase Agreement. Time is of the essence in consummating the Transactions.

GG.     Given all of the circumstances of the chapter 11 cases and the adequacy and fair value of the Purchase Price under the Asset Purchase Agreement, the Transactions constitute a reasonable and sound exercise of the Debtors' business judgment, are in the best interests of the Debtors, their estates, their creditors and other parties in interest and should be approved.

HH.     The consummation of the Transactions is legal, valid and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Transactions.

**NOW THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1.     The relief requested in the Motion is granted and approved, and the Transactions contemplated thereby and by the Asset Purchase Agreement are approved as set forth in this Order.

2.     Any and all objections and responses to the Motion that have not been withdrawn, waived, settled or resolved, and all reservations of rights included therein, are hereby overruled and denied.

3.     Notice of the Motion, the Auction, the Sale Hearing and the Transactions contemplated by the Asset Purchase Agreement was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

**Approval of the Sale of the Acquired Assets**

4.      The Purchaser's offer for the Acquired Assets, as embodied in the Asset Purchase Agreement, is the highest and best offer for the Acquired Assets and the Asset Purchase Agreement, including all other ancillary documents, and all of the terms and conditions thereof, and the Transactions contemplated thereby, are hereby approved in all respects.

5.      The sale of the Acquired Assets and the consideration provided by the Purchaser under the Asset Purchase Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code and other applicable law.

6.      Pursuant to section 363(b) of the Bankruptcy Code, the Debtors, acting by and through their existing agents, representatives and officers, are authorized and empowered to take any and all actions necessary or appropriate to (a) consummate the Transactions pursuant to and in accordance with the terms and conditions of the Asset Purchase Agreement, (b) close the Transactions as contemplated in the Asset Purchase Agreement and this Order, (c) transfer and assign all right, title and interest (including common law rights) to all property, licenses and rights to be conveyed in accordance with the terms and conditions of the Asset Purchase Agreement, and (d) execute and deliver, perform under, consummate, implement and close fully the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement and the Transactions, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the Asset Purchase Agreement and such other ancillary documents.

7.      This Order shall be binding in all respects upon the Debtors, their estates, all creditors, all holders of equity interests in the Debtors, all holders of any encumbrances, claims, interests and Liens (whether known or unknown) against any Debtor, any holders of encumbrances, claims, interests and Liens against or on all or any portion of the Acquired Assets, all counterparties to any executory contract or unexpired lease of the Debtors, the Purchaser and all successors and assigns of the Purchaser, and any trustees, examiners or other fiduciary under any section of the Bankruptcy Code, if any, subsequently appointed in any of the Debtors' chapter 11 cases or upon a conversion to chapter 7 under the Bankruptcy Code of the Debtors' cases.  The terms and provisions of the Asset Purchase Agreement and this Order shall inure to the benefit of the Debtors, their estates, and their creditors, the Purchaser, and their respective affiliates, successors, and assigns, and any affected third parties, including, but not limited to, all persons asserting any encumbrances, claims, interests and Liens in the Acquired Assets to be sold to the Purchaser pursuant to the Asset Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s), party, entity, or other fiduciary under any section of any chapter of the Bankruptcy Code, as to which trustee(s), party, entity, or other fiduciary such terms and provisions likewise shall be binding.

**Sale and Transfer of Acquired Assets**

8.      Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, upon the Closing Date and pursuant to the Asset Purchase Agreement, the Acquired Assets shall be transferred to the Purchaser free and clear of all encumbrances, claims, interests, and Liens, including, without limitation, any interest or claim not assumed by the Purchaser pursuant to the Asset Purchase Agreement.

9.      On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of all of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to Purchaser pursuant to the terms and allocations set forth in the Asset Purchase Agreement.  On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete and general assignment of all right, title and interest of the Debtors and each estate to the Purchaser in the Assumed Executory Contracts.  For the avoidance of doubt, the Excluded Assets set forth in the Asset Purchase Agreement are not included in the Acquired Assets.

10.      Subject to the terms and conditions of this Order, the transfer of Acquired Assets to the Purchaser pursuant to the Asset Purchase Agreement does not require any consents other than as specifically provided for in the Asset Purchase Agreement and constitutes a legal, valid and effective transfer of the Acquired Assets, and shall vest Purchaser with right, title and interest of the Debtors in and to the Acquired Assets as set forth in the Asset Purchase Agreement, as applicable, free and clear of all encumbrances, claims, interests and Liens of any kind or nature whatsoever (unless otherwise assumed in the Asset Purchase Agreement).

11.      To the greatest extent available under applicable law and except as provided in the Asset Purchase Agreement, the Purchaser, as provided by the Asset Purchase Agreement,

shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Acquired Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date as provided by the Asset Purchase Agreement.

12.     All entities who are presently, or on the Closing may be, in possession of some or all of the Acquired Assets to be sold, transferred or conveyed pursuant to the Asset Purchase Agreement are hereby directed to surrender possession of the Acquired Assets to the Purchaser on the Closing Date.

13.     Except as expressly permitted or otherwise specifically provided by the Asset Purchase Agreement or this Order, all entities holding encumbrances, claims, interests and Liens in all or any portion of the Acquired Assets (unless otherwise assumed in the Asset Purchase Agreement) arising under or out of, in connection with, or in any way relating to the Debtors, the Acquired Assets, the operation of the Debtors' Business prior to the Closing Date or the transfer of the Acquired Assets to the Purchaser, hereby are forever barred, estopped and permanently enjoined from asserting against the Purchaser or their successors or assigns, their property or the Acquired Assets, such entities' encumbrances, claims, interests and Liens in and to the Acquired Assets.  On the Closing Date, each creditor of the Debtors is authorized and directed to execute such documents and take all other actions as may be necessary to release encumbrances, claims, interests and Liens on the Acquired Assets, if any, as provided for herein, as such encumbrances, claims, interests and Liens may have been recorded or may otherwise exist.  The transactions authorized herein shall be of full force and effect, regardless of the Debtors' lack of good standing in any jurisdiction in which such Debtor is formed or authorized to transact business.

