UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION
www.flsb.uscourts.gov

| | |
|---|---|
| In re: | Case No. 10-10711-BKC-JKO |
| PPOA HOLDING, INC., *et al.*, | Chapter 11 Cases |
| Debtors._____/ | (Jointly Administered) |

### BAYSHORE PARTNERS, LLC'S OBJECTION TO FINAL FEE APPLICATION OF ARENT FOX LLP AS CO-COUNSEL TO THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS [ECF NO. 407]

Bayshore Partners, LLC ("Bayshore"),[1] investment banker to the Debtors and administrative creditor, by and through undersigned counsel respectfully submits this *Objection* (the "Objection") to *Final Fee Application of Arent Fox LLP as Co-Counsel to the Official Committee of Unsecured Creditors* (the "Fee Application") [ECF No. 407].  In support, Bayshore states as follows:

**PRELIMINARY STATEMENT**

Bayshore regrets having to file this fee application objection.  As noted by the Fifth Circuit in *First Colonial*,[2] "the determination of what constitutes reasonable compensation for services furnished by an attorney in a bankruptcy proceeding can be a distasteful task."  The distaste is compounded when one professional must object to the fee application of another professional.  However, after having reviewed Arent Fox LLP's ("AF") Fee Application, Bayshore is compelled to object to the breath-taking sum sought by AF in light of the minimal

---

[1] Bayshore is the broker-dealer affiliate of Farlie Turner & Co.  For purposes of this Application and Motion, all representations regarding Bayshore shall incorporate by reference Farlie Turner.

[2] *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977).

benefit provided to the Debtors' estates as a result of such services. Specifically, AF seeks $783,269.50[3] in fees incurred, and another $70,000 in estimated fees to get to them through the Effective Date, for a total of $853,269.50.[4] A remarkable sum by any measure, but the amount of fees sought does not, in and of itself, reveal whether the request is appropriate or even justifiable. To properly ascertain the appropriateness of the princely sum sought by AF in its Fee Application, the question must be asked: Has AF met its burden (and it *is* AF's burden) to establish that the fees sought meet the standards set forth in 11 U.S.C. §§ 330 and 331? Put differently, has AF provided actual and necessary services to the estate and its creditors which would justify the amount sought? Unfortunately, the answer is no.

As set forth herein, AF has generated substantial and unsupportable fees, and the only readily apparent benefit to the estate and its creditors appears to be a $100,000 carveout for unsecured creditors which was an amount the Debtors' secured creditor Canadian Imperial Bank of Commerce ("CIBC") agreed, but was not compelled, to carveout for the benefit of unsecured creditors. The $100,000 carveout represents a mere 1% of the amount owed and ultimately paid to CIBC.

Accordingly, for the reasons more fully described below, Bayshore respectfully submits that the fees sought by AF in its Fee Application should be reduced by (1) disallowing payment for the amount of fees heldback from prior approved interim fee applications and (2) disgorgement of any fees incurred in an amount and to the extent deemed by this Court to be just and proper.

---

[3] This amount represents approximately 40% more than the fees sought by Debtors' counsel. Moreover, AF's blended rate of $421 is approximately 20% higher than the Debtors' blended rate of $349.

[4] This amount excludes amounts sought for reimbursement of expenses.

## JURISDICTION

1.  The Court has jurisdiction over AF's Fee Application and this Objection pursuant to 28 U.S.C. §§ 1334 and 157(b). This is a core proceeding pursuant to 28 U.S.C §157.

2.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

3.  On January 13, 2010 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4.  On February 8, 2011, AF filed its Fee Application [ECF No. 407], pursuant to which AF seeks final allowance of $783,269.50 in fees, and an additional $70,000.00 in estimated fees through and including the Effective Date of the Plan.