14.    Upon consummation of the Transactions set forth in the Asset Purchase Agreement, if any person or entity that has filed financing statement, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing encumbrances, claims, interests and Liens against or in the Acquired Assets shall not have delivered to the Debtors prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfactions, releases of all encumbrances, claims, interests and Liens that the person or entity has with respect to the Acquired Assets (unless otherwise assumed in the Asset Purchase Agreement), or otherwise, then (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) the Purchaser is hereby authorized to file, register or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all encumbrances, claims, interests and Liens in the Acquired Assets of any kind or nature.  For the avoidance of doubt, to the extent necessary, upon consummation of the Transactions set forth in the Asset Purchase Agreement, the Purchaser is authorized to file termination statements, lien terminations or other amendments in any required jurisdiction to remove and record, notice filings or financing statements recorded to attach, perfect or otherwise notice any lien or encumbrance that is extinguished or otherwise released pursuant to this Order under section 363 and the related provisions of the Bankruptcy Code.

15.    All entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtors to sell and transfer the Acquired Assets to the Purchaser in accordance with the terms of the Asset Purchase Agreement and this Order.

18

16.     This Order is and shall be binding upon and govern the acts of all entities, including, without limitation, federal, state and governmental agencies or departments, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the Transactions contemplated by the Asset Purchase Agreement.

17.     Effective upon the Closing Date and without further order of the Court, the Debtors and the Committee shall waive any and all actions related to and release the Purchaser and the DIP Lenders (as defined in the DIP Order) from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the DIP Credit Agreement or the DIP Order, any documents related to the DIP Credit Agreement or the DIP Order, any aspect of the prepetition or postpetition relationship with the Purchaser and DIP Lenders and any Debtor, or any other acts or omissions by the Purchaser or DIP Lenders in connection with the DIP Credit Agreement or the DIP Order, any documents related to the DIP Credit Agreement or the DIP Order and any aspect of their prepetition or postpetition relationship with any Debtor.

**Contracts to be Assigned**

18.     From and after the Effective Date, the Debtors shall not reject or alter (or attempt to alter) the terms of any executory Contracts or unexpired leases to which any Debtors is a party

(collectively, the "Scheduled Contracts") unless otherwise agreed to in writing by Purchaser or as provided in the Asset Purchase Agreement.

19.    Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing Date, the Debtors' assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Asset Purchase Agreement of the Assumed Executory Contracts, including any Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement, is hereby approved in its entirety, and the requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

20.    The Debtors are hereby authorized and directed in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing Date of the sale of the Acquired Assets (or as otherwise provided in the Asset Purchase Agreement with respect to Designated Contracts), the Assumed Executory Contracts (or the Designated Contracts that are assumed and assigned in accordance with the Asset Purchase Agreement) free and clear of all encumbrances, claims, interests and Liens of any kind or nature whatsoever (unless otherwise assumed in the Asset Purchase Agreement) and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assumed Executory Contracts to the Purchaser, including with respect to any Designated Contracts that are assumed and assigned to the Purchaser pursuant to the Asset Purchase Agreement.

21.    Upon the Closing (or as otherwise provided in the Asset Purchase Agreement with respect to Designated Contracts), in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title and

interest of each Assumed Executory Contract (including any Designated Contract that is assumed and assigned to the Purchaser pursuant to the Asset Purchase Agreement).  The Debtors shall cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing, as further provided in the Asset Purchase Agreement.

22.    Notwithstanding anything to the contrary, the Purchaser may elect to take assignment of certain executory contracts and unexpired leases listed on Schedule 2.6(c) of the Asset Purchase Agreement (the "Designated Contracts") for up to ninety (90) days after the Closing Date of the Asset Purchase Agreement (the "Contract Retention Period").  Purchaser may, at its sole discretion and at any time during the Contract Retention Period, deliver to Debtors one (1) or more written notices (each, an "Assumption Notice") requesting assumption and assignment of any Designated Contract(s).  Upon receipt of an Assumption Notice, the Debtors shall take all actions reasonably necessary to seek to assume and assign to Purchaser pursuant to section 365 of the Bankruptcy Code the Designated Contract(s) set forth in the applicable Assumption Notice, and Purchaser shall be responsible for satisfying any costs of cure relating to such Designated Contracts, including filing with the Bankruptcy Court and serving a notice on such counterparty to the Designated Contract that identifies the Purchaser of the Acquired Assets and provides notice that the Debtors are assuming and assigning the Designated Contract to the Purchaser.  To the extent that any Designated Contract is a Facility Lease, the Debtors hereby grant the Purchaser a license to use and possess the Facility which is leased pursuant to such Facility Lease; provided, however, that Purchaser shall have no liabilities or obligation under such Facility Lease, including with respect to environmental, health or safety matters.  Such license shall commence on the Closing Date and shall terminate on the earlier of the date such Facility Lease is rejected and the last day of the Contract Retention Period.

Notwithstanding anything in this Agreement to the contrary, on the date that any Designated Contract is assumed and assigned to Purchaser pursuant to Section 2.6(c) of the Asset Purchase Agreement, such Contract shall be deemed an Assumed Executory Contract for all purposes under the Asset Purchase Agreement.

23.     The Assumed Executory Contracts, including any Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement, shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assumed Executory Contract or Designated Contract that is assumed and assigned to Purchaser pursuant to the Asset Purchase Agreement (including those of the type described in sections 365(b)(2) and 365(f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer.

24.     Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, and except as otherwise provided by this Order, the Purchaser shall pay all Cure Amounts set forth on Schedule 1.1 of the Asset Purchase Agreement in an aggregate amount up to but not to exceed the Purchaser Cure Amounts Cap in connection with the assignment and assumption of the Assumed Executory Contracts and any Designated Contract.  The Debtors shall pay all Cure Amounts set forth on Schedule 1.1 of the Asset Purchase Agreement in excess of the Purchaser Cure Amounts Cap in connection with the assignment and assumption of the Assumed Executory Contracts and any Designated Contract.

25.     The Cure Amounts are hereby fixed at the amounts set forth in the Cure Notice served by the Debtors, or the amounts determined on the record at the Sale Hearing, as the case may be, and the non-Debtor parties to the Assumed Executory Contracts, including the non-Debtor parties to any Designated Contracts that are assumed and assigned to the Purchaser

22

pursuant to the terms of the Asset Purchase Agreement, are forever bound by such Cure Amounts and are herby enjoined from taking any action against the Purchaser or the Acquired Assets with respect to any claim for cure under any Assumed Executory Contract, including any Designated Contract that is assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement.