## ARGUMENT

5.  It is well established that professional fee awards are based upon a standard of "reasonableness," and that services provided by the applicant must be actual and necessary. *See* 11 U.S.C. § 330; *In re Southeast Banking Corp.*, 314 B.R. 250, 268 (Bankr. S.D.Fla. 2004); *In re Underground Utilities Constr. Co., Inc.*, 13 B.R. 735, 737 (Bankr. S.D.Fla. 1981); *Committee v. Puget Sound Plywood, Inc.*, 924 F.2d 955, 958 (9th Cir. 1991); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir 1974) made applicable to bankruptcy proceedings by *In re First Colonial Corp. of America*, 544 F.2d 1291 (5th Cir. 1977).

6.  The determination of what is reasonable compensation for actual, necessary services for purposes of reimbursement is within the sound discretion of the bankruptcy court. *In re Leonard Jed Co.*, 103 B.R. 706, 711 (Bankr. D.Md. 1989). Moreover, "[s]ince attorneys assisting the trustee in the administration of a bankruptcy estate are acting not as private persons,

but as officers of the court, they should not expect to be compensated as generously for their services as they might be were they privately employed." *First Colonial*, 544 at 1299.

7.      However, while the decision of what fees are reasonable, actual and necessary is a determination made by the Court, it is incumbent upon other professionals appearing before the Court to bring to the Court's attention instances where fees sought by other professionals are not reasonable, actual or necessary.  By doing so, the Court is given assistance in its oversight role.  Conversely, professionals that turn a blind eye to exorbitant and unjustified fees sought by other professionals become part of a "conspiracy of silence."  As noted by the Eleventh Circuit, in *In re Daikin Miami Overseas, Inc*., 868 F.2d 1201, 1207 (11th Cir. 1989): "[C]ourts have an affirmative duty to prevent a 'conspiracy of silence' among bankruptcy attorneys."  *See In re Daikin Miami Overseas, Inc*., 868 F.2d 1201, 1207 (11th Cir. 1989).  It is in the spirit of that charge this Objection is raised.

**AF Accumulated Unreasonable Fees in Pursuit of Apparently Unsupportable Positions**

8.      Even a cursory inspection of AF's Fee Application reveals that AF spent extraordinary amounts of time achieving very little if anything for the estate and its creditors.  For example, after months of litigation with secured creditor Canadian Imperial Bank of Commerce ("CIBC"), the only apparent benefit to the estate's unsecured creditors is a $100,000 carveout.  As noted by the court in *Leonard Jed*: "[n]ot everything which creditors' committee counsel does in a bankruptcy case is chargeable to the estate, either because it confers a *negligible benefit to the estate* or because it is *excessive*.  *In re Leonard Jed Co*., 103 B.R. 713 (emphasis added).  Such is the case here.  When considered against the backdrop of what was achieved, AF's services were, in large part, unreasonable and unnecessary.

9. Unfortunately, the dispute with CIBC spans multiple categories in AF's Fee Application, so it is difficult to say, without flyspecking each time entry, exactly how much AF seeks in fees for work arising from or related to its litigation with CIBC.  AF incurred fees litigating with CIBC well in excess of the $100,000 carveout it ultimately negotiated.  In any event, it is clear that AF spent an extraordinary amount of time litigating with CIBC.[5]

10. Importantly, it appears that the bulk of fees incurred by AF with respect to the CIBC litigation arose as a result of AF aggressively pursuing unsupportable positions.[6]  For example, it appears AF (i) refused to acknowledge the validity of CIBC's claims and (ii) asserted unsupported claims against CIBC regarding (a) the valuation and allocation of proceeds of certain previously sold assets of the Debtors and (b) alleged avoidable transfers received by CIBC as proceeds from the 2007 sale of the Debtors' Delaware Credit facility.  *See* CIBC Limited Objection at ¶ 14.

11. Pursuit of unsupportable claims does not benefit the estate and fees sought in such pursuit are without question unreasonable and unnecessary.  However, AF's aggressive litigation position with CIBC damaged the estate in other ways as well.