26.     The payment of the applicable Cure Amounts (if any) by the Purchaser shall (a) effect a cure of all defaults existing thereunder as of the date that such executory contracts or unexpired leases are assumed and (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default.  The Purchaser shall then have assumed the Assumed Executory Contracts, including any Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement, and pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assumed Executory Contracts (or Designated Contracts that are assumed and assigned to the Purchaser pursuant to the Asset Purchase Agreement) shall not be a default thereunder.  After the payment of the relevant Cure Amounts by the Purchaser, neither the Debtors nor the Purchaser shall have any further liabilities to the counterparties to the Assumed Executory Contracts, including with respect to any Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement, other than the Purchaser's obligations under the Assumed Executory Contracts or Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement, that accrue and become due and payable on or after the date that such Assumed Executory Contracts, or Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement, are assumed.

27.     Purchaser may, at its sole discretion and at any time during the Contract Retention Period, deliver to the Debtors one (1) or more written notices (each, a "<u>Rejection Notice</u>") notifying Debtors of its intent not to assume any Designated Contract(s).  On the date that Purchaser provides a Rejection Notice with respect to such Designated Contract, such Designated Contract will be deemed an Excluded Contract for all purposes under the Asset Purchase Agreement, the Debtors shall immediately reject such Excluded Contract, and all obligations arising thereafter in connection with such Excluded Contract shall be considered Excluded Liabilities under the Asset Purchase Agreement.  Upon the expiration of the Contract Retention Period, all Designated Contracts that have not been deemed Assumed Executory Contracts pursuant to an Assumption Notice and have not been subject of a Rejection Notice shall be automatically deemed to be Excluded Contracts, the Debtors shall immediately reject such Excluded Contracts, and all obligations arising thereafter in connection with such Excluded Contracts shall be considered Excluded Liabilities under the Asset Purchase Agreement.

28.     As soon as practicable after the Closing Date, the Debtors shall reject all Excluded Contracts.  To the extent that any executory Contract or unexpired lease relating to the Business is not identified prior to the Closing Date or is not an Assumed Executory Contract, an Excluded Contract or a Designated Contract on the Closing Date, such executory Contract or unexpired lease shall be deemed an Excluded Contract and the Debtors shall immediately reject any such executory Contract or unexpired lease upon discovery.

29.     To the extent that any Designated Contract is a Facility Lease, the Debtors shall grant the Purchaser a license to use and possess the Facility which is leased pursuant to such Facility Lease.  Such license shall commence on the Closing Date and shall terminate on the earlier of the date such Facility Lease is rejected and the last day of the Contract Retention

Period. The Purchaser shall compensate the Debtors for the ordinary course costs of such Designated Contract in accordance with the terms of such contract, in each case first arising after the Closing Date and actually incurred by the Debtors in performing obligations after the Closing under such Designated Contract until the earlier of the date such Designated Contract is assigned to the Purchaser, the date the Purchaser delivers a Rejection Notice with respect to such Designated Contract, or the last day of the Contract Retention Period.

30.    Any provisions in any Assumed Executory Contracts (or any Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement) that prohibit or condition the assignment of such Assumed Executory Contracts (or such Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement) or allow the party to such Assumed Executory Contracts (or to such Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement) to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assumed Executory Contract (or such Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement), constitute unenforceable anti-assignment provisions that are void and of no force and effect. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of the Assumed Executory Contracts (or such Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement) have been satisfied.

31.    Any party having the right to consent to the assumption or assignment of any Assumed Executory Contract (or such Designated Contracts that are assumed and assigned to the

Purchaser pursuant to the terms of the Asset Purchase Agreement) that failed to object to such assumption or assignment is deemed to have consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code.

32.    The Purchaser is able to provide adequate assurance of future performance under the relevant Assumed Executory Contracts (or under the relevant Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement) within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

33.    There shall be no assignment fees, increases, rent-acceleration or any other fees charged to the Purchaser or the Debtors as a result of the assumption and assignment of the Assumed Executory Contracts (or the Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement).

34.    Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all counterparties to the Assumed Executory Contracts, if any, including any counterparties to the Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement, are forever barred and permanently enjoined from raising or asserting against the Debtors or Purchaser any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assumed Executory Contracts, including related to any Designated Contracts that are assumed and assigned to the Purchaser pursuant to the terms of the Asset Purchase Agreement, existing as of the date that such Contracts are assumed or arising by reason of the Closing.

35.    Neither Purchaser nor any successor of Purchaser shall be responsible for or have any encumbrances, claims, interests and Liens or obligations arising out of any of the contracts,

agreements or understandings that are Excluded Contracts, including with respect to any Designated Contracts that become Excluded Contracts after the Closing Date (except as specifically provided by the Asset Purchase Agreement).

36.     Within two (2) days after the Closing Date, the Debtors will file a complete list of the Scheduled Contracts that were assumed and assigned, as of the Closing Date, to the Purchaser.  The Debtors will file a complete list of Designated Contracts at that time.

37.     To the extent that the Purchaser requests assumption and assignment of any Designated Contract after the Closing Date, the Debtors shall serve the non-Debtor counterparty to such Designated Contract with the Assumption Notice substantially in the form attached as Exhibit 4 to the Bidding Procedures Order.  As soon as practicable after the Contract Retention Period, the Debtors shall file a final and complete list of all Assumed Executory Contracts.

38.     Upon (a) service of an Assumption Notice substantially in the form attached as Exhibit 4 to the Bidding Procedures Order and (b) payment by Purchaser of the associated Cure Amount(s), the assumption and assignment of the Designated Contracts shall be deemed effective, without further order of the Court.

**Additional Provisions**

39.     Effective upon the Closing Date, all entities are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against the Purchaser, their successors and assigns, or the Acquired Assets, with respect to any (a) encumbrances, claims, interests and Liens arising under, out of, in connection with or in any way relating to the Debtors, the Purchaser, the Acquired Assets, or the operation of the Business or the Acquired Assets prior to the closing of the Transactions, or (b) successor liability,

including, without limitation, the following actions:  (i) commencing or continuing in any manner any action or other proceeding against the Purchaser, their successors or assigns, assets or properties, (ii) enforcing, attaching, collecting or recovering in any manner any judgment, award, decree or order against the Purchaser, their successors, assets or properties, (iii) creating, perfecting or enforcing any encumbrances, claims, interests and Liens against the Purchaser, their successors or assigns, assets or properties; (iv) asserting any setoff, right of subrogation or recoupment of any kind against any obligation due the Purchaser or their successors or assigns, (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof, or (vi) revoking, terminating or failing or refusing to issue or renew any license, permit or authorization to operate any of the Acquired Assets or conduct any of the businesses operated with the Acquired Assets.