---

[5] CIBC related entries span the following categories:  Committee and Debtor Communications, Conferences (08); Adversary Proceedings (09); Plan and Disclosure Statement Matters and Solicitation (11); Cash Collateral and DIP Financing (12); Investigation of Secured Creditor, Equipment Lessors and Lienholders (17) and Litigation, Collection and Investigation (19).  The Investigation of Secured Creditor category *alone* accounts for $176,601 of the fees sought for 377 hours of work.

[6] See *CIBC's Limited Objection to Motion of the Official Committee of Unsecured Creditors for Entry of an Order Approving the Stipulation Concerning Investigation, Assertion, and Prosecution of Certain of the Debtors' and Estate's Claims and Causes of Action and Assertion Against CIBC on Behalf of the Committee, Debtors and Debtors' Estates* ("CIBC Limited Objection") [ECF No. 194].

12. As a result of the Committee's insistence to escrow CIBC's payment from the purchase price of the sale, rather than pay it over to CIBC at closing (which could have been done subject to clawback if the Committee prevailed in its position vis-à-vis the validity of CIBC's liens), interest continued to accrue on CIBC's claim between the Sale Closing Date of March 5, 2010 and June 4, 2010 – the date the Court approved the CIBC Conditional Payment Stipulation and CIBC was paid out of the escrowed funds. Accordingly, hundreds of thousands of dollars were needlessly incurred by the estate as a result of the unreasonable and unnecessary legal strategy employed by AF.

13. In addition to the foregoing, the Court need look no further than the recent objection (the "<u>Indemnification Objection</u>") [ECF No. 441] filed by the Committee and penned by AF, in which AF takes the position that the Court approved Indemnification Procedures were nothing more than prepetition obligations rendering the Indemnification, and the Court's approval of it, meaningless. None of the caselaw cited in the Indemnification Objection are on point, because none deal with a prepetition professional that was retained postpetition, with a prepetition indemnification being approved by a court pursuant to a retention order.

14. To add insult to injury, AF argues in its Indemnification Objection that the Court should revisit the approval of the Indemnification Procedures in the Retention Orders in the first place as "improvident" or otherwise equitably excise the Indemnification Procedures out of the Retention Orders – even though the Indemnification Procedures were so important they were specifically addressed by the Court. This objection is especially grating, since the Committee had opportunity to review the terms of Bayshore's Indemnification Procedures at the time Bayshore sought retention, and while the Committee negotiated certain issues it identified with

Bayshore's term of engagement, it ultimately fully settled any issues the Committee may have had with the terms of Bayshore's retention.

15. Finally, AF argues in its Indemnification Objection that the Court should equitably subordinate Bayshore's administrative claim because it arises out of damages for rescission of a securities action; and rely on cases such as *In re Christian Life Center*, 821 F.2d 1370 (9th Cir. 1370) for such a proposition. However, as noted by *Christian Life Center* court:

> Even were we to accept this argument [that 11 U.S.C. §510(b) subordinates indemnification claims], <u>section 510(b) would not apply here</u>. The officer's indemnity claims are for litigation costs, not for reimbursement of liability owed to the holders of the securities. The argument that the security holder may circuitously elevate his claim to a general unsecured claim through indemnity is relevant only to indemnity of liability. The security holder recovers nothing from the officers when the latter are merely indemnified for defense costs. <u>Thus section 510(b)-at least prior to the 1984 amendment-does not require subordination of indemnity claims for defense costs</u>. The blanket order subordinating all indemnity claims to general unsecured claims, even those for defense costs, is not proper under that section.

*In re Christian Life Center*, 821 F.2d at 1376 (emphasis added).

16. Accordingly, since such extreme and unsupportable positions bestow no benefit to the estate and its creditors, AF is not entitled to full payment of its fees for such litigation tactics.

**<u>AF Seeks Excessive Reimbursement for Fees Related to the Sale of the Debtors' Assets</u>**

17. AF seeks $87,000 for its "monitoring" of the sale of the Debtors' assets which, according to AF "resulted in an enhanced purchase price." Fee Application at ¶ D. However, as more fully described in Bayshore's *Application for Indemnification of Fees and Costs* [ECF No. 408], it was actually Bayshore which held the labor oar with respect to the diligence, marketing and negotiation of the deal structure and the APA both pre- and post-petition. AF contributed little if anything to that process.