40.    Except as otherwise expressly provided in the Asset Purchase Agreement, the Purchaser shall have no obligation, as successor or otherwise (including with respect to successor or vicarious liabilities of any kind or character), to pay wages, bonuses, severance pay, benefits (including, without limitation, contributions or payments on account of any under-funding with respect to any and all pension plans) or any other payment to employees of Debtors or their Affiliates.  The Purchaser shall have no liability, as successor or otherwise (including with respect to successor or vicarious liabilities of any kind or character), with respect to any collective bargaining agreement, employee pension plan, employee welfare or retention, benefit and/or incentive plan to which Debtors or their Affiliates are a party and relating to the Business (including, without limitation, arising from or related to the rejection or other termination of any such agreement), and the Purchaser shall in no way, as successor or otherwise (including with

respect to successor or vicarious liabilities of any kind or character), be deemed a party to or assignee of any such agreement, and no employee of the Purchaser shall be deemed in any way covered by or a party to any such agreement, and all parties to any such agreement are hereby enjoined from asserting against the Purchaser any and all encumbrances, claims, interests and Liens arising from or relating to such agreement.  Any and all notices, if any, required to be given to the Debtors' or their Affiliates' employees pursuant to the Workers Adjustment and Relocation Adjustment Act, or any similar federal or state law, shall be the sole responsibility and obligation of the Debtors and their Affiliates and the Purchaser shall have no responsibility or liability therefore.

41.    Except for the encumbrances, claims, interests and Liens assumed by the Purchaser in the Asset Purchase Agreement and without limiting paragraphs 8, 38 and 39 of this Order, the Purchaser is not, by virtue of the consummation of the Transactions contemplated by the Asset Purchase Agreement, assuming nor shall it be liable or responsible, as a successor or otherwise (including with respect to successor or vicarious liabilities of any kind or character), under any theory of law or equity, including, any theory of antitrust, environmental successor or transferee liability, labor law, de facto merger or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter raised, which may be asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors, or any of its predecessors or Affiliates or any obligations of the Debtors or their predecessors or Affiliates arising prior to the Closing Date, for any liabilities, debts, commitments or obligations (whether known or unknown, disclosed or undisclosed, absolute, contingent, inchoate, fixed or otherwise) in any way whatsoever relating to or arising from the Acquired Assets or the Debtors' operation of its businesses or use of the Acquired Assets on or prior to the Closing Date, including, but not

29

limited to, any liabilities, debts, commitments or obligations arising on or prior to the Closing and under or in connection with (i) any employment or labor agreements (including any collective bargaining agreements), consulting agreements, severance arrangements, change-in-control agreements or other similar agreement to which the Debtors are a party, (ii) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtors, (iii) the cessation of the Debtors' operations, dismissal of employees, or termination (including rejection) of employment or labor agreements (including any collective bargaining agreements) or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to applicable law, (iv) workmen's compensation, occupational disease or unemployment or temporary disability insurance claims, (v) environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to Closing, (vi) any bulk sales or similar law, (vii) any liabilities, debts, commitments or obligations of, or required to be paid by, the Debtors for any Taxes of any kind for any period, (viii) any liabilities, debts, commitments or obligations for any Taxes relating to the business of the Debtors or the Acquired Assets for or applicable to the pre-closing period, (ix) any litigation, (x) any products liability, other tort or similar claims, whether pursuant to any state or any federal laws or otherwise including those arising from products or distribution thereof by or on behalf of Debtors, and (xi) any Excluded Liabilities as set forth in the Asset Purchase Agreement.  The Purchaser has given substantial consideration under the Asset Purchase Agreement for the benefit of the holders of any encumbrances, claims, interests and Liens.  The consideration given by the Purchaser shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of the Purchaser, which releases shall be deemed to have been given

in favor of the Purchaser by all holders of encumbrances, claims, interests and Liens against or interests in the Debtors or any of the Acquired Assets.

42.     The Debtors, including but not limited to their respective officers, employees and agents, are hereby authorized to execute such documents and do such acts as are necessary or desirable to carry out the transactions contemplated by the terms and conditions of the Asset Purchase Agreement and this Order.  The Debtors shall be, and they hereby are, authorized to take all such actions as may be necessary to effectuate the terms of this Order.

43.     To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (i) to allow the Purchaser to give the Debtors any notice provided for in the Asset Purchase Agreement, and (ii) to allow the Purchaser to take any and all actions permitted by the Asset Purchase Agreement in accordance with the terms and conditions thereof.

44.     At or prior to the Closing, the Debtors shall take all necessary action to change their names to a name that does not include the word "Protective" or "Ceramic" or any other name or mark included in the Debtors' intellectual property or any translations, adaptations, derivations or combinations of any of the foregoing or any name or mark confusingly similar thereto.

45.     The Transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchaser without collusion and in good faith, as that term is defined in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transactions shall not affect the validity of the Transactions (including the assumption and assignment of the Assumed Executory Contracts by the Purchaser, if any, and the sale free and clear of all encumbrances, claims, interests and Liens

(unless otherwise assumed in the Asset Purchase Agreement)), unless such authorization and consummation of such Transactions are duly stayed pending such appeal. The Purchaser is a good faith buyer within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

46.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (a) these chapter 11 cases, (b) any subsequent chapter 7 or chapter 11 case of the Debtors or (c) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Order.

47.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Transactions.

48.     There are no brokers involved in consummating the Transactions and no brokers' commissions are due.

49.     The failure specifically to include any particular provisions of the Asset Purchase Agreement including any of the documents, agreements or instruments executed in connection therewith in this Order shall not diminish or impair the efficacy of such provision, document, agreement or instrument, it being the intent of the Court that the Asset Purchase Agreement and each document, agreement or instrument be authorized and approved in its entirety.

50.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

51.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Motion in these chapter 11 cases, the terms of this Order shall govern.

52.     To the extent there are any inconsistencies between the terms of this Order and the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

53.     The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto in accordance with the terms thereof without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates.