7
LAW OFFICES OF MELAND RUSSIN & BUDWICK, P.A.
3000 SOUTHEAST FINANCIAL CENTER, 200 SOUTH BISCAYNE BOULEVARD, MIAMI, FLORIDA  33131 • TELEPHONE (305) 358-6363

18.     Importantly, even though Bayshore was engaged day and night in its efforts to close the sale of the Debtors' assets, from the Petition Date until the Sale Closing Date, Bayshore was only paid two monthly invoices totaling $50,000 (Bayshore's success fee was completely contingent).  Accordingly, had the closing not occurred, Bayshore would have only received its guaranteed fee of $50,000, but the Committee would have incurred fees nearly twice that of Bayshore's fees.

19.     Fortunately, as a result of Bayshore's efforts, the sale did close and the Debtors received a purchase price of approximately $10,000,000.  However, the example illustrates the disconnect between the amounts sought and results obtained by AF.  The total fees awarded to Bayshore amount to approximately $553,000 of which $341,000 was contingent upon a successful closing.  This represents approximately 50% of the total fees sought by AF, but where Bayshore's efforts led to a $10,000,000 sale price for the Debtors' assets, AF's efforts led to little more than a $100,000 negotiated carveout by CIBC to unsecured creditors.  Stated differently, Bayshore was paid substantially less than AF for generating 100 times more cash proceeds for creditors.

**AF Seeks Excessive Reimbursement for Fees Incurred in Relation to the Plan and Disclosure Statement**

20.     AF further seeks $225,051.50 and spent 593.5 hours on the plan and disclosure statement category.  AF asserts in its Fee Application that AF spent time, among other things, reviewing the Debtors' initial draft plan and disclosure statement and negotiating a potential joint plan. Notwithstanding this generic articulation of a supposedly negotiated joint plan process, the fact remains that competing plans were filed by the Debtors and the Committee in November 2010, nearly a year after the Petition Date.

21.     A review of the Debtors' Agreed Motion to Extend Exclusivity [ECF No. 219] reveals that, at least as of May 2010, the Debtors were trying to propose a joint plan with the Committee.[7]  However, any plans to submit a joint plan was ultimately abandoned, as the Plan on file is proposed solely by the Committee.

22.     At a minimum, AF has not explained why it incurred a quarter of a million dollars in fees to propose a joint liquidating plan.  The fees sought in this category are curiously high, considering the amount of time it took for the Committee to even comment upon the Debtors' draft plan and disclosure statement.  As noted by the Debtors in their Second Motion to Extend Exclusivity [ECF No. 265], the Debtors provided their draft disclosure statement to the Committee on April 28, 2010, followed by their draft plan on May 6, 2010, but it was not until June 29, 2010 that the Committee provided the Debtors with *any* comments on their draft plan and disclosure statement.

23.     Certainly, the time AF took to propose a joint plan (which efforts ultimately failed) stands in contradiction to the assertion by AF in its Fee Application that it faced serious time constraints to get up to speed on a number of matters including the *Committee's* plan of liquidation.[8]

24.     Finally, a review of AF's Fee Application reveals that AF spent 70 hours on professional retention issues, but this is also excessive.  The amount of professionals retained in

---

[7] "The Debtors and the Committee have been in discussions regarding the terms of a joint plan of reorganization.  The collaboration between the Debtors and the Committee with respect to the terms of a plan are ongoing."  Motion to Extend Exclusivity at ¶6.

[8] "At times, quick resolution of, and serious negotiation on, a variety of issues was required, including matters involving …the Committee's plan of liquidation."  Fee Application at ¶ 18.

this case is small[9] and the only retention application which merited any written objection from the Committee was that of Frank Jaumot as Chief Restructuring Officer of the Debtors, and even then, the objection was limited in scope.