54.     The provisions of this Order are nonseverable and mutually dependent.

55.     Notwithstanding Bankruptcy Rules 6004(h), 6006(d), 7062 and 9014, this Order shall be effective immediately upon entry and the Debtors and the Purchaser are authorized to close the Transactions immediately upon entry of this Order.

56.     The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Order.

57.     The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtors are a party or which has been assigned by the Debtors to the Purchaser, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Transactions.

# # #

Submitted by:

Jordi Guso, Esq.
Berger Singerman, P.A.
200 South Biscayne Boulevard, Suite 1000
Miami, FL  33131
Tel.:  (305) 755-9500
Fax:  (305) 714-4340
Email: juguso@bergersingerman.com

Copy furnished to:

Jordi Guso, Esq.

*(Attorney Jordi Guso is directed, pursuant to Local Rule 5005-1, to serve conformed copies of this Order upon all parties in interest, and to file a Certificate of Service with the Court confirming such service.)*

## EXHIBIT C

## FORM OF ASSIGNMENT AND ASSUMPTION AGREEMENT

## ASSIGNMENT AND ASSUMPTION AGREEMENT

THIS ASSIGNMENT AND ASSUMPTION AGREEMENT, dated as of [_____ ___], 2009 is executed and delivered pursuant to that certain Asset Purchase Agreement, dated as of January [___], 2010 (the "Agreement"), by and among, Protective Products of America, Inc., a Delaware corporation, CPC Holding Corporation of America, a Delaware corporation, Ceramic Protection Corporation of America, a Delaware corporation, Protective Products International Corp., a Florida corporation, and Protective Products of North Carolina LLC, a North Carolina limited liability company (each, an "Assignor" and collectively, "Assignors") and Protective Products Enterprises, Inc., a Delaware corporation ("Assignee").

IT IS MUTUALLY AGREED AS FOLLOWS:

1.  Terms used herein and not otherwise defined shall have the respective meanings ascribed thereto in the Agreement.

2.  Except as otherwise provided below, effective as of the date hereof (the "Effective Date"), each Assignor hereby sells, assigns, conveys and transfers to Assignee all rights of such Assignor (i) under the Assumed Executory Contracts, (ii) under and to any Permits and warranties relating (directly or indirectly) to the Acquired Assets or the Business, and (ii) under and to all other Acquired Assets.

3.  Effective as of the Effective Date, Assignee hereby assumes and agrees to be responsible for the payment, performance and discharge of the Assumed Obligations.

4.  Upon the terms and subject to the conditions contained herein, the Assignors and Assignee agree (i) to use commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable to effect, consummate, make effective, confirm or evidence transactions contemplated by this Assignment and Assumption Agreement, and (ii) to execute any documents, instruments or conveyances of any kind which may be reasonably necessary or advisable to carry out any of the transactions contemplated by this Assignment and Assumption Agreement.

5.  This Assignment and Assumption Agreement will be binding from and after its execution upon Assignors and Assignee and their respective successors and assigns.

6.  To the extent any term, condition or provision of this Assignment and Assumption Agreement is in any way inconsistent with or in conflict with any term, condition or provision of the Agreement, the Agreement shall govern and control.

7.      This Assignment and Assumption Agreement may be executed in one or more counterparts, each of which shall be an original.  Any counterpart may be delivered by facsimile signature or electronic mail and any such counterpart shall be deemed an original, shall constitute effective execution and delivery of this Assignment and Assumption Agreement and may be used in lieu of the original Assignment and Assumption Agreement for all purposes.

8.      This Assignment and Assumption Agreement shall be governed by and construed in accordance with the laws of the State of Delaware (without regard to any choice of law or conflict of laws principles thereof).

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties have duly executed and delivered this Assignment and Assumption Agreement as of the date first written above.

**ASSIGNEE:**

PROTECTIVE PRODUCTS ENTERPRISES, INC.
By:        _____
Name:        G. Brian McGee
Its:        Vice President

**ASSIGNORS:**

PROTECTIVE PRODUCTS OF AMERICA, INC.

By:        _____
Name:        _____
Its:        _____

CPC HOLDING CORPORATION OF AMERICA

By:        _____
Name:        _____
Its:        _____

CERAMIC PROTECTION CORPORATION OF AMERICA

By:        _____
Name:        _____
Its:        _____

PROTECTIVE PRODUCTS INTERNATIONAL CORP.

By:     _____
Name:   _____
Its:      _____

PROTECTIVE PRODUCTS OF NORTH
CAROLINA LLC

By:     _____
Name:   _____
Its:      _____

## EXHIBIT D

## FORM OF BILL OF SALE

## BILL OF SALE

THIS BILL OF SALE, dated as of [_____ ___], 2010, is executed and delivered pursuant to that certain Asset Purchase Agreement, dated as of January [___], 2010 (the "Agreement"), by and among Protective Products Enterprises, Inc., a Delaware corporation ("Purchaser"), on the one hand, and Protective Products of America, Inc., a Delaware corporation, CPC Holding Corporation of America, a Delaware corporation, Ceramic Protection Corporation of America, a Delaware corporation, Protective Products International Corp., a Florida corporation, and Protective Products of North Carolina LLC, a North Carolina limited liability company (collectively, "Sellers"), on the other hand.  Capitalized terms not otherwise defined in this Bill of Sale have the meanings ascribed to them in the Agreement.

For good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Sellers hereby sell, convey, transfer, assign and deliver to Purchaser, and Purchaser hereby purchases and acquires from Sellers, all of Sellers' rights, titles and interests in the Acquired Assets.  Sellers, for themselves, their successors and assigns, irrevocably constitute and appoint Purchaser, its successors and assigns, and each of them, the true and lawful attorney of Sellers, their successors and assigns, with full power of substitution and gives and grants unto Purchaser, its successors and assigns, and each of them, full power and authority in the names of Sellers, their successors and assigns, at any time and from time to time, to demand, sue for, recover and receive any and all rights, demands, claims and causes of action of every kind and description whatsoever incident or relating to the Acquired Assets, for the purpose of fully vesting in Purchaser, its successors and assigns, all and singular, all the right, title and interest of Sellers in and to the Acquired Assets.

To the extent any term, condition or provision of this Bill of Sale is in any way inconsistent with or in conflict with any term, condition or provision of the Agreement, the Agreement shall govern and control.

This Bill of Sale may be executed in one or more counterparts, each of which shall be an original.  Any counterpart may be delivered by facsimile signature or electronic mail and any such counterpart shall be deemed an original, shall constitute effective execution and delivery of this Bill of Sale and may be used in lieu of the original Bill of Sale for all purposes.