## CONCLUSION

25.     By its objection, Bayshore does not challenge that AF spent the time on this case that it reports in its Fee Application.  However, the amount sought by AF is clearly excessive, as the services provided by AF described above appear to be unnecessary and unreasonable in light of the limited benefits AF provided to the Debtors' estates.  At this point, the only tangible result achieved by AF for the benefit of the general unsecured creditors appears to be a $100,000 carveout from CIBC.  It is not reasonable for AF to recover fees ($853,269.50) that amounts to 853% of the amount recovered for the benefit of their constituents ($100,000).  By contrast, Bayshore's total bankruptcy court approved fees (the vast majority of which was contingent upon achieving a successful closing) amounted to approximately 4% of the $10,000,000 in proceeds it generated through an extraordinarily successful marketing process of the Debtors' assets.

**WHEREFORE** Bayshore objects to AF's Fee Application and respectfully requests an order of the Court: (1) declaring the amounts heldback from AF's interim fee applications forfeit; (2) disgorging fees previously awarded to AF pursuant to the Court's interim fee orders in an

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

---

[9] In addition to AF: (1) Berger Singerman, counsel to the Debtors; (2) Bayshore, investment banker to the Debtors; (3) Genovese Joblove & Battista, co-counsel to the Committee; (3) Frank Jaumot, Chief Restructuring Officer of the Debtors (limited objection lodged by Committee); and (4) Ernst & Young, Accountants and Tax Advisors to Debtor.

amount and to the extent determined by the Court to be appropriate; and (3) granting such other and further relief as the Court deems just and proper.

    Dated:  February 28, 2011
            Miami, Florida

                                       s/ Peter D. Russin
                                      Peter D. Russin, Esquire
                                      Florida Bar No. 765902
                                      prussin@melandrussin.com
                                      James C. Moon, Esquire
                                      Florida Bar No. 938211
                                      jmoon@melandrussin.com
                                      MELAND RUSSIN & BUDWICK, P.A.
                                      3000 Southeast Financial Center
                                      200 South Biscayne Boulevard
                                      Miami, Florida  33131
                                      Telephone: (305) 358-6363
                                      Telecopy: (305) 358-1221

                                      *Attorneys for Bayshore Partners, LLC and*
                                      *Farlie Turner & Co.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing was served on February 28, 2011, via the Court's Notice of Electronic Filing upon Registered Users set forth on the attached Exhibit 1.

 s/ James C. Moon
James C. Moon, Esquire

**SERVICE LIST**

**Electronic Mail Notice List**

The following is the list of parties who are currently on the list to receive e-mail notice/service for this case and who therefore will be served via the Court's Notice of Electronic Filing:

David W Black     dblack@fwblaw.net
Robert G Fracasso Jr     rfracasso@shutts.com
Debi Evans Galler     dgaller@bergersingerman.com, jalvarez@bergersingerman.com,efile@bergersingerman.com
Larry I Glick     lglick@shutts.com
Jordi Guso     jguso@bergersingerman.com, efile@bergersingerman.com;fsellers@bergersingerman.com
Heather L Harmon     HHarmon@gjb-law.com, gjbecf@gjb-law.com
Hollie N Hawn     hhawn@broward.org
Harris J. Koroglu     hkoroglu@shutts.com, jgoodwin@shutts.com
Luder F Milton     sdelacruz@hf-law.com
Glenn D Moses     gmoses@gjb-law.com, gjbecf@gjb-law.com
Kevin S Neiman     kneiman@hblegal.net
Office of the US Trustee     USTPRegion21.MM.ECF@usdoj.gov
Gary S Phillips     gphillips@phillipslawyers.com
Ariel Rodriguez     ariel.rodriguez@usdoj.gov
William G Salim Jr     wsalim@mmsslaw.com, cleibovitz@mmsslaw.com
Laura J. Varela     lvarela@phillipslawyers.com

# Exhibit 1