This instrument shall be governed by and construed in accordance with the laws of the state of Delaware (without regard to any choice of law or conflict of laws principles thereof).

**[SIGNATURE PAGES FOLLOW]**

IN WITNESS WHEREOF, the parties hereto have caused this Bill of Sale to be duly executed as of the date first written above.

**PURCHASER:**

PROTECTIVE PRODUCTS ENTERPRISES, INC.
By:         _____
Name:       G. Brian McGee
Its:        Vice President

**SELLERS:**

PROTECTIVE PRODUCTS OF AMERICA, INC.


By:         _____
Name:       _____
Its:        _____


CPC HOLDING CORPORATION OF AMERICA


By:         _____
Name:       _____
Its:        _____


CERAMIC PROTECTION CORPORATION OF AMERICA

By:         _____
Name:       _____
Its:        _____


PROTECTIVE PRODUCTS INTERNATIONAL CORP.

By:         _____
Name:       _____
Its:        _____


PROTECTIVE PRODUCTS OF NORTH

CAROLINA LLC

By: _____
Name: _____
Its: _____

**<u>EXHIBIT E</u>**

**<u>FORM OF INTELLECTUAL PROPERTY ASSIGNMENTS</u>**

## PATENT ASSIGNMENT

**THIS PATENT ASSIGNMENT** ("Assignment") is made and entered into as of this _____ day of _____, 2010, ("Effective Date"), by and between _____, a _____ corporation ("Assignor"), and **Protective Products Enterprises, Inc.**, a Delaware corporation ("Assignee").

**WHEREAS**, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of January ___, 2010, pursuant to which Assignor has agreed to sell, and Assignee has agreed to purchase, certain assets of Assignor;

**WHEREAS**, Assignor is the sole and exclusive owner of the entire right, title and interest in and to the United States patents and patent applications and the foreign patents and patent applications set forth on Schedule A attached hereto (collectively, the "Patents"); and

**WHEREAS**, Assignee wishes to acquire from Assignor, and Assignor wishes to assign to Assignee, the entire right, title and interest in and to the Patents.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, assigns, transfers and sets over to Assignee, the entire right, title and interest in and to the Patents, for the United States and for all foreign countries, including, without limitation, any continuations, divisions, continuations-in-part, reissues, reexaminations, extensions and foreign equivalents thereof, and all other corresponding rights that are or may be secured under the laws of the United States or any foreign country, now or hereafter in effect, including, without limitation, the subject matter of all claims which may be obtained therefrom, together with all income, royalties, damages or payments accrued, due or payable as of the Effective Date or thereafter, including, without limitation, all claims for damages by reason of past, present or future infringement or other unauthorized use of the Patents, with the right to sue for, and collect the same, in each case, for Assignee's own use and enjoyment and for the use and enjoyment of its successors, assigns and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made.

Assignor hereby authorizes and requests the Commissioner of Patents and Trademarks, and the corresponding entities or agencies in any applicable foreign countries, to record Assignee as the assignee and owner of the Patents.

Assignor shall take all further actions and provide to Assignee, its successors, assigns and other legal representatives, all such cooperation and assistance at Assignee's request (including, without limitation, the execution and delivery of any and all affidavits, declarations, oaths, exhibits, assignments, powers of attorney and other documentation) to more fully and effectively effectuate the purposes of this Assignment, including, without limitation, with respect to: (i) the preparation and prosecution of any applications covering the inventions assigned herein; (ii) the prosecution or defense of any interference, opposition, reexamination, reissue, infringement or other proceedings that may arise in connection with any of the rights assigned herein, including, without limitation, testifying as to any facts relating to any of the rights assigned herein and this Assignment; (iii) obtaining any additional patent protection relating to

- 2 -

rights assigned herein that may be secured under the laws now or hereafter in effect in the United States or in any other country; and (iv) the implementation or perfection of this Assignment in all applicable jurisdictions throughout the world.

\*   \*   \*   \*   \*   \*

**IN WITNESS WHEREOF,** the Assignor and Assignee have caused this Assignment to be signed and executed by the undersigned officers thereunto duly authorized this ___ day of _____, 2010.

**ASSIGNOR:**

**[NAME OF ASSIGNOR]**

By: _____
Name: _____
Title: _____

**ASSIGNEE:**

**PROTECTIVE PRODUCTS ENTERPRISES, INC.**

By: _____
Name: _____
Title: _____

STATE OF                         )
                                 ) SS.
COUNTY OF                        )

        On this _____ day of _____, 2010, there appeared before me _____, personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of _____.

 

_____
Notary Public

STATE OF                         )
                                 ) SS.
COUNTY OF                        )

        On this _____ day of _____, 2010, there appeared before me _____, personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of Protective Products Enterprises, Inc.

 

_____
Notary Public

**SCHEDULE A**

**U.S. PATENTS AND PATENT APPLICATIONS**

| Title | Patent No. / Application No. | Issue Date / Filing Date |
|---|---|---|
|  |  |  |

## FOREIGN PATENTS AND PATENT APPLICATIONS

| Title | Country | Patent No. / Application No. | Issue Date / Filing Date |
|-------|---------|------------------------------|--------------------------|
|       |         |                              |                          |

## TRADEMARK ASSIGNMENT

THIS TRADEMARK ASSIGNMENT ("Assignment") is made and entered into as of this _____ day of _____, 2010, ("Effective Date"), by and between **Protective Products International Corp.**, a Florida corporation("Assignor"), and **Protective Products Enterprises, Inc.**, a Delaware corporation ("Assignee").

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of January _____, 2010, pursuant to which Assignor has agreed to sell, and Assignee has agreed to purchase, certain assets of Assignor;

WHEREAS, Assignor is the sole and exclusive owner of the entire right, title and interest in and to the United States trademark registrations and trademark applications and the foreign trademark registrations and trademark applications set forth on Schedule A attached hereto, together with all goodwill associated with any of the foregoing (collectively, the "Marks"); and

WHEREAS, Assignee wishes to acquire from Assignor, and Assignor wishes to assign to Assignee, the entire right, title and interest in and to the Marks.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, assigns, transfers and sets over to Assignee, the entire right, title and interest in and to the Marks, for the United States and for all foreign countries, including, without limitation, any registrations and applications therefor, any renewals and extensions of the registrations, and all other corresponding rights that are or may be secured under the laws of the United States or any foreign country, now or hereafter in effect, together with all goodwill associated with any of the foregoing, and together with all income, royalties or payments accrued, due or payable as of the Effective Date or thereafter, including, without limitation, all claims for damages by reason of past, present or future infringement or other unauthorized use of the Marks, with the right to sue for, and collect the same, in each case, for Assignee's own use and enjoyment and for the use and enjoyment of its successors, assigns and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made.

Assignor hereby requests the Commissioner of Patents and Trademarks, and the corresponding entities or agencies in any applicable foreign countries, to record Assignee as the assignee and owner of the Marks.

Assignor shall take all further actions and provide to Assignee, its successors, assigns and other legal representatives, all such cooperation and assistance at Assignee's request (including, without limitation, the execution and delivery of any and all affidavits, declarations, oaths, samples, exhibits, specimens, assignments, powers of attorney and other documentation) to more fully and effectively effectuate the purposes of this Assignment, including, without limitation, with respect to: (i) the preparation and prosecution of any application for registration, or any application for renewal of a registration, relating to any of the rights assigned herein; (ii) the prosecution or defense of any interference, opposition, infringement, dilution or other proceedings that may arise in connection with any of the rights assigned herein, including,

without limitation, testifying as to any facts relating to the rights assigned herein and this Assignment; (iii) obtaining any additional trademark protection relating to rights assigned herein that may be secured under the laws now or hereafter in effect in the United States or in any other country; and (iv) the implementation or perfection of this Assignment in all applicable jurisdictions throughout the world.

*   *   *   *   *

**IN WITNESS WHEREOF,** the Assignor and Assignee have caused this Assignment to be signed and executed by the undersigned officers thereunto duly authorized this _____ day of _____, 2010.

**ASSIGNOR:**

**PROTECTIVE PRODUCTS INTERNATIONAL CORP.**

By:   _____
Name:  _____
Title:   _____

**ASSIGNEE:**

**PROTECTIVE PRODUCTS ENTERPRISES, INC.**

By:   _____
Name:  _____
Title:   _____

STATE OF                              )
                                     ) SS.
COUNTY OF                            )

        On this _____ day of _____, 2010, there appeared before me _____, personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of Protective Products International Corp.

_____

_____
Notary Public

STATE OF                              )
                                     ) SS.
COUNTY OF                            )

        On this _____ day of _____, 2010, there appeared before me _____, personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of Protective Products Enterprises, Inc.

_____
Notary Public

**SCHEDULE A**

**U.S. TRADEMARK REGISTRATIONS**

| Mark | Registration No. / Application No. | Issue Date / Filing Date |
|------|-----------------------------------|--------------------------|
|      |                                   |                          |

## <u>U.S. TRADEMARK APPLICATIONS</u>

| <u>Mark</u> | <u>Application No.</u> | <u>Filing Date</u> |
|---|---|---|
|  |  |  |

## FOREIGN TRADEMARK REGISTRATIONS

| Mark | Country | Registration No. / Application No. | Issue Date / Filing Date |
|------|---------|-----------------------------------|--------------------------|
|      |         |                                   |                          |

## <u>FOREIGN TRADEMARK APPLICATIONS</u>

| <u>Mark</u> | <u>Country</u> | <u>Application No.</u> | <u>Filing Date</u> |
|---|---|---|---|
|  |  |  |  |

## TRADEMARK ASSIGNMENT

THIS TRADEMARK ASSIGNMENT ("Assignment") is made and entered into as of this ____ day of _____, 2010, ("Effective Date"), by and between **Ceramic Protection Corporation**, a Canadian corporation("Assignor"), and **Protective Products Enterprises, Inc.**, a Delaware corporation ("Assignee").

WHEREAS, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of January ____, 2010, pursuant to which Assignor has agreed to sell, and Assignee has agreed to purchase, certain assets of Assignor;

WHEREAS, Assignor is the sole and exclusive owner of the entire right, title and interest in and to the United States trademark registrations and trademark applications and the foreign trademark registrations and trademark applications set forth on Schedule A attached hereto, together with all goodwill associated with any of the foregoing (collectively, the "Marks"); and

WHEREAS, Assignee wishes to acquire from Assignor, and Assignor wishes to assign to Assignee, the entire right, title and interest in and to the Marks.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, assigns, transfers and sets over to Assignee, the entire right, title and interest in and to the Marks, for the United States and for all foreign countries, including, without limitation, any registrations and applications therefor, any renewals and extensions of the registrations, and all other corresponding rights that are or may be secured under the laws of the United States or any foreign country, now or hereafter in effect, together with all goodwill associated with any of the foregoing, and together with all income, royalties or payments accrued, due or payable as of the Effective Date or thereafter, including, without limitation, all claims for damages by reason of past, present or future infringement or other unauthorized use of the Marks, with the right to sue for, and collect the same, in each case, for Assignee's own use and enjoyment and for the use and enjoyment of its successors, assigns and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made.

Assignor hereby requests the Commissioner of Patents and Trademarks, and the corresponding entities or agencies in any applicable foreign countries, to record Assignee as the assignee and owner of the Marks.

Assignor shall take all further actions and provide to Assignee, its successors, assigns and other legal representatives, all such cooperation and assistance at Assignee's request (including, without limitation, the execution and delivery of any and all affidavits, declarations, oaths, samples, exhibits, specimens, assignments, powers of attorney and other documentation) to more fully and effectively effectuate the purposes of this Assignment, including, without limitation, with respect to: (i) the preparation and prosecution of any application for registration, or any application for renewal of a registration, relating to any of the rights assigned herein; (ii) the prosecution or defense of any interference, opposition, infringement, dilution or other proceedings that may arise in connection with any of the rights assigned herein, including,

- 16 -

without limitation, testifying as to any facts relating to the rights assigned herein and this Assignment; (iii) obtaining any additional trademark protection relating to rights assigned herein that may be secured under the laws now or hereafter in effect in the United States or in any other country; and (iv) the implementation or perfection of this Assignment in all applicable jurisdictions throughout the world.

*    *    *    *    *

**IN WITNESS WHEREOF,** the Assignor and Assignee have caused this Assignment to be signed and executed by the undersigned officers thereunto duly authorized this _____ day of _____, 2010.

**ASSIGNOR:**

**CERAMIC PROTECTION CORPORATION**

By:    _____
Name: _____
Title: _____

**ASSIGNEE:**

**PROTECTIVE PRODUCTS ENTERPRISES, INC.**

By:    _____
Name: _____
Title: _____

STATE OF                  )
                         ) SS.
COUNTY OF             )

           On this ____ day of _____, 2010, there appeared before me _____, personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of Ceramic Protection Corporation.

 

                                      _____
                                      Notary Public

STATE OF                  )
                         ) SS.
COUNTY OF             )

           On this ____ day of _____, 2010, there appeared before me _____, personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of Protective Products Enterprises, Inc.

 

                                      _____
                                      Notary Public

**SCHEDULE A**

**U.S. TRADEMARK REGISTRATIONS**

| Mark | Registration No. / Application No. | Issue Date / Filing Date |
|------|-----------------------------------|--------------------------|
|      |                                   |                          |

## <u>U.S. TRADEMARK APPLICATIONS</u>

| <u>Mark</u> | <u>Application No.</u> | <u>Filing Date</u> |
|---|---|---|
|  |  |  |

## FOREIGN TRADEMARK REGISTRATIONS

| Mark | Country | Registration No. / Application No. | Issue Date / Filing Date |
|------|---------|-----------------------------------|--------------------------|
|      |         |                                   |                          |

## FOREIGN TRADEMARK APPLICATIONS

| Mark | Country | Application No. | Filing Date |
|------|---------|-----------------|-------------|
|      |         |                 |             |

## COPYRIGHT ASSIGNMENT

      **THIS COPYRIGHT ASSIGNMENT** ("<u>Assignment</u>") is made and entered into as of this _____ day of _____, 2010 ("<u>Effective Date</u>"), by and between _____, a _____ corporation ("<u>Assignor</u>"), and **Protective Products Enterprises, Inc.**, a Delaware corporation ("<u>Assignee</u>").

      **WHEREAS**, Assignor and Assignee are parties to that certain Asset Purchase Agreement dated as of January ___, 2010, pursuant to which Assignor has agreed to sell, and Assignee has agreed to purchase, certain assets of Assignor;

      **WHEREAS**, Assignor is the sole and exclusive owner of the entire right, title and interest in and to the United States copyright registrations and copyright applications and the foreign copyright registrations and copyright applications set forth on <u>Schedule A</u> attached hereto (collectively, the "<u>Copyrights</u>"); and

      **WHEREAS**, Assignee wishes to acquire from Assignor, and Assignor wishes to assign to Assignee, the entire right, title and interest in and to the Copyrights.

      **NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, assigns, transfers and sets over to Assignee, the entire right, title and interest in and to the Copyrights, for the United States and for all foreign countries, including, without limitation, any renewals and extensions thereof, the right to duplicate, reproduce, copy, distribute, display, license, adapt, and prepare derivative works from the Copyrights, and all other corresponding rights that are or may be secured under the laws of the United States or any foreign country, now or hereafter in effect, together with all income, royalties, damages or payments accrued, due or payable as of the Effective Date or thereafter, including, without limitation, all claims for damages by reason of past, present or future infringement or other unauthorized use of the Copyrights, with the right to sue for, and collect the same, and together with all physical or tangible embodiments of the Copyrights, in Assignor's possession or under Assignor's control, in each case, for Assignee's own use and enjoyment and for the use and enjoyment of its successors, assigns and other legal representatives, as fully and entirely as the same would have been held and enjoyed by Assignor if this Assignment had not been made.

      Assignor hereby authorizes and requests the Register of Copyrights of the United States, and the corresponding entity or agency in any applicable foreign country, to record Assignee as the assignee and owner of the Copyrights.

      Assignor shall take all further actions and provide to Assignee, its successors, assigns and other legal representatives, all such cooperation and assistance at Assignee's request (including, without limitation, the execution and delivery of any and all affidavits, declarations, oaths, exhibits, assignments, powers of attorney and other documentation) to more fully and effectively effectuate the purposes of this Assignment, including, without limitation, with respect to:  (i) the preparation and prosecution of any application for registration, or any application for renewal of a registration, relating to any of the rights assigned herein; (ii) the prosecution or defense of any Copyright Office proceedings, infringement, or other proceedings that may arise

- 24 -

in connection with any of the rights assigned herein, including, without limitation, testifying as to any facts relating to the rights assigned herein and this Assignment; (iii) obtaining any additional copyright protection relating to rights assigned herein that may be secured under the laws now or hereafter in effect in the United States or in any other country; and (iv) the implementation or perfection of this Assignment in all applicable jurisdictions throughout the world.

\*    \*    \*    \*    \*

**IN WITNESS WHEREOF,** the Assignor and Assignee have caused this Assignment to be signed and executed by the undersigned officers thereunto duly authorized this ___ day of _____, 2010.

**ASSIGNOR:**

**[NAME OF ASSIGNOR]**

By:      _____
Name: _____
Title:  _____

**ASSIGNEE:**

**PROTECTIVE PRODUCTS ENTERPRISES, INC.**

By:      _____
Name: _____
Title:  _____

STATE OF                   )
                                ) SS.
COUNTY OF           )

On this ____ day of _____, 2010, there appeared before me _____, personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of _____.

_____
Notary Public

STATE OF                   )
                                ) SS.
COUNTY OF           )

On this ____ day of _____, 2010, there appeared before me _____, personally known to me, who acknowledged that he signed the foregoing Assignment as his voluntary act and deed on behalf and with full authority of Protective Products Enterprises, Inc.

_____
Notary Public

**SCHEDULE A**

**U.S. COPYRIGHT REGISTRATIONS**

| Title | Registration No. | Issue Date / Filing Date |
|-------|------------------|--------------------------|
|       |                  |                          |

## <u>U.S. COPYRIGHT APPLICATIONS</u>

| <u>Title</u> | <u>Application No.</u> | <u>Filing Date</u> |
|---|---|---|
| | | |

## <u>FOREIGN COPYRIGHT REGISTRATIONS</u>

| Title | Country | Registration No. / Application No. | Issue Date / Filing Date |
|-------|---------|-----------------------------------|--------------------------|
|       |         |                                   |                          |

## FOREIGN COPYRIGHT APPLICATIONS

| Title | Country | Application No. | Filing Date |
|-------|---------|-----------------|-------------|
|       |         |                 |             |